**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRED'S, INC., *et al.*,[1] | ) | Case No. 19-_____ (   ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DEBTORS' APPLICATION FOR ENTRY OF AN ORDER**
**PURSUANT TO 28 U.S.C. § 156(C), BANKRUPTCY CODE SECTION 105(A),**
**AND LOCAL BANKRUPTCY RULE 2002-1(F) AUTHORIZING APPOINTMENT**
**OF EPIQ CORPORATE RESTRUCTURING, LLC AS CLAIMS AND NOTICING**
**AGENT TO THE DEBTORS' NUNC PRO TUNC TO THE PETITION DATE**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") in

these Chapter 11 cases (the "Chapter 11 Cases") respectfully state as follows in support of this

motion (the "Section 156(c) Application"):

**RELIEF REQUESTED**

1.     By this Section 156(c) Application, the Debtors seek entry of an order,

substantially in the form attached hereto as **Exhibit A** (the "Order"), pursuant to 28 U.S.C. §

156(c), section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as

amended, the "Bankruptcy Code"), and rule 2002-1(f) of the Local Rules of Bankruptcy Practice

and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local

Bankruptcy Rules"), appointing Epiq Corporate Restructuring, LLC ("Epiq") as claims and

noticing agent ("Claims and Noticing Agent"), *nunc pro tunc* to the Petition Date (as defined

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Store, Inc. (4510); Summit Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 2001 Bryan Street, Suite 1550, Dallas, Texas 75201.

below), to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these Chapter 11 Cases.

2.       The Debtors' selection of Epiq as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)* (the "Claims Agent Protocol"), in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Claims and Noticing Agent's rates are competitive and reasonable given its quality of services and expertise.  The terms of retention are set forth in the standard services agreement, dated July 31, 2019, annexed hereto as **Exhibit B** (the "Services Agreement"); *provided, however*, that Claims and Noticing Agent is seeking approval solely of the terms and provisions as set forth in this Section 156(c) Application and the Order.

3.       For the reasons set forth herein, the Debtors submit that the relief requested herein is in the best interest of the Debtors, their estates, creditors, stakeholders and other parties in interest, and therefore, should be granted.

## JURISDICTION AND VENUE

4.       The Court has jurisdiction over this Section 156(c) Application pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C § 157(b)(2).  Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Section 156(c) Application to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final order or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory and other legal predicates for the relief requested herein are 28 U.S.C. § 156(c), Bankruptcy Code section 105(a), and Local Bankruptcy Rule 2002-1(f).

## BACKGROUND

### I.      The Chapter 11 Case

7.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of the Bankruptcy Code.

8.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee has been appointed by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), nor has a trustee or examiner been appointed in the Chapter 11 Case.

9.      In support of this Section 156(c) Application, the Debtors rely upon and incorporates by reference the (a) Declaration of Brian Hunt, Consulting Director at Epiq, (the "Hunt Declaration"), attached hereto as **Exhibit C**, and (b) the *Declaration of Mark A. Renzi in Support of the Debtors' First Day Motions* (the "First Day Declaration"), filed with the Court concurrently herewith.

## BASIS FOR RELIEF

10.      Although the Debtors have not yet filed its schedules of assets and liabilities, it anticipates that there will be thousands of entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

11.     Epiq has acted as the claims and noticing agent in numerous cases of comparable size, including several cases currently pending in this District. *See, e.g.*, *In re Kona Grill, Inc.*, Case No. 19-10953 (CSS) (Bankr. D. Del. April 30, 2019); *In re Mattress Firm, Inc.*, Case No. 18-12241 (CSS) (Bankr. D. Del. October 05, 2018); *In re The NORDAM Group, Inc.*, Case No. 18-11699 (MFW) (Bankr. D. Del. Jul. 22, 2018); *In re Color Spot Holdings, Inc.*, Case No. 18-11272 (LSS)(Bankr. D. Del. May 29, 2018); *In re The Weinstein Company Holdings LLC*, Case No. 18-10601 (MFW) (Bankr. D. Del. Apr. 18, 2018); In re *HCR ManorCare, Inc.*, Case No. 18-10467 (KG) (Bankr. D. Del. Apr. 5, 2018); *In re Herald Media Holdings, Inc.*, Case No. 17-12881 (LSS) (Bankr. D. Del. Jan. 25, 2018); *In re Maurice Sporting Goods, Inc.*, Case No. 17-12481 (CSS) (Bankr. D. Del. Dec. 18, 2017); *In re GST AutoLeather, Inc.*, Case No. 17-12100 (LSS) (Bankr. D. Del. Oct. 27, 2017); *In re Dex Media, Inc.*, Case No. 16-11200 (KG) (Bank. D. Del. May 15, 2016); *In re Fresh & Easy, LLC*, Case No. 15-12220 (BLS) (Bank. D. Del. October 30, 2015); *In re Allen Systems Group, Inc.*, Case No. 15-10332 (KJC) (Bankr. D. Del. Feb. 18, 2015); *In re Deb Stores Holding, LLC*, Case No. 14-12676 (KG) (Bankr. D. Del. Dec. 4, 2014); *In re AWI Delaware, Inc.*, Case No. 14-12092 (KJC) (Bankr. D. Del. Sept. 9, 2014); *In re Natrol, Inc.*, Case No. 14-11446 (BLS) (Bankr. D. Del. June 11, 2014); *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del, May 2, 2014).

12.     By appointing Epiq as the Claims and Noticing Agent in these Chapter 11 Cases, the distribution of notices and the processing of claims will be expedited, and the clerk's office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

## SERVICES TO BE PROVIDED

13.     This Section 156(c) Application pertains only to the work to be performed by Claims and Noticing Agent under the Clerk's delegation of duties permitted by 28 U.S.C. §

4

156(c) and Local Bankruptcy Rule 2002-1(f), and any work to be performed by Claims and Noticing Agent outside of this scope is not covered by this Section 156(c) Application or by any order granting approval hereof.  Specifically, Claims and Noticing Agent may perform the following tasks in its role as claims and noticing agent (the "Claims and Noticing Services"), as well as all quality control relating thereto:

(a)     Prepare and serve required notices and documents in the case in accordance with the Bankruptcy Code and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in the form and manner directed by the Debtors and/or the Court, including (i) notice of the commencement of the  case and the initial meeting of creditors under Bankruptcy Code Section 341(a), (ii) notice of any claims bar date, (iii) notices of transfers of claims, (iv) notices of objections to claims and objections to transfers of claims, (v) notices of any hearings on a disclosure statement and confirmation of the Debtors plan or plans of reorganization, including under Bankruptcy Rule 3017(d), (vi) notice of the effective date of any plan, and (vii) all other notices, orders, pleadings, publications and other documents as the Debtors or Court may deem necessary or appropriate for an orderly administration of the case.

(b)     Maintain an official copy of the Debtors schedules of assets and liabilities and statement of financial affairs (collectively, "Schedules"), if any, listing the Debtors known creditors and the amounts owed thereto;

(c)     Maintain (i) a list of all potential creditors, equity holders and other parties-in-interest; and (ii) a "core" mailing list consisting of all parties described in sections 2002(i), (j) and (k), and those parties that have filed a notice of appearance pursuant to Bankruptcy Rule 9010; update said lists and make said lists available upon request by a party-in-interest or the Clerk;

(d)     Furnish a notice to all potential creditors of the last date for the filing of proofs of claim, if necessary, and a form for the filing of a proof of claim, after such notice and form are approved by this Court, and notify said potential creditors of the existence, amount and classification of their respective claims as set forth in the Schedules, which may be effected by inclusion of such information (or the lack thereof, in cases where the Schedules indicate no debt due to the subject party) on a customized proof of claim form provided to potential creditors;

(e)     Maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received;

(f)     For *all* notices, motions, orders or other pleadings or documents served, prepare and file or caused to be filed with the Clerk an affidavit or certificate of service within seven (7) business days of service which includes (i) either a copy of the notice served or the docket numbers(s) and title(s) of the pleading(s) served, (ii) a list of persons to whom it was mailed (in alphabetical order) with their addresses, (iii) the manner of service, and (iv) the date served;

(g)     Process all proofs of claim received, if any, including those received by the Clerk's Office, and check said processing for accuracy, and maintain the original proofs of claim in a secure area;

(h)     Maintain an electronic platform for purposes of filing proofs of claim;

(i)     Maintain the official claims register, if any, for each Debtor (the "<u>Claims Registers</u>") on behalf of the Clerk; upon the Clerk's request, provide the Clerk with certified, duplicate unofficial Claims Registers; and specify in the Claims Registers the following information for each claim docketed: (i) the claim number assigned, (ii) the date received, (iii) the name and address of the claimant and agent, if applicable, who filed the claim, (iv) the amount asserted, (v) the asserted classification(s) of the claim (*e.g.*, secured, unsecured, priority, etc.), (vi) the applicable Debtor, and (vii) any disposition of the claim;

(j)     Provide public access to the Claims Registers, if any, including complete proofs of claim with attachments, if any, without charge;

(k)     Implement necessary security measures to ensure the completeness and integrity of the Claims Registers, if any, and the safekeeping of the original claims;

(l)     Record all transfers of claims and provide any notices of such transfers as required by Bankruptcy Rule 3001(e);

(m)     Relocate, by messenger or overnight delivery, all of the court-filed proofs of claim to the offices of Claims and Noticing Agent, not less than weekly;

(n)     Upon completion of the docketing process for all claims received to date for each case, turn over to the Clerk copies of the claims register for the Clerk's review (upon the Clerk's request);

(o)     Monitor the Court's docket for all notices of appearance, address changes, and claims-related pleadings and orders filed and make necessary notations on and/or changes to the claims register;

(p)     Assist in the dissemination of information to the public and respond to requests for administrative information regarding the case as directed by

the Debtors or the Court, including through the use of a case website and/or call center.

(q)    If the case is converted to chapter 7, contact the Clerk's Office within three (3) days of the notice to Claims and Noticing Agent of entry of the order converting the case;

(r)    Thirty (30) days prior to the close of this case, to the extent practicable, request that the Debtors submit to the Court a proposed Order dismissing the Claims and Noticing Agent and terminating the services of such agent upon completion of its duties and responsibilities and upon the closing of this case;

(s)    Within seven (7) days of notice to Claims and Noticing Agent of entry of an order closing the Chapter 11 Case, provide to the Court the final version of the claims register as of the date immediately before the close of the  case; and

(t)    At the close of this case, box and transport all original documents, in proper format, as provided by the Clerk's Office, to (i) the Federal Archives Record Administration, located at 14700 Townsend Road, Philadelphia, PA 19154-1096 or (ii) any other location requested by the Clerk's Office.

14.    The Claims Registers shall be opened to the public for examination without charge during regular business hours and on a case-specific website maintained by Claims and Noticing Agent.

15.    Claims and Noticing Agent shall not employ any past or present employee of the Debtors for work that involves the Chapter 11 Cases.

## COMPENSATION

16.    The Debtors respectfully request that the undisputed fees and expenses incurred by Claims and Noticing Agent in the performance of the above services be treated as administrative expenses of the Debtors estates pursuant to 28 U.S.C. § 156(c) and Bankruptcy Code section 503(b)(1)(A) and be paid in the ordinary course of business without further application to or order of the Court.  Claims and Noticing Agent agrees to maintain records of all services showing dates, categories of services, fees charged and expenses incurred, and to serve

monthly invoices on the Debtors, the U.S. Trustee, counsel for the Debtors, counsel for any official committee, if any, monitoring the expenses of the Debtors and any party-in-interest who specifically requests service of the monthly invoices.  If any dispute arises relating to the Services Agreement or monthly invoices, the parties shall meet and confer in an attempt to resolve the dispute; if resolution is not achieved, the parties may seek resolution of the matter from the Court.

17.    Before the Petition Date, the Debtors provided Claims and Noticing Agent a retainer in the amount of $25,000.  The Claims and Noticing Agent seeks to first apply the retainer to all pre-petition invoices, and thereafter, to have the retainer replenished to the original retainer amount, and thereafter, to hold the retainer under the Services Agreement during the case as security for the payment of fees and expenses incurred under the Services Agreement.

## EPIQ'S DISINTERESTEDNESS

18.    In connection with its retention as claims and noticing agent, Claims and Noticing Agent represents in the Hunt Declaration, among other things, that:

(a)    Claims and Noticing Agent will not consider itself employed by the United States government and shall not seek any compensation from the United States government in its capacity as the claims and noticing agent in the case;

(b)    By accepting employment in the case, Claims and Noticing Agent waives any rights to receive compensation from the United States government in connection with the Debtors case;

(c)    In its capacity as the claims and noticing agent in the case, Claims and Noticing Agent will not be an agent of the United States and will not act on behalf of the United States; and

(d)    It is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code with respect to the matters upon which it is to be engaged.

## COMPLIANCE WITH CLAIMS AND NOTICING AGENT PROTOCOL

19.     This Section 156(c) Application complies with the Claims Agent Protocol and substantially conforms to the standard 28 U.S.C. § 156(c) application filed in this Court.  To the extent that there is any inconsistency between this Section 156(c) Application, the Order, and the Services Agreement, the Order shall govern.

## WAIVER OF ANY APPLICABLE STAY

20.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Section 156(c) Application is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully requests that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

21.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the District of Delaware, (b) the Debtors' thirty largest unsecured creditors on a consolidated basis, (c) counsel to the DIP Agent, (d) the United States Attorney's Office for the District of Delaware, (e) the Internal Revenue Service, (f) the Securities and Exchange Commission, (g) any other party required to be provided notice under Local Rule 9013-1(m); and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.  Due to the nature of the relief requested herein, the Debtors submit that no other or further notice need be provided.

## **NO PRIOR REQUEST**

22.    No previous request for the relief sought herein has been made to this Court or any other court.

*[Remainder of page intentionally left blank.]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Section 156(c) Application and such other and further relief as may be just and proper.

Dated: September 9, 2019
        Wilmington, Delaware

/s/ Derek C. Abbott

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Matthew B. Harvey (No. 5186)
Joseph C. Barsalona II (No. 6102)
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
Email:  dabbott@mnat.com
        aremming@mnat.com
        mharvey@mnat.com
        jbarsalona@mnat.com

- and -

Adam L. Shiff (*pro hac vice* motion pending)
Robert M. Novick (*pro hac vice* motion pending)
Matthew B. Stein (*pro hac vice* motion pending)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800
Email:  AShiff@kasowitz.com
        RNovick@kasowitz.com
        MStein@kasowitz.com

**PROPOSED COUNSEL FOR DEBTORS AND
DEBTORS IN POSSESSION**

# **EXHIBIT A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRED'S, INC., *et al.*,[1] | ) | Case No. 19-_____ (   ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**ORDER PURSUANT TO 28 U.S.C. § 156(C), BANKRUPTCY CODE SECTION 105(A), AND LOCAL BANKRUPTCY RULE 2002-1(F) AUTHORIZING APPOINTMENT OF EPIQ CORPORATE RESTRUCTURING, LLC AS CLAIMS AND NOTICING AGENT TO THE DEBTORS' *NUNC PRO TUNC* TO THE PETITION DATE**

Upon the application (the "Section 156(c) Application") of the Debtors for an order (the "Order"), pursuant to 28 U.S.C. § 156(c), section 105(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules") for an order authorizing the retention and appointment of Epiq Corporate Restructuring, LLC ("Epiq") as claims and noticing agent ("Claims and Noticing Agent") nunc pro tunc to the date of filing of these Chapter 11 Cases (the "Petition Date"), to, among other things, (i) distribute required notices to parties in interest, (ii) receive, maintain, docket and otherwise administer the proofs of claim filed in the Chapter 11 Cases, and (iii) provide such other administrative services – as required by the Debtors – that would fall within the purview of services to be provided by the Clerk's Office; and upon the Hunt Declaration; and the Debtors having estimated that there are thousands of parties in interest in these Chapter 11 cases; and the Court being satisfied that Claims and Noticing Agent has the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Store, Inc. (4510); Summit Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 2001 Bryan Street, Suite 1550, Dallas, Texas 75201.

capability and experience to provide such services and that Claims and Noticing Agent does not hold an interest adverse to the Debtors or the estate respecting the matters upon which it is to be engaged; and good and sufficient notice of the Section 156(c) Application having been given; and no other or further notice being required; and it appearing that the employment of Claims and Noticing Agent is in the best interests of the Debtors, the estate and creditors; and sufficient cause appearing therefor; it is hereby[2]

**ORDERED, ADJUDGED AND DECREED that:**

1.      Notwithstanding the terms of the Services Agreement, the Section 156(c) Application is approved solely as set forth in this Order.

2.      The Debtors are authorized to retain Claims and Noticing Agent effective as of the Petition Date under the terms of the Services Agreement, and Claims and Noticing Agent is authorized and directed to perform noticing services and to receive, maintain, record and otherwise administer the proofs of claim filed in this case, and all related tasks, all as described in the Section 156(c) Application (the "Claims and Noticing Services").

3.      The Claims and Noticing Agent shall serve as the custodian of court records and shall be designated as the authorized repository for all proofs of claim filed in this case and is authorized and directed to maintain official claims register for the Debtors, to provide public access to every proof of claim unless otherwise ordered by the Court and to provide the Clerk with a certified duplicate thereof upon the request of the Clerk.

4.      Claims and Noticing Agent is authorized and directed to obtain a post office box or address for the receipt of proofs of claim.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Section 156(c) Application.

5.      Claims and Noticing Agent is authorized to take such other action to comply with all duties set forth in the Section 156(c) Application.

6.      Debtors are authorized to compensate Claims and Noticing Agent in accordance with the terms of the Services Agreement upon the receipt of reasonably detailed invoices setting forth the services provided by Claims and Noticing Agent and the rates charged for each, and to reimburse Claims and Noticing Agent for all reasonable and necessary expenses it may incur, upon the presentation of appropriate documentation, without the need for Claims and Noticing Agent to file fee applications or otherwise seek Court approval for the compensation of its services and reimbursement of its expenses.

7.      Notwithstanding anything to the contrary in this Order, (i) payments made by the Debtors pursuant to the authority granted in this Order must be in compliance with, and shall be subject to, the requirements imposed on the Debtors under the Debtors' postpetition financing agreements (the "DIP Financing Agreements") and the terms and conditions of the interim and final orders, as applicable, approving the DIP Financing Agreements and governing the Debtors' use of cash collateral (in either case, the "DIP Financing Order"), including, without limitation, that such expenditures must comply with the DIP Budget under, and as defined in, the DIP Financing Agreements, (ii) to the extent there is any inconsistency between the terms of the DIP Financing Order and any action taken or proposed to be taken hereunder, the terms of the DIP Financing Order shall control, and (iii) neither the entry of this Order nor any prepetition or postpetition agent's or lender's failure to object to the entry of this Order is intended, or shall be construed, as a consent to or waiver of any objection to any payment or expenditure under this Order or otherwise in excess of the amount authorized under the DIP Financing Agreement and the DIP Budget.

8.      Claims and Noticing Agent shall maintain records of all services showing dates, categories of services, fees charged and expenses incurred, and shall serve monthly invoices on the Debtors, the U.S. Trustee, counsel for the Debtors, counsel for any official committee, if any, monitoring the expenses of the Debtors and any party-in-interest who specifically requests service of the monthly invoices.

9.      The parties shall meet and confer in an attempt to resolve any dispute which may arise relating to the Services Agreement or monthly invoices, and that the parties may seek resolution of the matter from the Court if resolution is not achieved.

10.     Pursuant to section 503(b)(1)(A) of the Bankruptcy Code, the fees and expenses of Claims and Noticing Agent under this Order shall be an administrative expense of the Debtors' estates.

11.     The Claims and Noticing Agent may apply its retainer to all pre-petition invoices, which retainer shall be replenished to the original retainer amount, and thereafter, Claims and Noticing Agent may hold its retainer under the Services Agreement during the Chapter 11 Case as security for the payment of fees and expenses incurred under the Services Agreement.

12.     The Debtors shall indemnify Claims and Noticing Agent under the terms of the Services Agreement.

13.     The Claims and Noticing Agent shall not be entitled to indemnification, contribution or reimbursement pursuant to the Services Agreement for services other than the services provided under the Services Agreement, unless such services and the indemnification, contribution or reimbursement therefore are approved by the Court.

14.     Notwithstanding anything to the contrary in the Services Agreement, the Debtors shall have no obligation to indemnify Claims and Noticing Agent, or provide contribution or

4

reimbursement to Claims and Noticing Agent, for any claim or expense that is either:  (i) judicially determined (the determination having become final) to have arisen from Claims and Noticing Agent's gross negligence, willful misconduct, or fraud; (ii) for a contractual dispute in which the Debtors allege the breach of Claims and Noticing Agent's contractual obligations if the Court determines that indemnification, contribution or reimbursement would not be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003), or (iii) settled prior to a judicial determination under (i) or (ii), but determined by this Court, after notice and a hearing, to be a claim or expense for which Claims and Noticing Agent should not receive indemnity, contribution or reimbursement under the terms of the Services Agreement as modified by this Order.

15.     If, before the earlier of (i) the entry of an order confirming a Chapter 11 plan in this case (that order having become a final order no longer subject to appeal), or (ii) the entry of an order closing this case, Claims and Noticing Agent believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Services Agreement (as modified by this Order), including without limitation the advancement of defense costs, Claims and Noticing Agent must file an application therefore in this Court, and the Debtors may not pay any such amounts to Claims and Noticing Agent before the entry of an order by this Court approving the payment.  This paragraph is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by Claims and Noticing Agent for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify Claims and Noticing Agent.  All parties in interest shall retain

5

the right to object to any demand by Claims and Noticing Agent for indemnification, contribution or reimbursement.

16.     In the event Claims and Noticing Agent is unable to provide the services set out in this order, Claims and Noticing Agent will immediately notify the Clerk and Debtors' counsel and cause to have all original proofs of claim and computer information turned over to another claims and noticing agent with the advice and consent of the Clerk and Debtors' counsel.

17.     The Debtors may submit a separate retention application pursuant to 11 U.S.C. § 327 and/or any applicable law, for work that is to be performed by Claims and Noticing Agent but is not specifically authorized by this Order.

18.     The Debtors and Claims and Noticing Agent are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Section 156(c) Application.

19.     The Claims and Noticing Agent shall not cease providing claims processing services during the case(s) for any reason, including nonpayment, without an order of the Court.

20.     In the event of any inconsistency between the Services Agreement, the Section 156(c) Application and the Order, this Order shall govern.

21.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

22.     The requirements set forth in Local Bankruptcy Rule 9013-1(b) are satisfied by the contents of the Section 156(c) Application.

23.     The Debtors and Epiq are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

24.     Notwithstanding any term in the Services Agreement to the contrary, the Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2019
        Wilmington, Delaware


_____
United States Bankruptcy Judge

**EXHIBIT B**

**Service Agreement**



# EPIQ CORPORATE RESTRUCTURING

## STANDARD SERVICES AGREEMENT

This Standard Services Agreement is being entered into by and between the undersigned parties, referred to herein as "Epiq" and "Client" as of the Effective Date, as defined below.  In consideration of the premises herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## General Terms and Conditions

**1.  Services.**

In accordance with the charges, terms and conditions contained in this agreement and in the schedule(s) attached hereto (collectively, the "Agreement"), Epiq agrees to furnish Client with the services set forth on the Services Schedule hereto (the "Services") in connection with a corporate restructuring.  Services will be provided on an as needed basis and upon request or agreement of Client.  Charges for the Services will be based on the pricing schedule provided to Client hereto (the "Pricing Schedule").  The Pricing Schedule sets forth individual unit pricing for each of the Services provided by Epiq and represents a bona fide proposal for that Service.  Client may request separate Services or all of the Services reflected in the Pricing Schedule.

**2.  Term.**

This Agreement shall become effective on the date of its acceptance by both Epiq and Client; provided, however, Epiq acknowledges that Bankruptcy Court approval of its engagement may be required in order for Epiq to be engaged in a chapter 11 proceeding.  The Agreement shall remain in effect until terminated: (a) by Client, on thirty (30) days' prior written notice to Epiq and, to the extent Epiq has been retained by Bankruptcy Court order, entry of an order of the Bankruptcy Court discharging Epiq; or (b) by Epiq, on ninety (90) days' prior written notice to Client and, to the extent Epiq has been retained by Bankruptcy Court order, entry of an order of the Bankruptcy Court discharging Epiq.

**3.  Charges.**

3.1    For the Services and materials furnished by Epiq under this Agreement, Client shall pay the fees, charges and costs set forth in the Pricing Schedule subject to any previously agreed upon discount if applicable.  Epiq will bill Client monthly.  All invoices shall be due and payable upon receipt.

3.2    Epiq reserves the right to make reasonable increases to the unit prices, charges and professional service rates reflected in the Pricing Schedule on an annual basis effective January 2, 2020.  If such annual increases exceed 10% from the prior year's level, Epiq shall provide sixty (60) days' prior written notice to Client of such proposed increases.



3.3 Client agrees to pay Epiq for all materials necessary for performance of the Services under this Agreement (other than computer hardware and software) and any reasonable out of pocket expenses including, without limitation, transportation, long distance communications, printing, photocopying, fax, postage and related items.

3.4 Client shall pay or reimburse all taxes applicable to services performed under this Agreement and, specifically, taxes based on disbursements made on behalf of Client, notwithstanding how such taxes may be designated, levied or based. This provision is intended to include sales, use and excise taxes, among other taxes, but is not intended to include personal property taxes or taxes based on net income of Epiq.

3.5 Client shall pay to Epiq any actual charges (including fees, costs and expenses as set forth in the Pricing Schedule) related to, arising out of or resulting from any Client error or omission. Such charges may include, without limitation, print or copy re-runs, supplies, long distance phone calls, travel expenses and overtime expenses for work chargeable at the rates set forth on the Pricing Schedule.

3.6 In the event of termination pursuant to Section 2 hereof, Client shall be liable for all amounts then accrued and/or due and owing to Epiq under the Agreement.

3.7 To the extent permitted by applicable law, Epiq shall receive a retainer in the amount of $25,000 (the "Retainer") that may be held by Epiq as security for Client's payment obligations under the Agreement. The Retainer is due upon execution of this Agreement. Epiq shall be entitled to hold the Retainer until the termination of the Agreement. Following termination of the Agreement, Epiq shall return to Client any amount of the Retainer that remains following application of the Retainer to the payment of unpaid invoices.

## 4. Confidentiality.

Client data provided to Epiq during the term of this Agreement in connection with the Services ("Client Data") shall be maintained confidentially by Epiq in the same manner and to the same level as Epiq safeguards data relating to its own business; provided, however, that if Client Data is publicly available, was already in Epiq's possession or known to it, was required to be disclosed by law, was independently developed by Epiq without use or reference to any Client Data, or was rightfully obtained by Epiq from a third party, Epiq shall bear no responsibility for public disclosure of such data. Client agrees that Epiq shall not be liable for damages or losses of any nature whatsoever arising out of the unauthorized acquisition or use of any Client Data or other Client materials provided to Epiq in the performance of this Agreement.

DocuSign Envelope ID: 37002F65-902F-41A2-AD46-9BA554D30F66



**5.  Title to Property.**

Epiq reserves all property rights in and to all materials, concepts, creations, inventions, works of authorship, improvements, designs, innovations, ideas, discoveries, know-how, techniques, programs, systems and other information, including, without limitation, data processing programs, specifications, applications, processes, routines, sub-routines, procedural manuals and documentation furnished or developed by Epiq for itself or for use by Client (collectively, the "Property").  Charges paid by Client do not vest in Client any rights to the Property, it being expressly understood that the Property is made available to Client under this Agreement solely for Client's use during and in connection with each use of the Epiq equipment and services.  Client agrees not to copy or permit others to copy any of the Property.

**6.  Disposition of Data.**

6.1    Client is responsible for the accuracy of the programs and Client Data it provides or gives access to Epiq and for the output resulting from such data.  Client shall initiate and maintain backup files that would allow Client to regenerate or duplicate all programs and Client Data which Client provides or gives access to Epiq.  Client agrees, represents and warrants to Epiq that, prior to delivery of any Client Data to Epiq, it has full authority to deliver Client Data to Epiq.  Client agrees, represents and warrants to Epiq that it has obtained binding consents, permits, licenses and approvals from all necessary persons, authorities or individuals, and has complied with all applicable policies, regulations and laws, required by Client, in order to allow Epiq to use all Client Data delivered to it in connection with its Services.  Epiq shall not be liable for, and Client accepts full responsibility for, any liability or obligation with respect to Client Data prior to Epiq's receipt, including without limitation, any liability arising during the delivery of Client Data to Epiq.

6.2    Any Client Data, programs, storage media or other materials furnished by Client to Epiq in connection with this Agreement (collectively, the "Client Materials") may be retained by Epiq until the services provided pursuant to this Agreement are paid for in full, or until this Agreement is terminated with the services provided herein having been paid for in full.  Client shall remain liable for all out of pocket charges incurred by Epiq under this Agreement as a result of any Client Materials maintained by Epiq.  Epiq shall dispose of Client Materials in the manner requested by Client (except to the extent disposal may be prohibited by law).  Client agrees to pay Epiq for reasonable expenses incurred as a result of the disposition of Client Materials.  Epiq reserves the right to dispose of any Client Materials if this Agreement is terminated without Client's direction as to the return or disposal of Client Materials or Client has not paid all charges due to Epiq for a period of at least ninety (90) days; provided, however, Epiq shall provide Client with thirty (30) days' prior written notice of its intent to dispose of such data and media.

**7.  Indemnification.**

Client shall indemnify, defend and hold Epiq, its affiliates, parent, and each such entity's officers, members, directors, agents, representatives, managers, consultants and employees (each an "Indemnified Person") harmless from and against any and all losses, claims, damages, liabilities, costs

DocuSign Envelope ID: 37002F65-902F-41A2-AD46-9BA554D30F66



(including, without limitation, costs of preparation and attorneys' fees) and expenses as incurred (collectively, "Losses"), to which any Indemnified Person may become subject or involved in any capacity arising out of or relating to this Agreement or Epiq's rendering of services pursuant hereto, regardless of whether any of such Indemnified Persons is a party thereto, other than Losses resulting solely from Epiq's gross negligence or willful misconduct. Without limiting the generality of the foregoing, "Losses" includes any liabilities resulting from claims by third persons against any Indemnified Person. Client and Epiq shall notify the other party in writing promptly of the commencement, institution, threat, or assertion of any claim, action or proceeding of which Client is aware with respect to the services provided by Epiq under this Agreement. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of Client, and shall survive the termination of this Agreement until the expiration of all applicable statutes of limitation with respect to Epiq's liabilities.

## 8. <u>Limitation of Liability</u>

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THIS SECTION SHALL CONTROL.

(a) EACH PARTY AND ITS RESPECTIVE AGENTS SHALL NOT HAVE ANY OBLIGATION OR LIABILITY TO THE OTHER PARTY OR TO ANY THIRD PARTY (WHETHER IN TORT, EQUITY, CONTRACT, WARRANTY OR OTHERWISE AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE, PRODUCT LIABILITY, OR STRICT LIABILITY IN ACCORDANCE WITH APPLICABLE LAW, RULE OR REGULATION) FOR ANY INDIRECT, GENERAL, PUNITIVE, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO BUSINESS INTERRUPTION, LOST WAGES, BUSINESS OR PROFITS, OR LOSS OF DATA INCURRED BY CLIENT OR ANY OTHER PERSON, ARISING OUT OF RELATING TO THIS AGREEMENT, OR ANY USE, INABILITY TO USE OR RESULTS OF USE OF THE SERVICES OR SOFTWARE OR OTHERWISE, EVEN IF SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b) EPIQ SHALL NOT BE LIABLE TO CLIENT FOR ANY LOSSES REGARDLESS OF THEIR NATURE THAT ARE CAUSED BY OR RELATED TO A FORCE MAJEURE EVENT.

(c) THE TOTAL LIABILITY OF EACH PARTY AND ITS AGENTS TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ALL LOSSES ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE SERVICES SHALL NOT EXCEED THE TOTAL AMOUNT PAID BY THE CLIENT TO EPIQ FOR THE PARTICULAR SERVICES WHICH GAVE RISE TO THE LOSSES IN THE IMMEDIATE SIX (6) MONTHS PRIOR TO THE DATE OF THE ACTION GIVING RISE TO THE ALLEGED LOSS.



**9.  Representations / Warranties.**

Epiq makes no representations or warranties, express or implied, including, without limitation, any implied or express warranty of merchantability, suitability, fitness or adequacy for a particular purpose or use, quality, productiveness or capacity.

**10. Confidential On-Line Workspace**

Upon request of Client, Epiq shall be authorized to: (a) establish a confidential on-line workspace with an outside vendor in connection with the provision of its services to Client pursuant to this Agreement; and (b) with the consent of Client and/or its designees, publish documents and other information to such confidential workspace.  By publishing documents and other information to this confidential workspace in accordance with the foregoing, Epiq shall not be considered in violation of any of the provisions of this Agreement, including, but not limited to, Section 4 (Confidentiality).

**11.  General**

11.1  No waiver, alteration, amendment or modification of any of the provisions of this Agreement shall be binding upon either party unless signed in writing by a duly authorized representative of both parties.

11.2  This Agreement may not be assigned by Client without the express written consent of Epiq, which consent shall not be unreasonably withheld.  The services provided under this Agreement are for the sole benefit and use of Client, and shall not be made available to any other persons.

11.3  This Agreement shall be governed by the laws of the State of New York, without regard to that state's provisions for choice of law.  Client and Epiq agree that any controversy or claim arising out of or relating to this Agreement or the alleged breach thereof shall be settled by mandatory, final and binding arbitration before the American Arbitration Association in New York, New York and such arbitration shall comply with and be governed by the rules of the American Arbitration Association, provided that each party may seek interim relief in court as it deems necessary to protect its confidential information and intellectual property rights.  Any arbitration award rendered pursuant to this provision shall be enforceable worldwide.

11.4  The parties hereto agree that this Agreement is the complete and exclusive statement of the agreement between the parties which supersedes all proposals or prior agreements, oral or written, and all other communications between the parties relating to the subject matter of this Agreement.

11.5  Client will use its best efforts to cooperate with Epiq at Client's facilities if any portion of the Services requires its physical presence thereon.

11.6  In no event shall Epiq's Services constitute or contain legal advice or opinion, and neither Epiq nor its personnel shall be deemed to practice law hereunder.

DocuSign Envelope ID: 37002F65-902F-41A2-AD46-9BA554D30F66



11.7    Except for Client's obligation to pay fees, expenses and charges hereunder when due, neither party shall be in default or otherwise liable for any delay in or failure of its performance under this Agreement to the extent such delay or failure arises by reason of any act of God, any governmental requirement, act of terrorism, riots, epidemics, flood, strike, lock-out, industrial or transportational disturbance, fire, lack of materials, war, event of force majeure, or other acts beyond the reasonable control of a performing party.

11.8    This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

11.9    All clauses and covenants in this Agreement are severable; in the event any or part of them are held invalid or unenforceable by any court, such clauses or covenants shall be valid and enforced to the fullest extent available, and this Agreement will be interpreted as if such invalid or unenforceable clauses or covenants were not contained herein.    The parties are independent contractors and, except as expressly stated herein, neither party shall have any rights, power or authority to act or create an obligation on behalf of the other party.



11.10   Notices to be given or submitted by either party to the other, pursuant to this Agreement, shall be sufficiently given or made if given or made in writing and sent by hand delivery, overnight or certified mail, postage prepaid, and addressed as follows:

<u>If to Epiq</u>:

        Epiq Corporate Restructuring, LLC
        777 Third Avenue, 12th Floor
        New York, New York 10017
        Attn:  Robert A. Hopen

<u>If to Client</u>:

        Fred's, Inc.
        2001 Bryan Street, Suite 1550
        Dallas, Texas 75201
        Attn: Ben Morgan

<u>With a copy to</u>:

        Sarah Link Schultz, Esq.
        AKIN GUMP STRAUSS HAUER & FELD LLP
        2300 N. Field Street
        Dallas, TX 75201

11.11  Invoices sent to Client should be delivered to the following address:

        Same as above

11.12   The "Effective Date" of this Agreement is July 31, 2019.



IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**EPIQ CORPORATE RESTRUCTURING, LLC**

Name: Robert A. Hopen
Title: President

**CLIENT**

By:

Name: Joe Anto

Title: Ceo

DocuSign Envelope ID: 37002F65-902F-41A2-AD46-9BA554D30F66



# SERVICES SCHEDULE

## SCHEDULES/STATEMENT PREPARATION

➢ Assist the Debtors with administrative tasks in the preparation of their bankruptcy Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("Statements"), including (as needed):

- Coordinate with the Client and its advisors regarding the Schedules and Statements process, requirements, timelines and deliverables.
- Create and maintain databases for maintenance and formatting of Schedules and Statements data.
- Coordinate collection of data from Client and advisors.
- Provide data entry and quality assurance assistance regarding Schedules and Statements, including, specifically, the creation of Schedule G.

## CLAIMS MANAGEMENT

➢ Maintain copies of all proofs of claim and proofs of interest filed (in hard copy and electronic form).

➢ Provide a secure on-line tool through which creditors can file proofs of claim and related documentation, eliminating costly manual intake, processing and data entry of paper claims and ensuring maximum efficiency in the claim-filing process.

➢ Create and maintain electronic databases for creditor/party in interest information provided by the debtor (e.g., creditor matrix and Schedules of Statements of Assets and Liabilities) and creditors/parties in interest (e.g., proof of claim/interests).

➢ Process all proof of claim/interest submitted.

➢ Provide access to the public for examination of copies of the proofs of claim or interest without charge during regular business hours.

➢ Maintain official claims registers, including, among other things, the following information for each proof of claim or proof of interest:

- Name and address of the claimant and any agent thereof, if the proof of claim or proof of interest was filed by an agent;
- Date received;
- Claim number assigned; and
- Asserted amount and classification of the claim.

DocuSign Envelope ID: 37002F65-902F-41A2-AD46-9BA554D30F66



➢ Create and maintain a website with general case information, key documents, claim search function, and mirror of ECF case docket.

➢ Transmit to the Clerk's office a copy of the claims registers on a monthly basis, unless requested by the Clerk's office on a more or less frequent basis or, in the alternative, make available the claims register on-line.

➢ Implement necessary security measures to ensure the completeness and integrity of the claims registers.

➢ Record all transfers of claims pursuant to Bankruptcy Rule 3001(e) and provide notice of such transfers as required by Bankruptcy Rule 3001(e).

➢ Maintain an up-to-date mailing list for all entities that have filed a proof of claim, proof of interest or notice of appearance, which list shall be available upon request of a party in interest or the Clerk's office.


**<u>NOTICING</u>**

➢ Prepare and serve required notices in these  Chapter 11 cases, including:

- Notice of the commencement of these Chapter 11 cases and the initial meeting of creditors under section 341(a) of the Bankruptcy Code;

- Notice of any auction sale hearing;

- Notice of the claims bar date;

- Notice of objection to claims;

- Notice of any hearings on a disclosure statement and confirmation of the plan of reorganization; and

- Other miscellaneous notices to any entities, as the debtor or the Court may deem necessary or appropriate for an orderly administration of these Chapter 11 cases.

➢ After service of a particular notice - whether by regular mail, overnight or hand delivery, email or facsimile service - file with the Clerk's office an affidavit of service that includes a copy of the notice involved, a list of persons to whom the notice was mailed and the date and manner of mailing.

➢ Update claim database to reflect undeliverable or changed addresses.

DocuSign Envelope ID: 37002F65-902F-41A2-AD46-9BA554D30F66



➢ Coordinate publication of certain notices in periodicals and other media.

➢ Distribute Claim Acknowledgement Cards to creditor having filed a proof of claim/interest.

## BALLOTING/TABULATION

➢ Provide balloting services in connection with the solicitation process for any chapter 11 plan for which a disclosure statement has been approved by the court, including (as needed):

- Consult with Client and its counsel regarding timing issues, voting and tabulation procedures, and documents needed for the vote.

- Review of voting-related sections of the voting procedures motion, disclosure statement and ballots for procedural and timing issues.

- Assist in obtaining information regarding members of voting classes, including lists of holders of bonds from DTC and other entities (and, if needed, assist Client in requesting these listings).

- Coordinate distribution of solicitation documents.

- Respond to requests for documents from parties in interest, including brokerage firm and bank back-offices and institutional holders.

- Respond to telephone inquiries from lenders, bondholders and nominees regarding the disclosure statement and the voting procedures.

- Receive and examine all ballots and master ballots cast by voting parties. Date- stamp the originals of all such ballots and master ballots upon receipt.

- Tabulate all ballots and master ballots received prior to the voting deadline in accordance with established procedures, and prepare a certification for filing with the court.

Undertake such other duties as may be requested by the Client.

## CALL CENTER

➢ Provide state-of-the-art Call Center facility and services, including (as needed):

- Create frequently asked questions, call scripts, escalation procedures and call log formats.
- Record automated messaging.
- Train Call Center staff.
- Maintain and transmit call log to Client and advisors.

DocuSign Envelope ID: 37002F65-902F-41A2-AD46-9BA554D30F66



**MISCELLANEOUS**

➤ Provide such other claims processing, noticing and related administrative services as may be requested from time to time by the Client.

➤ Promptly comply with such further conditions and requirements as the Court may at any time prescribe.

➤ Comply with applicable federal, state, municipal, and local statutes, ordinances, rules, regulations, orders and other requirements.

➤ Provide temporary employees to the Clerk's Office to process claims, as necessary.



# PRICING SCHEDULE

## CLAIM ADMINISTRATION HOURLY RATES

| Title | Rates |
|---|---|
| Clerical/Administrative Support | $22.50 – $40.50 |
| IT / Programming | $30.00 – $76.50 |
| Case Managers | $63.00 – $148.50 |
| Consultants/ Directors/Vice Presidents | $144.00 – $171.00 |
| Solicitation Consultant | $171.00 |
| Executive Vice President, Solicitation | $193.50 |
| Executives | No Charge |

## CLAIMS AND NOTICING RATES[1]

| | |
|---|---|
| Printing | $0.09 per image |
| Personalization / Labels | WAIVED |
| Envelopes | VARIES BY SIZE |
| Postage / Overnight Delivery | AT COST AT PREFERRED RATES |
| E-Mail Noticing | WAIVED FOR MSL* |
| Fax Noticing | $0.05 per page |
| Claim Acknowledgement Letter | $0.05 per letter |
| Publication Noticing | Quoted at time of request |

## DATA MANAGEMENT RATES

| | |
|---|---|
| Data Storage, Maintenance and Security | $0.09 per record/month |
| Electronic Imaging | $0.09 per image; no monthly storage charge |
| Website Hosting Fee | NO CHARGE |
| CD- ROM (Mass Document Storage) | Quoted at time of request |

## ON-LINE CLAIM FILING SERVICES

| | |
|---|---|
| On-Line Claim Filing | NO CHARGE |

---

[1]    Noticing via overnight delivery after traditional overnight drop-off times (e.g., 9:00 p.m. in NYC) may result in additional print charges.

*Quoted at time of request for high volume blasts to all creditors

DocuSign Envelope ID: 37002F65-902F-41A2-AD46-9BA554D30F66



## CALL CENTER RATES

Standard Call Center Setup         NO CHARGE

Call Center Operator         $55 per hour

Voice Recorded Message         $0.34 per minute

## OTHER SERVICES RATES

Custom Software, Workflow
and Review Resources         Quoted at time of request

Depositions/Court Reporting         Quoted at time of request, bundled pricing available

eDiscovery         Quoted at time of request, bundled pricing available

Virtual Data Room --
Confidential On-Line Workspace         Quoted at time of request

Disbursements -- Check and/or Form 1099         Quoted at time of request

Disbursements -- Record to Transfer Agent         Quoted at time of request

**<u>EXHIBIT C</u>**

**Hunt Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRED'S, INC., *et al.*,[1] | ) | Case No. 19-_____ ( ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DECLARATION OF BRIAN HUNT IN SUPPORT OF**
**DEBTORS' APPLICATION FOR ENTRY OF AN ORDER PURSUANT**
**TO 28 U.S.C. § 156(C), BANKRUPTCY CODE SECTION 105(A), AND LOCAL**
**BANKRUPTCY RULE 2002-1(F) AUTHORIZING APPOINTMENT OF EPIQ**
**CORPORATE RESTRUCTURING, LLC AS CLAIMS AND NOTICING AGENT TO**
**THE DEBTORS *NUNC PRO TUNC* TO THE PETITION DATE**

I, Brian Hunt, being duly sworn, state the following under penalty of perjury and that the

following is true to the best of my knowledge, information and belief:

1.      I am a Consulting Director with Epiq Corporate Restructuring, LLC ("Epiq"),

with offices located at 777 3rd Avenue, 12th Floor, New York, New York 10017.   I am

authorized to submit this declaration (this "Declaration") in support of the Debtors' Application

for Entry of an Order Pursuant to 28 U.S.C. 156(a), Bankruptcy Code Section 105(a), and Local

Bankruptcy Rule 2001-1(f) authorizing appointment of Epiq Corporate Restructuring, LLC as

Claims and Notice Agent to the Debtors *Nunc Pro Tunc* to the Petition Date (the "Section 156(c)

Application").[2]   Except as otherwise noted, I have personal knowledge of the matters set forth

herein, and if called and sworn as a witness, I could and would testify competently thereto.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Store, Inc. (4510); Summit Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 2001 Bryan Street, Suite 1550, Dallas, Texas 75201.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Section 156(c) Application.

2.      As agent and custodian of the Court records pursuant to 28 U.S.C. § 156(c), Epiq

will perform at the request of the Clerk the noticing and claims services specified in the Section

156(c) Application and Services Agreement.  In addition, at the Debtors' request, Epiq will

perform such other claims and noticing services specified in the Section 156(c) Application.  For

the avoidance of doubt, pursuant to the Services Agreement, Epiq will perform the Claims and

Noticing Services for the debtors and debtors in possession in these Chapter 11 Cases.

## EPIQ'S QUALIFICATIONS

3.      Epiq is one of the country's leading Chapter 11 administrators, with significant

expertise in noticing, claims administration, soliciting, balloting, and facilitating other

administrative aspects of Chapter 11 cases.  Epiq has substantial experience in cases of this size

and complexity, and has acted as the official claims and noticing agent in many large bankruptcy

cases including the following cases in this District:  *In re Kona Grill, Inc.*, Case No. 19-10953

(CSS) (Bankr. D. Del. April 30, 2019); *In re Mattress Firm, Inc.*, Case No. 18-12241 (CSS)

(Bankr. D. Del. October 05, 2018); *In re The NORDAM Group, Inc.*, Case No. 18-11699 (MFW)

(Bankr. D. Del. July 22, 2018); *In re Color Spot Holdings, Inc.*, Case No. 18-11272 (LSS)

(Bankr. D. Del. May 29, 2018); *In re The Weinstein Company Holdings LLC*, Case No. 18-

10601 (MFW) (Bankr. D. Del. Apr. 18, 2018); In re *HCR ManorCare, Inc.*, Case No. 18-10467

(KG) (Bankr. D. Del. Apr. 5, 2018); *In re Herald Media Holdings, Inc.*, Case No. 17-12881

(LSS) (Bankr. D. Del. Jan. 25, 2018); *In re Maurice Sporting Goods, Inc.*, Case No. 17-12481

(CSS) (Bankr. D. Del. Dec. 18, 2017); *In re GST AutoLeather, Inc.*, Case No. 17-12100 (LSS)

(Bankr. D. Del. Oct. 27, 2017); *In re Dex Media, Inc.*, Case No. 16-11200 (KG) (Bank. D. Del.

May 15, 2016); *In re Fresh & Easy, LLC*, Case No. 15-12220 (BLS) (Bank. D. Del. Oct. 30,

2015); *In re Allen Systems Group, Inc.*, Case No. 15-10332 (KJC) (Bankr. D. Del. Feb. 18,

2015); *In re Deb Stores Holding, LLC*, Case No. 14-12676 (KG) (Bankr. D. Del. Dec. 4, 2014);

*In re AWI Delaware, Inc.*, Case No. 14-12092 (KJC) (Bankr. D. Del. Sept. 9, 2014); *In re Natrol,*

*Inc.*, Case No. 14-11446 (BLS) (Bankr. D. Del. June 11, 2014); *In re Energy Future Holdings*

*Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. May 2, 2014).

## DISINTERESTEDNESS

4.      Epiq represents, among other things, the following:

(a)     Epiq neither holds nor represents any interest adverse to the Debtors'
estates in connection with any matters for which Epiq will be employed;

(b)     I am not related or connected to and, to the best of my knowledge, no
other professional of Epiq is related to or connected to any United States
Bankruptcy Judge for the District of Delaware or the United States Trustee
or to any employee in the offices thereof;

(c)     Epiq will not consider itself employed by the United States government
and shall not seek any compensation from the United States government in
its capacity as the Claims and Noticing Agent in these Chapter 11 Cases;

(d)     by accepting employment in these Chapter 11 Cases, Epiq waives any
rights to receive compensation from the United States government;

(e)     in its capacity as the Claims and Noticing Agent in these Chapter 11
Cases, Epiq will not be an agent of the United States and will not act on
behalf of the United States;

(f)     Epiq will not employ any past or present employees of the Debtors in
connection with its work as the Claims and Noticing Agent in these
Chapter 11 Cases;

(g)     in its capacity as the Claims and Noticing Agent in these Chapter 11
Cases, Epiq will not intentionally misrepresent any fact to any person;

(h)     Epiq shall be under the supervision and control of the Clerk's office with
respect to the receipt and recordation of claims and claim transfers; and

(i)     none of the services provided by Epiq as the Claims and Noticing Agent
shall be at the expense of the Clerk's office.

5.      In connection with the preparation of this Declaration, I caused to be submitted

for review by our conflicts system the names of all known potential parties in interest (the

"Parties-in-Interest") in this case.  The list of Parties-in-Interest was provided by the Debtors and

3

included, among other parties, the Debtors, the Debtors' current and former directors and officers, significant stockholders, secured creditors, and top 30 unsecured creditors. The results of the conflicts check were compiled and reviewed by employees of Epiq, under my supervision. At this time, Epiq is not aware of any relationship which would present a disqualifying conflict of interest.

6.     Epiq currently serves, or in the past may have served, in a neutral capacity as claims, noticing, balloting and/or solicitation agent for certain of these parties or related parties. However, given Epiq's neutral position as claims and noticing agent or administrative advisor in the listed parties' cases, or any other cases, Epiq does not view such relationships as real or potential conflicts. Further, to the best of my knowledge any such relationship is completely unrelated to these Chapter 11 Cases. Accordingly, to the best of my knowledge, Epiq and each of its employees are "disinterested persons," as that term is defined in Bankruptcy Code section 101(14), and neither Epiq nor any of its employees hold or represent an interest adverse to the Debtors' estate related to any matter for which Epiq will be employed.

7.     In addition, to the best of my knowledge, none of Epiq's employees are related to bankruptcy judges in the District of Delaware, the United States Trustee for Region 3, any attorney known by Epiq to be employed in the Office of the United States Trustee serving the District of Delaware, or are equity security holders of the Debtors.

8.     To the best of my knowledge, neither Epiq nor any of its personnel have any relationship with the Debtors that would impair Epiq's ability to serve as Claims and Noticing Agent. Epiq may have relationships with certain of the Debtors' creditors as vendors or in connection with cases in which Epiq serves or has served in a neutral capacity as claims and noticing agent. To the best of my knowledge, such relationships are completely unrelated to

these Chapter 11 Cases. Epiq's personnel may have relationships with some of the Debtors' creditors or other parties in interest. To the best of my knowledge, however, such relationships, to the extent they exist, are of a personal financial nature and completely unrelated to these Chapter 11 Cases. Epiq has, and will continue to represent clients in matters unrelated to these Chapter 11 Cases. In addition, Epiq has had, and will continue to have, relationships in the ordinary course of its business with certain vendors, professionals, and other parties in interest that may be involved in the Debtors' case in matters unrelated to this case.

9.      Epiq is a wholly owned subsidiary of Epiq Systems, Inc., which is corporate parent to certain companies that provide integrated technology products and services to the legal profession for electronic discovery, class action settlements, financial transactions, chapter 7 and 13 bankruptcy, litigation, and regulatory compliance. Given the legal and operational separateness of Epiq from its affiliates and the administrative nature of the services performed by such companies, Epiq does not believe that a conflict would arise solely from any relationship or claim of an Epiq affiliate or its corporate parent.

10.      Epiq Systems, Inc., is a wholly owned subsidiary of Document Technologies, LLC ("DTI"), a global legal process outsourcing company, which is an ultimate wholly owned subsidiary of DTI Topco, Inc. ("DTI Topco"). DTI Topco is a privately-held entity with majority ownership held by OMERS Administration Corporation ("OAC"), the administrator of the OMERS pension funds, and managed by OMERS Private Equity Inc. ("OPE," which together with OAC are referred to as "OMERS"), and funds managed by Harvest Partners, LP ("Harvest"), a leading private equity investment firm.

11.     Neither OMERS nor Harvest are currently identified on the Potential Parties in Interest list. However, the following disclosure is made out of an abundance of caution and in an effort to comply with the Bankruptcy Code and Bankruptcy Rules.

12.     Designees of OMERS and Harvest are members of the Board of Directors of DTI Topco ("Parent Board Designees").  No designees of OMERS or Harvest are members of the Board of Directors of DTI or Epiq, or any other subsidiaries of DTI. Further, Epiq has the following restrictions in place (collectively, the "Barrier"):  (i) prior to the Debtors commencing these cases, Epiq did not share the names or any other information identifying the Debtors with OMERS, Harvest, or the Parent Board Designees; (ii) Epiq has not and will not furnish any material nonpublic information about the Debtors to OMERS, Harvest, or the Parent Board Designees; (iii) no OMERS or Harvest personnel, including the Parent Board Designees, work on Epiq client matters or have access to Epiq client information, client files, or client personnel; (iv) no OMERS or Harvest personnel, including the Parent Board Designees, work in Epiq's offices; (v) other than the Parent Board Designees, Epiq operates independently from OMERS and Harvest, including that it does not share any employees, officers or other management with OMERS or Harvest, has separate offices in separate buildings, and has separate IT systems; and (vi) no Epiq executive or employee is a director, officer or employee of OMERS or Harvest (or vice versa other than the Parent Board Designees).

13.     Epiq has searched the names of OMERS and Harvest against the Debtors and the Potential Parties in Interest list provided by the Debtors. Based solely on the foregoing search, Epiq has determined, to the best of its knowledge, that there are no material connections that require disclosure. Because of any applicable securities laws and the fact that Epiq operates independently from OMERS and Harvest, prior to the Petition Date, Epiq was unable to further

6

investigate with either OMERS or Harvest, to the extent necessary, any potential or actual connection between either OMERS or Harvest and the Debtors and the potential parties in interest.

14.     Epiq shares a corporate parent with certain companies that provide integrated technology products and services to the legal profession for electronic discovery, class action settlements, financial transactions, chapter 7 and 13 bankruptcy, litigation, and regulatory compliance.  Given the legal and operational separateness of Epiq from its affiliates and the administrative nature of the services performed by such companies, Epiq does not believe that a conflict would arise solely from any relationship or claim of an Epiq affiliate or its corporate parent.

15.     Epiq has working relationships with certain of the professionals retained by the Debtors and other parties herein but such relationships are completely unrelated to these Chapter 11 Cases.  Epiq has represented, and will continue to represent, clients in matters unrelated to these Chapter 11 Cases, and has had, and will continue to have, relationships in the ordinary course of its business with certain professionals in connection with matters unrelated to these Chapter 11 Cases.

16.     Epiq has not been retained to assist any entity or person other than the Debtors on matters relating to, or in connection with, these Chapter 11 Cases.  If Epiq's proposed retention is approved by this Court, Epiq will not accept any engagement or perform any service for any entity or person other than the Debtors in these Chapter 11 Cases.

17.     Based on the foregoing, I believe Epiq is a "disinterested person" as that term is referenced in section 327(a) of the Bankruptcy Code and as defined in section 101(14) of the Bankruptcy Code.  Moreover, to the best of my knowledge, neither Epiq nor any of its partners

7

or employees hold or represent any interest materially adverse to the Debtors' estate with respect to any matter upon which Epiq is to be engaged.

18.     If any new facts or relationships are discovered, Epiq will supplement its disclosure to the Court.

19.     In performing the services of the Claims and Noticing Agent, Epiq will charge the Debtors the rates set forth in the Services Agreement.

20.     Prior to the Commencement Date, the Debtors provided Epiq a retainer in the amount of $25,000.  Epiq agrees to use the retainer per the terms of the Services Agreement.

21.     Epiq will comply with all requests of the Clerk's office, including the Claims Agent Protocol and the guidelines promulgated by the Judicial Conference of the United States for the implementation of 28 U.S.C. § 156(c).

22.     The services provided by Epiq will be administrative in nature, and Epiq will not provide services in the nature of legal representation and/or advice to the Debtors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: September 9, 2019

EPIQ CORPORATE RESTRUCTURING, LLC


*/s/ Brian Hunt*
Name:  Brian Hunt
Title:   Consulting Director