**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRED'S INC., *et al.*[1] | ) | Case No. 19-11984 (CSS) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DECLARATION OF MARK A. RENZI,
CHIEF RESTRUCTURING OFFICER OF FRED'S, INC.,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mark A. Renzi, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Fred's, Inc. ("Fred's" or the "Company") and its debtor affiliates as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").  In such capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      Prior to becoming Chief Restructuring Officer, I advised the Debtors in my capacity as Managing Director of Berkeley Research Group, LLC ("BRG") beginning April 18, 2019.

3.      I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these Chapter 11 Cases and in support of the Debtors' Chapter 11 petitions and certain motions and applications filed today.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Store, Inc. (4510); Summit Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 2001 Bryan Street, Suite 1550, Dallas, TX 75201.

4.      Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am above 18 years of age, and I am competent to testify.

## CORPORATE HISTORY AND BUSINESS OPERATIONS

### A.      General

5.      Fred's, Inc. was founded in 1947.  Fred's stores generally serve low, middle- and fixed-income families located in small- to medium-sized towns (populations of 15,000 or less).  Its customers tend to be value-oriented and budget-conscious, and often live in rural areas without easy access to large discount retailers.  Fred's describes its mission as "to improve the lives of customers by selling products that deliver value and convenience to the communities we serve."  Fred's stores stock over 14,000 items that address the everyday needs of its customers, including nationally recognized brand-name products, proprietary "Fred's" label products, and lower priced off-brand products.  Fred's management believes its customers shop at Fred's stores as a result of their convenient locations, products at everyday low prices, pharmacy department and healthcare services, regularly advertised departmental promotions and seasonal specials.

### B.      Fred's Historical Business

6.      As of May 4, 2018, Fred's and its subsidiaries operated 556 general merchandise and pharmacy stores, including 11 franchised locations, in multiple states in the southeastern United States.  Fred's company-owned, full-service stores had an average selling space of 14,684 square feet.  Fred's operations are typically managed at the individual store level, with primary operations at each of these locations consisting of general merchandise, or "front store" operations and pharmacy operations.    The Company's front store merchandise strategy

emphasized convenience and value.  Fred's maintained low opening price points and competitive prices on key products across all departments and regularly offered seasonal specials and promotions supported by direct mail, newspaper, social media and email advertising.  Seasonal specials, private label products, and closeout merchandise supplemented the selection of merchandise.  In 169 of its locations, front-store operations were supplemented by a full-service pharmacy, sometimes the only pharmacies in the town or county.

7.    The following table sets forth certain information with respect to stores and pharmacies during the Company's prior three fiscal years:

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| Full-service stores open at the beginning of the year | 536 | 573 | 581 |
| Full-service stores opened/acquired | 4 | 4 | 2 |
| Full-service stores closed | (6) | (41) | (10) |
| Full-service stores open at the end of the year | 534 | 536 | 573 |
| Xpress stores open at the beginning of the year | 48 | 55 | 60 |
| Xpress stores opened/acquired | — | — | 1 |
| Xpress stores closed | (23) | (5) | (5) |
| Xpress stores converted to full-service stores | (2) | (2) | (1) |
| Xpress stores open at the end of the year | 23 | 48 | 55 |
| **Total Company-owned stores** | **557** | **584** | **628** |
| Franchise stores at end of period | 11 | 12 | 16 |
| **Total Fred's retail stores** | **568** | **596** | **644** |
| Number of stores with pharmacies at the end of the year | 169 | 348 | 362 |
| Total selling square feet of full-service stores (in thousands) | 7,841 | 7,876 | 8,451 |
| Average selling square feet per full-service store | 14,684 | 14,694 | 14,749 |

8.    As of February 2, 2019, the Company had 2,642 full-time and 3,930 part-time employees, the majority of which were store employees.  The number of employees has varied seasonally.

C.      **Prepetition Strategic and Financial Initiatives Leading To the Chapter 11 Cases**.

9.      Since more than a year prior to the Petition Date, the Debtors' have been executing turnaround strategies.  During its 2018 fiscal year, management sought to create value by monetizing non-core assets, reducing selling, general and administrative expenses, improving assortment and optimizing inventory levels, closing underperforming stores, and reducing debt levels. This included "Front Store" optimizations including reductions in workforce and other operating expenses to lower selling, general and administrative expenses, fomenting growth in new categories such as closeouts, beer and wine, lottery and expansion of private brand offerings throughout many departments, and continued reductions in unproductive inventory and optimization of merchandise selection throughout the front store.

10.     On April 11, 2019, the Company announced that it had retained Peter J. Solomon ("PJ Solomon") to assist Fred's board of directors (the "Board") in undertaking a comprehensive review of the full range of strategic alternatives available to the Company to maximize value, including, consideration of opportunities to engage in a sale, merger, a consolidation or business combination, further store closures, asset divestitures, financing transactions or restructurings.

11.     Thereafter, the Company undertook a comprehensive evaluation of its store portfolio, which examined historical and recent store performance and the timing of lease expirations, among other factors, and made a series of decisions to close underperforming stores and sell additional pharmacy assets, the most material of which were as follows:

- On April 11, 2019, the Company announced that the Board had approved a plan to close 159 underperforming stores.  The Company completed the closure of these stores by June 1, 2019.

- On May 16, 2019, the Company announced that the Board had approved a plan to close an additional 104 underperforming stores. The Company completed the closure of these stores by June 30, 2019.

- On July 5, 2019, the Company announced that the Board had approved a plan to close

4

an additional 49 underperforming stores. The Company completed the closure of these stores by August 17, 2019.

- On July 12, 2019, the Company announced that the Board had approved a plan to close an additional 129 underperforming stores. The Company completed the closure of these stores by August 27, 2019.

12.     The Debtors' efforts also included completing a sale within the last month of 38 of its retail pharmacy stores to a subsidiary of CVS for a cash purchase price of $11.7 million, plus $3.5 million for inventory; additionally, the Debtors completed a sale of certain prescription files and the related data and records, retail pharmaceutical inventory, and certain other assets from 179 of the Company's retail pharmacy stores to Walgreen Co. for a cash purchase price of approximately $176.7 million during the fourth quarter of fiscal 2018.

## THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

**A.      The Debtors' Corporate Structure.**

13.     The following chart illustrates the Debtors' corporate structure as of the Petition Date:

[*Chart begins subsequent page*.]



**B.      The Debtors' Capital Structure.**

14.      The following description is intended to provide a synopsis of the Debtors' capitalization and the historical financing transactions that led thereto.  For a more complete description, please see the information contained in the Company's SEC Form 10-K for the fiscal year ended February 2, 2019, and the Company's SEC Form 10-Q for the quarterly period ended May 4, 2019, which may be accessed at www.investors.fredsinc.com/sec-filings.

**1.      The Prepetition Credit Facility**

15.      On April 9, 2015, the Company entered into a Revolving Loan and Credit Agreement (as subsequently amended and supplemented, the "Prepetition Credit Facility") with Regions Bank and Bank of America, N.A.  Draws are limited to the lesser of the commitment

amount or the borrowing base, which is periodically determined by reference to the value of certain receivables, inventory and scripts, less applicable reserves.

16.    Under the Prepetition Credit Facility, the Company has a financial covenant to maintain at all times excess availability of at least 10% of the commitments, and if excess availability falls below such threshold it would constitute an event of default under the Prepetition Credit Facility.

17.    On April 15, 2019, Bank of America, N.A. imposed a reserve of $20.0 million in connection with the announced planned closures of 159 stores (see above) and related matters, which reduced excess availability, and the administrative agent declared an "Account Control Event" in connection with such closures and exercised control over the Company's collection accounts.  This increased the amount of the reserve to $32 million.  Thereafter, from time to time, the Company entered into a series of forbearance agreements and amendments to the Prepetition Credit Facility that, among other things, increased the Company's borrowing costs and reduced availability.

18.    As of the Petition Date, outstanding borrowings under the Prepetition Credit Facility were approximately $15.1 million, and approximately $8.8 million of letters of credit were outstanding, having been reduced to such amounts largely as a result of the proceeds of store closures and assets sales referenced above.

## 2.    Other Financing Debts

19.    The Company's prescription drugs are replenished through the pharmacy inventory management system and shipped directly from the Company's primary pharmaceutical wholesaler, Cardinal Health, Inc. (together with certain of its affiliates, "Cardinal").  During 2018, 2017 and 2016, approximately 50.0%, 43.5%, and 43.2%, respectively, of the Company's total purchases were made from Cardinal.  The Company operates under a purchase and supply

contract with Cardinal Health as its primary wholesaler, which continues through December 2021. Debtor Fred's Stores of Tennessee, Inc. granted Cardinal Health liens on pharmacy assets to secure the outstanding trade debt incurred in connection with the supply of these goods. Such liens are contractually subordinate to the security granted under the Prepetition Credit Facility. As of the Petition Date, the approximate outstanding balance due to Cardinal was $20.9 million.

20.    Prior to the Petition Date, GE Commercial Finance Business Property Corporation (the "Summit Lender") was granted a security interest in certain property (the "Summit Collateral") of (a) Debtor Summit Properties-Jacksboro, LLC in connection with that certain Promissory Note, Commercial Deed of Trust, Security Agreements, Assignment of Leases and Rents and Fixture Filing dated December 29, 2006 (which rights, upon Debtors' information and belief, have been acquired by Fidelity Bank), and (b) Debtor Summit Properties-Bridgeport, LLC in connection with that certain Promissory Note, Commercial Deed of Trust, Security Agreements, Assignment of Leases and Rents and Fixture Filing dated September 7, 2007 (which rights, upon Debtors' information and belief, have been acquired by EverBank). As of the Petition Date, the Debtors estimate that Summit Properties-Jacksboro, LLC and Summit Properties-Bridgeport, LLC owe the Summit Lender (or its respective successors or assignees) approximately $700,000 and $700,000, respectively.

### 3.    Equity Securities

21.    As of, or shortly before, the Petition Date, the equity securities of Fred's Inc. consisted of the following:

- Preferred stock, nonvoting, no par value, 10,000,000 shares authorized, none outstanding;

- Preferred stock, Series C junior participating nonvoting, no par value, 50,000 shares authorized, none outstanding;

- Common stock, Class A voting, no par value, 60,000,000 shares authorized,

39,060,971 shares issued and outstanding, respectively;

- Common stock, Class B nonvoting, no par value, 11,500,000 shares authorized, none outstanding; and

- Treasury Stock, 3,800,000 shares (at May 4, 2019).

## THE DEBTORS' OFFICERS AND DIRECTORS

22.     As of the Petition Date, the Debtors' Board members were Heath B. Freeman, Timothy A. Barton, Dana Goldsmith Needleman, Steven B. Rossi, and Thomas E. Zacharias, and the Debtors' Executive Officers were Joseph Anto, Chief Executive Officer, Mark Renzi, Chief Restructuring Officer, and Michael Ladd, Chief Stores Officer.  These individuals will continue to serve as the Debtors' Officers and Directors after the Petition Date.

23.     The Board utilizes several subcommittees.  One such committee is the restructuring committee, which was officially appointed on July 24, 2019, and is comprised of Dana Needleman, Thomas Zacharias, Steven, Rossi, and Tim Barton (the "Restructuring Committee").  The Restructuring Committee's mission was to evaluate – in consultation with the Debtors' financial advisors, BRG and PJ Solomon – strategic alternatives, and determine the best path forward for the Debtors.

## THE PROPOSED DIP FINANCING AND MARKETING PROCESS

24.     In the months preceding the Petition Date, the Debtors' cash flows were severely constrained because events of default had occurred under Prepetition Credit Facility and the facility had been in an overadvance state.  While the lenders (the "Prepetition Credit Parties") under the Prepetition Credit Facility had agreed to a series of contractual amendments and forbearance agreements and refrained from accelerating their debt, it became clear to the Restructuring Committee and the Debtors that the Debtors required an alternative source of financing.

25.     The Restructuring Committee instructed BRG and PJ Solomon to prepare a projection of postpetition cash flows for the Debtors for the initial nine (9) weeks of the Debtors' Chapter 11 Cases (the "Budget").  The Budget and projections with respect to the Debtors' funding requirements were prepared in good faith and based upon assumptions the Debtors believe to be reasonable.

26.     Also based on the foregoing, the Debtors determined that they required access to postpetition financing sufficient to provide liquidity to administer the estates during the course of the Chapter 11 Cases.  As reflected in the Budget, immediate access to postpetition financing is essential to fund the administration of the Chapter 11 Cases and enable the Debtors to pursue sales of their assets to maximize value for creditors.  Without immediate access to postpetition financing, the Debtors and their creditors face a material risk of substantial, irreparable, and ongoing harm.

27.     In parallel with their ongoing search for viable refinancing and recapitalization options, the Restructuring Committee directed PJ Solomon to begin contacting parties regarding the terms of potential debtor-in-possession financing facilities that would provide the Debtors with sufficient liquidity to administer the Chapter 11 Cases.  The Debtors and their advisors designed a competitive marketing process to obtain multiple bids and to provide the flexibility to use competing proposals to negotiate the most favorable terms possible.

28.     The Debtors solicited proposals for postpetition financing from large money-center banks and sophisticated alternative investment institutions familiar with the Debtors' capital structure.  By August 15, 2019, Debtors had received financing proposals from four entities.  Over the following days, the Debtors, with the assistance of their professionals, continued their arm's-length and good faith negotiations regarding each financing proposal.

10

Importantly, none of these potential sources of financing was willing to provide financing on a junior basis.  Thus, the Debtors were unable to obtain alternative postpetition financing through credit allowable only as an administrative expense or secured by liens on the Debtors' assets that are junior to the liens of the Prepetition Credit Parties.

29.    On August 29, 2019, the Debtors signed a commitment letter with one of the foregoing alternative investment institutions, agreeing on the principal terms of a postpetition financing.  On or about September 4, 2019, however, that institution announced that it did not intend to provide postpetition financing to the Debtors because it believed recent results from the Debtors' business operations were lower than the financial projections it had relied upon in agreeing to provide postpetition financing.

30.    The Debtors' only viable option at that juncture was to negotiate the terms of a postpetition credit facility with the Prepetition Credit Parties (the "DIP Facility").    Having negotiated and analyzed those terms in consultation with its advisors, the Debtors determined that the DIP Facility represents the best financing available to the Debtors under the circumstances, allowing them to repay the loan under the Prepetition Credit Facility and administer the Chapter 11 Cases.

31.    The repayment of the Prepetition Credit Facility pursuant to the terms of the DIP Facility is a sound exercise of the Debtors' business judgment, is a material component of the structure of the DIP Facility, and was required by the DIP lenders as a condition to their commitment to provide postpetition financing.  The Debtors were unable to obtain DIP financing that did not provide for the repayment of prepetition amounts on these terms.

32.    The Debtors agreed to roll-up the debt accrued under the Prepetition Credit Facility (the "Prepetition Lender Debt") as described below, because the Debtors believe that,

among other things, it (i) will not prejudice the Debtors' stakeholders and (ii) provides significant benefits to the Debtors' estates.  The roll-up of the Prepetition Lender Debt will not prejudice the Debtors or their estates because the Debtors believe, among other things, the Prepetition Credit Parties are oversecured.

33.    Ultimately, the DIP Facility provides the Debtors with the best path for an orderly transition into Chapter 11.  I believe that the Prepetition Lenders are unlikely to continue to lend postpetition without some assurance regarding their prepetition claims.  Absent the Prepetition Credit Parties' support, the first month of the Chapter 11 Cases would likely devolve into a costly priming fight.  In contrast, the roll-up of the Prepetition Credit Facility merely affects the timing, not the amount or certainty, of the Prepetition Credit Parties' recovery.

34.    Pursuant to the terms of the DIP Facility, the Debtors have also agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  I believe that these fees are an integral component of the overall terms of the DIP Facility, were required by the DIP Agent and the DIP Lender as consideration for the extension of postpetition financing, are reasonable and customary for similar transactions, and, taken with the other aspects of the DIP Facility, constitute the best financing terms available.

35.    The Debtors seek entry of an order authorizing them, *inter alia*, to obtain postpetition financing pursuant to the DIP Facility.  Key terms of the DIP Facility include, but are not limited to, the following:

| Provision and Rule | Summary of Terms |
|---|---|
| **DIP Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Fred's, Inc. and certain of its subsidiaries.<br>*See* DIP Loan Agreement Preamble. |
| **DIP Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each Borrower, as to each other Borrower.<br>*See* DIP Loan Agreement § 1.1. |

| | |
|---|---|
| **DIP Facility Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Regions Bank, Bank of America, N.A. and the financial institutions from time to time party to the DIP Loan Agreement.<br><br>*See* DIP Loan Agreement Preamble. |
| **Term**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The DIP Facility shall terminate on the earliest to occur of the following: (a) the Stated Revolving Commitment Termination Date (as defined in the DIP Loan Agreement); (b) the date on which Borrowers terminate the Revolving Commitments pursuant to Section 2.1(c) of the DIP Loan Agreement; (c) the date on which the Revolving Commitments are terminated pursuant to Section 11.2 of the DIP Loan Agreement; (d) thirty-five (35) days after the entry of the Interim Order if the Final Order has not been entered on or before such date (unless such date has been amended or extended in writing by Administrative Agent and Co-Collateral Agents in their discretion); (e) the effective date of any confirmed Acceptable Plan (as defined in the DIP Loan Agreement) or the date of entry of a Confirmation Order (as defined in the DIP Loan Agreement) with respect to any other Chapter 11 Plan (as defined in the DIP Loan Agreement); (f) the date of filing by any Credit Party of a Chapter 11 Plan that is not an Acceptable Plan; (g) the date of entry of a Confirmation Order with respect to a Chapter 11 Plan filed by a Person other than a Credit Party (as defined in the DIP Loan Agreement) if such Chapter 11 Plan is not an Acceptable Plan; (h) the date of closing of any sale of all or any substantial part of the assets of Credit Parties (as defined in the DIP Loan Agreement) taken as a whole (other than the Summit Entities and National Equipment Management and Leasing, Inc.) (as defined in the DIP Loan Agreement); (i) the date on which the DIP Agent is granted relief from the automatic stay (after giving effect to any notice required for DIP Agent to enforce its Liens as described in any DIP Financing Order (as defined in the DIP Loan Agreement)); (j) the date on which Payment in Full (as defined in the DIP Loan Agreement) of the Obligations (as defined in the DIP Loan Agreement) and Pre-Petition Lender Debt has occurred; and (k) the date on which any of the Chapter 11 Cases is dismissed or converted to Chapter 7.<br><br>*See* DIP Loan Agreement § 1.1. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | A superpriority, secured, asset-based revolving credit facility in the principal amount of up to $35,000,000.<br><br>*See* Interim Order at 2. |
| **Roll-Up**<br><br>Local Rule 4001-2(a)(i)(E) | <u>Interim Roll-Up:</u>  All proceeds and collections on or after the Petition Date in respect of any accounts receivable or payment intangibles of any Debtor that arose from any sale, lease or other disposition of any DIP Collateral or the rendition of any services by any Debtor shall be promptly turned over to the Prepetition Agent to be applied by it to pay (or, in the case of contingent obligations, to cash collateralize) the Prepetition Lender Debt in accordance with the terms of the Prepetition Loan Documents until Payment in Full of the Prepetition Lender Debt.<br><br>*See* Interim Order ¶ 7(d).<br><br><u>Final Roll-Up:</u>  Subject to entry of the Final Order, and as and to the extent provided therein, the DIP Lenders shall fund under the DIP Facility (to the extent that Payment in Full of the Prepetition Lender Debt has not theretofore occurred pursuant to paragraph 7 of the Interim Order) one or more DIP Loans in an amount sufficient to cause Payment in Full of, or cash collateralize, all of the Prepetition Lender Debt, and in such event the Debtors shall be deemed to have requested a funding of one or more DIP Loans to the extent requested by the DIP Agent<br><br>*See* Interim Order ¶ 5(a). |

| | |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule 4001 (c)(1)(B) | <u>Non-Default Interest Rate</u>:  (a) with respect to Revolving Loans (as defined in the DIP Loan Agreement), at the Base Rate (as defined in the DIP Loan Agreement) <u>plus</u> 3.25% (the "<u>Applicable Margin</u>"), (b) with respect to Swing Line Loans (as defined in the DIP Loan Agreement), at the Swing Line Rate (*i.e.*, the Base Rate plus the Applicable Margin) (unless and until converted to a Revolving Loan pursuant to the terms of Section 2.3 of the DIP Loan Agreement), and (c) with respect to any other Obligations which are then due and payable (including, to the extent permitted by law, interest not paid when due), at the Base Rate plus the Applicable Margin, unless and except to the extent that another interest rate is prescribed therefor in the Loan Documents evidencing such Obligations.<br><u>Default Rate</u>:  (a) with respect to Loans (as defined in the DIP Loan Agreement), the Base Rate plus the Applicable Margin plus an additional two percent (2%) per annum, and (b) with respect to any other Obligations (as defined in the DIP Loan Agreement), the interest rate otherwise specified in regard thereto after default (or, if no interest rate is specified, the Base Rate plus the Applicable Margin) plus an additional two percent (2%) per annum.<br>*See* DIP Loan Agreement § 3.1. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(i) | Prepetition Credit Parties.<br><br>*See* Interim Order ¶ E(iv). |

| | |
|---|---|
| **Adequate Protection** <br> Bankruptcy Rules 4001 (b)(1)(B)(iv), 4001(c)(1)(B)(ii) | Subject to the terms and conditions set forth in the Interim Order, including the Carve-Out, the Prepetition Credit Parties and the Cardinal Vendors shall receive valid and perfected replacement and security interests in, and liens on all of the Debtors' right, title and interest in, to and under all DIP Collateral consisting of the same types of the Debtors' property to which the Prep attached prepetition, provided that the foregoing liens shall be junior to the DIP Liens. <br><br> *See* Interim Order ¶¶ 7, 8. |
| **Waiver/Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified pursuant to the terms of the Interim Order and the DIP Financing Documents as necessary to permit the Debtors and the DIP Credit Parties to effectuate the DIP Facility. <br><br> *See* Interim Order ¶ 21. |
| **Carve-Out** <br> Bankruptcy Rule 4001(c)(1)(b) <br><br> Local Rule 4001-2(a)(i)F) | <u>Priority and Extent of Carve-Out</u>.    Subject to the terms, conditions, and limitations contained in the Interim Order, the DIP Liens, the Superpriority Claims, the Prepetition Security Interests (as defined in the Interim Order), the Adequate Protection Liens (as defined in the Interim Order), and the Adequate Protection Claims (as defined in the Interim Order) shall be subject and subordinate to the following (collectively, the "<u>Carve-Out</u>"): <br><br> (i) fees required to be paid to the Clerk of this Court pursuant to 28 U.S.C. § 156(c) and to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) (collectively, the "<u>Statutory Fees</u>"); plus <br><br> (ii) the allowed fees and expenses actually incurred by Debtor Professionals (as defined in the Interim Order) and Committee Professionals (as defined in the Interim Order) on or after the Petition Date in a cumulative aggregate sum of: (x) for the period prior to the delivery of a Carve-Out Trigger Notice (as defined below), an amount not to exceed the lesser of (A) the aggregate weekly amounts budgeted to be funded in advance for each Debtor Professional and Committee Professional for such week in accordance with the Budget, and (B) the actual amount of allowed Estate Professional Fees (as defined in the Interim Order) for each Estate Professional (as defined in the Interim Order) incurred on or after the Petition Date up to, through and including the date a Carve-Out Trigger Notice is delivered (the "<u>Pre-Trigger Professional Fees</u>") subject in all respects to the terms of the Interim Order, the Final Order, and any other interim or other compensation order entered by this Court; provided, however, that to the extent that any DIP Obligations remain outstanding, solely for purposes of calculating the amount of the Carve-Out, Pre-Trigger Professional Fees shall not exceed $5,250,000 in the aggregate (the "<u>Pre-Trigger Cap</u>"); and (y) beginning the first day after the delivery by the DIP Agent of a Carve-Out Trigger Notice to the Notice Parties (as defined in the Interim Order), the fees and expenses incurred by the Debtor Professionals in an aggregate amount not to exceed $500,000.  Nothing in the Interim Order shall be construed (1) to impair the ability of any interested party to object to the fees or expenses of any Estate Professional, (2) as a consent to the allowance of any Estate Professional Fee of any Estate Professional, (3) as an undertaking by any of the DIP Credit Parties to be responsible for payment of any Estate Professional Fees in connection with the Chapter 11 Cases or any Successor Cases (as defined in the Interim Order), or (4) to obligate any DIP Credit Party or Pre-Petition Credit Party to pay (or constitute a guarantee of payment of) any Estate Professional Fees.  In no event shall the Carve-Out, or the funding of any DIP Loans or use of Cash Collateral to satisfy the Carve-Out, result in any reduction in the amount of any DIP Obligations or Prepetition Lender Debt, the security therefor, or the obligations of the Debtors to pay same in accordance with the Prepetition Loan Documents or the DIP Financing Documents, as applicable.  The DIP Agent shall be entitled to maintain a reserve (the "<u>Reserve</u>") against the Borrowing Base |

under (and as defined in) the DIP Loan Agreement in the amount of $1,700,000 on the Petition Date. From and after the Petition Date, the amount of the Reserve shall be the lesser of: (A) the sum of (1) at any given time, the amount of budgeted fees and expenses of Debtor Professionals and Committee Professionals (as set forth in the Budget) for the current week, *plus* (2) the amounts of any prior weekly budgeted fees and expenses of Debtor Professionals and Committee Professionals (as set forth in the Budget) that the Debtors have failed to fund into the Carve-Out Account in accordance with Interim Order ¶ 12(c), *plus* (3) $1,000,000, and (B) the sum of $6,250,000 minus the amount that the Debtors have funded into the Carve-Out Account in accordance with Interim Order ¶ 12(c).

The Carve-Out Trigger Notice.  The term "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Notice Parties, which notice shall specify that it is a "Carve-Out Trigger Notice" and may be delivered at any time (x) concurrently with the closing of a sale or disposition of any Debtor's assets that is expected to provide sufficient funds to cause Payment in Full of all outstanding DIP Obligations (other than contingent obligations under the DIP Loan Agreement), (y) after or concurrently with the effective date of a Chapter 11 plan of reorganization or liquidation (whether proposed by one or more Debtors or any other interested party), or (z) after the occurrence of any Event of Default under (and as defined in) the DIP Loan Agreement.

Funding Carve-Out Account.  The Debtors shall maintain an escrow account with [xxx] for the payment of allowed Estate Professional Fees of Debtor Professionals and Committee Professionals (the "Carve-Out Account").  Subject to the Budget and the terms and conditions of the DIP Financing Documents, the Debtors shall fund the Carve-Out Account, including through borrowings under the DIP Credit Agreement, in accordance with the Budget on a weekly basis, in advance, until the delivery of a Carve-Out Trigger Notice.  Promptly after each such deposit into the Carve-Out Account, the Debtors shall provide the DIP Agent with evidence of each such deposit and the then-current balance in the Carve-Out Account at the time of, and after giving effect to, such deposit.  Each deposit to the Carve-Out Account (whenever made) and amounts otherwise paid to Estate Professionals after issuance of a Carve-Out Trigger Notice shall reduce the Carve-Out (and the DIP Credit Parties' obligations with respect thereto) on a dollar-for-dollar basis.  Upon the delivery of a Carve Out Trigger Notice, the Debtors shall deposit into the Carve-Out Account $500,000 plus amounts estimated to be equal to the unpaid Statutory Fees described in 12(a)(i) of the Interim Order, whereupon the Carve-Out and the DIP Credit Parties' obligations with respect thereto shall be deemed satisfied.  The DIP Agent shall retain a first priority, perfected security interest in all funds in the Carve-Out Account to the extent of any surplus remaining after payment of all allowed Estate Professional Fees and Statutory Fees pursuant to the Carve-Out as set forth in Interim Order ¶ 12, with such excess to be remitted to the DIP Agent as soon as reasonably practicable.  The Debtors shall first use funds in the Carve-Out Account to pay any Estate Professional Fees or Statutory Fees that have been authorized by the Court to be paid, and shall not request advances under the DIP Loans to pay any such fees or expenses unless and until the funds in the Carve-Out Account have been exhausted.  All funds deposited to the Carve-Out Account shall be used solely to pay the Estate Professional Fees and Statutory Fees comprising the Carve-Out until those items are paid in full, and thereafter any balance shall be remitted to the DIP Agent for application to the DIP Obligations, and thereafter any balance shall be remitted to the Prepetition Agent for application to the Pre-Petition Lender Debt.  In no event shall the Carve-Out, or the funding of any DIP Loans or use of any Cash Collateral to satisfy all or any part of the Carve-Out, result in any reduction in the amount of any DIP Obligations or Prepetition Lender Debt, the security therefor, or the joint and several obligations of the Debtors to pay same in accordance with the DIP Financing Documents or Prepetition Loan Documents, as applicable; and any funding of the Carve-Out with

| | |
|---|---|
| | DIP Loan Proceeds shall be added to, and made a part of, the DIP Obligations, secured by all of the DIP Collateral and entitled to all of the benefits and protections granted by the Interim Order and the DIP Financing Documents.<br><br>*See* Interim Order ¶ 12. |
| **506(c) Waiver**<br><br>Bankruptcy Rule 4001 (c)(1)(B)(x)<br><br>Local Rule 4001-2(a)(i)(C) | Subject to entry of the Final Order, no costs or expenses of administration shall be imposed upon any DIP Credit Party, any Prepetition Credit Party or any of the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of such DIP Credit Party or Prepetition Credit Party, as the case may be, and no such consent shall be implied from any action, inaction or acquiescence by any DIP Credit Party or Prepetition Credit Party, as applicable.<br><br>*See* Interim Order ¶ 10. |
| **Section 552(b)**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(H) | All payments or proceeds remitted (a) to the DIP Agent on behalf of any DIP Credit Party or (b) to the Prepetition Agent on behalf of any Prepetition Credit Parties, in each case pursuant to the provisions of the Interim Order or any subsequent order of the Court, shall be received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim, charge, assessment or other liability arising out of or based on, directly or indirectly, section 506(c) (subject to entry of the Final Order) or the "equities of the case" exception of 552(b) of the Bankruptcy Code (subject to entry of the Final Order), subject, with respect to payments on account of the Prepetition Lender Debt, only to any timely challenges by third parties permitted by the Interim Order.<br><br>*See* Interim Order ¶ 9. |
| **Liens on Certain Claims or Causes of Action**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x)<br>Local Rule 4001-2(a)(i)(D) | *See* The DIP Liens shall extend to the proceeds of avoidance actions.<br>*See* Interim Order ¶ 3(e). |
| **Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Loan Agreement provides for each of the following DIP Milestones, RX Sale Milestones and Real Estate Sale Milestones (each as defined below and, collectively, the "Milestones"), and the applicable deadline therefor:<br>(a)　　Debtors shall achieve each of the following milestones (the "DIP Milestones"), in each case on terms and conditions, and subject to documentation (including, in all cases, forms of all applicable orders and agreements) in form and substance, acceptable in all respects to Administrative Agent and Co-Collateral Agents in all respects:<br>　　(i)　　On the Petition Date (i.e., *[September 9, 2019]*), Debtors shall file motions with the Court seeking approval of (x) the DIP Loan Agreement and the other Loan Documents (collectively, the "DIP Senior Credit Facility"); and (y) the assumption of a consulting agreement with SB360 Capital Partners ("SB360") and the procedures for, and conduct of, going out of business sales ("GOB Sales") for all of the Debtors' remaining stores (the "GOB Sale Motion").<br>　　(ii)　　On or before *[September 12, 2019]*, the Court shall have entered the Interim Order authorizing the Debtors' entry into and the parties' performance under the DIP Facility on an interim basis.<br>　　(iii)　　On or before *[September 12, 2019]*, the Court shall have entered an order approving the GOB Sale Motion and authorizing the GOB Sales to commence promptly upon entry thereof in accordance therewith.<br>　　(iv)　　So as to be heard by no later than the "second day hearing" in the |

Chapter 11 Cases, Debtors shall have filed a motion with the Bankruptcy Court seeking approval of the retention of Berkeley Research Group or another financial consultant acceptable to Administrative Agent and each of the Co-Collateral Agents in their Permitted Discretion (as defined in the DIP Loan Agreement).

(v)    On or before *[October 15, 2019]*, the Court shall have entered the Final Financing Order authorizing the Debtors' entry into and the parties performance under the DIP Facility on a final basis.

(vi)    On or before October 30, 2019, the GOB Sales shall have been completed with respect to all of the remaining stores of the Debtors.

(b)    Debtors shall achieve each of the following milestones (the "Rx Sale Milestones"), in each case on terms and conditions, and subject to documentation (including, in all cases, forms of all applicable orders and agreements) in form and substance, acceptable in all respects to Administrative Agent and Co-Collateral Agents in all respects:

(i)    On the Petition Date (i.e., *[September 9, 2019]*), Debtors shall file a motion (the "Rx Sale Procedures Motion"), in form and substance satisfactory to Administrative Agent and Co-Collateral Agents, requesting an order of the Court approving procedures for a sale, in one or a series of related transactions, of all or substantially all of (or, if approved in writing by Administrative Agent and each of the Co-Collateral Agents in their Permitted Discretion, certain of) the Pharmacy Scripts and Pharmacy Inventory of Debtors (the "Rx Sales") under section 363 of the Bankruptcy Code. The Rx Sale Procedures Motion shall, among other things, seek approval of procedures for Rx Sales based upon the sale price of Pharmacy Inventory and Pharmacy Scripts for each Rx Sale.

(ii)    On or before *[September 23, 2019]*, Debtors shall have obtained a Sale Procedures Order approving the Sale Procedure Motion (the "Rx Sale Procedures Order") to govern the conduct of the Rx Sales. The Rx Sale Procedures Order shall, with respect to the Rx Sales, require that the proceeds of the Rx Sales shall be in a minimum amount satisfactory to Administrative Agent and Co-Collateral Agents in their sole and absolute discretion and that such proceeds be applied to the Obligations and the Prepetition Lender Debt in accordance with the DIP Loan Agreement.

(iii)    On or before October 18, 2019 (or such later date as shall be approved by Administrative Agent and Co-Collateral Agents in writing in their sole and absolute discretion), Debtors shall consummate and close Rx Sales with respect to all or substantially all of the Pharmacy Inventory and Pharmacy Scripts (as defined in the DIP Loan Agreement) that are "Contracted Assets" (as defined in the Rx Sale Procedures Motion) as of the Petition Date, with all net proceeds paid to Administrative Agent for application to the Obligations and the Prepetition Lender Debt in accordance with the DIP Loan Agreement.

(c)    Debtors shall achieve each of the following milestones (the "Real Estate Sale Milestones"), in each case on terms and conditions, and subject to documentation (including, in all cases, forms of all applicable orders) in form and substance, acceptable in all respects to Administrative Agent and Co-Collateral Agents in all respects:

(i)    On or before *[September 16, 2019]* (or such later date as shall be approved by Administrative Agent and Co-Collateral Agents in writing in their sole and absolute discretion), Debtors shall file a motion (the "Real Estate Sale Procedures Motion"), in form and substance satisfactory to Administrative Agent and Co-Collateral Agents, requesting an order of the Court approving procedures for (A) a sale, in one or a series of related transactions, of all or substantially

18

|  | all of (or, if approved in writing by Administrative Agent and each of the Co-Collateral Agents in their Permitted Discretion, certain of) the real estate assets of Debtors (the "Real Estate Sales") under section 363 of the Bankruptcy Code.  The Real Estate Sale Procedures Motion shall, among other things, (x) seek approval of bidding procedures for the Real Estate Sales, (y) establish the date of the Real Estate Auction (as defined below), and (z) establish a date for a hearing to approve Real Estate Sales to be effectuated pursuant to the Real Estate Auction. |
|--|--|
| (ii) | On or before *[October 7, 2019]* (or such later date as shall be approved by Administrative Agent and Co-Collateral Agents in writing in their sole and absolute discretion), Debtors shall have obtained a Sale Procedures Order approving (A) a stalking horse bidder and (B) the Real Estate Sale Procedure Motion (the "Real Estate Sale Procedures Order") to govern the conduct of the Real Estate Sales.  The Real Estate Sale Procedures Order shall, with respect to the Real Estate Sales, require that the proceeds of the Real Estate Sales be in a minimum amount satisfactory to Administrative Agent and Co-Collateral Agents in their sole and absolute discretion and that such proceeds be applied to the Obligations and the Prepetition Lender Debt in accordance with the DIP Loan Agreement. |
| (iii) | On or before October 17, 2019 (or such later date as shall be approved by Administrative Agent and Co-Collateral Agents in writing in their sole and absolute discretion), Debtors shall complete an auction for the Real Estate Sales (the "Real Estate Auction").  At the conclusion of the Real Estate Auction, Debtors shall declare a "winning bidder(s)" and a "back-up bidder(s)" for the each of the Real Estate Sales in consultation with Administrative Agent and Co-Collateral Agents. The terms of each "winning bid" and "back-up bid" shall be acceptable to Administrative Agent and Co-Collateral Agents and shall, among other things, provide for proceeds of the Real Estate Sales in a minimum amount satisfactory to Administrative Agent and Co-Collateral Agents in their sole and absolute discretion. |
| (iv) | On or before November *[15]*, 2019 (or such later date as shall be approved by Administrative Agent and Co-Collateral Agents in writing in their sole and absolute discretion), Debtors shall consummate and close all of the Real Estate Sales, with all net proceeds paid to Administrative Agent for application to the Obligations and the Prepetition Lender Debt in accordance with the DIP Loan Agreement. |

*See* DIP Loan Agreement, Schedule 8.16.

| **Challenge Period** Bankruptcy Rule 4001(c)(1)(B)(xiii) Local Rule 4001-2(a)(i)(B) | Each Debtor's admissions, stipulations, agreements and releases contained in the Interim Order shall be binding upon all other parties in interest (including, without limitation, the Committee, any examiner, or post-confirmation trustee or other fiduciary) under all circumstances and for all purposes unless and to the extent (a) such other party in interest (including the Committee (as defined in the Interim Order)) obtains requisite standing to do so and has timely and properly filed an adversary proceeding or contested matter by no later than the Challenge Deadline (as defined herein) (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Lender Debt or any Prepetition Security Interest (as defined in the Interim Order) or (B) otherwise asserting any defenses, claims, causes of action, counterclaims or offsets against any Prepetition Credit Party or its respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in any way relating to any transactions, events, actions or failure to act under or in connection with any of |
|--|--|

| | |
|---|---|
| | the Prepetition Loan Documents (collectively, a "Challenge") and (b) this Court rules in favor of the plaintiff with respect to any such timely and properly filed Challenge.  The term "*Challenge Deadline*" means the earliest to occur of (A) the date that this Court enters an order confirming any chapter 11 plan of reorganization or liquidation proposed by any Debtor or other interested party, (B) the date of entry of an order approving the sale of all or substantially all of the assets of any Debtor, and (C) (i) in the case of a party in interest with requisite standing other than the Committee, 75 days after the date of entry of the Interim Order, (ii) in the case of the Committee, 60 days after the filing of notice of appointment of the Committee, or (iii) in each case of clauses (i) and (ii), any such later date agreed to in writing by the Prepetition Agent, in its sole discretion, or ordered by this Court for cause shown, after notice and an opportunity to be heard.  *See* Interim Order ¶ 23. |
| **Stipulations to Prepetition Liens and Claims**  Bankruptcy Rule 4001(c)(1)(B)(iii)  Local Rule 4001-2(a)(i)(B) | Prepetition Loan Documents.  All of the Prepetition Loan Documents create legal, valid and binding obligations on the part of each Debtor signatory thereto.  Prepetition Liens.  The Prepetition Security Interests (as defined in the Interim Order) are legal, valid, binding, enforceable, non-avoidable and duly perfected and are not subject to any attachment, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, any applicable non-bankruptcy law or otherwise; and, as of the Petition Date and before giving effect to the Interim Order, the Debtors are not aware of any security interests or liens having priority over the Prepetition Security Interests except those certain liens expressly permitted under the Prepetition Loan Agreement and that on the Petition Date had priority over the Prepetition Security Interests in the Prepetition Collateral.  Prepetition Lender Debt.  As of the Petition Date, outstanding borrowings under the Prepetition Credit Facility were approximately $15.1 million, and approximately $8.8 million of letters of credit were outstanding, having been reduced to such amounts largely by proceeds of store closures and assets sales.  Summit Liens.  Prior to the Petition Date, the Summit Lender was granted a security interest in the Summit Collateral.  As of the Petition Date, the Debtors estimate that Summit Properties-Jacksboro, LLC and Summit Properties-Bridgeport, LLC owe the Summit Lender (or its respective successors or assignees) approximately $700,000 and $700,000, respectively.  Cardinal Liens/Lien Subordinations.  As of the Petition Date, the Debtors estimate outstanding accounts payable to the Cardinal Vendors owing by the Debtors in the approximate amount of $20.9 million, secured by the Cardinal Liens (as defined in the Interim Order).  The Cardinal Liens are subordinated to the Prepetition Agent's liens in the Prepetition Collateral.  *See* Interim Order ¶ E. |
| **Representations and Warranties** Bankruptcy Rule 4001 (c)(1)(B) | The DIP Loan Agreement contains usual and customary representations and warranties for transactions of this type to be made by the Debtors as of the date they execute the DIP Loan Agreement, and as of the date of any borrowing under the DIP Facility, subject to qualifications, disclosure schedules and limitations for materiality pursuant to the DIP Loan Agreement.  DIP Loan Agreement § 7. |
| **Affirmative and** | The DIP Loan Agreement contains usual and customary affirmative covenants for |

| | |
|---|---|
| **Negative Covenants**<br>Bankruptcy Rule<br>4001 (c)(1)(B) | transactions of this type, including without limitation concerning the use of proceeds, insurance, inspections and appraisals, books and records, borrowing base reporting, budgets and variance reports and cash management.<br><br>The DIP Loan Agreement contains usual and customary negative covenants for transactions of this type, including without limitation that the Debtors shall not (other than pursuant to certain exceptions set forth in the DIP Loan Agreement): incur certain indebtedness; incur certain liens; merge, consolidate, liquidate, or dissolve; sell assets; make restricted payments; and transactions with affiliates.<br>DIP Loan Agreement §§ 8, 9. |
| **Events of Default**<br>Bankruptcy Rule<br>4001(c)(1)(B) | The DIP Loan Agreement contains usual and customary events of default, subject to customary cure provisions, which include, without limitation: (i) nonpayment of Obligations when due; (ii) non-performance of certain covenants and obligations under the DIP Loan Agreement; (iii) material judgments; (iv) default on other material post-petition obligations; (v) breach of any representation or warranty; (vi) certain adverse regulatory actions; and (vii) failure to achieve any of the Milestones.<br><br>DIP Loan Agreement § 11. |
| **Fees**<br><br>Bankruptcy Rule 4001<br>(c)(1)(B) | Upfront Fee.  2% of each DIP Lender's revolving commitment, due and payable on the Closing Date (as defined in the DIP Loan Agreement).<br>Letter of Credit Fronting Fee.   0.375% per annum on the daily maximum amount available to be drawn under each Letter of Credit (as defined in the DIP Loan Agreement).<br>Collateral Monitoring Fees.  $4,250 per month per Co-Collateral Agent.<br>Arrangement Fee.  $250,000 payable to the DIP Agent.<br>Administrative Fee.  $25,000 payable to the DIP Agent.<br>Field Examination Fees.   $1,000 per day payable to a person performing field examinations pursuant to the DIP Loan Agreement.<br>Commitment Fee / Unused Line Fee.  0.5% of unused line of credit; payable monthly.<br>Letter of Credit Fee.  (Base Rate + 3.25%) multiplied by the maximum availability to be drawn under Letters of Credit.<br>DIP Loan Agreement § 3.2 and Fee Letters referenced therein. |
| **Liens and Priorities**<br><br>Bankruptcy Rule<br>4001(c)(1)(B)(i) | As security for the Debtors' timely payment and performance of all DIP Obligations, the DIP Agent shall have, for the benefit of the DIP Credit Parties, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens upon all of the DIP Collateral, in the priorities set forth in the Interim Order (the "<u>DIP Liens</u>").  The DIP Credit Parties shall receive, *inter alia*:<br><br>Priming DIP Liens.   Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected security interests and liens upon any Prepetition Collateral, which security interests and liens shall in all respects be prior and senior in priority to (1) the Prepetition Security Interests and the Prepetition Lender Adequate Protection Liens (as defined in the Interim Order) with respect to such Prepetition Collateral, (2) the Cardinal Liens and Cardinal Adequate Protection Liens (as defined in the Interim Order) with respect to the Cardinal Collateral, and (3) any security interest or other lien on DIP Collateral that on the Petition Date was unperfected, is invalid, unenforceable or avoidable, or is equitably or contractually subordinated to the DIP Liens or the Prepetition Security Interests.<br><br>Liens Senior to Certain Other Liens. Neither the DIP Liens nor the Adequate Protection Liens (as defined in the Interim Order) shall be (i) subject or subordinate to (A) any lien |

| | |
|---|---|
| | or security interest that is avoided and preserved for the benefit of any Debtor or its estate under section 551 of the Bankruptcy Code, (B) any lien or security interest of any lessor or landlord under any agreement or applicable state law to the extent any such lien has been waived in favor of any of the Prepetition Security Interests, (C) except to the extent the DIP Financing Documents (as defined in the Interim Order) expressly allow a postpetition lien to have priority over the DIP Liens, any liens granted by any Debtor to other Persons or otherwise arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any Cardinal Vendor, or any Governmental Authority (as defined in the Interim Order) for any liability of any Debtor, or (D) any intercompany or affiliate liens or security interests of any Debtor; (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code or otherwise; or (iii) subject to sections 510, 549 or 550 of the Bankruptcy Code. <br><br> <u>Superpriority Claims</u>.  All DIP Obligations shall constitute allowed superpriority claims (the "<u>*Superpriority Claims*</u>") against each Debtor (without the need to file any proof of claim) pursuant to section 364(c)(1) of the Bankruptcy Code and shall have priority in right of payment over (i) all other obligations, liabilities and indebtedness of such Debtor, whether now in existence or hereafter incurred by such Debtor, (ii) all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and (iii) all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507, 546, 552(b), 726, 1113, or 1114 of the Bankruptcy Code. Such Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof. <br><br> *See* Interim Order ¶¶ 3, 4. |
| **Indemnification** <br><br> Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Loan Agreement contains usual and customary indemnification provisions in favor of the DIP Agent. <br> DIP Loan Agreement § 12.5. |

## **EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS**

36.     Contemporaneously herewith, the Debtors filed a number of First Day Motions and are seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the effective administration of the Chapter 11 Cases.  I believe the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to maximize the value of their assets in a manner that will benefit all of the Debtors' stakeholders.

37.     Certain of the First Day Motions request authority to pay certain prepetition claims.  I understand that Bankruptcy Rule 6003 provides, in pertinent part, that the Court shall

not consider motions to pay prepetition claims during the first twenty-one days following the filing of a Chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  Accordingly, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where failure to pay such claims would result in immediate and irreparable harm to the Debtors and their respective estates.

38.    I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief.  The relief sought in each of the First Day Motions is necessary and appropriate given the circumstances of the Debtors' business.  A description of the relief requested and the facts supporting the First Day Motions follows.

**A.    Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases (the "<u>Joint Administration Motion</u>").**

39.    The Debtors have filed several purely administrative or procedural First Day Pleadings, including the Joint Administration Motion.  As with many large chapter 11 cases that are jointly administered, the Debtors share numerous creditors and may not maintain lists of the names and addresses of their respective creditors on a debtor-by-debtor basis.  Also, joint administration is preferable because many of the motions, applications, hearings and orders that will arise in the Chapter 11 Cases will affect all Debtors jointly.  Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

**B.      Debtors' Motion for Entry of an Order (i) Extending the Time to File
Schedules of Assets and Liabilities and Statements of Financial Affairs,
(ii) Waiving the Requirement to File Equity Lists and Provide Notice to Equity
Security Holders, and (iii) Authorizing the Debtors to File a Consolidated List of the
Debtors' 30 Largest Unsecured Creditors (the "Scheduling Motion").**

40.      Pursuant to the Scheduling Motion, the Debtors seek entry of an order (i)
extending the time to file schedules of assets and liabilities and statements of financial affairs;
(ii) waiving the requirement to file equity lists and provide notice to equity security holders; and
(iii) authorizing the debtors to file a consolidated list of the Debtors' 30 largest unsecured
creditors.  The Debtors seek this relief for several reasons.

41.      First, due to the size and complexity of the Debtors' business, the large number of
known and potential creditors, and the numerous burdens imposed on the Debtors' management
and professional advisors in the early days after the petition filings, it is necessary to seek a
further extension for filing the schedules.  The Debtors' management and advisors required more
time to gather and analyze the Debtors' substantial volume of financial information.

42.      Second, because Fred's, Inc., is publicly-traded on the NASDAQ stock exchange,
this Debtor has approximately 35.24 million publicly-held shares outstanding.  Compiling a list
of equity holders with their last known addresses and sending each equity holder notice of an
order for relief, would be extremely expensive and time consuming.  Therefore, the Debtors'
seek a waiver of the requirement to compile a list of Fred's, Inc.'s equity holders and to
individually notify each of those equity holders of the relief sought.

43.      Third, because the Debtors share numerous creditors, compiling a separate top 30
creditor list for each Debtor would be expensive, inefficient, and time consuming.  As such, the
Court should authorize the filing of a single consolidated creditor list.

44.     Finally, by granting the relief sought by this motion, the Court will maximize efficiency in administering these Chapter 11 Cases and ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee.

**C.      Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c), Bankruptcy Code Section 105(A), and Local Bankruptcy Rule 2002-1(F) Authorizing Appointment of Epiq Corporate Restructuring, LLC As Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date (the "<u>Claims and Noticing Agent Application</u>").**

45.     Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order appointing Epiq Corporate Restructuring, LLC ("Epiq") as claims and noticing agent (the "<u>Claims and Noticing Agent</u>") for the Debtors in their chapter 11 cases effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

46.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Epiq to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding that based on all engagement proposals obtained and reviewed that Epiq's rates are competitive and comparable to the rates charged by their competitors for similar services.

47.     The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases. In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Claims and Noticing Agent Application.

**D.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using Existing Centralized Cash Management System, (B) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (C) Maintain Existing Bank Accounts and Check Stock and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").**

48.    Through the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) continue using the Cash Management System (as defined below), (ii) honor, in the reasonable exercise of their business judgment, certain prepetition obligations related to the use of the Cash Management System, and (iii) maintain their existing Bank Accounts (as defined below) and check stock; (b) scheduling a final hearing; and (c) granting related relief.

49.    The Debtors' business requires the collection, transfer, and disbursement of funds through a number of bank accounts at various banks (collectively, the "<u>Bank Accounts</u>").  In the ordinary course of business and prior to the Petition Date, the Debtors maintained a centralized cash management system (the "<u>Cash Management System</u>").  Like other large and complex businesses, the Debtors designed the Cash Management System to efficiently collect, transfer, and disburse funds generated through the Debtors' day-to-day operations and to accurately record such collections, transfers, and disbursements as they are made.  A demonstrative chart of the Cash Management System and a list of the Debtors' Bank Accounts are attached to the Cash Management Motion.

**E.    Debtors' Motion for Entry of an Order (I) Authorizing, But Not Directing, the Debtors To (A) Continue Insurance Policies Entered into Prepetition and (B) Satisfy All Obligations Relating to the Prepetition Insurance Policies and (II) Granting <u>Related</u> Relief (the "<u>Insurance Programs Motion</u>").**

50.    Pursuant to the Insurance Programs Motion, the Debtors seek entry of an order to (i) maintain the Debtors' insurance policies and surety bond program (the "<u>Insurance Programs</u>")

and (ii) satisfy any obligations arising in connection with the Insurance Programs. The Insurance Programs include, but are not limited to, coverage for workers' compensation claims, automobile claims, employment claims, directors' and officers' liability claims, professional liability, certain general liability claims, and various property related liabilities. If these policies were allowed to lapse, the Debtors would be exposed to substantial liability for any damages resulting to persons and property of the Debtors and others. Maintaining the directors' and officers' liability policy also is necessary to retain the Debtors' senior management, who are critical to the success of the Debtors' orderly liquidation, and to enable the Debtors to financially indemnify their officers and directors per the requirements set forth in their corporate bylaws. Moreover, the guidelines of the Office of the United States Trustee require the Debtors to maintain their Insurance Programs. Lastly, in the ordinary course of business, the Debtors are required to provide surety bonds to certain parties to secure payment or performance of certain obligations, typically in connection with payments to utilities or to governmental agencies. Failure to provide, maintain, or timely replace the surety bonds may prevent the Debtors from undertaking essential functions related to the Debtors' operations.

51.     As such, the Debtors' Insurance Programs are essential to preserving the value of the Debtors' business, properties, and assets. Also, in many cases, the insurance coverage provided by the Insurance Programs is required by diverse regulations, laws, and contracts. Any failure to make the payments required by the Debtors' Insurance Programs or surety bonding program could have a significant negative impact on the Debtors' operations. Accordingly, the Debtors seek approval of the Insurance Programs Motion and the relief requested therein.

**F.**      **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Pay Prepetition Employee Wages, Benefits, and Other Obligations and (B) Continue Employee Programs and Severance Program and (II) Granting Related Relief (the "Employee Wages Motion").**

52.      Pursuant to the Employee Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (i) pay outstanding checks previously issued for wages and salaries, (ii) withhold taxes; (iii) reimburse expenses (*e.g.*, travel expenses, business meals, car allowances and rentals); and (iv) maintain employee benefits (*e.g.*, bonus programs, health plan benefits, and general welfare payments, including, but not limited to, disability protection, life insurance and other insurance coverage), and certain designated payments (*e.g.*, 401(k) plans and wage garnishments).

53.      As of the Petition Date, the Debtors employ approximately 1,839 people who serve in a number of capacities supporting the Debtors' operations at their corporate office, distribution centers, or retail stores and pharmacies (the "Employees").   The Employees comprise approximately 982 full-time ("Full-Time") and 857 part-time ("Part-Time") Employees.   All of the Debtors' Part-Time Employees are employed at one of the Debtors' various retail store locations.   The Debtors' Full-Time Employees are employed at all levels of the Debtors' business operations.

54.      The Debtors submit that payment of these employee-related expenses and obligations will enhance value for the benefit of all stakeholders because staying current on these payments will help ensure that the Employees—the lifeblood of the Debtors' business operations—will continue to provide vital services to the Debtors at this critical juncture. Without these payments, Employee turnover may increase, and the Employees may become demoralized and unproductive due to significant financial strain and other hardships.   Employees may then elect to seek alternative employment opportunities.   Significantly, in some instances,

payment of workforce obligations is required by law, including the requirement to remit and pay deductions, withholdings, and employer payroll taxes to the appropriate entities.   Therefore, payment of these prepetition Employee obligations is a necessary and critical element of the Debtors' efforts to preserve value and will increase the likelihood of retaining Employees during the Debtors' liquidation.

**G.     Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices and (B) Pay and Honor Related Prepetition Obligations; and (II) Granting Related Relief (the "Customer Programs Motion").**

55.     Pursuant to the Customer Programs Motion, the Debtors seek entry of an order authorizing the Debtors to maintain and administer their Customer Programs and honor certain prepetition obligations related thereto.

56.     The Debtors have historically provided certain incentives, discounts, and accommodations to maximize loyalty and attract new customers to their stores.   Encouraging shoppers to visit their stores is important to the Debtors' ongoing operations in these Chapter 11 Cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

57.     The prepetition obligations that the Customer Program addresses include accrued credits, adjustments, discounts, prepayments, or other similar programs owing to customers. The vast majority of these obligations do not entail the expenditure of cash.

58.     I believe that continuing to administer the Customer Programs without interruption during the pendency of the Chapter 11 Cases is critical to preserve the value of the Debtors' assets by, most importantly, preserving the Debtors' valuable customer relationships and loyalty, which will inure to the benefit of all of the Debtors' creditors and benefit their estates.   In contrast, if the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and owing to customers, the Debtors risk alienating their customers and might

suffer corresponding losses in customer loyalty and goodwill that will harm their prospects maximizing the value of their estates.

59.    Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**H.    Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Hereto (the "Utilities Motion").**

60.    Pursuant to the Utilities Motion, the Debtors seek entry of a interim and final orders (a) prohibiting utility providers from altering, refusing, or discontinuing services, (b) determining adequate assurance of payment for future utility services, and (c) establishing procedures for determining adequate assurance of payment for future utility services.

61.    In connection with the operation of their businesses, the Debtors obtain water, electricity, natural gas, sewer, water, telecommunications, waste disposal, and other similar services (collectively, the "Utility Services") from a number of utility providers or their broker (collectively, the "Utility Providers"). The relief requested in the Utilities Motion applies to all Utility Providers.

62.    On average, the Debtors spend approximately $990,000.00 per month on the Utility Services.  The Debtors propose depositing $426,026.54 into a segregated account as additional assurance of payment (the "Adequate Assurance Deposit"), which together with existing security deposits in the amount of $399,030.00 is an amount sufficient to cover one-half of the Debtors' average monthly cost based on the historical average payment.

63.    Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures. These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not

sufficient. This ensures that all key stakeholder groups obtain notice of such request before it is honored.

64.     Furthermore, the Debtors request that Utility Providers be prohibited from altering, refusing or discontinuing service to the Debtors on account of: (a) unpaid charges for prepetition services, (b) a pending Adequate Assurance Request, or (c) any objections filed in response to the Adequate Assurance Deposit. Utility Services should be preserved on an uninterrupted basis because it is essential to the Debtors' ongoing operations and an orderly liquidation. The Debtors' retail enterprise requires maintaining open and active stores to entice and allow customers to make purchases. Any disruption would adversely impact customer relationships and result in a significant decline in the Debtors' revenues and profits. This, in turn, jeopardizes the value of the Debtors' estates and impact creditor recoveries. Therefore, it is critical that Utility Services continue uninterrupted during these Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

I.     **Debtors' Motion for Entry of an Order Authorizing Certain Procedures To Maintain the Confidentiality of Pharmacy Customers' Information as Required by Applicable Privacy Rules (the "Patient Confidentiality Motion").**

65.     Pursuant to the Patient Confidentiality Motion, the Debtors seek entry of an order authorizing certain procedures to maintain the confidentiality of patient information as required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), while providing required disclosure in these Chapter 11 Cases.

66.     HIPAA and its corresponding regulations impose stringent standards on health care providers and establish significant penalties for any health care provider that uses or discloses patient information. *See* 42 U.S.C. § 1302d, et. seq. and 45 C.F.R. § 164.502.

31

67.     In the ordinary course of business, the Debtors have access to and receive "protected health information" that the Debtors are required to maintain confidentially; they prohibited from disclosing, except in limited circumstances, "individually identifiable health information." 45 C.F.R. § 164.502. HIPAA defines "individually identifiable health information" as any information relating to the individual's "past, present or future physical or mental health or condition, the provision of health care to the individual, or the past, present or future payment for the provision of health care to the individual" that also "identifies the individual or for which there is a reasonable basis to believe that the information can be used to identify the individual." 42 U.S.C. § 1320d(6). Individually identifiable health information is referred to as PHI under HIPAA.

68.     The Debtors could be subjected to significant monetary penalties for the unauthorized disclosure of PHI. 45 C.F.R. § 160.402. Such penalties can be imposed even if a person "did not know and, by exercising reasonable diligence, would not have known" that a violation occurred. 45 C.F.R. § 160.404(b)(2)(i).

69.     The Debtors believe, and I agree, that the requirements to maintain patient confidentiality under HIPAA conflict with the requirements to disclose information under the Bankruptcy Code, specifically the duty to file a list of all creditors under Bankruptcy Code section 521(a)(1)(A) and the duty to file schedules of all assets and liabilities under Bankruptcy Code section 521(a)(1)(B).   The Debtors therefore respectfully request that such patient information be protected through the proposed Privacy Procedures herein pursuant to Bankruptcy Code section 107(c), which allows a bankruptcy court, for cause, to protect an individual if disclosure would create an undue risk of unlawful injury.

70.    I submit that the relief requested herein appropriately balances the need to maintain confidential patient information under HIPAA with the need for adequate disclosure under the Bankruptcy Code. Given the nature of any information that may reveal even the identity of patients, confidentiality in this context is of paramount importance.

**J.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Payment of Certain Prepetition Claims of Lien Claimants and 503(b)(9) Claimants and (II) Granting Related Relief (the "Lien Claimants Motion").**

71.    Pursuant to the Lien Claimants Motion, the Debtors seek the authority to pay various Lien Claimants (as defined below), certain 503(b)(9) Claimants (as defined below), in an interim amount not to exceed $212,000, and a final amount not to exceed 312,000, as well as related relief.

72.    In the ordinary course of business, the Debtors work with two third-party vendors (the "Shipping Vendors") to ensure the uninterrupted flow of goods to the Debtors' stores and their distribution center.  These Shipping Vendors work directly with other vendors (the "Shipper Lien Claimants"), who are responsible for the actual shipment and transportation of goods and pharmacy products to the Debtors' stores and distribution center.  The failure of the Debtors to ensure that all prepetition claims of the Shipper Lien Claimants (the "Shipper Lien Claims") are paid could result in the Shipper Lien Claimants asserting possessory liens, under applicable non-bankruptcy law, against the Debtors' property in their possession and refusing to deliver the Debtors' property in their possession.

73.    Additionally, in the ordinary course of business, the Debtors use other third-party vendors who, under applicable non-bankruptcy law, have the potential to assert mechanic's, materialmen's, artisan's, or other similar liens against the Debtors' property (collectively, the "Other Lien Claimants" and together with the Shipper Lien Claimants, the "Lien Claimants") if the Debtors fail to pay their prepetition claims (the "Other Lien Claims" and together with the

Shipper Lien Claims, the "Lien Claims").  The Other Lien Claimants provide a number of services to the Debtors to facilitate their operations and ability to maximize the value of their estates, such as sorting, tagging, pricing, and boxing the Debtors' products outside of the Debtors' stores and distribution center and routine maintenance and repair services at the Debtors' stores and distribution center.

74.    Additionally, in the ordinary course of their business, the Debtors work with approximately 1100 vendors, certain of whom may have delivered goods to the Debtors within the 20-day period immediately preceding the Petition Date (the "503(b)(9) Claimants"), thereby giving rise to prepetition claims under Bankruptcy Code section 503(b)(9) (the "503(b)(9) Claims").  The Debtors' relationships with many of the 503(b)(9) Claimants are not governed by long-term contracts, and instead, the Debtors often obtain supplies on an order-by-order basis. As a result, a 503(b)(9) Claimant may refuse to supply new orders, or require more restrictive trade terms, absent payment of its 503(b)(9) Claim.  Either of these consequences would put additional strain on the Debtors' businesses.

75.    Accordingly, for the reasons set forth herein and in the Lien Claimants Motion, I respectfully submit that the relief requested in the Lien Claimants Motion is in the best interest of the Debtors' estates and their creditors, and should therefore be granted to enable the Debtors to retain access to suppliers of critical sources of good and services that the Debtors depend on to operate their businesses and conduct an orderly liquidation of their assets.

**K.    Debtors' Motion for Entry of Interim and Final Orders Authorizing, but Not Directing, (I) The Debtors to Pay Certain Taxes and Fees, (II) Financial Institutions to Honor and Process all Related Checks and Electronic Payment Requests, and (III) Granting Related Relief (the "Taxes Motion").**

76.    Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to remit and pay, regardless of whether they arose before the Petition

Date, in the ordinary course of business, certain taxes and fees, including, but not limited to sales, use, franchise, property, and certain other governmental taxes and fees (collectively, the "Taxes and Fees") up to 3,600,000 on an interim basis, and up to $4,100,000 on a final basis, in addition to related relief.

77.     The Debtors conduct business in 11 different states, and various local jurisdictions, and as such, incur or collect Taxes and Fees and remit such Taxes and Fees to various taxing, licensing, and other governmental authorities (collectively, the "Taxing Authorities"). The Debtors must continue to pay the Taxes and Fees to avoid costly distractions during these chapter 11 cases.

78.     I respectfully submit that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates and of its creditors and other parties in interest, because it will enable the Debtors to continue to operate their businesses and avoid the adverse consequences that would result from the nonpayment of Taxes and Fees while these chapter 11 cases are pending.

**L.      Debtors' Motion for Approval of Procedures for the Sale of De Minimis Pharmacy Assets Free and Clear of Liens, Claims, Interests, and Encumbrances (the "Pharmacy Assets Motion").**

79.     Pursuant to the Pharmacy Assets Motion, the Debtors seek entry of an order establishing procedures for the sale of *de minimis* pharmacy assets consisting of the stock of prescription pharmaceutical inventory located in the remaining pharmacies in each of the Debtors' stores and/or the prescription files and records, pharmacy customer lists and patient profiles (the "Pharmacy Asserts") having a sale price of $1,500,000 or less.

80.     The Debtors engaged in a multi-phase prepetition marketing effort of its Pharmacy Assets, and have already sold most of those Assets. The remaining Pharmacy Assets

are mainly housed at locations where front-store operations have closed or are in the process of closing.

81.    As a result of the Debtors' aggressive marketing of the Pharmacy Assets, the Debtors currently have 62 transactions that can close in the near term: executed contracts for 3 locations, signed letters of intent for 10 locations, and accepted bids at 49 locations.

82.    Despite the potentially large aggregate value that the Debtors will generate by closing these asset sales, the Debtors' remaining Pharmacy Assets, on an individual basis each has a *de minimis* value.

83.    Given their current liquidity positon and existing milestones in the DIP Facility, the Debtors are under pressure to monetize the Pharmacy Assets as quickly as possible. Specifically, time is of the essence as the value of these assets diminishes by the day as an extended lag time between the commencement of these Chapter 11 Cases and the sale of the Pharmacy Assets increases the risk that pharmacy customers migrate, significantly reducing the value that the Debtors can realize from script and related sales.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the procedures requested in the Pharmacy Assets Motion.

**M.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Unexpired Leases of Nonresidential Real Property Effective as of the Rejection Date, (II) Establishing Rejection Procedures, and (III) Granting Related Relief (the "<u>Rejection Procedures Motion</u>").**

84.    Pursuant to the Rejection Procedures Motion, the Debtors seek entry of a final order allowing the Debtors to reject certain unexpired leases of nonresidential real property (the "<u>Initial Leases</u>"), effective as of the Rejection Date (as defined in the Rejection Procedures Motion), and the authority to abandon certain personal property.  Additionally, the Debtors seek authority to implement certain procedures regarding the rejection (the "<u>Rejection Procedures</u>") of

additional unexpired nonresidential leases that are not Initial Leases (the "Leases").  Finally, the Debtors seek authority to establish a deadline to file proofs of claim regarding any Leases.

85.     Prior to the Petition Date, the Debtors ceased operations in 251 of their locations, leaving the Debtors with real property leases for empty and/or unused stores.  These Initial Leases, which the Debtors identified prepetition, are no longer necessary to the Debtors' operations and are no longer beneficial to their estates.  The Initial Leases are at Premises where store closings have already occurred, and which lack any marketable value.  Therefore, the Debtors have determined that rejecting the Initial Leases at this juncture would be beneficial to their estates and to their creditors and others parties in interest.

86.     The Debtors have proposed the Rejection Procedures to govern the rejection of its remaining leases.  The implementation of such Rejection Procedures will save the Debtors administrative expenses and will streamline this process, avoiding the need to file multiple, individual motions for individual stores or contracts.

87.     Accordingly, for the reasons set forth herein and as further detailed in the Rejection Procedures Motion, I respectfully submit that the relief requested therein will save the Debtors' estates substantial resources, and that such relief is in the best interest of the Debtors' estates and their creditors and other parties in interest.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  September 9, 2019
          Wilmington, Delaware

                                        _/s/ Mark A. Renzi_____
                                        Name:  Mark A. Renzi
                                        Title:  Chief Restructuring Officer