## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRED'S, INC., *et al.*,[1] | Case No. 19-11984 (CSS) |
| Debtors. | Jointly Administered |
|  | **Obj. Deadline:  Oct. 9, 2019 at 4:00 p.m. (ET)**<br>**Hearing Date:  Oct. 16, 2019 at 3:00 p.m. (ET)** |

### DEBTORS' MOTION PURSUANT TO SECTIONS 105(A), 363 AND 365 OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER AUTHORIZING THE (I) SALE OF CERTAIN PHARMACY ASSETS TO EXPRESSRX FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) ASSUMPTION AND ASSIGNMENT OF LEASES, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases") respectfully state as follows in support of this motion (the "Motion"):

### RELIEF REQUESTED

1.    By this Motion, the Debtors seek entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, authorizing the sale ("the "ExpressRx Transaction") of certain pharmacy assets (the "Contracted Pharmacy Assets") designated in that certain Asset Purchase Agreement, (the "ExpressRx APA") between the Debtors and SC Pharmacy Group Acquisition Co. LLC (the "Purchaser," and together with certain of its affiliates, "ExpressRx Co."), attached hereto as **Exhibit B**, pursuant to (a) sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6004 and 2002(a)(2) of the Federal Rules of

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Store, Inc. (4510); Summit Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 2001 Bryan Street, Suite 1550, Dallas, TX 75201.

Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") free and clear of all liens, claims, interests, and encumbrances and authorizing the Debtors to assume and assign certain leases (the "Leases") to the Purchaser in connection therewith.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and other legal predicates for the relief sought herein are Bankruptcy Code sections 105, 363, and 365, Bankruptcy Rules 2002(a)(2) and 6004, and Local Rule 6004-1.

## BACKGROUND

### A.      General Background.

4.      On September 9, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or

examiner has been made in these Chapter 11 Cases.  An unsecured creditors' committee was appointed on September 18, 2019.

5.      A detailed description of the Debtors' business, their capital structure, and the facts and circumstances leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Mark A. Renzi, Chief Restructuring Officer of Fred's, Inc., in Support of Chapter 11 Petitions and First Day Motions* [D.I. 17] (the "<u>First Day Declaration</u>").  Further support for the relief sought herein is set forth in the *Declaration of Scott Moses* filed contemporaneously herewith.

> **B.      <u>Overview of the Prepetition Pharmacy Assets Marketing Process</u>**

6.      Throughout the past year, the Debtors have worked closely with their advisors to stabilize their business and improve their financial condition.  As part of this process, the Debtors sought to enhance their liquidity through a complete divestment of their legacy pharmacy business.  To date, the Debtors' months-long marketing process has been quite successful, having monetized a substantial number of pharmacies and bolstered its liquidity position.  The Debtors remain engaged in further monetizing their pharmacy holdings.

7.      The Debtors' pharmacy holdings consist of the stock of prescription pharmaceutical inventory located in the remaining pharmacies in each of the Debtors' stores (the "<u>Pharmacy Inventory</u>") and/or the prescription files and records, pharmacy customer lists and patient profiles (the "<u>Pharmacy Files</u>" and, together with the Pharmacy Inventory, the "<u>Pharmacy Assets</u>").  The Debtors' remaining Pharmacy Assets are mainly housed at locations where front-store operations have already closed or are in the process of closing.

C.      **The Prepetition Marketing Process for the Contracted Pharmacy Assets**

8.      The execution of the ExpressRx APA was the culmination of a comprehensive and intensive marketing process led by independent financial advisor PJ Solomon ("Solomon"). This process took place over many months prior to the commencement of the Chapter 11 Cases and resulted in the highest and best bid for the Contracted Pharmacy Assets.

9.      The Debtors engaged Solomon in February 2018 as their investment banking advisor to advise the company on strategic alternatives for its pharmacy business, including a potential sale of some or all of its Pharmacy Assets located in 347 separate locations. Solomon researched the potential universe of buyers who would have an interest in purchasing the Pharmacy Assets.

10.     For its initial sale process ("Felix 1"), Solomon contacted 21 strategic buyers. Of the 21 parties contacted, six signed a Non-Disclosure Agreement ("NDA") and four submitted preliminary proposals. In September 2018, Walgreens and the Debtors executed a contract for the sale of Pharmacy Assets located at 185 of the Debtors' pharmacies. After transaction adjustments required by the FTC that excluded six pharmacies from the transaction, Walgreens acquired the Pharmacy Assets of 179 pharmacies for a total consideration of approximately $177 million. These closings occurred on a rolling basis from November 2018 through January 2019.

11.     In September 2018, the Debtors directed Solomon to conduct another sale process for the remaining Pharmacy Assets. In connection with this second sales effort, Solomon contacted 33 strategic buyers. Of the 33 parties contacted, thirteen signed an NDA and three submitted proposals. These proposals were received from Walgreens, CVS and ExpressRx. In July 2019, CVS and the Debtors executed a contract for the sale of the Pharmacy Assets from 38 pharmacies for a total consideration of approximately $12 million plus inventory.

12.     In August 2019, after months of negotiations, ExpressRx and the Debtors executed a term sheet for the sale of ten (10) individual, single-site pharmacies, including their respective Pharmacy Assets, for a total consideration of approximately $7 million.

13.     On September 25, 2019, the Purchaser and the Debtors signed the ExpressRx APA, pursuant to which the Purchaser will purchase the ten (10) pharmacies, including their Pharmacy Assets, and assume the Leases at the four locations where tenancy is not currently on a month-to-month basis.

14.     Given their current liquidity positon and existing milestones in the DIP Facility, the Debtors are under pressure to monetize the Pharmacy Assets as quickly as possible. Moreover, specifically with respect to the Pharmacy Assets, time is of the essence as their value diminishes by the day. Specifically, an extended lag time between the commencement of these Chapter 11 Cases and the sale of the Pharmacy Assets increases the risk that pharmacy customers migrate, significantly reducing the value that the Debtors can realize from script and related sales. Indeed, in the recent ShopKo case (*In re Specialty Retail Shops Holding Corp.*, Case No. 19-80064, Bankr. D. Nebraska (Jan. 16, 2019)), where the debtors sought to sell their pharmacy assets via an expedited auction process, the value of the debtors' pharmacy assets plummeted postpetition because they were not sold quickly enough. Here, the Debtors' aggressive prepetition efforts to sell their Pharmacy Assets and the relief sought herein are an attempt to avoid that same fate.

### D.     The ExpressRx APA

15.     As more fully described in the ExpressRx APA, the Debtors propose to enter into a transaction whereby the Purchaser will make a series of payments, outlined the below chart, to acquire substantially all of the Debtors' Pharmacy Assets at the ten specified locations and

assume obligations under four related Leases.  The following chart summarizes the terms and conditions of the proposed sale and discloses certain information required pursuant to Local Rule 6004-11:

| Significant Terms of ExpressRx APA | |
| --- | --- |
| *Parties* | The parties to the ExpressRx APA (the "ExpressRx APA") will include (i) SC Pharmacy Group Acquisition Co. LLC ("Purchaser") and (ii) Fred's Stores of Tennessee, Inc. ("Seller").  The Purchaser, SC Pharmacy Group Acquisition Co. LLC, is sponsored and funded by a private equity fund with substantial resources. |
| *Structure of Transaction*<br><br>Section 2.1(a) | Upon the terms and subject to the conditions set forth in the ExpressRx APA, at each closing and upon payment of the portion of the Purchase Price attributable to such closing, Seller will sell, and Purchaser will purchase from Seller, all of Seller's right, title and interest in and to the applicable Purchased Assets (as more fully described below) free and clear of all encumbrances (subject to certain exceptions). |
| *Purchased Assets*<br><br>Section 2.1(b) | "Purchased Assets" include the following assets of the Pharmacies:<br><br>1. prescription files, prescription records and related data ("Script Assets");<br><br>2. retail prescription and pharmaceutical inventory ("Pharmaceutical Inventory");<br><br>3. other non-pharmaceutical inventory ("Non-Pharmaceutical Inventory");<br><br>4. furniture, fixtures and equipment;<br><br>5. certain permits, to the extent freely and legally transferable<br><br>6. telephone numbers and fax numbers<br><br>7. certain real estate leases, as more fully described below;<br><br>8. certain other books and records, tangible and intangible personal property used exclusively in connection with the Pharmacy; and<br><br>9. the goodwill with respect to the assets being sold (clauses 4 through 9, the "Other Purchased Assets").<br><br>The Purchased Assets do not include, among other items, cash, cash equivalents, or securities of Seller or any of Seller's Affiliates (including any |

| | |
|---|---|
| | drawer cash), accounts receivable or proceeds thereof, Seller's intellectual property, motor vehicles and all property located on the Pharmacy's premises but not owned by Seller.<br><br>"Pharmacies" mean the ten pharmacy locations as specifically set forth in the ExpressRx APA. |
| *Purchase Price:*<br><br>Section 2.2 | Purchase Price. The aggregate purchase price (the "Purchase Price") to be paid by Purchaser to Seller with respect to the Purchased Assets is equal to:<br><br>1. $4,426,983 (the "Script Base Price"), for the Script Assets, as adjusted (the "Adjusted Script Price") *plus*<br><br>2. the value of the Pharmaceutical Inventory as determined pursuant to inventory audit and valuation procedures outlined in the ExpressRx APA (with respect to each Pharmacy's Pharmaceutical Inventory, the "Pharmaceutical Inventory Purchase Price") (provided, that the aggregate Pharmaceutical Inventory Purchase Price for all Pharmacies shall not exceed $1,950,000); *plus*<br><br>3. the value of the Non-Pharmaceutical Inventory as determined pursuant to the valuation procedures further described in the ExpressRx APA (with respect to each Pharmacy's Non-Pharmaceutical Inventory, the "Non-Pharmaceutical Inventory Purchase Price") (provided, that the aggregate Non-Pharmaceutical Inventory Purchase Price for all Pharmacies shall not exceed $525,000); and<br><br>4. $119,050 for the Other Purchased Assets (the "Other Purchased Assets Price"), allocated $11,905 per Pharmacy (the "Other Purchased Assets Price Allocation").<br><br>The Script Base Price is subject to adjustment based on a comparison of the Pharmacies' prescription volume as set forth in the ExpressRx APA (the "Base Volume") and the Pharmacies' prescription volume for the 14-week period ending on the close of business on the Saturday one week prior to the Closing Date (the "Closing Volume"). The Script Base Price will be adjusted in the amount of $8.25 times the difference between the applicable Base Volume and Closing Volume, provided that no adjustment will be made unless the applicable Closing Volume is more than 105%, or less than 95%, of, the applicable Base Volume. |
| *Closing Mechanics:*<br><br>Section 2.3; 2.4 | The transaction may be consummated in up to three closings, with Pharmacy Assets of at least eight of the ten Pharmacies included in the initial closing (based on satisfaction of the pharmacy specific conditions summarized below).  At each closing, the Purchaser will pay the Script Purchase Price and the Other Assets Purchase Price. |

| | |
|---|---|
| | Commencing at the close of business of each Pharmacy on the Friday preceding its anticipated Closing Date, a third party inventory valuator will conduct a physical inventory valuation of the Pharmaceutical Inventory and Non-Pharmaceutical Inventory at such Pharmacy.  Purchaser shall pay the applicable Pharmaceutical Inventory Purchase Price and the Non-Pharmaceutical Inventory Purchase Price for all Pharmacies included in such Closing no later than one (1) Business Day following the determination of the applicable Pharmaceutical Inventory Purchase Price in accordance with the terms set forth in the ExpressRx APA. |
| *Representations and Warranties:*<br><br>Article III; Article IV | The Seller is giving customary representations, including regarding: (i) organization and qualification; (ii) authorization and enforceability; (iii) governmental authorizations; (iv) non-contravention; (v) title to assets; (vi) employee matters; (vii) real property; (viii) environmental; (ix) script volume; (x) inventory; (xi) compliance with laws and regulations relating to the Script Assets; (xii) the accuracy of the books and records of the Pharmacies; (xiii) taxes; (xiv) health regulatory matters; (xv) related party transactions; and (xvi) no broker fees.<br><br>The Purchaser is giving customary representations, including regarding (i) organization and qualification; (ii) authorization and enforceability; (iii) governmental authorizations; (iv) non-contravention; (v) absence of litigation; (vi) no brokers fees; and (vii) Purchaser's investigation. |
| *Covenants:*<br>Article V | The parties have agreed to customary covenants, including covenants relating to the operation of the pharmacies during the executory period, efforts to consummate the transactions and the parties obligations related to the data included in the Script Assets. The Seller has agreed to a 2-year non-competition covenant, restricting its ability to operate any retail pharmacy within a 50-mile radius of the Pharmacies (subject to certain exclusions for Seller's other pharmacies). |
| *Closing Conditions:*<br><br>*Article VIII* | The Closing is subject to certain closing conditions including (i) the receipt of the Order, (ii) no other order enjoining the consummation of the transactions, (iii) the accuracy of the parties representations, (iv) the parties' compliance with their covenants, (v) the transfer of the Script Assets and (vi) certain conditions specific to each pharmacy related to regulatory notices and the execution by the landlords of the premises on which the Pharmacies are located of (A) estoppel certificates, (B) subordination, non-disturbance and attornment agreement and (C) for certain properties in which the leases are month-to-month, an agreement of the landlord to lease the premises to the Purchaser on substantially similar terms as those currently set forth in the Seller's leases.<br><br>The ExpressRx APA may be terminated if the initial closing has not occurred prior to December 9, 2019 (subject to certain exceptions). |

| | |
|---|---|
| Indemnity and Holdback<br><br>*Section 2.4(c); Article IX* | Seller has agreed to indemnify Purchaser for breaches of representations, warranties, post-Closing covenants and certain excluded liabilities arising out of the Pharmacy businesses prior to the closings.  The indemnity is capped at $500,000 and secured by a holdback of $500,000.<br><br>The holdback will be paid to the Purchaser, net of any deductions arising as a result of the Seller's indemnity obligations, on the later of (x) April 30, 2020 and (y) the earlier of (1) the effective date of a plan of restructuring or liquidation of Seller or the conversion of the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, and (2) the first anniversary of the Closing. The representations, warranties and post-Closing covenants survive until such time. |

## BASIS FOR RELIEF

16.     Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).

17.     As an initial matter, the prepetition marketing process described in herein featured the typical characteristics of any legitimate corporate asset sale process: (i) identifying the universe of buyers, (ii) contacting those buyers; (iii) receiving bids in a fair, arm's-length and open process; and (iv) selecting the highest-bid with the most certainty of closing.  Indeed, the Debtors were hard-pressed to maximize returns from each prepetition transaction, as they were seeking to avoid bankruptcy.

18.     Furthermore, the Debtors determined in the beginning of 2019 to liquidate the Pharmacy Assets and have successfully engaged in such efforts.

19.     The Debtors do not believe that the cost and delay arising from a competitive auction process or pursuing a potential transaction with an entity other than the Purchaser with respect to the Contracted Pharmacy Assets would be reasonably likely to increase value for the estates—particularly given the extensive prepetition marketing efforts conducted by the Debtors prior to the date hereof.  As a result, the Debtors respectfully submit that it is an exercise of their

sound business judgment to sell the Contracted Pharmacy Assets to the Purchaser pursuant to the ExpressRx APA via a private sale, which will maximize the value of these assets for the benefit of all creditors.  Accordingly, the Debtors respectfully request that the Court enter the proposed order authorizing the ExpressRx APA and the Express Rx Transaction contemplated thereby.

## A.  A Private Sale of the Contracted Pharmacy Assets is Appropriate Under Bankruptcy Rule 6004

20.     Bankruptcy Rule 6004(f) and Local Rule 6004-11 (b)(iv)(D) permit a debtor to conduct a private sale pursuant to section 363.  Specifically, Bankruptcy Rule 6004(f) provides that "…sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1) (emphasis added).  *See In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del 1981) (holding that manner of sale is within the debtor's discretion); *In re Bakalis*, 220 B.R. 525, 531-32 (Bankr. E.D.N.Y. 1998) (stating that debtor has authority to conduct public or private sales of estate property).

21.     Courts have in the past approved private sales or non-ordinary course sales that maximize creditor returns.  *See In re Specialty Retail Shops Holding Corp.*, Case No. 19-80064, Bankr. D. Nebraska (Jan. 16, 2019).  Indeed, the Debtors are wary of the complications that could arise should the ExpressRx Transaction not be approved, where, ironically, the bidders would likely be exactly the same as the prepetition bidders, but, because of the potential for rapid decline of asset values in a liquidation, bid offers may be substantially less.  *See In re Woodruff*, 580 B.R. 291, 297 (Bankr. M.D. Ga. 2018) ("Because Chapter 11 liquidation plans are particularly dependent on the value of estate assets, courts must be intensely mindful of diminishing asset values in these cases"); *See also  In re Washington Mut.*, Inc., No. 08-12229 MFW, 2012 WL 1563880, at *23 (Bankr. D. Del. Feb. 24, 2012) (creditors would suffer diminished recoveries in a liquidation scenario or "fire-sale" because such circumstances

"substantially reduce the potential value of this asset").    By conducting the comprehensive marketing process, instead of "failing…to explore its market alternatives," the Debtors will avoid "a situation of distress" where assets can be purchased at "a fire sale price." *In re HomeBanc Mortg. Corp.*, 573 B.R. 495, 516 (Bankr. D. Del. 2017), aff'd, 590 B.R. 69 (D. Del. 2018). Indeed, the sale of a chapter 11 debtor's assets to a specific purchaser outside of the ordinary course of business was appropriate under the circumstances, especially where "[m]ost significantly, the assets of the Debtor are declining in value." *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998).    Here, marketing the Contracted Pharmacy Assets for a second time risks inviting bids that are substantially lower than the currently contemplated sales price, not to mention that the Debtors' estates will incur additional costs by running a duplicative sales process which will involve the exact same assets and (likely) the exact same bidders.

22.    Where there was competitive bidding, aggressive marketing, and a "need for speed" private sale of assets was appropriate:    "Thus, for each day that this Court does not approve the sale, significant interest is accruing and the closing on the sale to [the Purchaser] is further delayed….there is one less dollar available to pay other creditors.    All of these circumstances underscore that there is a need for speed with respect to this Court approving the sale of the [assets]. *In re 9 Houston LLC*, 578 B.R. 600, 614 (Bankr. S.D. Tex. 2017).

23.    The Debtors believe that the marketing process has allowed the Debtors to obtain fair and reasonable purchase prices for the Contracted Pharmacy Assets and to effectuate the ExpressRx Transaction in an efficient and streamlined process.    The ExpressRx Transaction undoubtedly serves the important objectives of obtaining not only a fair and reasonable purchase price for the Contracted Pharmacy Assets, but also the highest or otherwise best value for the

Contracted Pharmacy Assets, which will inure to the benefit of all parties in interest in the Chapter 11 Cases.

24.     In addition, based on the thorough prepetition marketing of the assets, there is a strong likelihood that the proposed purchase price is the best offer the Debtors' will receive, particularly because the sale of the Contracted Pharmacy Assets is a package deal.  "It is a well-established principle of bankruptcy law that the…Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.  *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992).

25.     In light of Bankruptcy Rule 6004(f) and case law regarding section 363 sales, a debtor may conduct a private sale if a good business reason exists. *See, e.g., In re Pritam Realty, Inc.*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *Condere*, 228 B.R. at 629 (authorizing private sale of debtors' tire company where "[d]ebtor has shown a sufficient business justification for the sale of the assets to the [p]urchaser"); *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in determining whether a private sale should be approved.  The court should exercise its discretion based upon the facts and circumstances of the proposed sale"); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).  Finding a good business reason is a low bar, and courts have generally prevented private sales only when there was a total lack of effort to market the assets or when courts suspect that the private sale would benefit an insider to the detriment of the estate: "As for the suggestion that [there is only one] possible purchaser, the court is skeptical given (1) the absence of any effort to market the assets

to an entity other than the proposed purchaser, and (2) the potential impact of the agreement to employ [an insider] on the Debtors' decision to enter into the private sale without exploring alternatives" and so the Court would not approve asset sale outside the ordinary course of business. *In re P.D.M. Co.*, 523 B.R. 558, 559 (Bankr. W.D. Mich. 2015). Here, the Debtors' decision to arrange a prepetition marketing process for the Contracted Pharmacy Assets, overseen by an independent financial advisor, to monetize the assets and improve the financial position of the Debtors in the hope of avoiding bankruptcy, certainly qualifies as an exercise of sound business judgment.

26.    Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action *appears* to enhance the debtor's estate." *Crystalin, L.L.C. v. Selma Props. Inc.* (*In re Crystalin, L.L.C.*), 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (emphasis in original, internal alterations and quotations omitted)). Courts require only that the debtors "show that a sound business purpose justifies such actions." *See In re Montgomery Ward Holding Corp.*, 242 B.R. at 153 (citations omitted); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729, 2003 WL 22316543, at *31 (Bankr. S.D.N.Y. Mar. 4, 2003); *In re Lionel Corp.*, 722 F.2d at 1071. *See also In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct" (citation omitted).

27.    In addition, a sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.,* 788

F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *Four B. Corp. v. Food Barn Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 566 n.16 (8th Cir. 1997) (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).  Here, where the private sale is a result of a robust marketing process to non-insider purchasers, overseen by an independent and well-regarded financial advisor retained for the very purpose of garnering the best price for the Contracted Pharmacy Assets, the Debtors can demonstrate that the resulting ExpressRx Transaction has a justifiable business purpose.  It is an exercise of the Debtors' business judgment.

28.    Indeed, courts in this and other districts have approved private sales of estate property pursuant to section 363(b)(1) when there has been a valid business reason for not conducting an auction.  *See, e.g., Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. Feb. 3, 2009) (approving the private sale of real property for approximately $2.4 million); *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. Dec. 18, 2008) (approving the private sale of real property for approximately $3.8 million); *In re Wellman, Inc.*, No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2008) (approving private sale of industrial complex capable of converting recycled carpet into nylon engineered resins for $17.9 million); *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. July 23, 2007) (authorizing private sale of business line which designs and manufactures materials used in catalytic converters to remove pollutants produced by engines for approximately $22 million); *In re Solutia, Inc.*, No. 03-17949 (SCC) (Bankr S.D.N.Y. Dec. 28, 2006) (approving private sale of real property for approximately $7.1 million).

**B. Approval of the ExpressRx Transaction is in the Best Interest of the Debtors, Their Estates, and All Parties in Interest.**

29.    Courts have approved the authorization of a sale of a debtor's assets under section 363 of the Bankruptcy Code if such sale is based upon the sound business judgment of the debtor. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983).

30.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:  (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, as exists with respect to the ExpressRx Transaction, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Van Gorkom*, 488 A.2d at 872).

31.    As set forth in detail above, a strong business justification exists for the sale of Contracted Pharmacy Assets. An orderly but expeditious sale of Contracted Pharmacy Assets is critical to maximizing the value of the Debtors assets and recoveries for the Debtors' economic stakeholders.

### C.  The Assets Should Be Sold Free and Clear of
####    Liens, Claims, Interests, and Encumbrances.

32.     In the interest of attracting the best offers, the Contracted Pharmacy Assets should

be sold free and clear of any and all liens, claims, interests, and other encumbrances, in

accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests,

and encumbrances attaching to the proceeds of the applicable sale.  Section 363(f) of the

Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and

encumbrances if any one of the following conditions is satisfied:

> i.      applicable non-bankruptcy law permits sale of such property free and clear
>         of such interest;
>
> ii.     such entity consents;
>
> iii.    such interest is a lien and the price at which such property is to be sold is
>         greater than the value of all liens on such property;
>
> iv.     such interest is in bona fide dispute; or
>
> v.      such entity could be compelled, in legal or equitable proceeding, to accept
>         a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del.

2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five

conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.");

*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988)

(same).

33.     Here, the Debtors believe that any of the parties holding liens in the Pharmacy

Assets could be compelled to accept a monetary satisfaction of such interests. Where the

purchase price for a debtor's assets is the best available purchase price under the circumstances,

a court may authorize the sale free and clear of existing liens, claims, and encumbrances

pursuant to section 363(f)(3) of the Bankruptcy Code even if the purchase price is less than the

face amount of liens, claims, and encumbrances. *See In re Boston Generating*, LLC, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010).  Accordingly, the Debtors believe that the sale of the Pharmacy Assets will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and the ExpressRx Transaction should be approved free and clear of all liens, claims, and encumbrances against the Pharmacy Assets.

### D.  The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

34.  As explained above, as part of the ExpressRx Transaction the Debtor is assuming and assigning Leases connected to four of the ten pharmacies that comprise the Contracted Pharmacy Assets.  Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. $ 365(a).  The standard governing court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *See Sharon Steel Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).  Additionally, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any 'actual pecuniary loss' relating to such default. 11 U.S.C. § 365(b)(1).

35.  Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract.  *See In re Rickel Home Centers, Inc.*, 209 F .3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the

debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674,682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).  Furthermore, Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

36.    Finally, Bankruptcy Code section 365(b) codifies the requirements for assuming an executory contract of a debtor.  This provision provides that if there has been a default in an executory contract or unexpired lease of the debtor, that contract or lease may not be assumed unless at the time of the assumption the Debtor:  "(A) cures, or provides adequate assurance that the trustee will promptly cure, such default...; and (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease."  11 U.S.C. § 365(b)(1).

37.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlísle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  For example, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has

expressed willingness to devote sufficient funding to business in order to give it strong likelihood

of succeeding).   Here, the Purchaser is sponsored and funded by a private equity fund with

substantial resources.   As a result, the Purchaser and any designee to which it may assign its

rights under the ExpressRx APA will have the financial wherewithal to comply with the

obligations of the tenant under the assigned Leases.

38.    Indeed, as set forth in the ExpressRx APA, to the extent any defaults exist under

any unexpired lease or contract sought to be assumed by the Debtors and assigned to the

Purchaser, such defaults are required to be cured as required under Bankruptcy Code section

365(b)(1).  The Debtors believe that ExpressRx, Purchaser, and its designees have the financial

capability to satisfy any and all obligations they will incur in connection with the Leases.  To that

end, the Debtors are implementing the following procedures:

i.    Concurrently with the service of this Motion, the Debtors will serve on each of the affected landlords pertaining to the four Leases a notice in substantially the same form attached as **Exhibit C** (the "Cure Notice").  The Cure Notice shall:

a)   Identify the specific Lease by its address and disclose that such Lease may be assumed and assigned to the Purchaser in connection with the ExpressRx Transaction;

b)   Identify the non-Debtor counter-party to the Lease;

c)   State the cure amounts, if any, that the Debtors believe is necessary to assume such Lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount");

d)   State the date of the hearing on the ExpressRx Transaction (the "Sale Hearing") and that objections to the Motion or the Cure Amount will be heard at the Sale Hearing, or at a later hearing, as determined by the Debtors; and

e)   State the deadline by which the non-Debtor counterparty shall file any objection to the relief sought in the Motion, including the Cure Amount.

ii.   Any Objection to the Cure Amount must state with specificity what Cure Amount the non-Debtor counterparty to the Lease believes is required and provide appropriate documentation in support thereof.

iii.  Any Objection solely to the Cure Amount may not prevent or delay the Debtors' assumption and assignment of the Leases.  If a party objects solely to the Cure Amount,

the Debtors may, with the consent of the Purchaser, hold the claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties.  So long as the Cure Amount is held in reserve, and there are no other unresolved objections, the Debtors can, without further delay, assume and assign such Leases.  Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

iv. If no objection to the Cure Amount is timely received, the Cure Amount set forth in the Cure Notice shall control notwithstanding anything to the contrary in any assigned Lease or other document as of the date of the Cure Notice.

v. To the extent that any non-Debtor counterparty wishes to object to the adequate assurance of future performance by the Purchaser under the applicable Lease, then such non-Debtor counterparty shall file an objection no later than the Objection Deadline.

vi. All objections must be served so as to be received by October 8, 2019 at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline").  The Debtors propose that any objection must be in writing and filed with the Clerk of the Court, 824 Market St. N, 3rd Floor, Wilmington, DE, and served so as to be received by the Objection Deadline, on (i) counsel to the Debtors, Kasowitz Benson Torres LLP, 1633 Broadway, New York, New York, 10019, Attention: Adam L. Shiff (AShiff@kasowitz.com), Robert M. Novick (RNovick@kasowitz.com), and Matthew B. Stein (MStein@kasowitz.com), Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, Wilmington, DE 19801 Attention: Derek C. Abbot (DAbbot@mant.com) and Andrew R. Remming (ARemming@mnat.com); (ii) counsel to the Committee of Unsecured Creditors, Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, NY 10020, Attention Jeffrey Cohen (jcohen@lowenstein.com), One Lowenstein Drive, Roseland, NJ 07068 (mkaplan@lowenstein.com), and Womble Bond Dickinson (US) LLP, 1313 North Market Street, Suite 1200, Wilmington, DE 19801 Attn: Matthew P. Ward, (matthew.ward@wbd-us.com) and (iii) counsel for the DIP Agent, Parker, Hudson, Rainer & Dobbs LLP, 303 Peachtree Street NE, Suite 3600, Atlanta Georgia 30308, Attention Bryan E. Bates (bbates@phrd.com), and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attention: John H. Knight (knight@rlf.com).

vii. To the extent that any non-Debtor counterparty does not timely file and serve an objection, such counterparty will be: (i) deemed to have consented to the Cure Amount, if any, set forth in the Cure Notice; (ii) barred, estopped and enjoined from asserting any additional Cure Amount under the Lease; (iii) barred from objecting to the assumption and assignment of the Lease to the Purchaser, and (iv) barred from objecting to adequate assurance of future performance by the Purchaser.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(H)**

39.    The Debtors also request that, to the extent applicable to the relief requested in

this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that

"[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until

the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to maximize the value of their assets and recoveries for their economic stakeholders.  Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

40.    Notice of this Motion shall be given to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the official committee of unsecured creditors; (c) counsel to the DIP Agent; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) any party required to be provided notice under Local Rule 9013-1(m); and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.  A copy of this Motion and any order approving it will also be made available on the Debtors' case information website located at https://dm.epiq11.com/freds.  The Debtors respectfully submit that no further notice is required.

## NO PREVIOUS REQUEST

41.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the proposed order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: September 25, 2019
       Wilmington, Delaware

/s/ Joseph C. Barsalona II
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Matthew B. Harvey (No. 5186)
Joseph C. Barsalona II (No. 6102)
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbott@mnat.com
        aremming@mnat.com
        mharvey@mnat.com
        jbarsalona@mnat.com

- and -

Adam L. Shiff (*pro hac vice* motion pending)
Robert M. Novick (*pro hac vice* motion pending)
Matthew B. Stein (*pro hac vice* motion pending)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
Email: AShiff@kasowitz.com
        RNovick@kasowitz.com
        MStein@kasowitz.com

**COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**