# **Exhibit A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| FRED'S, INC., *et al.*,[1] | ) | Case No. 19-11984 (CSS) |
| Debtors. | ) | Jointly Administered |
| | ) | **Re: D.I. _____** |

**ORDER (I) AUTHORIZING THE SALE OF CERTAIN PHARMACY ASSETS TO EXPRESSRX FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §363, (II) ASSUMPTION AND ASSIGNMENT OF LEASES IN CONNECTION WITH CERTAIN PHARMACY ASSETS AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion") of the above captioned debtors and debtors in possession (the "Debtors") for the entry of an order (this "Order"): (a) authorizing the sale (the "ExpressRx Transaction") of the assets and business of certain pharmacies (the "Contracted Pharmacy Assets") pursuant to the Asset Purchase Agreement by and among the Debtors and SC Pharmacy Acquisition Co. LLC (the "Purchaser"), in substantially the form attached hereto as **Exhibit 1** (the "ExpressRx APA")[2] listed in the Pharmacy Asset Sale Schedule attached hereto as **Exhibit 2**, free and clear of liens, claims, interests, and encumbrances (collectively, the "Encumbrances") with any such Encumbrances to attach to the proceeds thereof with the same validity and priority (under the Bankruptcy Code) as such Encumbrances had immediately prior to the consummation of the ExpressRx Transaction; (b) authorizing the Debtors to assume and assign certain unexpired non-residential real property

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Store, Inc. (4510); Summit Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 2001 Bryan Street, Suite 1550, Dallas, TX 75201.

[2] Capitalized terms used but not defined herein have the meaning assigned to such terms in the Agreement.

leases listed in the Lease Assumption and Assignment Schedule attached hereto as **Exhibit 3** (the "Leases") to the Purchaser; and (c) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the Debtors provided due and proper notice that is adequate and appropriate under the particular circumstances; and the Court having held a hearing to consider the relief requested in the Motion and any objections or other responses to the relief requested therein (the "Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and upon consideration of the record of the Hearing, and all proceedings had before the Court, the arguments of counsel made, and the evidence proffered and adduced, at the Hearing; and it appearing that due notice of the Motion and the form of this Order has been provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and that the legal and factual bases set forth in the Motion and presented at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and any objections or other responses to the relief requested herein having been withdrawn, resolved, or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND THAT**:

A. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings

of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. The statutory and other legal predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

C. Notice of the Hearing was fair and equitable under the circumstances and complied in all respects with the Bankruptcy Code and the Bankruptcy Rules.

D. A fair and reasonable opportunity to object to and to be heard with respect to the Motion, the ExpressRx Transaction, and the relief requested in the Motion has been given, as required by the Bankruptcy Code and the Bankruptcy Rules, to all Persons[3] entitled to notice, including the following: (a) all parties who have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002 and (b) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Contracted Pharmacy Assets.

E. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for this Court to grant the relief requested in the Motion. The Debtors' entry into and performance under the ExpressRx APA: (a) constitutes a sound and reasonable exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; (b) provides value to and is beneficial to the Debtors' estates; and (c) is reasonable and appropriate under the circumstances. Business justifications for the ExpressRx Transaction include the following: (a) the ExpressRx APA constitutes the highest and best offer received for the Contracted Pharmacy Assets; (b) the

[3] "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any governmental authority (meaning any federal, state, local, or foreign government or governmental or regulatory

ExpressRx APA presents the best opportunity to maximize the value of the Contracted Pharmacy Assets; (c) unless the ExpressRx Transaction is consummated expeditiously in accordance with the terms of the ExpressRx APA, recoveries to the Debtors' creditors may be materially diminished; and (d) the value of the Debtors' estates will be maximized through the sale of the Contracted Pharmacy Assets pursuant to the ExpressRx APA.

F. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). If any inconsistency arises between this Order and the ExpressRx APA, this Order shall control.

G. The Debtors and their advisors (i) engaged in a robust and extensive marketing and sale process for the Contracted Pharmacy Assets prior to the Petition Date, and (ii) determined that the Purchaser's offer to purchase the Contracted Pharmacy Assets pursuant to the ExpressRx APA represents the highest and best offer the Debtors received for the Contracted Pharmacy Assets. The marketing and sale process was non-collusive, pursued diligently and in good faith, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Contracted Pharmacy Assets. The marketing and sale process conducted by the Debtors obtained the highest and best value for the Contracted Pharmacy Assets for the Debtors and their estates, and any other transaction would not have yielded as favorable an economic result. Accordingly, the total consideration provided by the Purchaser, upon the terms and conditions set forth in the ExpressRx APA (including the form and total consideration to be realized by the Debtors pursuant to the ExpressRx APA), is the highest and best offer received by the Debtors and constitutes fair value, fair, full, and adequate

authority, agency, board, bureau, commission, court, department, or other governmental entity) or any group of any of the foregoing.

consideration, reasonably equivalent value and reasonable market value for the Contracted Pharmacy Assets.

H. Under the facts and circumstances of these Chapter 11 Cases, the purchase price for the Contracted Pharmacy Assets is fair and reasonable.

I. The ExpressRx APA was proposed, negotiated, and will be entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code.

J. The Purchaser is a purchaser in good faith with respect to the Contracted Pharmacy Assets, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Debtors were free to deal with any other party interested in buying or selling some or all of the Contracted Pharmacy Assets on behalf of the Debtors' estates. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the ExpressRx APA to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or that would prevent the application of section 363(m) of the Bankruptcy Code. Neither the Purchaser nor any of its Affiliates[4] has acted in a collusive manner with any entity and the marketing and sale process for the Contracted Pharmacy Assets was not controlled by any agreement among bidders. The Purchaser's prospective performance and payment of amounts owing under the ExpressRx is in good faith and for valid business purposes and uses. Neither the Purchaser nor any of its Affiliates is an "insider" of any of the Debtors, as that term is defined in section 101 of the Bankruptcy Code,

---

[4] "Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise

and no common identity of incorporators, directors, or controlling stockholders existed between the Purchaser or its Affiliates and the Debtors.

K. The ExpressRx APA and the ExpressRx Transaction contemplated therein were negotiated, proposed, and entered into by the Debtors and the Purchaser in good faith, without collusion and from arm's-length bargaining positions.

L. Neither the Purchaser nor any of its Affiliates is, nor will any of them be, a mere continuation of, or a successor to, and is not holding itself out as a mere continuation of, or successor to, the Debtors in any respect, and there is no continuity of enterprise between the Debtors and the Purchaser. The ExpressRx Transaction does not amount to a consolidation, merger, or *de facto* merger of the Purchaser or any of its Affiliates and the Debtors. Neither the Purchaser nor any of its Affiliates and their respective successors, assigns, members, partners, principals, and shareholders (or equivalent) shall assume or in any way be responsible for any obligation or liability of any Debtor (or any Affiliates thereof) and/or any Debtor's estate, including any obligation under any labor practice agreement, except as expressly provided in the ExpressRx APA or herein.

M. All of the requirements of section 363 of the Bankruptcy Code have been met with respect to the sale of the Contracted Pharmacy Assets pursuant to the ExpressRx APA.

N. The Debtors may sell the Contracted Pharmacy Assets free and clear of all Encumbrances, including all liens (including, to the extent permitted under the Bankruptcy Code, those related to the so-called "bulk sales," "bulk transfer" and similar laws), claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights (including reclamation rights, rights of first refusal, rights of first offer, or consent rights), liabilities, judgments, servitudes, encumbrances, options, purchase options, mortgages,

subleases, charges, hypothecations, indentures, security interests, security agreements, loan agreements, instruments, conditional sale or other title retention agreements, pledges, demands, offsets, recoupment, rights of recovery, decrees of any court or foreign or domestic governmental entity, and other interests of any kind or nature whatsoever against the Debtors or the Contracted Pharmacy Assets, including any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against the Debtors, and any derivative, vicarious, transferee, or successor liability claims, rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, and whether imposed by agreement, understanding, law, equity, or otherwise arising under or out of, in connection with, or in any way related to the Debtors, the Debtors' interests in the Contracted Pharmacy Assets, the operation of the Debtors' businesses before the Closing (throughout this Order, as defined in the ExpressRx APA), or the transfer of the Debtors' interests in the Contracted Pharmacy Assets to the Purchaser, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Without limiting the generality of the foregoing, "Encumbrances" shall include any and all liabilities or obligations whatsoever arising under or

out of, in connection with, or in any way relating to: (a) any of the Debtors' employee benefit plans, including any Encumbrances related to unpaid contributions or current or potential withdrawal or termination liability; (b) the Worker Adjustment and Retraining Notification Act of 1988; or (c) any of the Debtors' current and former employees. Those holders of Encumbrances who did not object (or who ultimately withdrew their objections, if any) to the ExpressRx Transaction or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances who did object that have an interest in the Contracted Pharmacy Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Encumbrances that constitute interests in the Contracted Pharmacy Assets, if any, attach solely to the proceeds of the ExpressRx Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force, and effect that such holders had prior to the ExpressRx Transaction, subject to any defenses that may be available to the Debtors. All Persons having Encumbrances of any kind or nature whatsoever against the Debtors or the Contracted Pharmacy Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Encumbrances against the Purchaser or any of its assets, property, Affiliates, successors, assigns, or the Contracted Pharmacy Assets.

O. The Purchaser has not agreed to assume and shall have no obligations with respect to any Encumbrances. The Purchaser would not have entered into the ExpressRx APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors and their estates and their creditors, if the ExpressRx Transaction of the Contracted Pharmacy Assets were not free and clear of all Encumbrances, or if the Purchaser would, or in

the future could, be liable for any such Encumbrances, including, as applicable, any liabilities related to the operation of the Pharmacies by the Debtors.

P. The total consideration to be provided to the Debtors by the Purchaser, upon the terms and conditions set forth in the ExpressRx APA (including the form and total consideration to be realized by the Debtors pursuant to the ExpressRx APA), reflects the Purchaser's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Contracted Pharmacy Assets free and clear of all Encumbrances (including any potential derivative, vicarious, transferee, or successor liability claims).

Q. As of the Closing, the transfer of the Contracted Pharmacy Assets to the Purchaser and its designated Affiliates will be a legal, valid, and effective transfer of the Contracted Pharmacy Assets, and will vest the Purchaser with all right, title, and interest of the Debtors in and to the Contracted Pharmacy Assets free and clear of all Encumbrances.

R. The Debtors (a) have full corporate or limited liability company (as applicable) power and authority to execute the ExpressRx APA and all other documents contemplated thereby, and the ExpressRx Transaction has been duly and validly authorized by all necessary corporate action of the Debtors, (b) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the ExpressRx APA, and (c) upon entry of this Order, other than any consents or approvals identified in the ExpressRx APA (including with respect to antitrust matters), need no consent or approval from any other Person to consummate the ExpressRx Transaction.

S. The Contracted Pharmacy Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the

Bankruptcy Code. The Debtors are the sole and rightful owners of the Contracted Pharmacy Assets, and no other Person has any ownership right, title, or interests therein.

T. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Leases to the Purchaser or its designated Affiliates in connection with the consummation of the ExpressRx APA, and the assumption and assignment of the Leases is in the best interest of the Debtors, their estates and creditors, and other parties in interest. The Leases being assigned under the ExpressRx APA are an integral part of the ExpressRx APA and, accordingly, such assumptions and assignments are reasonable and enhance value to the Debtors estates. Any non-Debtor counterparty to any Lease that has not actually filed with the Court an objection to such assumption as of the date hereof is deemed to have consented to such assumption and assignment.

U. The Debtors and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), 365(b)(1)(B), and 365(f) of the Bankruptcy Code, in connection with the sale and assumption and assignment of the Leases to the extent provided under the ExpressRx APA and have: (1) cured or provided adequate assurance of prompt cure of any default existing prior to the date hereof under any of the Leases, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code; and (2) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Leases, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance of and under the Leases, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. Each provision of the Leases or applicable non-bankruptcy law that purports to prohibit, restrict or condition, or

could be construed as prohibiting, restricting or conditioning, assignment of any Leases in connection with the ExpressRx Transaction has been satisfied or is otherwise unenforceable under Bankruptcy Code section 365.

V. The ExpressRx APA is a valid and binding contract between the Debtors and the Purchaser and shall be enforceable pursuant to its terms. The ExpressRx APA, the ExpressRx Transaction and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, any chapter 7 or chapter 11 trustee appointed in these Chapter 11 Cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

W. The ExpressRx Transaction must be approved and consummated promptly in order to preserve the value of the Contracted Pharmacy Assets. Therefore, time is of the essence in consummating the ExpressRx Transaction, and the Debtors and Purchaser intend to close the ExpressRx Transaction as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the ExpressRx Transaction as contemplated by the ExpressRx APA. Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d).

X. The legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS ORDERED THAT:**

1. The Motion is granted as set forth herein.

2. Any responses or objections to, unless otherwise adjourned, or reservations of rights regarding, the entry of this Order or the relief granted herein or requested

in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, are hereby denied and overruled on the merits with prejudice. All persons and entities that failed to timely object, or withdrew their objections, to the Motion or this Order are deemed to consent to the relief granted herein for all purposes, including pursuant to sections 363(f)(2) of the Bankruptcy Code.

3. The ExpressRx APA, any schedules or exhibits thereto, and all transactions contemplated therein, and all of the terms and conditions thereof are hereby approved and are incorporated herein by reference, and the Debtors are authorized to take any and all actions necessary or appropriate to consummate the ExpressRx APA. The failure specifically to include any particular provision of the ExpressRx APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the ExpressRx APA be approved in its entirety.

4. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to execute, deliver and perform their obligations under and comply with the terms of the ExpressRx APA and to consummate the Express Rx Transaction, pursuant to, and in accordance with, the terms and conditions of the ExpressRx APA and this Order. The provisions of this Order shall be self-executing, and neither the Debtors nor the Purchaser or its Affiliates shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate and implement the provisions of this Order.

5. The Debtors, their Affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be reasonably necessary or

desirable to implement the ExpressRx APA and to take all further actions as may be: (a) reasonably requested by the Purchaser for the purpose of assigning, transferring, and conveying to the Purchaser or its designated Affiliates or reducing to possession, the applicable Contracted Pharmacy Assets; or (b) necessary or appropriate to the performance of the obligations contemplated by the ExpressRx APA, all without further order of the Court.

6. All Persons that are currently, or are on or after the Closing, in possession of some or all of the applicable Contracted Pharmacy Assets are hereby directed to surrender possession of such Contracted Pharmacy Assets to the Purchaser or such Affiliates as it shall designate as of the Closing or at such time as the Purchaser requests.

7. Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Contracted Pharmacy Assets in accordance with the terms of the ExpressRx APA. The Contracted Pharmacy Assets shall be transferred to the Purchaser (or its Affiliates), and upon the Closing, such transfers shall: (a) be valid, legal, binding, and effective, (b) vest the Purchaser or such Affiliates with all right, title, and interest of the Debtors in the Contracted Pharmacy Assets, and (c) be free and clear of all Encumbrances in accordance with section 363(f) of the Bankruptcy Code, with all Encumbrances that represent interests in property to attach to the net proceeds of the ExpressRx Transaction, in the same amount and order of their priority, with the same validity, force, and effect which they have against the Contracted Pharmacy Assets, and subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately prior to the Closing.

8. Except as otherwise provided in the ExpressRx APA, all Persons (and their respective successors and assigns) including all debtholders, equityholders, governmental, tax and regulatory authorities, lenders, employees, former employees, pension plans,

multiemployer pension plans, labor unions, trade creditors, and any other creditors holding Encumbrances against the Debtors or the Contracted Pharmacy Assets, are hereby forever barred, estopped and permanently enjoined from asserting or pursuing such Encumbrances against the Purchaser, its Affiliates, successors or assigns, their property or the Contracted Pharmacy Assets, including taking any of the following actions with respect to an Encumbrance (other than any liability expressly assumed under the ExpressRx APA): (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, its Affiliates, successors or assigns, assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its Affiliates, successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any Encumbrances against the Purchaser, its Affiliates, successors or assigns, assets or properties; (d) asserting an Encumbrance as a setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser or its Affiliates, successors or assigns; (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any of the Contracted Pharmacy Assets or conduct any of the business operated with such assets. No such Persons shall assert or pursue against the Purchaser or its Affiliates, successors or assigns any such Encumbrance.

9. This Order (a) shall be effective as a determination that, as of the Closing, all Encumbrances have been unconditionally released, discharged, and terminated as to the Purchaser and its Affiliates and the Contracted Pharmacy Assets, and that the conveyances and transfers described herein have been effected, and (b) is and shall be binding upon and govern

the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any asset; and each of the foregoing Persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the ExpressRx APA.

10. Following the Closing, no holder of any Encumbrance shall interfere with the Purchaser's or its Affiliates' title to or use and enjoyment of the Contracted Pharmacy Assets based on or related to any such Encumbrance or based on any actions the Debtors may take in these Chapter 11 Cases.

11. Except as expressly set forth in the ExpressRx APA, the Purchaser and its Affiliates, successors and assigns shall have no liability for any Encumbrance, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature or character whatsoever, including Encumbrance arising under: (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including any pension plan of or related to any of the Debtors or any Debtor's Affiliates or predecessors or any current or former employees of any of the foregoing, or the termination of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; (e) any employee, workers' compensation, occupational disease or unemployment or temporary

disability related law (including claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Multiemployer Pension Plan Amendments Act of 1980, (xi) state and local discrimination laws, (xii) state and local unemployment compensation laws or any other similar state and local laws, (xiii) state workers' compensation laws, (xiv) any other state, local, or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors); (f) any antitrust laws; (g) any product liability or similar laws, whether state or federal or otherwise; (h) any environmental laws, rules, or regulations, including under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (i) any bulk sales or similar laws; (j) any federal, state, or local tax statutes, regulations or ordinances, including the Internal Revenue Code of 1986, as amended; and (k) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory, or any other theory of successor liability.

12. Each holder of any Encumbrances against the Debtors, their estates, or any of the Contracted Pharmacy Assets: (a) has, subject to the terms and conditions of this Order, consented to the ExpressRx Transaction or is deemed to have consented to the ExpressRx Transaction; (b) could be compelled, in a legal or equitable proceeding, to accept money

satisfaction of such Encumbrance; or (c) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.

13. The ExpressRx APA and the ancillary documents thereto and the consummation thereof, and the ExpressRx Transaction itself shall not be avoided under section 363(n) or chapter 5 of the Bankruptcy Code. The consideration provided by the Purchaser under the ExpressRx APA is fair and reasonable. Neither the Debtors nor the Purchaser nor any of its Affiliates have engaged in any conduct that would cause or permit the ExpressRx APA to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.

14. Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby directed to accept this Order and any and all other documents and instruments necessary and appropriate to consummate the transactions contemplated by the ExpressRx APA.

15. The Debtors are hereby authorized to assume and assign to the Purchaser or its designated Affiliates effective upon the Closing, the Leases free and clear of all Interests or Claims of any kind or nature whatsoever and execute and deliver to the Purchaser or such Affiliates such documents or other instruments as may be necessary to assign and transfer the Leases to the Purchaser.

16. To the extent that an objection by a counterparty to any Lease, including all objections related to Cure Amounts, is not resolved prior to the Closing, the Debtors, in consultation with the Purchaser, may elect to: (i) not acquire the Debtors' business interest in such Lease; (ii) postpone the assumption and assignment of such Lease to the Purchaser or its designated Affiliate until the resolution of such objection; or (iii) reserve the disputed Cure

Amount and assume the Lease. So long as the Debtors hold the claimed Cure Amount in reserve, and there are no other unresolved objections to the assumption and assignment of the applicable Lease, the Debtors can, without further delay, assume and assign the Lease to the Purchaser or its designated Affiliate that is the subject of the objection. Under such circumstances, the respective objecting counterparty's recourse is limited to the funds held in reserve on account of such disputed Cure Amount.

17. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser or its designee shall be fully and irrevocably vested in all right, title, and interest of the Debtors under each Lease. To the extent provided in the ExpressRx APA, the Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing.

18. The Leases shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser and its designated Affiliate in accordance with their respective terms, notwithstanding any provision in any such Leases that is assumed and assigned to the Purchaser or its designee pursuant to the ExpressRx APA (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

19. Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, the Debtors shall pay the Cure Costs relating to any Lease contemporaneously with Closing or at such time as a dispute regarding a Cure Amount has been resolved by the parties or the Court.

20. The Cure Costs to which no objections have been filed are hereby fixed at the amounts set forth in the Lease Assumption and Assignment Schedule filed by the Debtors, or as otherwise agreed, in writing and with the reasonable consent of the Purchaser, between the

Debtors and the non-Debtor third parties to such Leases, and the non-Debtor parties to such Leases are forever bound by such Cure Costs and, upon payment of such Cure Costs, are hereby enjoined from taking any action against the Purchaser or its Affiliates or the Assets with respect to any claim for cure under any Lease.

21. The payment of the Cure Costs (if any) shall effect a cure of all defaults existing as of the date that such Leases are assumed and compensate for any actual pecuniary loss to such non-Debtor party resulting from such default. No other amounts will be owed by the Debtors, their estates or the Purchaser or its Affiliates with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Leases and any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser or its Affiliates that any additional amounts are due or defaults exist under the Leases that arose or accrued, or relate to or are attributable to the period before the Closing.

22. The Purchaser or its designated Affiliate shall have assumed the obligation of the tenant under the Leases, and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Leases shall not be a default thereunder. After the payment of the relevant Cure Costs by the Debtors, neither the Debtors nor the Purchaser nor any of its Affiliates shall have any further liabilities to the counterparties to the Assigned Contracts, other than the Purchaser's (or its designee's, as the case may be) obligations under the Leases that accrue and become due and payable on or after the date that such Leases are assumed and assigned.

23. Any provisions in any Lease that prohibit or condition the assignment of such Lease or allow the party to such Lease to terminate, recapture, impose any penalty,

condition on renewal or extension or modify any term or condition upon the assignment of such Leases constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment of the Leases have been satisfied.

24. Any party having the right to consent to the assumption or assignment of any Lease that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

25. The Purchaser or its designee, as applicable, shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

26. The Purchaser or its designee, as applicable, has provided adequate assurance of future performance under the relevant Leases within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

27. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Leases are forever barred and permanently enjoined from raising or asserting against the Debtors or the Purchaser or any of its Affiliates any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date that such Leases are assumed or arising by reason of the Closing.

28. The Debtors are hereby authorized to take all actions necessary to implement and effectuate the terms of this Order and the relief granted pursuant to this Order, the ExpressRx Transaction, and the ExpressRx APA.

29. Notwithstanding the applicability, or the possible applicability, of Bankruptcy Rules 4001, 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry. This Order constitutes a final order.

30. The terms and provisions of the ExpressRx APA and this Order shall be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates and their creditors (whether known or unknown), the Purchaser and its Affiliates, successors and assigns, and any affected third parties, including all Persons asserting an Encumbrance (collectively, the "Bound Parties"), notwithstanding any subsequent appointment of any trustee, examiner, receiver, party, entity, or other fiduciary under any chapter of the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, or any trustee, examiner or receiver, party, entity, or other fiduciary. The provisions of this Order and the terms and provisions of the ExpressRx APA, and any actions taken pursuant hereto or thereto as of the date of the entry of such Order shall survive the entry of any order that may be entered confirming or consummating any plan(s) of the Debtors or converting the Debtors' cases from chapter 11 to chapter 7, and the terms and provisions of the ExpressRx APA, as well as the rights and interests granted pursuant to this Order and the ExpressRx APA, shall continue in these or any superseding cases and shall be binding upon the Bound Parties and their respective successors and permitted assigns, including any trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

31. Nothing contained in any chapter 11 plan hereinafter confirmed in these Chapter 11 Cases, or any order confirming such plan, or any other order in these Chapter 11 Cases (including any order approving the wind-down or dismissal of these Chapter 11 Cases or any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from the provisions of the ExpressRx APA or the terms of this Order. This Order shall survive any dismissal of any of these Chapter 11 Cases.

32. The ExpressRx APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment or supplement does not materially change the terms of the ExpressRx APA or any related agreements, documents, or other instruments.

33. This Court shall retain jurisdiction (to the greatest extent allowed by applicable law) with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order, the ExpressRx APA, all amendments thereto, and any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to this Order or the ExpressRx APA (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

Wilmington, Delaware
Dated: ____________, 2019

______________________________
THE HON. CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

**ExpressRx APA**

**EXECUTION VERSION**

# ASSET PURCHASE AGREEMENT

**BETWEEN**

**SC PHARMACY GROUP ACQUISITION CO. LLC**

**AND**

**FRED'S STORES OF TENNESSEE, INC.**

dated as of

September 25, 2019

# TABLE OF CONTENTS


**Page**

**ARTICLE I**
DEFINITIONS ....... 1

**ARTICLE II**
PURCHASE AND SALE OF ASSETS ....... 9

Section 2.1 **Purchase and Sale of Assets** ....... 9
Section 2.2 **Purchase Price** ....... 12
Section 2.3 **Closing** ....... 14
Section 2.4 **Deliveries at the Closings** ....... 15
Section 2.5 **Allocation of the Purchase Price** ....... 18
Section 2.6 **Additional Agreements of the Parties** ....... 18

**ARTICLE III**
REPRESENTATIONS AND WARRANTIES CONCERNING SELLER ....... 21

Section 3.1 **Organization; Qualification** ....... 21
Section 3.2 **Power and Authority; Enforceability** ....... 21
Section 3.3 **Non-Contravention; Governmental Authorizations** ....... 21
Section 3.4 **Title to Purchased Assets** ....... 22
Section 3.5 **Script Volume** ....... 22
Section 3.6 **Inventory** ....... 22
Section 3.7 **Permits, Compliance with Laws** ....... 23
Section 3.8 **Absence of Liabilities, Claims and Litigation** ....... 23
Section 3.9 **Books and Records of the Pharmacies** ....... 24
Section 3.10 **Tax Matters** ....... 24
Section 3.11 **Employee Matters** ....... 24
Section 3.12 **Real Property** ....... 25
Section 3.13 **Environmental** ....... 25
Section 3.14 **Health Regulatory Matters** ....... 26
Section 3.15 **Related Party Transactions** ....... 28
Section 3.16 **Brokers' Fees** ....... 28
Section 3.17 **No Additional Representations** ....... 28

**ARTICLE IV**

REPRESENTATIONS AND WARRANTIES CONCERNING BUYER ....... 28

Section 4.1 **Organization; Qualification**. ....... 29

Section 4.2 **Power and Authority; Enforceability**. ....... 29

Section 4.3 **Non-Contravention; Governmental Authorizations**. ....... 29

Section 4.4 **Absence of Litigation**. ....... 29

Section 4.5 **Brokers' Fees**. ....... 30

Section 4.6 **Buyer's Investigation**. ....... 30

Section 4.7 **Financing**. ....... 30

**ARTICLE V**

PRE-CLOSING COVENANTS ....... 31

Section 5.1 **Operation of Pharmacies**. ....... 31

Section 5.2 **Approvals; Commercially Reasonable Efforts** ....... 31

Section 5.3 **Notices**. ....... 32

Section 5.4 **Employee Matters** ....... 32

Section 5.5 **Access and Information**. ....... 33

Section 5.6 **Confidentiality; Publicity**. ....... 34

Section 5.7 **Restrictive Covenant**. ....... 35

Section 5.8 **Script Assets** ....... 35

Section 5.9 **Third Party Consents** ....... 36

Section 5.10 **Financing**. ....... 36

**ARTICLE VI**

POST-CLOSING COVENANTS ....... 37

Section 6.1 **General**. ....... 37

Section 6.2 **Transfer Taxes** ....... 37

Section 6.3 **Tax Matters** ....... 37

**ARTICLE VII**

CONDITIONS PRECEDENT TO CLOSING. ....... 38

Section 7.1 **Conditions Precedent to Obligations of the Parties**. ....... 38

Section 7.2 **Conditions Precedent to Obligation of Buyer**. ....... 38

Section 7.3 **Condition Precedent to Obligation of Seller**. ....... 39

**ARTICLE VIII**

TERMINATION. ....... 41

Section 8.1 **Termination of Agreement**. 41

Section 8.2 **Effect of Termination**. 41

**ARTICLE IX**
INDEMNIFICATION 42

Section 9.1 **Survival of Representations, Warranties and Covenants**. 42

Section 9.2 **Indemnification Provisions for Benefit of Buyer**. 42

Section 9.3 **Indemnification Provisions for Benefit of Seller**. 43

Section 9.4 **Limitations on Indemnification Liability**. 43

Section 9.5 **Indemnification As Exclusive Remedy**. 44

**ARTICLE X**
MISCELLANEOUS 44

Section 10.1 **Entire Agreement**. 44

Section 10.2 **Successors**. 45

Section 10.3 **Assignments**. 45

Section 10.4 **Notices**. 45

Section 10.5 **Counterparts** 46

Section 10.6 **Headings**. 46

Section 10.7 **Governing Law; Consent to Jurisdiction**. 46

Section 10.8 **Amendments and Waivers**. 47

Section 10.9 **Severability**. 47

Section 10.10 **Expenses**. 47

Section 10.11 **Construction**. 47

Section 10.12 **Bulk Transfer Laws** 48

Section 10.13 **No Third Party Beneficiaries**. 48

Section 10.14 **Schedules**. 48

Section 10.15 **Time is of the Essence**. 48

Section 10.16 **Specific Performance**. 48

**LIST OF EXHIBITS AND SCHEDULES**

| | | |
|---|---|---|
| Exhibit A | — | Limited Power of Attorney |
| Exhibit B | — | Inventory Statement |
| Exhibit C-1 | — | Transfer Instrument |
| Exhibit C-2 | — | Estoppel Certificate and Agreement |
| Exhibit C-3 | — | Subordination, Non-Disturbance and Attornment Agreement |
| Exhibit C-4 | — | Lease Reinstatement Agreement |

| | | |
|---|---|---|
| Schedule 2.1(b)(v) | — | Permits |
| Schedule 2.1(b)(vii) | — | Assumed Real Estate Leases |
| Schedule 2.1(c)(x) | — | Property Located on Premises |
| Section 2.2(b) | — | Pharmacy Asset Sale Schedule |
| Schedule 2.1(d) | — | Assumed Contracts and Liabilities |
| Schedule 2.2(c)(i) | — | Inventory Instructions |
| Schedule 7.1 | — | Pharmacy Specific Conditions |

**SELLER DISCLOSURE SCHEDULES**

| | | |
|---|---|---|
| Section 3.2 | — | Power and Authority; Enforceability |
| Section 3.3(a) | — | Non-Contravention |
| Section 3.3(b) | — | Governmental Authorizations |
| Section 3.4 | — | Title to Purchased Assets |
| Section 3.6 | — | Inventory |
| Section 3.7(a) | — | Permits, Compliance with Laws |
| Section 3.8 | — | Litigation |
| Section 3.9 | — | Books and Records of the Pharmacies |
| Section 3.11 | — | Employee Matters |
| Section 3.12 | — | Real Property |
| Section 3.13 | — | Environmental |
| Section 3.14 | — | Health Regulatory Matters |
| Section 3.14(f) | — | Non-Standard Business |

**BUYER DISCLOSURE SCHEDULES**

| | | |
|---|---|---|
| Section 4.3(b) | — | Non-Contravention; Governmental Authorizations |

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of September 25, 2019, is entered into by and between SC Pharmacy Group Acquisition Co. LLC, a Delaware limited liability company ("***Buyer***") and Fred's Stores of Tennessee, Inc., a Delaware corporation ("***Seller***", and together with Buyer, the "***Parties***").

WHEREAS, Seller desires to sell to Buyer and Buyer desires to purchase from Seller, certain assets of Seller, all on terms and subject to the conditions set forth herein; and

WHEREAS, concurrently with the execution of this Agreement, and as a condition and inducement to Seller's willingness to enter into this Agreement, MHR Institutional Partners Fund IV LP, a Delaware limited partnership (the "***Equity Commitment Party***") has duly executed and delivered to Seller a guarantee of Buyer's obligations hereunder, dated as of the date of this Agreement, in favor of Seller;

WHEREAS, on September 9, 2019, the Seller filed a voluntary petition (the "***Bankruptcy Case***") under chapter 11 of Title 11 §§101-1330 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"); and

WHEREAS, the consummation of the Transactions (as defined below) is subject to, among other things, the entry, after due notice in accordance with the Bankruptcy Code, of the Sale Order (as defined below) by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants contained herein, Buyer and Seller agree as set forth below.

## ARTICLE I
## DEFINITIONS

"***Action***" means any action, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, inquiry, investigation or similar event, occurrence, or proceeding.

"***Affiliate***" or "***Affiliated***" with respect to any specified Person, means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such specified Person. For this definition, "control" (and its derivatives) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person.

"***Assumed Contracts***" means the contracts set forth on Schedule 2.1(d).

"***Assumed Contract Liabilities***" means those liabilities and obligations of Seller arising from the operation of the Pharmacy Business after the applicable Closing Date under the Assumed Contracts and Assumed Real Estate Leases.

"***Assumed Real Estate Leases***" means the real estate leases pursuant to which Seller or its applicable Subsidiary leases the Leased Real Property as set forth on Schedule 2.1(b)(vii) as the same shall have been amended from time to time and including any and all amendments, extensions and related agreements.

"***Business Day***" means a day on which banks are ordinarily open for transaction of normal banking business in New York and Tennessee.

"***Buyer Material Adverse Effect***" means any event, change, circumstance, effect or other matter that has, or could reasonably be expected to have, either individually or in the aggregate with all other events, changes, circumstances, effects or other matters, with or without notice, lapse of time or both, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or to consummate the Transactions.

"***Closing***" means the Initial Closing or any Subsequent Closing.

"***Closing Date***" means, with respect to any Pharmacy, the date the Closing occurs with respect to such Pharmacy.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Confidential Information***" means any information concerning the businesses and affairs of Buyer or Seller, as the case may be except (i) to the extent that the information is or becomes generally available to the public through no fault of the Party or its Affiliates receiving such information, (ii) to the extent that the Party that received the information can demonstrate that it independently developed the same information without in any way relying on any Confidential Information, or (iii) to the extent that the same information becomes available to the Party receiving such information on a non-confidential basis from a source other than a Party or its Affiliates, which source, to the disclosing Party's Knowledge, is not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation to the other Party.

"***Confidentiality Agreements***" means, collectively, that certain Confidentiality Agreement, executed as of January 5, 2019 between Fred's, Inc. and NW LLC, as amended by that certain letter agreement, dated as of April 4, 2019 and that certain letter agreement, dated as of April 4, 2019 between MHR Fund Management LLC and Fred's, Inc.

"***Consent***" means any consent, approval, notification or waiver.

"***Deductible***" means, as of any measurement date, an amount equal to the product of (a) $70,000 *multiplied by* (b) a fraction equal to (i) portion of the Purchase Price theretofore paid at all the Closings that have occurred prior to such measurement date *divided by* (ii) the Purchase Price (as adjusted pursuant to Section 2.2).

"***Direct and Indirect Remuneration***" has the meaning set forth under the implementing regulations to Medicare Part D (at 42 C.F.R. § 423.308).

"***Employees***" means any of Seller's or its Affiliate's employees who are employed exclusively in a Pharmacy.

"***Encumbrance***" means any encumbrance, security interest, lien, option, adverse claim, restriction, mortgage, deed of trust, security interest, indenture, pledge, judgment, charge, restriction, right of first refusal or first offer, lease, sublease, license, conditional sale or other title retention agreements, community property interest, collateral assignment, hypothecation, right of way, option, transfer restriction and claims, whether voluntarily incurred or arising by operation of law (including any agreement to give any of the foregoing in the future).

"***Environmental Laws***" mean any Laws of any Governmental Entity in effect as of the date hereof relating to pollution or protection of the Environment, including Laws relating to the generation, handling, transportation, storage, disposal, discharge or Release of Hazardous Materials.

"***Fraud***" means an act, committed by a Party, with intent to deceive another Party with respect to the matters contemplated by the representations and warranties set forth in this Agreement and requires (i) a false representation of material fact, circumstance or condition; (ii) made with actual Knowledge that such representation is false; (iii) with an intention to induce the Party to whom such representation is made to act or refrain from acting in reliance upon it; (iv) causing that Party, in justifiable reliance upon such false representation and with ignorance to the falsity of such representation, to take or refrain from taking action; and (v) causing such Party to suffer damage by reason of such reliance.

"***GAAP***" means United States generally accepted accounting principles as in effect as of the date hereof.

"***Governmental Entity***" shall mean any and all federal, state or local governments, governmental institutions, public authorities and governmental entities of any nature whatsoever, and any subdivisions or instrumentalities thereof, including departments, boards, bureaus, commissions, agencies, courts, arbitral tribunals, administrations and panels, and any divisions or instrumentalities thereof, whether permanent or *ad hoc*.

***"Governmental Programs"*** shall mean any health benefit programs that are sponsored by a Governmental Entity in which a Pharmacy participates, whether pursuant to one or more contracts with the applicable Governmental Entity or otherwise, including, but not limited to, the Medicare prescription drug program and the Medicare Advantage program (Title XVIII of the Social Security Act); the Medicaid Program (Title XIX of the Social Security Act), and the TRICARE Program (10 U.S.C. § 1071 et seq.).

"***Hazardous Material***", means any substance, material or waste defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," or "toxic waste" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601, et. seq. as amended; the Hazardous Materials Transportation Act as amended, 49 U.S.C. § 5101 et. seq.; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et. seq.; similar state laws; and in the regulations adopted pursuant to each of the aforesaid laws, and including petroleum, petroleum products, asbestos and asbestos-containing materials, and polychlorinated biphenyls.

"***Health Care Laws***" means all Laws relating to: (a) the licensure, certification, qualification or authority to transact business in connection with the provision of, payment for, or arrangement of, health benefits or health insurance, including Laws that regulate managed care, third party payors and persons bearing the financial risk for the provision or arrangement of health care services and, without limiting the generality of the foregoing, Laws relating to Payment Programs; (b) the licensure, certification, qualification, authority and operations of pharmacies, wholesalers, drug prepackagers or other medical or health facilities or the dispensing, delivering, packaging, repackaging, manufacturing, distributing, importing, possessing, advertising, labeling, and adulteration of drug products, and controlled substances; (c) the solicitation or acceptance of improper incentives involving persons operating in the health care industry, including, without limitation, Fraud and Abuse Laws; (d) billings to insurance companies, health maintenance organizations and other managed care plans or otherwise related to insurance fraud; (e) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, (f) the Federal Drug and Cosmetic Act, 21 U.S.C. Section 301 et. seq.; (g) the Federal Controlled Substances Act, 21 U.S.C. §§ 801 et seq.; (h) the Controlled Substances Act (21 U.S.C. §§ 801 et seq.) and Controlled Substances Import and Export Act (21 U.S.C. §§ 951 et seq.) and applicable state Laws regulating the possession, distribution, provision or use of controlled substances; (i) the 340B Program, 42 U.S.C. § 256(b), and the Laws and official guidance issued by the Health Resources and Services Administration, (j) the Clinical Laboratory Improvement Amendments of 1988 (42 U.S.C. § 263a and regulations promulgated thereunder; (k) HIPAA; (l) any Laws governing the privacy, security, integrity, accuracy, transmission, storage or other protection of patient or individual health care information; (m) any state insurance, health maintenance organization or managed care Laws; (n) the Patient Protection; and Affordable Care Act (Pub. L. 111-148), as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111-152), and the regulations promulgated thereunder; (o) state laws related to the practice of pharmacy and medicine; and (p) any other Law, regulation, guidance document, manual provision, program memorandum, opinion letter, or other public issuance which regulates kickbacks, patient or program charges, recordkeeping, claims process, documentation requirements, medical necessity, referrals, the hiring of employees or acquisition of services or supplies from those who have been excluded from government health care programs, quality, safety, privacy, security, licensure, accreditation or any other aspect of providing health care services.

"***HIPAA***" means the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act of 2009, altogether with their implementing regulations.

"***Initial Closing Date***" means the date the Initial Closing occurs.

"***Knowledge***" means (i) when used with respect to Buyer, "Knowledge" means the actual Knowledge of the following individuals: Josh Sigmon and Keith Schaitkin; and (ii) when used with respect to Seller, "Knowledge" means the actual knowledge of the following individuals: Joseph Anto, Benjamin Morgan and Cora Beth Smith.

"***Law***" means any applicable statute, rule, regulation, administrative requirement, code or ordinance of any Governmental Entity, each as amended and now in effect.

"***Leased Real Property***" means the real property on which the Pharmacies are located, at the addresses set forth on the Pharmacy Asset Sale Schedule.

"***Liability" or "Liable***" means any liability or obligation, whether known or unknown, asserted or unasserted, absolute or contingent, matured or unmatured or conditional or unconditional.

"***Medicare***" means Title XVIII of the Social Security Act, as amended.

"***Medicaid***" means Title XIX of the Social Security Act, as amended.

"***Ordinary Course of Business***" means the operation of the Pharmacy Business in the ordinary course of business consistent with past custom and practice of Seller and its Subsidiaries, except as required or contemplated by the Transactions, including providing Buyer with copies of the Script Assets pursuant to the terms of this Agreement (and Buyer's use thereof solely for purposes of ensuring that Buyer is ready and able to fill prescriptions services as of the applicable Closing), or as otherwise consented to by Buyer in writing.

"***Organizational Documents***" means the articles of incorporation, certificate of incorporation, charter, bylaws, articles of formation, regulations, operating agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

***"Payment Programs"*** means Government Programs, commercial or private payor arrangements, including those operated or administered by pharmacy benefit managers, and other third-party payor programs.

"***Pharmacy Asset Sale Schedule***" means the schedule set forth on <u>Schedule 2.2(b)</u>.

"***Permit***" means any permit, license, order, certificate, approval, registration, filing, accreditation, certification or other similar authorization required by any Law or Governmental Entity for the conduct of the Pharmacy Business.

"***Permitted Encumbrances***" means (i) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures, (ii) mechanics' and other statutory liens which are not material in amount relative to the property affected, (iii) imperfections of title which are not material in amount relative to the property affected and which do not materially interfere with the present use of the property subject thereto or affected thereby, (iv) restrictions on transfer generally arising under Law, (v) performance bonds, letters of credit or similar arrangements securing the performance of contractual obligations, (vi) with respect to any of the Leased Real Property: (a) easements, covenants, conditions and restrictions of record, (b) easements, covenants, conditions and restrictions not of record as to which no material violation or encroachment exists or, if such violation or encroachment exists, as to which the cure of such violation or encroachment would not materially interfere with the conduct of the Pharmacy Business, taken as a whole, (c) zoning or other governmentally established restrictions or encumbrances, and (d) railroad trackage agreements, utility, slope and drainage easements, right of way easements and leases regarding signs, none of which individually or in the aggregate, would reasonably be expected to be material

to the Pharmacy Business taken as a whole, and (vii) any such other or additional title exceptions or Encumbrances that would not, individually or in the aggregate, reasonably be expected to be material to the Pharmacy Business taken as a whole.

"***Person***" means any individual, partnership, limited liability company, corporation, association, joint stock company, entity, joint venture, unincorporated organization or Governmental Entity.

"***Pharmacy***" means each of the retail pharmacies set forth on the Pharmacy Asset Sale Schedule.

"***Pharmacy Business***" means, with respect to any Pharmacy, the storing, dispensing, and selling of retail pharmaceutical products pursuant to a prescription order, along with the inventory, prescription files and assembled workforce necessary to dispense and sell drugs pursuant to a prescriber and such other business operations of the Pharmacies as conducted by Seller or its Subsidiaries immediately prior to the execution of this Agreement.

"***Pharmacy Specific Conditions***" means, with respect to any Pharmacy, the Third Party Consents or Consents of Governmental Entities listed under such Pharmacy on Schedule 7.1 hereto.

"***Post-Closing Tax Period***" means any taxable period beginning on or after the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

"***Power of Attorney***" means a power of attorney, between the Seller and the Buyer, in substantially the form attached as Exhibit A.

"***Pre-Closing Tax Period***" means any taxable period ending before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"***Premises***" means, for each Pharmacy, the premises of such Pharmacy located at the respective addresses set forth on the Pharmacy Asset Sale Schedule.

"***Premises Documentation***" means, for each of the Assumed Real Estate Leases demising Premises on which a Pharmacy is located: (A) an estoppel certificate and agreement substantially in the form of Exhibit C-2, with such changes thereto as may be reasonably agreed upon by the parties thereto, executed by the applicable landlord and dated within thirty (30) days of the Closing Date; (B) a subordination, non-disturbance and attornment agreement (SNDA) substantially in the form of Exhibit C-3, with such changes thereto as may be agreed upon by the parties thereto, executed by the holder of each mortgage secured by the applicable landlord's interest in the Premises; and (C) in cases in which the applicable lease has expired or been terminated or is scheduled to expire prior to one (1) year following the Closing Date, and a reinstatement term is not included in the estoppel certificate and agreement for such Pharmacy, an agreement reinstating such lease on the respective terms set forth on Exhibit C-4, with such changes thereto as may be agreed upon by the parties thereto.

"***Professional Personnel***" means each of the Pharmacy Business's employees and contractors who provide or have provided professional services on behalf of the Pharmacy Business that require any certification or license.

"***Release***" means release, spill, emission, migration, leaking, pumping, injection, deposit, disposal or discharge of any Hazardous Material into the environment.

"***Representatives***" means Persons acting on behalf of another Person, including such Person's officers, directors, employees, representatives, agents, independent accountants, investment bankers and counsel.

"***Sale Order***" means an order of the Bankruptcy Court in form and substance reasonably satisfactory to Buyer and Seller authorizing and approving this Agreement and all of the terms and conditions hereof, finding the Transactions to be arm's length transactions for reasonably equivalent value to the estate and approving and authorizing Seller to consummate the Transactions pursuant to Sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code.

"***Schedules***" means the scheduled disclosures included in each of Buyer Disclosure Schedule and the Seller Disclosure Schedule, as the case may be.

"***Seller Material Adverse Effect***" means any event, change, circumstance, effect or other matter that has, or could reasonably be expected to have, either individually or in the aggregate with all other events, changes, circumstances, effects or other matters, with or without notice, lapse of time or both, a material adverse effect on (a) the Purchased Assets, taken as a whole, or (b) the ability of Seller to perform its obligations under this Agreement or to consummate the Transactions, in each case after giving effect to any available indemnification, insurance, or other recoveries; *provided, however,* that in no event shall any of the following constitute a Material Adverse Effect or be taken into account in determining whether a Material Adverse Effect has occurred:

(a) any event, change, circumstance, effect or other matter resulting from or relating to changes in economic or financial conditions generally (except to the extent that such change has had a materially disproportionate negative effect on Seller (solely with respect to the Purchased Assets, taken as a whole) relative to other similarly situated Persons in its industry);

(b) any event, change, circumstance, effect or other matter that affects Seller's industry generally (except to the extent that such event, change, circumstance, effect or other matter has had a materially disproportionate negative effect on Seller (solely with respect to the Purchased Assets, taken as a whole) relative to other similarly situated Persons in their industry);

(c) any fact, event, series of events, change, effect or circumstance resulting from or relating to the public announcement, the execution of or the pendency or consummation of this Agreement;

(d) any national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military

or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States;

(e) any action taken by Buyer or any of its Affiliates or any omission to act or action taken with the consent of or at the request of Buyer or any of its Affiliates (including those omissions to act or actions taken which are permitted by or are otherwise in compliance with this Agreement);

(f) any matter that has been cured by Seller;

(g) changes in Laws of general applicability or accounting principles (including GAAP) or the enforcement, implementation or interpretation thereof (or proposals related to the foregoing);

(h) any epidemics, natural disasters (including hurricanes, tornadoes, floods or earthquakes) or any other force majeure events;

(i) taking any action permitted or contemplated by, or the failure to take any action prohibited by, this Agreement, or the taking of any action or refraining from taking any action at Buyer's request; or

(j) reasonably anticipated effects of the filing, commencement or prosecution of the Bankruptcy Case, provided that Seller shall have taken all actions reasonably required or reasonably requested by Buyer to mitigate such adverse effects on the Purchased Assets.

"***Straddle Period***" means any Tax period beginning before and on or ending after the Closing Date.

"***Subsidiary***" means, with respect to any Person: (i) any corporation of which 50% or more of the total voting power of all classes of the equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors is owned by such Person directly or through one or more other Subsidiaries of such Person and (ii) any Person other than a corporation of which at least a majority of the equity interests (however designated) entitled (without regard to the occurrence of any contingency) to vote in the election of the governing body, partners, managers or others that will control the management of such entity are owned by such Person directly or through one or more other Subsidiaries of such Person.

"***Tax***" means all federal, state, local, non-U.S. and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"***Tax Return***" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes filed or required to be filed with any Governmental Entity, including any schedule or attachment thereto, and including any amendment thereof.

"***Transaction Documents***" means this Agreement and the Transfer Instruments.

"***Transactions***" means all of the transactions contemplated by this Agreement and the other Transaction Documents, including: (i) the sale of the Purchased Assets by Seller to Buyer and Buyer's delivery of the Purchase Price therefor; (ii) the assumption of the Assumed Liabilities by Buyer, (iii) the execution, delivery and performance of all of the documents, instruments and agreements to be executed, delivered and performed in connection herewith; and (iv) the performance by Buyer and Seller of their respective covenants and obligations (pre- and post-Closing) under this Agreement.

"***Transferred Employee Liabilities***" means any Liabilities arising out of or relating to the Buyer's employment of any Offered Employee who accepts employment with Buyer, including without limitation (a) with respect to employee benefits, compensation or other arrangements.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

Section 2.1 **Purchase and Sale of Assets**.

(a) Upon the terms and subject to the conditions of this Agreement, at each Closing and upon payment of the portion of the Purchase Price attributable to such Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in and to the applicable Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances and to the extent permitted by the Sale Order), but excluding the Excluded Assets, for the Purchase Price.

(b) "***Purchased Assets***" means the Pharmacies and their respective Pharmacy Businesses, including the following assets at the time of such Pharmacy's Closing:

(i) all of Seller's prescription files, prescription records, signature logs, patient profiles, patient refill history, customer lists and all electronic data maintained in any format by Seller with respect to prescriptions filled by Seller at such Pharmacy or otherwise utilized, maintained and/or generated by Seller in the course of operating the Pharmacy Business, including all hard copy prescriptions, patient profiles, signature logs, customer lists, all electronic data and all other related data utilized by Seller in the course of operating such Pharmacy (collectively, the "***Script Assets***") for the last three (3) years prior to the Closing Date or such shorter period as such Pharmacy shall have been in operation;

(ii) subject to the terms of the Inventory Instructions, the retail prescription pharmaceutical inventory, insulin, syringes and schedule V items located at such Pharmacy (the "***Pharmaceutical Inventory***");

(iii) subject to the terms of the Inventory Instructions, the other non-Pharmaceutical Inventory located at the Pharmacies (the "***Non-Pharmaceutical Inventory***");

(iv) all furniture, fixtures, trade fixtures, equipment (including automated pill counters), office and building equipment, fittings, furniture, office equipment, supplies, computers, network equipment, circuits, DVR, cameras, security equipment, telephones, leasehold improvements, installations, and other tangible personal property, fixed assets and other assets of whatever kind or nature (other than as expressly included as Excluded Assets) located at such Pharmacy and owned by Seller, including, to the extent exclusive to such Pharmacy and transferable (including those that may be transferred with consent, subject to Section 2.7), all hardware, and software necessary to operate such Pharmacy's dispensing system and (with the exception of POS equipment) to operate the Pharmacy Business;

(v) the Permits described on Schedule 2.1(b)(v) that are utilized exclusively in the operation of such Pharmacy, solely to the extent freely and legally transferable (including those that may be transferred with consent, subject to Section 2.7);

(vi) all telephone numbers designated and publicly published exclusively as phone numbers of such Pharmacy, including but not limited to the main phone number for such Pharmacy, the fax number for such Pharmacy, and the doctor's line for such Pharmacy (the "***Pharmacy Telephone Numbers***");

(vii) the Assumed Real Estate Leases;

(viii) the Assumed Contracts, including, to the extent freely assignable or transferable (and as permitted by applicable Law), the contracts and other agreements, whether written or oral, relating to the provision of pharmacy products and services exclusively to the Pharmacy and consultant pharmacy services exclusively to customers of the Pharmacy, all guaranties and warranties of third parties to the extent they relate exclusively to the conduct of Seller at the Pharmacy or ownership of the Assets, and all non-competition agreements in favor of Seller to the extent related exclusively to the Pharmacy, each as set forth on Schedule 2.1(d).

(ix) other data, files, books, and records (whether in hard copy or computer or electronic format) relating exclusively to the Assets and/or the Pharmacy.

(x) all other assets or rights, real or personal, tangible or intangible, owned by Seller and used by Seller exclusively in the conduct of the Pharmacy; and

(xi) all goodwill with respect to the Assets being sold hereunder, the Purchased Assets described in Section 2.1(b)(iv) through this Section 2.1(b)(xi) being collectively referred to as the "***Other Purchased Assets***".

(c) Excluded Assets. The Purchased Assets shall not include the following (collectively, the "***Excluded Assets***"):

(i) any of Seller's motor vehicles, employee benefit plans and programs, computer hardware, software programs and systems not located on the Premises other than as expressly included in the Purchased Assets, point-of-sale equipment, software programs and systems whether or not located on the Premises (other than the wiring related

thereto, which shall be deemed to be a Purchased Asset), Permits other than those described on Schedule 2.1(b)(v) and Contracts other than the Assumed Contracts and Assumed Real Estate Leases;

(ii) any of Seller's websites, trademarks, trade names, intellectual property and other intangible property or rights;

(iii) any books and records related to Taxes of Seller (including accounting records and Tax Returns other than income Tax Returns) and all financial and Tax records relating to the Pharmacies that form part of Seller's or any of Seller's Affiliates' or any of their respective Affiliates' general ledger (other than those expressly included in the Script Assets);

(iv) cash, cash equivalents, or securities of Seller or any of Seller's Affiliates (including any drawer cash), accounts receivable or proceeds thereof, trade receivables, refunds or credits, claims for refunds or credits or rights to receive refunds or credit related to Taxes from any Governmental Entity with respect to Taxes of Seller, in each case, including any of such items related to the Pharmacies;

(v) other than the Script Assets as set forth above, any (A) registration information and customer data and other information derived from customer loyalty cards, promotions, rewards programs, co-branded credit card programs and the like, (B) customer lists (including email addresses and phone numbers), and (C) equipment related to the fredsinc.com and fredsmeds.com business operations;

(vi) a copy of all Script Assets, which Seller shall have the right to retain, to the extent permitted by, and subject to the requirements of applicable Law and Section 5.8;

(vii) all claims, to the extent arising out of, relating to or in respect of any other Excluded Asset and Excluded Liability or the operation of the Pharmacies prior to the Closing, and any proceeds thereunder, including (A) any such items arising under insurance policies, and (B) all guarantees, warranties, indemnities, and similar rights in favor of Seller or any of Seller's Affiliates in respect of any Excluded Asset, any Excluded Liability or the operation of the Pharmacies prior to the applicable Closing;

(viii) all claims or causes of action that Seller may assert against any third-party, other than claims or causes of action exclusively related to the Purchased Assets and arising after the Closing;

(ix) all property located on the Premises but not owned by Seller, including (A) any vendor owned equipment (including racks and displays, ice merchandise, reach-in beverage cases, ice cream cases, freezers, coffee and soft drink equipment, change safe, microwaves, and DVR and camera equipment), (B) property owned by a supplier of Seller (including backroom computer, electronic funds transfer equipment and routers), (C) any air and water stands, ATM machines, lotto machines, money order machines and payphones, and (D) any other leased, consigned or licensed property of any kind or nature, provided that Seller will list all such property for each Pharmacy on Schedule 2.1(c)(x) in

sufficient detail for Buyer to reasonably arrange for its re-leasing or replacement prior to Closing, with the assistance of Seller, as Buyer may reasonably request; and

(x) any other assets of Seller or its Affiliates not located on the Premises (other than any asset that is expressly a Purchased Asset).

(d) Assumed Liabilities. Subject to the terms and conditions of this Agreement, at the applicable Closing, Buyer shall not assume any and all Liabilities of Seller other than the Assumed Contract Liabilities and any other Assumed Liabilities specified on Schedule 2.1(d) (collectively, the "***Assumed Liabilities***"). For the avoidance of doubt, "Assumed Liabilities" do not include any liabilities arising out of or related to the conduct of the Pharmacy Business prior to the applicable Closing, any liability under the Assumed Real Estate Leases and Assumed Contracts relating to periods prior to the applicable Closing, or any liability related to any prescription fill prior to the applicable Closing Date, including Direct and Indirect Remuneration, or any other billing-related liabilities, it being understood and agreed that Buyer's responsibility for the Purchased Assets, the Pharmacy Business and any Assumed Liabilities of any Pharmacy will arise solely from its operation of the Pharmacy Business after the Closing of the purchase of such Pharmacy. Buyer will have no liability to any employees of Seller except Transferred Employee Liabilities, and no liability for Taxes except for (i) Buyer's share of Transfer Taxes, as provided in Section 6.2, (ii) Transfer Taxes and other Taxes relating to the Pharmacy and/or Purchased Assets for any Post-closing Tax Period.

(e) Excluded Liabilities. Other than the Assumed Liabilities, Buyer shall not assume or be liable for any Liabilities of Seller to the extent arising out of Seller's operation of the Purchased Assets prior to Closing (collectively, the "***Excluded Liabilities***"). Buyer shall not assume, or be obligated to perform, pay or otherwise discharge, any liability or obligation of Seller of any nature whatsoever, including, without limitation, any type of successor liability, as a result of the Transactions, all of which shall be deemed Excluded Liabilities hereunder, except for obligations and liabilities to be performed by Buyer as assignee under the Assumed Real Estate Leases and Assumed Contracts, which obligations and liabilities accrue subsequent to Closing. Without limiting the foregoing, Seller expressly acknowledges and agrees that Buyer is not assuming, and Buyer expressly disclaims and declines assumption of any and all obligations and/or liabilities of Seller or the Assets arising from or related to acts or omissions occurring on or prior to the Date of Inventory.

Section 2.2 **Purchase Price**.

(a) Purchase Price. The aggregate purchase price (the "***Purchase Price***") to be paid by Buyer to Seller with respect to the Purchased Assets is equal to:

(i) $4,426,983 (the "***Script Base Price***"), for the Script Assets, as adjusted pursuant to Section 2.2(b) (the "***Adjusted Script Price***") *plus*

(ii) the value of the Pharmaceutical Inventory as determined pursuant to Section 2.2(c) (with respect to each Pharmacy's Pharmaceutical Inventory, the "***Pharmaceutical Inventory Purchase Price***") (provided, that the aggregate

Pharmaceutical Inventory Purchase Price for all Pharmacies shall not exceed $1,950,000); *plus*

(iii) the value of the Non-Pharmaceutical Inventory as determined pursuant to Section 2.2(c) (with respect to each Pharmacy's Non-Pharmaceutical Inventory, the "***Non-Pharmaceutical Inventory Purchase Price***") (provided, that the aggregate Non-Pharmaceutical Inventory Purchase Price for all Pharmacies shall not exceed $525,000); and

(iv) $119,050 for the Other Purchased Assets (the "***Other Purchased Assets Price***"), allocated $11,905 per Pharmacy (the "***Other Purchased Assets Price Allocation***").

The Purchase Price shall be paid in accordance with Section 2.4(c).

(b) Script Purchase Price. The Script Base Price represents an aggregate annual volume of 536,604 prescriptions valued at $8.25 per prescription. The Pharmacy Asset Sale Schedule set forth on Schedule 2.2(b) sets forth the allocation agreed between the Parties of such aggregate volume and the aggregate Script Base Price to each Pharmacy (each, such Pharmacy's "***Base Volume***" and "***Base Script Price***"). Through the Closing Date for each Pharmacy, Seller shall continue to deliver to Buyer, promptly and on a weekly basis, its Script Tracker report setting forth prescriptions filled by such Pharmacies, on the basis of which the Parties shall, during the week prior to the Closing Date, cooperate to calculate the annualized prescription volume for each such Pharmacy using the same methodology used to calculate its Base Volume based on actual script volume for the 14-week period ending on the close of business on the Saturday one week prior to the Closing Date (defined in Section 2.2(c) below) (such annualized volume, the "***Closing Volume***" for such Pharmacy). The Base Script Price for each Pharmacy will be subject to upward or downward adjustment, as applicable, in the amount of $8.25 times the difference between the applicable Base Volume and Closing Volume, provided that no adjustment will be made unless the applicable Closing Volume is more than 105%, or less than 95%, of, the applicable Base Volume. The sum of the Base Script Prices, so adjusted, shall be the Adjusted Script Price forming part of the Purchase Price.

(c) Inventory Purchase Prices.

(i) Following the close of business for each Pharmacy on the Friday preceding the Closing Date for such Pharmacy (if a Business Day, and otherwise, on the preceding day) (the "***Date of Inventory***") and continuing, as necessary, through the following weekend, WIS International (the "***Third Party Valuator***") shall conduct a physical inventory and valuation of Pharmaceutical Inventory and Non-Pharmaceutical Inventory at such Pharmacy (each an "***Inventory Audit***"), using the terms, categories and cost factors listed in the inventory instructions set forth on Schedule 2.2(c)(i) attached hereto and made a part hereof (the "***Inventory Instructions***"). The Inventory Audit of each Pharmacy shall commence following the close of business for that Pharmacy. From the beginning of the Inventory Audit until the opening of business on the Closing Date, Seller shall close the Pharmacy to the general public. Prior to the commencement of the physical Inventory Audit, Seller shall reverse and return all filled and undelivered prescriptions at

the Pharmacy to stock in accordance with applicable Governmental Entity regulations, Laws and requirements, providing all necessary notice to any third-party payors, reversing any adjudicated claims made in respect of such prescriptions, and shall provide Buyer with a list of such prescriptions so that Buyer is prepared to fill such prescriptions after the Closing. Seller shall arrange to have its personnel present on the Date of Inventory and as necessary through the weekend, who shall monitor and assist in same, and Buyer shall be permitted to have one or more representatives observe each Inventory Audit. The costs and expenses of the Third Party Valuator are to be borne equally by Buyer and Seller. Each Inventory Audit shall be conducted, and the value ascribed to each item of Pharmaceutical Inventory by the Third Party Valuator in determining the aggregate value of the applicable Pharmacy's Pharmaceutical Inventory Purchase Price shall be determined in accordance with the Inventory Instructions.

(ii) At the conclusion of the Inventory Audits, the Third Party Valuator shall provide Buyer and Seller with a physical inventory valuation report in the form attached hereto as Exhibit B (the "***Inventory Statement***") setting forth (x) the Pharmaceutical Inventory Purchase Price with respect to the applicable Pharmacies' Pharmaceutical Inventory, not to exceed $1,950,000 (subject to the terms of the Inventory Instructions applicable to Pharmaceutical Inventory) and (y) the Non-Pharmaceutical Inventory Purchase Price for each Pharmacy's Non-Pharmaceutical Inventory, which shall be equal to 105% of Seller's cost for such Non-Pharmaceutical Inventory (and Seller shall provide Buyer with evidence, reasonably acceptable to the Buyer, of such cost), not to exceed $525,000 in the aggregate (subject to the terms of the Inventory Instructions applicable to Non-Pharmaceutical Inventory). On such Pharmacy's Closing Date, Seller shall provide to Buyer documentation of Seller's cost for such Non-Pharmaceutical Inventory. The Inventory Statement shall be final and binding on the Parties other than in the event of fraud or manifest error. Buyer and Seller agree to use good faith efforts to promptly resolve any good faith disputes or manifest errors in any Pharmacy's Inventory Audit or in the calculation of such Pharmacy's Pharmaceutical Inventory Purchase Price within two Business Days following the Closing.

Section 2.3 **Closing**.

(a) Buyer and Seller shall use commercially reasonable efforts to consummate the Transactions in a single Closing. Notwithstanding anything in this Agreement to the contrary, if at any time on or after the date hereof, the conditions set forth in Section 7.1, Section 7.2(a) and Section 7.3(a) have been satisfied or waived with respect to at least eight (8) Pharmacies (other than such conditions which, by their nature, are to be satisfied at a Closing), the sale and purchase of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement with respect to the Pharmacies for which the Pharmacy Specific Conditions have been satisfied or waived (other than such conditions which, by their nature, are to be satisfied at a Closing) (such Pharmacies, the "***Initial Closing Pharmacies***") shall take place at an initial closing (the "***Initial Closing***") on the first Monday that is at least three (3) Business Days following the satisfaction and waiver of such conditions (or, if such Monday is not a Business Day, on the next Business Day) and will be held at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York, at 9:00 a.m., New York City time, or such other time, place and date

as Buyer and Seller may agree in writing or remotely via the exchange of executed documents or closing deliverables.

(b) The Parties shall defer the Closing of the sale and purchase of the Purchased Assets and the assumption of the Assumed Liabilities of any Pharmacies not subject to the Initial Closing until such time as such Pharmacy's Pharmacy Specific Conditions are satisfied or waived (other than such conditions which, by their nature, are to be satisfied at a Closing) (each a "***Subsequent Closing Pharmacy***"). From and after the Initial Closing, Seller and Buyer shall continue to use commercially reasonable efforts to effect the Closing(s) with respect to each Subsequent Closing Pharmacy (each, a "***Subsequent Closing***"). A Subsequent Closing Pharmacy's Subsequent Closing will be held on the first Monday (or, if such Monday is not a Business Day, on the next Business Day) that is at least three (3) Business Days following the satisfaction or waiver of such Subsequent Closing Pharmacy's Pharmacy Specific Conditions or such other time as mutually agreed by the Parties (subject to the satisfaction or waiver at or prior to such time of such other conditions set forth in Section 7.1, Section 7.2(b) and Section 7.3(b)). Each such Subsequent Closing shall be held at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York, at 9:00 a.m., New York City time, or such other time, place and date as Buyer and Seller may agree in writing or remotely via the exchange of executed documents or closing deliverables. The day on which an applicable Subsequent Closing takes place is referred to as such Subsequent Closing Pharmacy's "***Subsequent Closing Date***".

Section 2.4 **Deliveries at the Closings**.

(a) Seller deliveries to Buyer:

(i) Prior to or at the Initial Closing, Seller will make the following deliveries to Buyer:

(A) a counterpart to a bill of sale and assignment and assumption agreement, substantially in the form of Exhibit C-1 (a "***Transfer Instrument***"), duly executed by Seller, conveying the Purchased Assets and Assumed Liabilities to be transferred at the Initial Closing;

(B) a certificate, duly executed by Seller, dated as of the Initial Closing Date, confirming the satisfaction of the conditions set forth in Section 7.2(a)(i) and Section 7.2(a)(ii) with respect to the Initial Closing Pharmacies;

(C) a certificate, duly executed by Seller, pursuant to Treasury Regulations Section 1.1445-2(b) that Seller is not a foreign person within the meaning of Section 1445 of the Code;

(D) two copies of the Power of Attorney, where permitted to grant such power of attorney by law, one dated the Initial Closing date and one dated 45 days following the Initial Closing date, duly executed by Seller, to the extent necessary for the uninterrupted operation of the applicable Initial Closing Pharmacies; and

(E) the Third Party Consents or Consents of Governmental Entities required as Pharmacy Specific Conditions for the Pharmacies included in the Initial Closing.

(ii) Prior to or at each Subsequent Closing, Seller will make the following deliveries to Buyer:

(A) a counterpart to a Transfer Instrument, duly executed by Seller, conveying the Purchased Assets and Assumed Liabilities to be transferred at the applicable Subsequent Closing;

(B) a certificate, duly executed by Seller, dated as of the Subsequent Closing Date, confirming the satisfaction of the conditions set forth in Section 7.2(b)(i) and Section 7.2(b)(ii) with respect to the Purchased Assets being transferred at the applicable Subsequent Closing;

(C) two copies of the Power of Attorney, where permitted to grant such power of attorney by law, one dated the Subsequent Closing date and one dated 45 days following the Subsequent Closing date, duly executed by Seller, to the extent necessary for the uninterrupted operation of the applicable Subsequent Closing Pharmacies; and

(D) the Third Party Consents or Consents of Governmental Entities required as Pharmacy Specific Conditions for the Pharmacies included in such Closing.

(b) Buyer deliveries to Seller:

(i) Prior to or at the Initial Closing, Buyer will make the following deliveries to Seller:

(A) a counterpart to the applicable Transfer Instrument, duly executed by Buyer, accepting the Purchased Assets and Assumed Liabilities to be transferred at the Initial Closing;

(B) a certificate, duly executed by Seller, dated as of the Initial Closing Date, confirming the satisfaction of the conditions set forth in Section 7.3(a)(i) and Section 7.3(a)(ii) with respect to the Initial Closing Pharmacies; and

(C) two copies of the Power of Attorney, where permitted to grant such power of attorney by law, one dated the Initial Closing date and one dated 45 days following the Initial Closing date, duly executed by Buyer, to the extent necessary for the uninterrupted operation of the applicable Initial Closing Pharmacies.

(ii) Prior to or at each Subsequent Closing, Buyer will make the following deliveries to Seller:

(A) a counterpart to the applicable Transfer Instrument, duly executed by Buyer, accepting the Purchased Assets and Assumed Liabilities to be transferred at the applicable Subsequent Closing;

(B) a certificate, duly executed by Buyer, dated as of the applicable Subsequent Closing Date, confirming the satisfaction of the conditions set forth in Section 7.3(b)(i) and Section 7.3(b)(ii); and

(C) two copies of the Power of Attorney, where permitted to grant such power of attorney by law, one dated the Subsequent Closing date and one dated 45 days following the Initial Closing date, duly executed by Buyer, to the extent necessary for the uninterrupted operation of the applicable Subsequent Closing Pharmacies.

(c) Closing Payments.

(i) At the Initial Closing, Buyer shall pay by wire transfer of immediately available funds to an account designated by Seller a portion of the Purchase equal to (i) the aggregate Base Script Price of the Initial Closing Pharmacies (as adjusted pursuant to Section 2.2(b)) *plus* (ii) the aggregate Other Purchased Assets Price Allocations of the Initial Closing Pharmacies, subject to clause (iii) below. At each Subsequent Closing, Buyer shall pay by wire transfer of immediately available funds to an account designated by Seller, a portion of the Purchase Price equal to (i) the aggregate Base Script Price of the applicable Pharmacies (as adjusted pursuant to Section 2.2(b)) *plus* (ii) the aggregate Other Purchased Assets Price Allocations of such Pharmacies, subject to clause (iii) below.

(ii) No later than one (1) Business Day following the determination of the applicable Pharmaceutical Inventory Purchase Price pursuant to Section 2.2(c), Buyer shall pay by wire transfer of immediately available funds to an account designated by Seller an amount equal to the Pharmaceutical Inventory Purchase Price and the Non-Pharmaceutical Inventory Purchase Price for all Pharmacies included in such Closing.

(iii) Notwithstanding the foregoing, an aggregate amount equal to $500,000 of the Purchase Price shall be withheld from the payments required to be made by Buyer pursuant to this Section 2.4(c), as proportionately as practicable from the foregoing payments at each Closing (the "***Holdback Amount***"), as a reserve to ensure payment and performance of Seller's indemnification obligations pursuant to Article IX. Buyer shall hold, administer and disburse the Holdback Amount, net of amounts, if any, applied against Seller's indemnification obligations pursuant to Article IX. Following Buyer's good faith determination of liability on account of Seller's indemnification obligations set forth in Section 9.2, Buyer shall provide Seller with at least three Business days prior written notice of such determination and, after expiration of such notice period, Buyer may deduct from the Holdback Amount an amount equal to the Losses for which Buyer is entitled to indemnification pursuant to Section 9.2 (and subject, in all respects to the limitations set forth in Article IX), if any, and either retain such amount for its own account or make payments directly to the appropriate party, in which case Seller's

indemnification obligations pursuant to Section 9.2 with respect to such Losses shall be deemed satisfied (provided, notwithstanding anything in this Section 2.4(c) to the contrary, Seller reserves all rights and remedies in the event Seller disputes Buyer's determination of any indemnification obligation hereunder or deduction to the Holdback Amount). In the event of any dispute with respect to Buyer's determination of any indemnification obligation or deduction to the Holdback Amount, Seller and Buyer shall negotiate in good faith to resolve such dispute. If, after good faith negotiations, Seller and Buyer are unable to resolve such dispute, the dispute shall be submitted to the Bankruptcy Court for resolution for final resolution, and, if the Bankruptcy Court is unwilling or unable to resolve such dispute, the Seller and Buyer shall submit the dispute to arbitration with a mutually agreed upon arbitrator for final resolution. On the later of (x) April 30, 2020 and (y) the earlier of (1) the effective date of a plan of restructuring or liquidation of Seller or the conversion of the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, and (2) the first anniversary of the Closing, Buyer shall pay by wire transfer of immediately available funds to an account designated by or on behalf of Seller the Holdback Amount less any amount previously deducted from the Holdback Amount in accordance with this Section 2.4(c)(iii). The terms and provisions of this Section 2.4(c) shall survive the Closing.

Section 2.5 **Allocation of the Purchase Price**.

Within ninety (90) days after the last Closing Date, Seller shall deliver a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Purchased Assets for Tax purposes) (the "***Allocation Schedule***"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Code. The Allocation Schedule shall be deemed final unless Buyer notifies Seller in writing that Buyer objects to one or more items reflected in the Allocation Schedule within thirty (30) days after delivery of the Allocation Schedule to Buyer. In the event of any such objection, Seller and Buyer shall negotiate in good faith to resolve such dispute; *provided, however*, that if Seller and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within sixty (60) days after the delivery of the Allocation Schedule to Buyer, such dispute shall be resolved by to a nationally recognized independent public accounting firm that is mutually acceptable to Seller and Buyer, who will determine the final and binding allocation of the Purchase Price within thirty (30) days of such referral, which determination will thereupon be conclusive and binding on Buyer and Seller for all purposes. The costs of such accountants will be shared equally by Buyer and Seller. Buyer and Seller each agree to file their respective federal and applicable state income Tax Returns, including IRS Form 8594, in a manner consistent with the Allocation Schedule.

Section 2.6 **Additional Agreements of the Parties.**

(a) Access. Subject to the prior consent of the applicable landlord of the Premises, Buyer shall have the right to enter each Pharmacy's Premises prior to (but no sooner than fourteen (14) days prior to) the Closing Date for the purpose of installing and pulling any additional electrical wiring necessary or advisable allow Buyer's pharmacy and POS computer systems to function in such Premises. Additionally, Buyer shall have the right to install and test its POS and pharmacy system controllers in each Pharmacy's Premises prior to (but no sooner than seven (7) days prior to) the Closing Date. Each installation shall be at a time reasonably agreed

upon by Buyer and Seller and shall not materially interfere with the operations of the Pharmacies in the Ordinary Course of Business. Buyer shall bear all cost associated with the installation of said wiring and controllers. Buyer will be liable for, and shall indemnify Seller against, any damage to the Premises or injury to a Person to the extent resulting from Buyer's access to any of any Pharmacy's Premises or installations pursuant to this Section 2.6(a). The terms and provisions of this Section 2.6(a) shall survive Closing.

(b) Telephone. Seller agrees to cooperate with Buyer in either, at Buyer's election, (i) the transfer of the telephone and fax lines and number(s) used in the operation of each Pharmacy to Buyer on its Closing Date, or (ii) remote call forwarding for such telephone and fax lines and numbers to Buyer for a period of ninety (90) days commencing on such Closing Date. Buyer shall facilitate the transfer or call forwarding, as applicable. Seller shall be solely responsible for the cancellation of, and final payment for, any lines or services not transferred to Buyer hereunder (including, but not limited to, telephone lines, fax lines, modem lines, equipment leases, service contracts and advertising). Without limiting the foregoing, in the event Buyer elects remote call forwarding under clause (ii) above, upon expiration of such ninety-day period, Seller shall disconnect the telephone and fax lines and cancel the existing telephone and fax accounts. Buyer and Seller shall equally bear the cost of all transfers and call forwarding pursuant to this Section 2.6(b). The terms and provisions of this Section 2.6(b) shall survive Closing.

(c) Advertising; Signage. At no additional cost to Buyer, Seller agrees that Buyer shall have the right to use Seller's trade names (DBA names) used in connection with the Pharmacies, including, without limitation, the trade names "Fred's", "Fred's Meds, and Fred's Xpress" in each case, for a period of six (6) months from the applicable Closing Date to advertise and promote the change of control of the Pharmacies and for correspondence related to the transfer of the Script Assets to Buyer from Seller as described herein, and to permit sufficient time for Buyer to obtain governmental approvals, to the extent required, for a change in trade name signage; provided, however, the form, placement and content of any such usage of Seller's trade names shall be subject to Seller's prior written consent, not to be unreasonably withheld, conditioned or delayed. Buyer will be liable for, and shall indemnify Seller against, any Losses incurred by Seller as a result of Buyer's usage of Seller's trade names pursuant to this Section 2.6(c). The terms and provisions of this Section 2.6(c) shall survive the Closing.

(d) Fixtures. With respect to each Pharmacy, Seller shall, within thirty (30) days of the applicable Closing Date, remove all interior and exterior signage in reference to the Pharmacy and all pharmacy-related fixtures and equipment that are not being transferred to Buyer pursuant to the terms hereof. The terms and provisions of this Section 2.6(d) shall survive Closing.

(e) Notifications; Retention of Copies. Seller shall send all required notifications of the sale of the Assets hereunder to all applicable Governmental Entities. Following the Closing, Seller shall retain copies of its prescription files, records and data of the Pharmacies as and to the extent required by, and in accordance with, applicable Law. Seller agrees to hold all such retained documentation and information in confidence and to take commercially reasonable measures to prevent any unauthorized disclosures thereof. In the event that Seller is requested or required by Law, subpoena, court order, or other similar legal process to disclose all or any portion of such documentation or information, Seller may make such disclosure, provided it will provide

Buyer with prompt written notice thereof, to the extent legally permitted. The terms and provisions of this Section 2.6(e) shall survive the Closing.

(f) Licenses; Provider Numbers. To the extent freely assignable and legally permitted, Seller agrees to reasonably cooperate with Buyer to effect the transfer of and/or in the application for, as Buyer may reasonably request, licenses and all pharmacy and other permits required to be obtained by Buyer in connection with the Pharmacy or sale of the Purchased Assets hereunder. To the extent freely assignable and legally permitted, Seller further agrees to reasonably cooperate with Buyer to effect a transfer to Buyer of Seller's third party provider numbers (other than Medicare) as Buyer may request, which transfer may include, without limitation, Seller's NPI and NCPDP numbers assigned to the Premises. Seller expressly acknowledges and agrees that Buyer is not assuming, and Buyer expressly disclaims and declines assumption of the Medicare provider numbers of Seller. Additionally, except as otherwise expressly provided in the attached Power of Attorney (as defined below) forms, Buyer expressly disclaims and declines assumption of any of Seller's third party provider numbers or licenses that shall not be otherwise transferred to Buyer pursuant to this section. Notwithstanding the foregoing, in all events, Buyer shall not assume, and shall not be deemed to have assumed, any and all obligations and/or liabilities of Seller, the Pharmacy or the Purchased Assets with respect to all third party provider numbers and licenses arising from or related to acts or omissions occurring on or prior to the Date of Inventory and said obligations and/or liabilities shall remain with Seller. Buyer will defend, indemnify and hold Seller and its Subsidiaries harmless from and pay any Loss, incurred by Seller and any of its Subsidiaries to the extent resulting from, relating to, arising out of, or attributable to Buyer's use of Seller's third party provider numbers. The terms and provisions of this Section 2.6(f) shall survive the Closing.

(g) DSCSA. Seller agrees to provide Buyer with all product tracing information and other information required by the Drug Supply Chain Security Act ("***DSCSA***") for the Pharmaceutical Inventory, including, without limitation, transaction histories, transaction statements, and transaction information, for such Pharmaceutical Inventory (collectively, the "***DSCSA Records***"). At no additional cost to Buyer, Seller shall fully cooperate and assist Buyer, at least thirty (30) days prior to the Date of Inventory, in Buyer's efforts to effect a transfer of the DSCSA Records using such means and efforts as determined by Buyer in its reasonable discretion. Such cooperation shall include Seller taking such acts as may be reasonably necessary, including, without limitation, executing a release or authorization for the benefit of any third parties that are maintaining any DSCSA Records on behalf of Seller, to facilitate the transfer of all DSCSA Records to Buyer. The terms and provisions of this Section 2.6(g) shall survive the Closing.

(h) CSOS. With respect to Seller's Controlled Substances Ordering System ("***CSOS***"), Seller agrees to: (1) maintain a person designated as its CSOS Coordinator for Seller's CSOS system for at least two years following the Closing (or such shorter period terminating upon the date Seller ceases to operate a pharmacy business); (2) provide Buyer with the appropriate contact information to direct the United States Drug Enforcement Agency ("***DEA***") to this person; (3) retain all CSOS-related records in accordance with applicable DEA regulations, including regulations specific to CSOS-related record retention, for at least two years following the Closing (or such shorter period terminating upon the date Seller ceases to operate a pharmacy business); and (4) provide Buyer with hardcopies of all CSOS-related records for the two-year period preceding the Closing (or any longer period required by state Law) at or before Closing, including

records of all orders placed and received via Seller's CSOS system (the orders and any disposition data (quantity received, date received, any statements of nonacceptance, etc.) must be clearly associated with each other), and DEA Forms 222 from the two years preceding the Closing (or any longer period required by state Law). The terms and provisions of this Section 2.6(h) shall survive the Closing.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES CONCERNING SELLER

Except as is provided in the disclosure letter delivered at or prior to the execution of this Agreement by Seller (the "***Seller Disclosure Schedule***"), Seller represents and warrants to Buyer as set forth below.

Section 3.1 **Organization; Qualification**.

Seller is a corporation that is duly organized, validly existing, and in good standing under the Laws of the State of Delaware. Subject to the applicable provisions of the Bankruptcy Code, Seller is duly authorized to own, lease and operate the Purchased Assets and to carry on its business as presently conducted with respect to the Purchased Assets.

Section 3.2 **Power and Authority; Enforceability**.

Seller has, subject to the entry of the Sale Order, the corporate power and authority necessary to execute and deliver each Transaction Document to which it is a party and to perform and consummate the Transactions. Seller has, subject to the entry of the Sale Order, taken all action necessary to authorize the execution and delivery of each Transaction Document to which it is a party, the performance of Seller's obligations hereunder and thereunder, and the consummation of the Transactions. In each case subject to the entry of the Sale Order, Seller has duly and validly executed and delivered this Agreement and, on or prior to each Closing, Seller will have duly and validly executed and delivered each other Transaction Document applicable to such Closing to which it is party. In each case subject to the entry of the Sale Order, this Agreement constitutes, and upon execution and delivery each other Transaction Document to which Seller is a party will constitute, a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, assuming due authorization, execution and delivery by the other parties thereto, and except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (the "***Insolvency and Equity Exceptions***"). Seller has conducted diligent and extensive marketing efforts to obtain the best price and sale terms for the Pharmacies and is entering into the transactions contemplated hereby in the good faith belief, based on the results of those efforts, that the terms and conditions of this Agreement represent an arm's length transaction between well-informed, well-advised and sophisticated parties and are fair to Seller from a financial point of view, and represent the best terms available to Seller under the circumstances for the sale of Pharmacies. Section 3.2 of the Seller Disclosure Schedule sets forth a resolution of the Board of Directors of Seller making finding to that effect.

Section 3.3 **Non-Contravention; Governmental Authorizations**.

(a) Except as set forth on Section 3.3(a) of the Seller Disclosure Schedule and as a result of the Bankruptcy Case, the execution and the delivery of the applicable Transaction Documents by Seller and, after giving effect to the Sale Order, the performance of its obligations hereunder and thereunder, and the consummation of the Transactions by Seller will not (i) violate any of the provisions of the Organizational Documents of Seller; and (ii) assuming that all Consents set forth on Section 3.3(a) and Section 3.3(b) of the Seller Disclosure Schedule have been obtained and any notifications described on Section 3.3(a) or Section 3.3(b) of the Seller Disclosure Schedule have been delivered and any waiting periods thereunder have terminated or expired, (A) violate any Law to which Seller is subject or (B) breach any contract or Permit to which Seller is a party or by which it is bound or to which any of the Purchased Assets is subject that would reasonably be expected to result in the imposition of any Encumbrance upon any of the Purchased Assets other than Permitted Encumbrances, except, in the case of clauses (ii)(A) and (B), where such violation or Encumbrance, respectively, would not reasonably be expected to materially interfere with or restrict the use or sale of the Purchased Assets from and after the applicable Closing Date.

(b) Except as set forth on Section 3.3(b) of the Seller Disclosure Schedule and entry of the Sale Order, no Consent of any Governmental Entity is required by, or with respect to, the execution, delivery and performance of this Agreement or the Transaction Documents or the consummation of the Transactions by Seller.

Section 3.4 **Title to Purchased Assets**.

Except as set forth on Section 3.4 of the Seller Disclosure Schedule and subject to the entry of the Sale Order, Seller has, and on the applicable Closing Date, will transfer to Buyer, good and valid title to all of the Purchased Assets (other than the Assumed Leases, for which Seller is only making the title representations and warranties expressly set forth in Section 3.12(b)) free and clear of all Encumbrances, other than Permitted Encumbrances and to the extent permitted by the Sale Order.

Section 3.5 **Script Volume**.

The Weekly Script Volume for each Pharmacy as set forth on the Pharmacy Asset Sale Schedule is an accurate calculation of such Pharmacy's average retail prescription volume for the twelve (12) month period ended on July 29, 2019 and each Weekly Script Volume has been calculated from and is consistent with the books and records of Seller, including its Script Tracker Report, which has been and will be prepared on a consistent basis throughout the periods relevant to this Agreement.

Section 3.6 **Inventory**.

The Pharmaceutical Inventory and Non-Pharmaceutical Inventory at each Pharmacy is of a quantity, quality and mix consistent with the past practices of such Pharmacy and at levels historically maintained by Seller at such Pharmacy, in each case in all material respects. The Pharmaceutical Inventory and Non-Pharmaceutical Inventory is, in all material respects, usable, merchantable and saleable in the Ordinary Course of Business of the applicable Pharmacy, except

the obsolete Pharmaceutical Inventory and Non-Pharmaceutical Inventory previously disclosed to Buyer.

Section 3.7 **Permits, Compliance with Laws**.

(a) Permits. Seller possesses all material Permits necessary for the operation of the Pharmacy Business and the same are in full force and effect, and Seller has not received notice of, nor is there any pending or, to Seller's knowledge, any threatened proceeding relating to, the revision, cancellation or termination of any such Permits, authorizations, certifications, or licenses. Assuming satisfaction of the Pharmacy Specific Conditions or, granting of a power of attorney, where permitted by Law, each Permit to be transferred to Buyer pursuant to Section 2.1(b)(v) will be available for use immediately after the Closing without limitation or restriction (except those limitations or restrictions pursuant to the terms of such Permit). Each of the Professional Personnel have all Governmental Authorizations necessary for the performance of his or her duties for the Pharmacy Business in connection with the conduct of business as currently conducted by the Pharmacy Business, in compliance, in all material respects, with applicable Law. All material Permits necessary for the operation of the Pharmacy Business are listed on Section 3.7(a) of the Seller Disclosure Schedule.

(b) Compliance with Laws. Seller's conduct of the Pharmacy Business has not, since September 1, 2016, violated in any material respect, and is in compliance in all material respects with, any and all Laws, including all Health Care Laws. Seller has not received any written notice or complaint to the effect that, or, to the Knowledge of Seller, otherwise been advised that, it is not in compliance with or it is in violation of any such Law with respect to any aspect of the Pharmacy Business. Seller has timely filed all material reports, registrations and statements required to be filed by it with any Governmental Entity, and has paid all related fees and assessments due and payable, in each case with respect to the Pharmacies.

Section 3.8 **Absence of Liabilities, Claims and Litigation**.

As of the date hereof, and except with respect to the Bankruptcy Case, Seller is not (x) subject to any outstanding order, writ, injunction, judgment or decree of any Governmental Entity or (y) a party to, the subject of, or to Seller's Knowledge, threatened to be made a party to or the subject of, any Action, in each case, solely with respect to the Purchased Assets and the Pharmacy Business, except as set forth on Section 3.8 of the Seller Disclosure Schedule. As of the date hereof, and except with respect to the Bankruptcy Case, there are no Actions by any Governmental Entity pending or, to Seller's Knowledge, threatened against Seller relating to or affecting the Purchased Assets, except, in each case, as would not reasonably be expected to have a Seller Material Adverse Effect or as set forth on Section 3.8 of the Seller Disclosure Schedule. Except with respect to the Bankruptcy Case, there are no (i) claims, actions, suits, labor disputes, arbitration, legal or administrative proceedings or investigations, including, without limitation, by the DEA, Office of Inspector General for the U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services, Food and Drug Administration ("***FDA***"), Health Resources & Services Administration, applicable Board of Pharmacy or other Governmental Entity, pending against Seller or, to Seller's Knowledge, threatened against Seller, or otherwise pending or, to Seller's knowledge, threatened with respect to the Pharmacy Business, the Purchased Assets, or any director, member, manager, officer or employee of Seller with respect to the Pharmacies, and, to Seller's knowledge,

no such actions, disputes, proceedings or investigations are contemplated or (ii) judgments, decrees, orders, writs, injunctions, rulings, decisions or awards of any court or Governmental Entity, including, without limitation, DEA, Office of Inspector General for the U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services, Food and Drug Administration, Health Resources & Services Administration, or applicable Board of Pharmacy, to which Seller is a party or is subject with respect to the Pharmacy Business or to which any of the Pharmacies or Purchased Assets is subject, in each case, except as would not be materially adverse to the Pharmacy Business.

Section 3.9 **Books and Records of the Pharmacies**.

Except as set forth on Section 3.9 of the Seller Disclosure Schedule, since September 1, 2016 Seller's Script Assets have been accessed, collected, compiled, disclosed, maintained, and stored in material compliance with all Health Care Laws and Script Assets are materially complete and accurate.

Section 3.10 **Tax Matters**.

All material Tax Returns required to have been filed prior to the date of this Agreement with respect to the Purchased Assets have been filed on or prior to the date of this Agreement, and all material Taxes shown thereon as owing have been paid. The representations and warranties set forth in this Section 3.10 are Seller's sole and exclusive representations and warranties regarding Tax matters.

Section 3.11 **Employee Matters**.

(a) Set forth on Section 3.11 of the Seller Disclosure Schedules is a complete and correct list of all Employees, their wage rates or salaries, and the dates of employment for such employees. Solely with respect to the Pharmacy Business, Seller has complied, since September 1, 2016, and is in compliance with, in all material respects, applicable legal requirements pertaining to the employment of labor, including those relating to wages, hours, collective bargaining, employment discrimination, drug testing, polygraphs, sexual harassment, worker's compensation, immigration, plant closing and unemployment compensation, and there are no claims, causes of action, charges, suits, complaints, administrative proceedings, arbitrations, material labor grievances, or government investigations or proceedings, pending or, to the Knowledge of Seller, threatened against Seller in connection therewith. Solely with respect to the Pharmacy Business, Seller has not received written notice of, nor does Seller have knowledge of, any matter that could reasonably form the basis for, any such claims. There are no collective bargaining agreements covering any Employees, no collective bargaining agent has been certified as a representative of any of the Employees, and no representation campaign or election is now in progress with respect to any of the Employees.

(b) Neither Seller nor any of its Affiliates is or since September 1, 2016 has been a party to, or is currently negotiating, any collective bargaining agreement or other labor union agreement applicable to any Employees. There is not and since September 1, 2016 there has not been (i) any strike or material work stoppage by, or lockout of, the Employees or (ii) any material Action involving Seller or any of its Affiliates with any Employees or with any union,

workers' council or other body of employee representatives pending before any Governmental Entity which relates to labor relations or employment matters with respect to any Employees.

(c) Seller and its Affiliates are, as of the date of this Agreement, in compliance in all material respects with all applicable Law relating to the employment of the Employees including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, workplace safety, discrimination, immigration and the payment of social security and other employment taxes.

Section 3.12 **Real Property**.

(a) Seller does not own fee title to the real property on which any Pharmacy is located. Seller is the sole tenant under the Assumed Real Estate Leases, and Seller has delivered correct and complete copies of all Assumed Real Estate Leases to Buyer. The Premises on which each of the Pharmacies is located, including without limitation the improvements and fixtures thereon, are in good operating condition and repair in all material respects.

(b) The Assumed Real Estate Leases grant Seller a valid leasehold estate in all Leased Real Property on which the Pharmacies are located, free and clear of all Encumbrances other than Permitted Encumbrances and to the extent permitted by the Sale Order. Seller represents and warrants that (i) all Assumed Real Estate Leases are in full force and effect, (ii) Seller has not received any written notice of a breach or default thereunder that remains currently outstanding and uncured, and (iii) to the Knowledge of Seller, neither Seller nor the landlord is in breach of or default under any of the Assumed Real Estate Leases, and, to the Knowledge of Seller, no event has occurred that, with notice or lapse of time or both, would constitute a material breach or default under any Assumed Real Estate Lease. Seller has not leased, licensed or granted any occupancy right in respect of such Leased Real Property to any other Person, and there are no subleases, licenses or other agreements granting to any Person (other than Seller) the right to use or occupy any of the Premises on which the Pharmacies are located.

(c) There are no restrictive covenants or other agreements, other than as set forth in the Assumed Real Estate Leases, and no zoning or other Laws, and no other legal impediment, any of which would prevent Buyer or its Affiliates from occupying and using the Premises in substantially the same manner as the Pharmacy Business is currently conducted.

(d) There are no pending or, to the Knowledge of Seller, any threatened condemnation proceedings, lawsuits or administrative actions relating to the Leased Real Property. Seller has not received written notice of, and, to the Knowledge of Seller, is not aware of, any material violation of Laws with respect to the Premises.

Section 3.13 **Environmental**.

With respect to each Pharmacy, except as set forth on Section 3.13 of the Seller Disclosure Schedule, (i) Seller is in material compliance with all applicable Environmental Laws, (ii) as of the Closing Date, Seller has not received written notice of any claims, actions, proceedings or other investigation alleging material noncompliance under, or more liability pursuant to, any Environmental Laws, which are currently outstanding, and no such claims, actions, proceeding or other investigations are pending or, to the Knowledge of the Seller, threatened by any

Governmental Entity or other Person, and (iii) to the Knowledge of Seller, since September 1, 2016, there has been no Release of any Hazardous Material that would reasonably be expected to result in a material liability of Seller under any Environmental Law.

Section 3.14 **Health Regulatory Matters.**

(a) With respect to each Pharmacy, the Pharmacy Business is in, and, to the Seller's Knowledge, each of Seller's Professional Personnel while providing services to the Pharmacy Business are in, and since September 1, 2016 have been in, compliance in all material respects with any and all Health Care Laws. Seller has not entered into, and is not in discussions to enter into, any corporate integrity agreement, deferred prosecution agreement, or settlement agreement with any Governmental Entity with respect to any actual or alleged violation of any Health Care Law relating to the operations of the Pharmacies.

(b) Seller has not received written notice of, and, to Seller's Knowledge, is unaware of, any inquiry, investigation or similar proceeding from any Governmental Entity, been sanctioned, or had a sanction proposed, by any Governmental Entity, or received or filed for any Governmental Program overpayments or other improper billings with respect to the Pharmacies other than those identified and corrected in the normal course of business. All Payment Program reports and claims filed or required to be filed with respect to the Pharmacies have been timely filed and are complete and accurate in all material respects. Such reports and claims properly claim and disclose all information and other items to be disclosed for the periods covered thereby in all material respects. With respect to the Pharmacies, Seller has caused to be paid all known and undisputed refunds, overpayments, discounts or adjustments to Payment Programs that have been invoiced or have otherwise become due to Payment Programs and has submitted complete and accurate certifications and attestations to Payment Programs in all material respects.

(c) Since September 1, 2016, Seller has not claimed or received reimbursements from Payment Programs in connection with the Pharmacy Business in excess of amounts permitted by applicable Law or contract, and has no material liability or obligation of any kind, whether accrued, contingent, absolute, inchoate or otherwise, whether due or to become due, under any Payment Programs for any refund, overpayment, discount or adjustment in connection with the Pharmacy Business. With respect to each Pharmacy, there are no pending or, to the Knowledge of the Seller, threatened, appeals, adjustments, challenges, audits, inquiries, litigation or written notices of intent to audit with respect to such prior claims, reports or billings, and the Pharmacy Business has not, since September 1, 2016, been audited, or otherwise examined by any Payment Programs.

(d) Since September 1, 2016, neither Seller, nor, to Seller's Knowledge, any director, member, manager, officer or employee of Seller with direct or indirect responsibility for any of the Pharmacies, has been disciplined or sanctioned, or has had a discipline or sanction proposed, by any Governmental Entity or excluded from participation in any Governmental Program, including Medicare or Medicaid, nor, to Seller's Knowledge, is Seller aware of any pending or threatened discipline, sanction, inquiry, investigation or government action that may lead to such exclusion, fine or other remedy.

(e) Seller is in material compliance with, and has submitted all reports and other information with respect to the Pharmacies required by, all prescription monitoring programs or other similar programs maintained by Governmental Entities or regulatory authorities and, to Seller's Knowledge, is not aware of and has not received any written notice of, or, to Seller's Knowledge, otherwise been advised of, any errors in any such submissions.

(f) The prescriptions filled at the Pharmacies have arisen from bona fide, legal transactions. The Script Assets have been accessed, collected, compiled, disclosed, maintained, and stored in material compliance with any and all Laws, including all Health Care Laws, and are materially consistent with industry standards and clinical guidelines applicable to pharmacists and licensed prescribers. The Script Assets are materially complete and materially accurate. Except as set forth on Section 3.14(f) of the Seller Disclosure Schedule, none of the prescriptions filled at the Pharmacies result from any Non-standard Business. As used in this Agreement, "**Non-standard Business**" means (A) delivering prescriptions by mail, courier, automobile or other delivery system (in each case, including prescriptions filled via the Internet), (B) compounding, including both sterile and non-sterile compounding, (C) filling prescriptions for patients in assisted or independent living facilities, nursing homes, hospice facilities, or other long-term care facilities, (D) infusion pharmacy services, (E) any non-prescription business (including durable medical equipment) done through the pharmacy computer and included in the prescription count, or (F) any prescriptions filled pursuant to any contract, agreement or understanding (other than a standard contract agreement or understanding with any Payment Program providing health care coverage to individuals).

(g) Neither Seller, nor, to the Knowledge of Seller, any director, officer or employee of Seller and no Professional Personnel, agent or other Person acting on behalf of Seller. including, but not limited to, any independently contracted sales or marketing representative, has made or received, offered to make or receive, solicited the making or receipt of, or agreed to make or receive, in material violation of any applicable Health Care Law, any direct or indirect contribution, gift, bribe, discount, rebate, payoff, influence payment, kickback or other payment, or order or purchase, to or from any Person, regardless of form, whether in money, property or service, with the purpose of obtaining, inducing or providing compensation for a referral to or from the Pharmacy Business or any customer(s) or to influence or otherwise convert patients to certain medications or generate business between the Pharmacy Business and any Person.

(h) Since September 1, 2016, the Pharmacy Business (i) has at all times been conducted in material compliance with all Laws, including Health Care Laws, relating to the protection and security of personal and health information; (ii) has been in material compliance with the privacy, security, and transaction requirements established by HIPAA; (iii) has developed and implemented policies and procedures and training programs to help assure past, current and ongoing compliance with HIPAA's privacy, security and standard transactions requirements; (iv) has entered into Business Associate (as defined in HIPAA) agreements materially compliant with HIPAA with all Business Associates (as defined in HIPAA); (v) has implemented reasonable and appropriate safeguards to protect the confidentiality, integrity and availability of personal and medical information in accordance with HIPAA; and (vi) has materially complied with all privacy policies or related programs Seller maintains relating to the collection, storage or use of personal and medical information. Seller has not received any written inquiries or written claims from, or been subject to any audit by, any Governmental Entity regarding the Business's compliance with

any of the foregoing. To Seller's Knowledge, no violation of HIPAA has been alleged or threatened against Seller in connection with the Pharmacy Business by any Governmental Entity in the last three (3) years. Seller has not experienced a breach of the security of individually identifiable health information or personally identifiable information in connection with the Pharmacy Business requiring it to report such breach to the Secretary of the Department of Health and Human Services or any state attorney general or similar state authority.

Section 3.15 **Related Party Transactions**.

(a) With respect to the Pharmacy Business of each Pharmacy, no Related Party of Seller owns or owned (of record or as a beneficial owner), at such time, a material equity, financial or profit interest in, a Person that, since September 1, 2016, was a party to any transaction with Seller that is material to such Pharmacy Business, other than a transaction conducted in the Ordinary Course of Business with Seller at substantially prevailing market prices and on substantially prevailing market terms.

(b) With respect to the Pharmacy Business of each Pharmacy, no Related Party of Seller, other than related to its, his or her status as a member, manager, officer or as an employee of Seller, is a party to any Assumed Contract or other business arrangement with Seller that is material to such Pharmacy Business.

Section 3.16 **Brokers' Fees**.

Except for PJ Solomon, L.P., no agent, broker, investment banker or other firm or Person is or will be entitled to any broker's or finder's fee or any other commission or similar fee from Seller in connection with the Transactions.

Section 3.17 **No Additional Representations**.

EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III, THE PURCHASED ASSETS TO BE TRANSFERRED HEREUNDER WILL BE TRANSFERRED "AS IS, WHERE IS," IN THEIR PRESENT CONDITION AND STATE OF REPAIR, WITH ALL FAULTS, LIMITATIONS AND DEFECTS (HIDDEN AND APPARENT). WITHOUT LIMITATION, BUYER ACKNOWLEDGES THAT, EXCEPT AS SPECIFICALLY SET FORTH TO THE CONTRARY IN THIS AGREEMENT, NO WARRANTIES OR REPRESENTATIONS, EXPRESSED OR IMPLIED, OF ANY KIND WHATSOEVER (INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE) HAVE BEEN MADE BY SELLER, ANY OF ITS AFFILIATES OR REPRESENTATIVES OR ANY OTHER PERSON, OR WILL BE RELIED UPON BY BUYER.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES CONCERNING BUYER

Except as is provided in the disclosure letter delivered at or prior to the execution of this Agreement by Buyer (the "***Buyer Disclosure Schedule***"), Buyer represents and warrants to Seller as follows:

Section 4.1 **Organization; Qualification**.

Buyer is an Oklahoma limited liability company duly created, formed or organized, validly existing and in good standing under the Laws of the State of Oklahoma. Buyer is duly authorized to own, lease and operate its properties and assets and to carry on its business as presently conducted.

Section 4.2 **Power and Authority; Enforceability**.

Buyer has the corporate power and authority necessary to execute and deliver each Transaction Document to which it is a party and to perform and consummate the Transactions. Buyer has taken all action necessary to authorize the execution and delivery of each Transaction Document to which it is a party, the performance of Buyer's obligations hereunder and thereunder, and the consummation of the Transactions. Buyer has duly and validly executed and delivered this Agreement and, on or prior to each Closing, Buyer will have duly and validly executed and delivered each other Transaction Document applicable to such Closing to which it is party. This Agreement constitutes, and upon execution and delivery each other Transaction Document to which Buyer is a party will constitute, a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, assuming due authorization, execution and delivery by the other parties thereto, and except as such enforcement may be limited by the Insolvency and Equity Exceptions.

Section 4.3 **Non-Contravention; Governmental Authorizations**.

(a) The execution and the delivery of the applicable Transaction Documents by Buyer and the performance of its obligations hereunder and thereunder, and consummation of the Transactions by Buyer will not (i) violate any of the provisions of the Organizational Documents of Buyer; (ii) assuming that all Consents set forth on Section 4.3(b) of the Buyer Disclosure Schedule have been obtained and any notifications described on Section 4.3(b) of the Buyer Disclosure Schedule have been delivered and any waiting periods thereunder have terminated or expired, materially violate any Law to which Buyer is subject, except where such violation would not, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the Transaction or to perform its obligations under the Transaction Documents; and (iii) breach any contract or Permit to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject that would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the Transactions or to perform its obligations under the Transaction Documents.

(b) Except as set forth on Section 4.3(b) of the Buyer Disclosure Schedule, no Consent of any Governmental Entity is required by or with respect to the execution, delivery and performance of this Agreement, the Transaction Documents and the Transactions.

Section 4.4 **Absence of Litigation**.

As of the date hereof, Buyer is not (x) subject to any outstanding order, writ, injunction, judgment or decree of any Governmental Entity or (y) a party to, the subject of, or, to Buyer's Knowledge is threatened to be made a party to or the subject of, any Action, except, in each case, as would not reasonably be expected to, individually or in the aggregate, prevent, materially delay

or materially impair Buyer's ability to consummate the Transactions or to perform its obligations under the Transaction Documents. There are no Actions by any Governmental Entity pending or, to Buyer's Knowledge, threatened against Buyer that would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the Transactions or to perform its obligations under the Transaction Documents.

Section 4.5 **Brokers' Fees**.

No agent, broker, investment banker or other firm or Person is or will be entitled to any broker's or finder's fee or any other commission or similar fee from Buyer in connection with the Transactions.

Section 4.6 **Buyer's Investigation**.

Buyer has conducted such investigation of the Purchased Assets as it has deemed necessary in order to make an informed decision concerning the Transactions. Buyer has reviewed all of the documents, records, reports and other materials identified in the Seller Disclosure Schedules or disclosed to Buyer prior to the date of this Agreement, and is familiar with the content thereof. Buyer acknowledges that it has been given access to and has visited and examined the Purchased Assets and is familiar with the condition thereof. For the purpose of conducting these investigations, Buyer has employed the services of its own Representatives. In all matters affecting the condition of the properties and assets and the contents of the documents, records, reports or other materials in connection with the Transactions, Buyer is relying upon the advice and opinion offered by its own Representatives. All materials and information requested by Buyer have been provided to Buyer to Buyer's satisfaction. None of Seller or any of its Affiliates or Representatives shall have or be subject to any liability to Buyer or any other Person resulting from the distribution to Buyer, or Buyer's use of, any such information, including any information, documents or material disclosed or made available to Buyer and its representatives, management presentations or in any other form in expectation of the Transactions.

Section 4.7 **Financing**.

(a) As of the date of this Agreement, Buyer has delivered to Seller complete and correct copies of a fully executed commitment letter, dated as of the date of this Agreement, between Parent and the Equity Commitment Party (the "***Equity Commitment Letter***") pursuant to which the Equity Commitment Party has committed, subject to the terms and conditions thereof, to invest in Buyer, directly or indirectly, the cash amounts set forth therein for the purpose of funding a portion of the aggregate value of the consideration payable by Buyer pursuant to this Agreement, and of which the Company is an express third-party beneficiary and entitled to specifically enforce the terms thereof (the "***Equity Financing***").

(b) As of the execution of this Agreement, (i) the Equity Commitment Letter is in full force and effect and constitutes the legal, valid and binding obligation of Buyer and the Equity Commitment Party, (ii) the Equity Commitment Letter has not been amended or modified prior to the execution of this Agreement; (iii) no such amendment or modification to the Equity Commitment Letter is contemplated by Buyer or the Equity Commitment Party; and (iv) the commitments contained in the Equity Commitment Letter have not been withdrawn, terminated,

repudiated, rescinded, amended, supplemented or modified in any respect, and no such withdrawal, termination, repudiation, rescission, amendment, supplement or modification is contemplated.

(c) Assuming (i) the Equity Financing is funded in accordance with the Equity Commitment Letter and (ii) the satisfaction of the conditions set forth in Section 7.1 and Section 7.2(a) (with respect to the Initial Closing and other than any Pharmacy Specific Conditions for Pharmacies not included in the Initial Closing) (and, if and when and applicable, Section 7.2(b) (with respect to the Subsequent Closings) and other than any Pharmacy Specific Conditions for Pharmacies not included in the applicable Subsequent Closing), the Equity Financing is sufficient to satisfy Buyer's obligations hereunder to (x) make all payments contemplated to be made by Buyer under this Agreement in connection with the Transactions (including the payment of all amounts payable by Buyer pursuant to ARTICLE II in connection with or as a result of the Transactions) and (y) pay all fees and expenses required to be paid at the Closing by Buyer in connection with the Transactions and the Equity Financing.

## ARTICLE V
## PRE-CLOSING COVENANTS

Section 5.1 **Operation of Pharmacies**.

(a) With respect to each Pharmacy, between the date hereof and the applicable Closing Date, Seller shall operate such Pharmacy in the Ordinary Course of Business. Seller shall use its commercially reasonable efforts to maintain the Pharmaceutical Inventory and Non-Pharmaceutical Inventory at levels historically maintained by Seller at such Pharmacy in the Ordinary Course of Business, in each case in all material respects.

(b) Buyer agrees that, in the event, prior to the Closing of a Pharmacy, Seller receives from any Pharmacy customer any instruction to transfer said Pharmacy customer's prescription records to a different pharmacy, Seller may transfer such records, but shall nonetheless to transfer such Pharmacy customer's prescription records to Buyer in accordance with Section 2.1(b)(i), except to the extent any such Pharmacy customer objects to such transfer, in which case Seller may exclude such customer's prescription records from the transfer to Buyer contemplated by Section 2.1(b)(i); *provided*, that any such instruction from a Pharmacy customer to transfer said Pharmacy customer's prescription records is obtained in good faith and in the Ordinary Course of Business and not for the purpose of undermining or circumventing the Transactions, including, without limitation, by Seller actively soliciting such transfers to other pharmacies owned or operated by Seller and/or its Affiliates.

(c) Buyer acknowledges and agrees that (a) nothing in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Seller, the Pharmacy Businesses or the Purchased Assets prior to the applicable Closing, (b) Seller shall exercise complete control and supervision over its operations and (c) notwithstanding anything to the contrary set forth in this Agreement, no consent of Buyer shall be required with respect to any matter set forth in this Section 5.1 or elsewhere in this Agreement to the extent the requirement of such consent would reasonably be expected to conflict with or violate any Law.

Section 5.2 **Approvals; Commercially Reasonable Efforts**.

On the terms and subject to the conditions of this Agreement, each of Seller and Buyer will use its commercially reasonable efforts to (i) take, or cause to be taken, all actions, and do, or cause to be done, all things, necessary, proper or advisable to cause the conditions to each Closing to be satisfied as promptly as practicable (and in any event no later than the Expiration Date, or, to the extent necessary with respect to any Pharmacy Specific Condition, the Subsequent Expiration Date) and to consummate and make effective, in the most expeditious manner practicable, the Transactions, including preparing and filing promptly and fully all documentation to effect all necessary filings, notifications, notices, petitions, statements, registrations, submissions of information, applications and other documents, (ii) obtain as promptly as practicable (and in any event no later than the Expiration Date, or, to the extent necessary with respect to any Pharmacy Specific Condition, the Subsequent Expiration Date) all approvals, consents, clearances, expirations or terminations of waiting periods, registrations, permits, authorizations and other confirmations from any Governmental Entity or third party necessary, proper or advisable to consummate the Transactions, and (iii) defend any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Transactions (and in any event no later than the Expiration Date, or, to the extent necessary with respect to any Pharmacy Specific Condition, the Subsequent Expiration Date).

Section 5.3 **Notices**.

(a) Each Party shall promptly notify the other of any action, suit or proceeding that shall be instituted or threatened against such Party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement.

(b) After the applicable Closing, at the time and to the extent required by applicable Law, Buyer will notify customers, state boards of pharmacy, the DEA, and all other applicable authorities of the sale, transfer, acquisition, and possession of the Purchased Assets; *provided*, *however*, that prior to notifying customers, Buyer must obtain written approval from Seller of the notice content; and *provided*, *further*, that Seller shall submit any of such notifications that Seller is required to submit under applicable Law. Buyer will be responsible for determining what change of ownership requirements, new licensure requirements, and notice requirements are necessary for Buyer to obtain all licenses and other Permits desired by Buyer in connection with the sale of the Purchased Assets. Upon reasonable request by Buyer and reasonable notice to Seller, Seller shall use commercially reasonable efforts, at Buyer's sole expense, to cooperate with Buyer to effect the application for, licenses and all pharmacy and other Permits desired by Buyer in connection with the sale of the Purchased Assets hereunder.

(c) Each Party will make the Script Assets available for access to patients, or will disclose them to other authorized third parties to the extent required by HIPAA and other applicable Laws. Buyer will respond to any inquiries relating to patient rights under HIPAA in a time and manner consistent with HIPAA after each applicable Closing; *provided*, that if Buyer's non-receipt from Seller of any Script Assets prevents Buyer from providing a complete response to such inquiries, then Seller will, upon prompt written request from Buyer, reasonably cooperate with Buyer in preparing a response.

Section 5.4 **Employee Matters**.

(a) At Buyer's election, prior to Closing, Buyer may make an offer of employment to any Employee (any such employee, an "***Offered Employee***"), for employment with Buyer. Seller shall use commercially reasonable efforts to assist Buyer in delivering any applicable offer to such Offered Employees, as reasonably requested by Buyer. Buyer shall be solely responsible for any Transferred Employee Liabilities and any Liability arising out of or relating to the employment of, or the decision to offer employment to, the Offered Employees by Buyer.

(b) During the period beginning as of the Initial Closing Date and ending on the date that is three (3) years from the Initial Closing Date (the "***Restricted Period***"), (i) Seller shall not, and shall cause its Subsidiaries not to, directly or indirectly, solicit, or otherwise attempt to induce any Offered Employee who accepted his or her employment offer with Buyer pursuant to Section 5.4(a) at or prior to the Closing Date for the applicable Pharmacy to terminate his or her employment with Buyer nor induce any Offered Employees to reject such offer; *provided, however*, that nothing in this Section 5.4 shall prohibit Seller or any of its Subsidiaries from taking the following actions:

(i) advertising for employees in newspapers, trade publications, or other media, or engaging recruiters to conduct general employee search activities, in either case not targeted specifically at the Offered Employees;

(ii) hiring or communicating with any Offered Employee who applies for employment with Seller or its Subsidiaries, whether or not such employee was involuntarily terminated, so long as such employee was not solicited by Seller or any of its Subsidiaries in violation of this Section 5.4(b); or

(iii) continuing to or offering to employ any person who is an employee of a Pharmacy and either does not receive an employment offer from Buyer or rejects an offer from Buyer (*provided* that Seller did not induce such Offered Employee to reject such employment offer in violation of this Section 5.4(b)).

Section 5.5 **Access and Information**.

(a) During the period commencing on the date hereof and ending on the Closing Date for each applicable Pharmacy, to the extent permitted under applicable Law, Seller will permit Buyer and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere with the normal business operations of Seller, to all properties, personnel, books, records, contracts, and documents pertaining to the Purchased Assets and will furnish copies of all such books, records, contracts and documents and other information as Buyer may reasonably request with respect to the Purchased Assets; *provided, however*, Buyer shall have no right to conduct any testing, sampling or invasive investigation of any property or facility. Buyer acknowledges that certain information contained in Seller's files may constitute information protected by HIPAA or other applicable privacy or security Laws, and the Parties shall use commercially reasonable efforts to agree on a form or manner of access or conduct that will (to the extent practicable) both grant Buyer access to such information and/or documentation and comply with applicable Law.

(b) PHI. After the applicable Closing Date, Buyer shall make the Protected Health Information (as defined hereinafter) that is part of the Script Assets available for access to patients and disclosure to other authorized third (3rd) parties in accordance with HIPAA and any other applicable state privacy and security Laws regarding individually identifiable health information and other applicable Laws. For the purposes of this Agreement, Protected Health Information shall have the same meaning as such term is defined in 45 CFR 160.103. Seller acknowledges and agrees that notwithstanding the foregoing, Buyer shall not assume any legal obligations or liabilities of Seller under the HIPAA Rules relating to any uses and disclosures of Protected Health Information made prior to the applicable Closing Date, other than legal obligations or liabilities arising out of Buyer's unauthorized use and/or disclosure of Protected Health Information delivered by Seller to Buyer in connection with the transactions contemplated hereby, including any diligence materials and any of the Script Assets (the "***Pre-Closing Buyer Disclosures***"). All inquiries, including those relating to patient rights or Seller's obligations under the HIPAA Rules relating to any uses and disclosures of Protected Health Information made prior to the applicable Closing Date shall be forwarded to Seller or its designated agent for handling (provided that Buyer shall address any Pre-Closing Buyer Disclosures) as required under HIPAA or other applicable Law). For a period of six (6) years after the applicable Closing Date, Seller shall maintain a designated point of contact and provide written notice to Buyer of the postal address of such designated point of contact (including updated written notice within five (5) Business Days should such address or such designated point of contact change).

(c) Script Assets. Seller and Buyer each shall preserve in accordance with the applicable record keeping requirements and regulations of Medicare, Medicaid, the FDA, the DEA and state pharmacy boards in jurisdictions that Seller and Buyer conduct business all records possessed by such party relating to the business at the Pharmacies prior to the applicable Closing. To the extent permitted in accordance with the HIPAA Rules and other applicable Laws, Buyer hereby agrees to make available to Seller, in a form reasonably determined by the Buyer, copies of the Script Assets transferred to Buyer pursuant to this Agreement if, after the Closing and for a legitimate business reason (which shall include third-party insurance audits), Seller requires copies of such Script Assets. To the extent Seller continues to have access to the Script Assets after the applicable Closing, Seller agrees that it shall not use the Script Assets for any purpose after such Closing except as required by Law, in connection with pending litigation, or the resolution of third party claims. Seller further agrees that neither Seller nor any of its Affiliates will solicit, whether by mail, internet or any other means, any of the patients whose records are being transferred to Buyer pursuant to this Agreement. In the event Seller is requested or required by Law, subpoena, court order, or other similar legal process to disclose all or any portion of the Script Assets transferred to Buyer pursuant to this Agreement, Seller may make sure disclosure, provided it will provide Buyer with prompt written notice thereof, to the extent legally permitted to do so.

The terms and provisions of this Section 5.5 shall survive the Closing.

Section 5.6 **Confidentiality; Publicity**.

(a) Except as may be required by Law, stock exchange or as otherwise expressly contemplated herein, no Party nor their respective Affiliates and Representatives will disclose to any third party any Confidential Information concerning the business or affairs of any other Party that it may have acquired from such Party in the course of pursuing the Transactions

without the prior written consent of such other Party; *provided, however*, any Party may disclose any such Confidential Information as follows: (i) to such Party's Affiliates and its or its Affiliates' Representatives, the actions for which the applicable Party will be responsible to the extent reasonably necessary to fulfill such disclosing Party's obligations under Section 5.2, Section 5.3(b), Section 5.3(c) and Section 5.4; (ii) to comply with any Law or order, provided that prior to making any such disclosure the Party making the disclosure notifies the other Party of any Action of which it is aware which may result in disclosure and uses its commercially reasonable efforts to limit or prevent such disclosure and (iii) as may be necessary or reasonably advisable in order to consummate the Transactions. If the Transactions are not consummated, each Party will return or destroy as much of the Confidential Information concerning the other Party as the Parties that have provided such information may reasonably request, to the extent permitted under applicable Law.

(b) Except as may be required by Law, stock exchange or as otherwise expressly contemplated herein, neither Buyer nor Seller shall issue any press release or otherwise publicly disclose this Agreement or the Transactions or any dealings between or among the Parties in connection with the subject matter hereof without the prior approval of the other Party, which approval shall not be unreasonably withheld. In the event that any such press release or other public disclosure shall be required, the Party required to issue such release or other disclosure shall consult in good faith with the other Party hereto with respect to the form and substance of such release or other disclosure prior to the public dissemination thereof. The Parties will use good faith efforts to agree upon the text of a joint announcement to be made by the Parties at or after Closing. If the Transactions are consummated, all Confidential Information exclusively concerning the Assets and Pharmacy Business purchased and sold at each Closing shall become property of Buyer as part of the Purchased Assets and the provisions of this Section 5.6 shall thereafter bind Seller, but not Buyer, with respect thereto.

Section 5.7 **Restrictive Covenant**.

For a period commencing on the applicable Closing Date with respect to such Pharmacy and ending on the second anniversary of such Pharmacy's applicable Closing Date, Seller shall not, and shall cause its Subsidiaries not to, directly or indirectly, operate any retail pharmacy within a 50-mile radius of such Pharmacy, *provided, however*, neither Seller nor any of its Subsidiaries shall be prohibited from continuing to own and/or operate any retail pharmacy owned and operated by Seller or its Subsidiaries as of the date of this Agreement.

Section 5.8 **Script Assets**.

(a) The Parties acknowledge that Buyer and Seller are each a "***Covered Entity***" as that term is defined under HIPAA. To facilitate the transition of care from Seller to Buyer, it is necessary that Buyer have access to electronic patient records prior to the Closing of each Pharmacy. Commencing on the date hereof and in anticipation of the transaction contemplated hereby, Seller shall deliver electronic copies of the Script Assets to Buyer as Buyer shall reasonably request and to the extent permitted by applicable Law (as defined herein), including, but not limited to HIPAA, Seller shall reasonably cooperate and assist Buyer in Buyer's efforts to convert or transfer the Script Assets, using such means and efforts as agreed upon by the parties. Buyer shall not access, use or disclose Protected Health Information (as defined in HIPAA) contained in the Script

Assets except in a manner that complies with HIPAA. The Parties will work in good faith to transfer the Script Assets to Buyer in the most effective, efficient, and secure manner.

(b) Buyer agrees to implement reasonable and appropriate administrative, physical and technical safeguards to restrict the access and use of the Script Assets of a Pharmacy prior to the Closing for such Pharmacy to data migration and integration purposes. Buyer agrees that it is undertaking the responsibility for custody and maintenance of the Script Asset records related to controlled substance invoices, DEA 222 forms (blue copies), and annual controlled substance inventory logs. If for whatever reason the transaction does not close, Buyer agrees to take reasonable steps return or to securely destroy (at Seller's option), and remove the Script Assets from its active servers and dispensing system.

(c) Prior to the applicable Closing Date for a Pharmacy, Buyer may use the Script Assets solely for purposes of ensuring that Buyer is ready and able to fill prescriptions services as of such Closing; *provided*, however, that Buyer (i) may only use the minimum necessary Script Assets to accomplish such purpose, and (ii) may not directly, or through use of any subcontractor or agent, in whole or in part, aggregate or de-identify the Script Assets.

(d) To the extent the Script Assets are maintained in electronic format, Buyer may elect (in its discretion) for Seller to convert (at Buyer's sole cost) and transfer all or any portion of such electronic Script Assets. Seller and Buyer will work in good faith to transfer the Script Assets to Buyer in the most effective, efficient, and secure manner. Seller shall use its commercially reasonable efforts to cooperate and assist Buyer, prior to the Closing for each Pharmacy, in Buyer's efforts to convert or transfer the Script Assets to Buyer. Seller may retain a copy of all books and records included in the Script Assets as reasonably necessary for regulatory, insurance, defense of claims purposes, or as permitted or required by applicable Law.

(e) If Seller receives payment from any patient, third-party payor, or other source for any prescription filled by Buyer on or after the applicable Closing Date for a Pharmacy or Buyer receives payment from any patient, third-party payor, or other source for any prescription filled by Seller or an Affiliate of Seller before the applicable Closing Date for a Pharmacy, the receiving Party will report such payment to the other Party in reasonable detail within fifteen (15) days of receipt and will, simultaneously with or promptly after each report, pay to the other Party the aggregate amount of the misdirected payments reflected in such report.

Section 5.9 **Third Party Consents**.

Prior to the Closing Date, Seller shall use commercially reasonable efforts to obtain (i) all consents required to assign the Assumed Contracts at Closing in form and substance reasonably acceptable to Buyer (the "***Assumed Contract Consents***") and (ii) all consents required to assign the Assumed Real Estate Leases at Closing (the "***Landlord Consents***" and together with the Assumed Contract Consents, the "***Third Party Consents***"), in each case with such changes to such form as may be requested by the applicable landlord, tenant or lender and approved by Buyer, which approval shall not be unreasonably withheld; provided, however, Buyer shall not be obligated to pay any consideration in any form to any third party from whom any such consent is requested.

Section 5.10 **Financing**.

(a) Subject to the terms and conditions of this Agreement, Buyer will not permit any amendment, supplement, modification, replacement or waiver to be made to, or any waiver of any condition, remedy or other provision under, the Equity Commitment Letter without the prior written consent of Seller.

(b) Buyer shall use its best efforts to cause the Equity Commitment Party to fund on each applicable Closing Date the Equity Financing, including by taking enforcement action, if all conditions to the applicable Closing set forth in Section 7.1 and Section 7.2(a) (with respect to the Initial Closing and other than any Pharmacy Specific Conditions for Pharmacies not included in the Initial Closing) (and, if and when and applicable, Section 7.2(b) (with respect to the Subsequent Closings) and other than any Pharmacy Specific Conditions for Pharmacies not included in the applicable Subsequent Closing) herein are satisfied or waived (other than those conditions that by their terms are to be satisfied at such Closing, but subject to the fulfillment or waiver of those conditions). Buyer shall provide notice to Seller promptly upon receiving the Equity Financing.

## ARTICLE VI
## POST-CLOSING COVENANTS

Section 6.1 **General**.

The Parties will cooperate reasonably with each other and with their respective Representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and will: (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transactions

Section 6.2 **Transfer Taxes**.

All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with transactions contemplated by this Agreement ("***Transfer Taxes***") shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Seller shall cooperate with respect thereto as necessary). Seller and Buyer shall, and shall cause their respective Affiliates to, cooperate in preparing and filing, and join in the execution of, any such Tax Returns. Buyer and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under applicable Law.

Section 6.3 **Tax Matters**.

(a) The Parties shall, and shall cause their respective Affiliates to, cooperate reasonably with each other to: (i) assist the other party in preparing any Tax Returns which such other party is responsible for preparing and filing in respect of the Purchased Assets, (ii) make available to the other and to any taxing authority as reasonably requested all information, records, and documents relating to the Purchased Assets, and (iii) provide timely notice to the other in

writing of any pending or threatened Tax audits or assessments relating to the Purchased Assets for taxable periods for which the other may have a liability.

(b) All real property, personal property and similar ad valorem Taxes ("***Property Taxes***") levied with respect to the Pharmacy and/or Purchased Assets for a Straddle Period shall be apportioned between Pre-Closing Tax Period and Post-Closing Tax Period on a per diem basis for any Straddle Period based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

Section 7.1 **Conditions Precedent to Obligations of the Parties**.

The obligations of each Party to consummate the Transactions are subject to the satisfaction (or waiver by Buyer and Seller) on or prior to the applicable Closing Date of the conditions below:

(a) No Order. No law, order, injunction, judgment, decree, ruling, assessment or award shall have been enacted, entered, issued or promulgated by a Governmental Entity (and be in effect) which prevents, makes illegal, prohibits, restrains or enjoins the consummation of the Transactions;

(b) Sale Order. The Sale Order shall have been duly entered and shall be in full force and effect and no longer subject to appeal.

Section 7.2 **Conditions Precedent to Obligation of Buyer**.

(a) The obligations of Buyer to consummate the Transactions contemplated by this Agreement to be consummated at the Initial Closing are subject to the satisfaction (or waiver by Buyer) on or prior to the Initial Closing Date of the conditions below:

(i) Accuracy of Representations and Warranties. With respect to each Pharmacy's Purchased Assets subject to the Initial Closing, (A) the representations and warranties of Seller set forth in ARTICLE III (other than the representations set forth in Section 3.1, Section 3.2, Section 3.4, Section 3.14, and Section 3.16 (collectively, the "***Seller Fundamental Representations***") shall be true and correct (disregarding all qualifications and limitations as to "materiality", "Seller Material Adverse Effect" or words of similar import set forth therein) at and as of the Initial Closing Date as if made at and as of such time (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period), except where the failure to be so true and correct would not have a Seller Material Adverse Effect and (B) the Seller Fundamental Representations shall be true and correct (disregarding all qualifications and limitations as to "materiality", "Seller Material Adverse Effect" or words of similar import set forth therein) in all material respects at and as of the Initial Closing Date as if made at and as of such time (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period).

(ii) Compliance with Obligations. Each of the agreements and covenants of Seller set forth in this Agreement to be performed or complied with at or prior to the Initial Closing shall have been duly performed or complied with in all material respects.

(iii) Closing Deliveries. Seller shall have duly delivered to Buyer each of the documents and instruments required to be delivered by Section 2.4(a)(i).

(iv) Pharmacy Specific Conditions. The Pharmacy Specific Conditions for at least eight Pharmacies shall have been satisfied or waived by Buyer.

(v) Transfer of Script Assets. The conversion and transfer of Seller's applicable Pharmacies' Script Assets, as contemplated in Section 1 hereof, shall be complete.

(b) The obligations of Buyer to consummate the Transactions contemplated by this Agreement to be consummated at any Subsequent Closing with respect to any Pharmacy are subject to the satisfaction (or waiver by Buyer) on or prior to such Subsequent Closing Date of the conditions below:

(i) Accuracy of Representations and Warranties. With respect to each Pharmacy's Purchased Assets subject to the applicable Subsequent Closing, the Seller Fundamental Representations shall be true and correct (disregarding all qualifications and limitations as to "materiality", "Seller Material Adverse Effect" or words of similar import set forth therein) in all material respects at and as of the applicable Subsequent Closing Date as if made at and as of such time (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period).

(ii) Compliance with Obligations. Each of the agreements and covenants of Seller set forth in this Agreement to be performed or complied with at or prior to the applicable Subsequent Closing shall have been duly performed or complied with in all material respects.

(iii) Closing Deliveries. Seller shall have duly delivered to Buyer each of the documents and instruments required to be delivered by Section 2.4(a)(ii).

(iv) Pharmacy Specific Conditions. The Pharmacy Specific Conditions for the applicable Pharmacies subject to such Subsequent Closing shall have been satisfied or waived by Buyer.

(v) Transfer of Script Assets. The conversion and transfer of Seller's applicable Pharmacies' Script Assets, as contemplated in Section 1 hereof, shall be complete.

Section 7.3 **Condition Precedent to Obligation of Seller**.

(a) The obligations of Seller to consummate the Transactions contemplated by this Agreement to be consummated at the Initial Closing are subject to the satisfaction (or waiver by Seller) on or prior to the Initial Closing Date of the conditions below:

(i) Accuracy of Representations and Warranties. (A) The representations and warranties of Buyer set forth in ARTICLE IV (other than representations set forth in Section 4.1, Section 4.2 and Section 4.5, collectively, the "***Buyer Fundamental Representations***") shall be true and correct (disregarding all qualifications and limitations as to "materiality", "Buyer Material Adverse Effect" or words of similar import set forth therein) at and as of the Initial Closing Date as if made at and as of such time (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period), except where the failure to be so true and correct would not have a Buyer Material Adverse Effect and (B) the Buyer Fundamental Representations shall be true and correct (disregarding all qualifications and limitations as to "materiality", "Buyer Material Adverse Effect" or words of similar import set forth therein) in all material respects at and as of the Initial Closing Date as if made at and as of such time (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period).

(ii) Compliance with Obligations. Each of the agreements and covenants of Buyer set forth in this Agreement to be performed or complied with at or prior to the Initial Closing shall have been duly performed or complied with in all material respects.

(iii) Closing Deliveries. Buyer shall have duly delivered to Seller each of the documents and instruments required to be delivered by Section 2.4(b)(i) and made each of the payments required by Section 2.4(c) to be made at or prior to the Initial Closing.

(b) The obligations of Seller to consummate the Transactions contemplated by this Agreement to be consummated at any Subsequent Closing with respect to any Pharmacy are subject to the satisfaction (or waiver by Seller) on or prior to the Subsequent Closing Date of the following conditions:

(i) Accuracy of Representations and Warranties. The Buyer Fundamental Representations shall be true and correct (disregarding all qualifications and limitations as to "materiality", "Buyer Material Adverse Effect" or words of similar import set forth therein) in all material respects at and as of the applicable Subsequent Closing Date as if made at and as of such time (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period).

(ii) Compliance with Obligations. Each of the agreements and covenants of Buyer set forth in this Agreement to be performed or complied with at or prior to the applicable Subsequent Closing shall have been duly performed or complied with in all material respects.

(iii) Closing Deliveries. Buyer shall have duly delivered to Seller each of the documents and instruments required to be delivered by Section 2.4(b)(ii) and made

each of the payments required by Section 2.4(c)(i) at such Closing and each of the payments required by Section 2.4(c) to have been made with respect to all prior Closings.

**ARTICLE VIII**
**TERMINATION**

Section 8.1 **Termination of Agreement**.

Prior to the Initial Closing, this Agreement may be terminated only as follows:

(a) by mutual written consent of Buyer and Seller;

(b) by either Buyer or Seller, by written notice to the other Party, if the Initial Closing has not taken place on or before December 9, 2019 (or if the Initial Closing has not occurred on or before such date, such later date as Buyer and Seller may agree to in writing) (the "***Expiration Date***"); *provided, however,* that any Party that has breached this Agreement, which breach has resulted in the failure of a condition in ARTICLE VII, shall not be entitled to terminate this Agreement pursuant to this Section 8.1(b);

(c) with respect to any Subsequent Closing Pharmacies, by either Buyer or Seller, by written notice to the other Party, if any Subsequent Closings of any Subsequent Closing Pharmacies has not taken place on or before January 3, 2019 (or if such Subsequent Closing has not occurred on or before such date, such later date as Buyer and Seller may agree to in writing) (the "***Subsequent Expiration Date***"); *provided, however,* that any Party that has breached this Agreement, which breach has resulted in the failure of a condition in ARTICLE VII, shall not be entitled to terminate this Agreement pursuant to this Section 8.1(c);

(d) by either Buyer or Seller, by written notice to the other Party, if any event, fact or condition (including a breach of a material representation and warranty by the non-terminating Party) occurs or exists which otherwise makes a condition precedent to the terminating Party's obligations to consummate the Transactions not capable of being satisfied, and such event, fact or condition, if of a type that can be cured, shall not have been cured by the non-terminating Party within thirty (30) days of notice thereof from the terminating Party, unless the occurrence or existence of such event, fact or condition shall be due to the failure of the terminating Party to perform or comply with any of the agreements or covenants in this Agreement or the other Transaction Documents to be performed or complied with by such Party prior to the Initial Closing; or

(e) by either Buyer or Seller, by written notice to the other Party, if a Governmental Entity will have issued a non-appealable final order, decree or ruling or taken any other action having the effect of permanently restraining, enjoining or otherwise prohibiting the Transactions, *provided*, that the Party seeking to terminate this Agreement pursuant to this Section 8.1(e) must have used its best efforts to have such order, decree or ruling removed prior to termination.

Section 8.2 **Effect of Termination**.

Except for the obligations under Section 2.6(a), Section 5.6, Section 5.8, this ARTICLE VIII and ARTICLE X, if this Agreement is terminated under Section 8.1, then all further obligations of the Parties under this Agreement will terminate, provided that in the case of any such termination other than pursuant to Section 8.1(a), then the rights of the non-breaching Party(ies) to pursue all legal remedies for damages such Party(ies) suffer will survive such termination unimpaired and no election of remedies will have been deemed to have been made.

# ARTICLE IX
# INDEMNIFICATION

Section 9.1 **Survival of Representations, Warranties and Covenants**.

The Parties, intending to modify any applicable statutes of limitations, agree that (a) the representations and warranties of Seller set forth in ARTICLE III of this Agreement and of Buyer set forth in ARTICLE IV of this Agreement shall survive the Closings for a period expiring on the date that is the later of (x) April 30, 2020 and (y) the earlier of (1) the effective date of a plan of restructuring or liquidation of Seller or the conversion of the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, and (2) the first anniversary of the Closing, (b) the covenants and agreements of the Parties contained in this Agreement that by their terms are to be performed or complied with on or prior to the applicable Closing shall not survive the applicable Closing and (c) the covenants and agreements of the Parties contained in this Agreement that by their terms are to be performed after the applicable Closing shall survive until the earlier of (x) the time at which such covenants and/or agreements are fulfilled in full or otherwise in accordance with its respective terms and (y) the later of (1) April 30, 2020 and (2) the earlier of (A) the effective date of a plan of restructuring or liquidation of Seller or the conversion of the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, and (B) the first anniversary of the Closing.

Section 9.2 **Indemnification Provisions for Benefit of Buyer**.

Subject to the limitations set forth in this ARTICLE IX, after the Initial Closing Date, Seller will defend, indemnify and hold the Buyer Indemnified Parties harmless from and pay any loss, damage, suit, action or cause of action (collectively, "***Losses***" and individually, each a "***Loss***"), incurred by a Buyer Indemnified Party to the extent resulting from, relating to, arising out of, or attributable to:

(a) any inaccuracy of or breach by the Seller of any representation or warranty set forth in ARTICLE III;

(b) any breach or nonperformance of any of the covenants or agreements of Seller set forth in this Agreement that are to be performed after the applicable Closing;

(c) any Excluded Liability, including any Liability arising out of or related to the Pharmacy Business prior to the Closing (other than the Assumed Liabilities), including without limitation any and all Liabilities related to any of the Pharmacy's prescription fills prior to such Pharmacy's Closing Date, any and all Liabilities based upon or arising out of the Purchased Assets or any of the Pharmacy's Pharmacy Business, its occupancy of the Premises or the Assumed Contracts and any recoupment or any other amount due or that may become due from Seller under a Payment Program out of the conduct of the Pharmacy Business, in each case prior to the Closing.

Section 9.3 **Indemnification Provisions for Benefit of Seller**.

Subject to the limitations set forth in this ARTICLE IX, after the Initial Closing Date, Buyer will defend, indemnify and hold the Seller Indemnified Parties harmless from and pay any Loss, incurred by a Seller Indemnified Party to the extent resulting from, relating to, arising out of, or attributable to:

(a) any breach of any of the representations and warranties of Buyer set forth in ARTICLE IV;

(b) any breach or nonperformance of any of the covenants or agreements of Buyer set forth in this Agreement that are to be performed after the applicable Closing;

(c) any Assumed Liability and any Liability arising out of the operation of the Pharmacy Business following the Closing, including any recoupment or any other amount due or that may become due from Buyer under a Payment Program related to prescription fills following such Pharmacy's Closing.

Section 9.4 **Limitations on Indemnification Liability**.

(a) Deductible. As to any claim for indemnification pursuant to Section 9.2(a) and Section 9.3(a), no Buyer Indemnified Party or Seller Indemnified Party, as applicable, seeking indemnity under this ARTICLE IX (an "***Indemnified Party***") shall be entitled to indemnification until all Losses to such Indemnified Parties exceed, in the aggregate, an amount equal to the applicable Deductible as of the date such claim is made by the Indemnified Party, in which case, subject to the other limitations set forth in this ARTICLE IX, such Indemnified Party shall be entitled to indemnification only to the extent (and solely with respect to the amount that) such aggregate Losses exceed the Deductible; provided, however, the Deductible shall not be applicable to Losses arising from inaccuracies or breaches of the Seller Fundamental Representations or the Buyer Fundamental Representations, as applicable, or to claims for indemnification under Sections 9.2(b) or (c) or under Sections 9.3(b) or (c).

(b) Maximum Liability. Seller's maximum aggregate Liability for indemnification of Losses pursuant to Section 9.2 will not exceed the Holdback Amount. Buyer's maximum aggregate Liability for indemnification of Losses pursuant to Section 9.3 of this Agreement, as applicable, will not exceed will not exceed the Holdback Amount.

(c) Damages. All claims or indemnification obligations any Indemnified Party makes under this ARTICLE IX will be limited to actual damages and will exclude any loss of revenue, income or profits, diminution in value, punitive, exemplary, incidental damages, or loss of business reputation or opportunity relating to the breach of this Agreement, or any theory of loss based on a multiple of cash flow, revenue or other financial metric, and any consequential, special or indirect damages. Any indemnifiable claim pursuant to Section 9.2 or Section 9.3 shall be limited to the amount of indemnifiable Losses sustained by the Indemnified Party by reason of such breach of any representation or warranty, nonperformance of any covenant or agreement or indemnifiable Action only, net of any (A) insurance proceeds that may be claimed by the Indemnified Parties, (B) Tax benefits realized by the Indemnified Parties and (C) recoveries from third parties pursuant to separate indemnification arrangements or otherwise. Notwithstanding

anything in this Agreement to the contrary, no Buyer Indemnified Party shall be indemnified or reimbursed for (A) any Loss arising or resulting from any change in applicable Laws from and after the Closing Date, (B) any Loss related to Taxes with respect to the applicable Pharmacy and/or Purchased Assets for any Post-Closing Tax Period, (C) Tax consequences arising from the receipt or accrual of an indemnity payment hereunder, including any such consequences arising from adjustments to the basis of any asset resulting from an adjustment to the Purchase Price or any additional Taxes resulting from any such basis adjustment or (D) any Taxes other than Property Taxes.

(d) Mitigation. The Parties shall cooperate with each other to resolve any claim or liability with respect to which one Party is obligated to indemnify the other Party hereunder, including by making commercially reasonable efforts to mitigate or resolve any such claim or liability.

(e) Adjustments to Purchase Price. All payments made pursuant to this ARTICLE IX shall be treated as adjustments to the Purchase Price.

(f) No Duplicative Recovery. No Indemnified Party shall be entitled to recover any amount relating to any matter arising under one provision of this Agreement to the extent such Indemnified Party (or other Buyer Indemnified Parties in the event of a Buyer Indemnified Party, or other Seller Indemnified Parties in the event of a Seller Indemnified Party) has already recovered such amount with respect to such matter pursuant to that or other provisions of this Agreement (including pursuant to circumstances taken into account in an adjustment to the Script Purchase Price pursuant to Section 2.2(b)).

Section 9.5 **Indemnification As Exclusive Remedy**.

From and after all the applicable Closings contemplated by this Agreement, the remedies provided for in this ARTICLE IX shall be exclusive and shall preclude assertion by any Indemnified Party of any other rights or the seeking of any and all other remedies against the Indemnitor for claims based on this Agreement, other than for actions for specific performance or other equitable remedies. Each Party hereto hereby waives any provision of applicable Laws to the extent that it would limit or restrict the agreement contained in this Section 9.5. The limitations contained above in this Section 9.5 shall not apply to claims based on Fraud or on willful or intentional violations of Law.

## ARTICLE X
## MISCELLANEOUS

Section 10.1 **Entire Agreement**.

This Agreement, together with the other Transaction Documents and the Exhibits and Schedules hereto and the certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the Parties in respect of its subject matter and supersedes all prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof or the Transactions (including that certain Exclusivity Agreement between the Parties dated July 29, 2019 but effective August 19, 2019).

Section 10.2 **Successors**.

All of the terms, agreements, covenants, representations, warranties, and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the Parties and their respective successors.

Section 10.3 **Assignments**.

No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyer and Seller; provided that Buyer may assign its rights to purchase each and any Pharmacy hereunder, and may also assign its rights with respect to Offered Employees, to one or more of its Affiliates by written notice given to Seller prior to the applicable Closing but without consent of Seller (provided, that, Buyer shall remain liable for all obligations of Buyer hereunder, including the payment of the Purchase Price), and provided, further, that, Seller may, by written notice but without the consent of Buyer, assign all of its rights to payment under this Agreement for collateral security purposes to any secured creditor of Seller, but no such assignment shall relieve Seller of any liability or obligation hereunder. Any attempted assignment or transfer in violation of this Section 10.3 shall be void.

Section 10.4 **Notices**.

Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date sent by electronic mail, with confirmation of transmission, if sent during normal business hours of the recipient, if not, then on the next Business Day, or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications, to be valid, must be addressed as follows:

(i) If to Buyer:

SC Pharmacy Group Acquisition Co. LLC
Attn: c/o MHR Fund Management LLC
1345 Avenue of the Americas
42nd Floor
New York, NY 10105
Email: JSigmon@mhrfund.com
KSchaitkin@mhrfund.com

With a copy to (which will not constitute notice):

Attn: Kelley Drye & Warren LLP
Attn: Bruce Kraus
101 Park Avenue
New York, NY 10178
Email: bkraus@kelleydrye.com

(ii) If to Seller:

Fred's Stores of Tennessee, Inc.
Attn: Joseph Anto and Ben Morgan
2001 Bryan Street
Dallas, Texas 75201
Email: janto@fredsinc.com
ben.morgan@fredsinc.com

With a copy to (which will not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
Attn: David D'Urso, Esq.
One Bryant Park
New York, NY 10036
Email:ddurso@akingump.com

(iii) or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice in accordance with this Section 10.4 to the sending Party (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain). If more than one method for sending notice as set forth above is used, the earliest notice date established as set forth above shall control.

Section 10.5 **Counterparts**.

This Agreement may be executed in any number of counterparts and delivered via facsimile or electronic mail, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.

Section 10.6 **Headings**.

The article and section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

Section 10.7 **Governing Law; Consent to Jurisdiction**.

(a) This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions that would cause the application of the substantive Laws of any jurisdiction other than the State of Delaware.

(b) Each Party irrevocably submits to the exclusive jurisdiction of (a) the Bankruptcy Court, or (b) if the Bankruptcy Court declines jurisdiction, the United States District Court for the District of Delaware, for the purposes of any action arising out of this Agreement or any transaction contemplated hereby. Each Party agrees to commence any such action in the Bankruptcy Court, or, if the Bankruptcy Court declines jurisdiction, the United States District Court for the District of Delaware or lastly, if such action may not be brought in such court for

jurisdictional reasons, in the state chancery courts of the State of Delaware. Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth above shall be effective service of process for any action in the State of Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 10.7. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action arising out of this Agreement or the Transactions in the State of Delaware, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action brought in any such court has been brought in an inconvenient forum. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF AND THEREOF.

Section 10.8 **Amendments and Waivers**.

No amendment, modification, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same will be in writing and signed by Buyer and Seller. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.

Section 10.9 **Severability**.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided that if any provision of this Agreement, as applied to any Party or to any circumstance, is adjudged by a Governmental Entity not to be enforceable in accordance with its terms, the Parties agree that the Governmental Entity making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

Section 10.10 **Expenses**.

Except as otherwise expressly provided in this Agreement, each Party will bear its own costs and expenses incurred in connection with the preparation, due diligence review, execution and performance of this Agreement and the Transactions including all fees and expenses of agents, Representatives, financial advisors, legal counsel and accountants.

Section 10.11 **Construction**.

The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement. Any reference to any federal, state, local, or foreign Law will be deemed also to refer to Law as amended and all

rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

Section 10.12 **Bulk Transfer Laws**.

Buyer hereby waives compliance by Seller with the provisions of any so-called "bulk transfer laws" of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchases Assets to Buyer in connection with the Transactions.

Section 10.13 **No Third Party Beneficiaries**.

Nothing in this Agreement, express or implied, is intended to confer on any person other than the Parties or their respective successors or assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement and no Offered Employee or current or former employee of Seller, or any beneficiary or dependent thereof, or any other person not a party to this Agreement shall be entitled to assert any claim hereunder.

Section 10.14 **Schedules**.

No reference to or disclosure of any information in the Schedules shall be construed as an admission or indication that such information is material or that such information is required to be referred to or disclosed in the Schedules, nor shall such information be deemed to establish a level or standard of materiality for purposes of this Agreement. The Schedules are arranged in sections corresponding to the sections contained in this Agreement merely for convenience, and the disclosures made in any single Schedule shall be incorporated by this reference in each of the other Schedules to the extent that it is reasonably apparent that such incorporated disclosure relates to the subject matter of the Schedule into which it is being incorporated pursuant to this sentence.

Section 10.15 **Time is of the Essence**.

With respect to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

Section 10.16 **Specific Performance**.

The Parties agree that irreparable damage for which monetary damages, even if available, may not be an adequate remedy would occur in the event that the Parties do not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder in order to complete the Transactions) in accordance with its specified terms or otherwise breach such provisions. The Parties acknowledge and agree that the Parties shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which they are entitled at law or in equity. Each of the Parties agrees that prior

to the valid termination of this Agreement in accordance with Article VIII, it will not oppose the granting of an injunction, specific performance and other equitable relief as provided herein on the basis that (x) either Party has an adequate remedy at law or (y) an award of specific performance is not an appropriate remedy for any reason at law or equity. Any Party seeking an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide, furnish or post any bond or other security in connection with any such order or injunction and each Party hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

BUYER:

**SC PHARMACY GROUP ACQUISITION CO. LLC**

By: ___________________________________
Name:
Title:

SELLER:

**FRED'S STORES OF TENNESSEE, INC.**

By: ___________________________________
Name:
Title:

**EXHIBIT A**

**LIMITED POWER OF ATTORNEY FOR USE OF PHARMACY LICENSES, CONTROLLED SUBSTANCES LICENSES, DEA AND OTHER REGISTRATION NUMBERS, AND DEA ORDER FORMS**

Fred's Stores of Tennessee, Inc., a Delaware corporation located at 2001 Bryan Street, Suite 1550, Dallas, Texas 75201 ("Registrant"), is authorized to sign the current applications for registration and licensure as the registrant under the Controlled Substances Act of the United States, and is licensed to operate a pharmacy at [address] under the laws of the State of [______]. Registrant, effective as of [__________], 2019 (the "Effective Date"), has made, constituted and appointed, and by these representations does make, constitute, and appoint, [BUYER NAME] ("Grantee"), and [______________] ("Pharmacist") (Grantee and Pharmacist are collectively referred to herein as the "Grantee Group") as Registrant's agent and attorney-in-fact for the limited purpose of utilizing Registrant's pharmacy licenses, controlled substances licenses, U.S. Drug Enforcement Administration ("DEA") controlled substances registration, NCPDP and NPI numbers, and any other registrations required under the laws of the state in which Registrant operates, to the full extent permissible by law, to continue operations at the pharmacy located at the address set forth above (the "Pharmacy"), which are listed on Exhibit A. The Grantee Group may act in this capacity until such time as Grantee receives (1) notice of the DEA's approval of Grantee's registration application ("DEA Notice"), (2) notice that Grantee is established in the DEA's Controlled Substances Ordering System ("CSOS"), (3) applicable pharmacy and controlled substances licenses issued in Grantee's name, and (4) other applicable registrations necessary to operate the Pharmacy issued in Grantee's name as listed on Exhibit A; provided, however, that in any event, this Limited Power of Attorney shall expire ninety (90) days following the Effective Date (the earlier of such dates, the "Termination Date").

Registrant further grants this Limited Power of Attorney For Use of Pharmacy Licenses, Controlled Substances Licenses, DEA and Other Registration Numbers, and DEA Order Forms ("Limited Power of Attorney") to Pharmacist to act, effective as the Effective Date through the Termination Date, as the true and lawful agent and attorney-in-fact of Registrant, and to act in the name, place, and stead of Registrant, to execute applications for books of official order forms and to sign such order forms in requisition for Schedules 2, 2N, 3, 3N, 4 and 5 controlled substances, in accordance with 21 U.S.C. § 828 and C.F.R. Title 21, Part 1305, as is necessary for the treatment of the Pharmacy's patients.

It is recognized that so long as this Limited Power of Attorney shall be in effect, to the extent permissible by law, the Grantee Group is hereby irrevocably vested with the powers granted herein and that Registrant does hereby renounce the right to revoke this Limited Power of Attorney or any of the powers hereby confirmed upon the Grantee Group. Where permitted by applicable law, Registrant also renounces all rights in its part to exercise the powers which the Grantee Group are authorized to perform pursuant to this Limited Power of Attorney.

Registrant recognizes that it is legally responsible for the pharmacy licenses, controlled substances licenses and DEA and other state registrations until such time as Grantee has obtained its own pharmacy licenses, controlled substances licenses and DEA and other registrations. Therefore,

Registrant grants this Limited Power of Attorney based upon the following covenants and warranties of Grantee: (1) the Grantee Group shall follow and abide by all federal and state laws and regulations governing controlled substances and pharmacy practice at all times while utilizing this Limited Power of Attorney, (2) Grantee shall make timely application for, diligently pursue and use its best efforts to obtain its own pharmacy licenses, controlled substances licenses and DEA and other registrations which are required for the dispensing of pharmaceuticals as listed on Exhibit A, including, but not limited to, controlled substances at the Pharmacy, as soon as practicable after the Closing Date, and (3) Grantee shall indemnify and hold harmless Registrant for all losses, liabilities, costs, expenses (including reasonable attorneys' fees) and penalties incurred, paid or required under penalty of law to be paid by Registrant related, in whole or in part, to Grantee Group's use of this Limited Power of Attorney.

Grantee agrees to notify Registrant in writing within five (5) days after: (1) receipt of the DEA Notice, (2) receipt of confirmation that Grantee is established in CSOS, and (3) receipt of all applicable state pharmacy and controlled substances licenses listed on Exhibit A.

This Limited Power of Attorney is executed and delivered pursuant to, and capitalized terms not otherwise defined herein (including all Exhibits hereto) shall have the meanings ascribed to them in the Asset Purchase Agreement, dated as of [__________], 2019, by and between Fred's Stores of Tennessee, Inc. and Grantee (as amended, supplemented, or otherwise modified from time to time).

[*Signature page follows.*]

**IN WITNESS WHEREOF**, Registrant, on the one hand, and Grantee and Pharmacist, on the other hand, have executed this Limited Power of Attorney effective as of _______________, 2019.

**REGISTRANT**:

**FRED'S STORES OF TENNESSEE, INC.**

By: ___________________________

Name: ___________________________

Title: ___________________________

Witnesses to Signature of Registrant:

1. _____________________________

2. _____________________________

Signed and dated on the ____ day of ____________, 2019, at __________________.

**GRANTEE**:

**SC PHARMACY GROUP ACQUISITION CO. LLC**

By: ____________________________

Name: ____________________________

Title: ____________________________

Witnesses to Signature of Grantee:

1. ______________________________

2. ______________________________

Signed and dated on the _____ day of _____________, 2019, at ___________________.

**PHARMACIST**:

By: ___________________________

Name: ___________________________

Title: ___________________________

I, ____________________ (attorney-in-fact), hereby affirm that I am the pharmacist named herin as attorney-in-fact and that the signature affixed hereto is my signature.

_________________________________
(Signature of attorney-in-fact)

Witnesses to Signature of Pharmacist:

1. _____________________________

2. _____________________________

Signed and dated on the ____ day of ____________, 2019, at __________________.

**EXHIBIT A**

**TO**
**LIMITED POWER OF ATTORNEY**

**Licenses and Registrations at Pharmacy Covered by Limited Power of Attorney**

| Licensee | License/Certificate | Expiration Date | License Number | Issuer |
|---|---|---|---|---|
| | Pharmacy License | | | |
| | Controlled Substance Registration | | | |
| | DEA Controlled Substance Registration | | | U.S. Drug Enforcement Administration |
| | NCPDP | | | |
| | NPI | | | |
| | | | | |
| | | | | |

**EXHIBIT B**
**INVENTORY STATEMENT**

DATE OF INVENTORY ________________________________________

TIME STARTED _____________________________________________

TIME COMPLETED __________________________________________

FRED'S STORE # & ADDRESS (the "Captioned Store")
__________________________________________

SECTION TO BE COMPLETED BY THE BUYER'S REPRESENTATIVE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | AWP/Ret $ | x Cost Factor | COST $ |
|---|---|---|---|
| **Brand RX**<br>Brand = AWP minus 25% | $_____________ | x 75% | $_____________ |
| **Generic RX**<br>Generic = AWP minus 92.5% | $_____________ | x 7.5% | $_____________ |
| **TOTAL RX INVENTORY** | $_____________ | | $_____________ |
| **TOTAL NON-RX INVENTORY** | | | $_____________ |
| **TOTAL INVENTORY** | | | $_____________ |

------------------------------------------------------------------------------------------------------------

UPON COMPLETION OF THE INVENTORY COUNT BOTH THE SELLER'S REPRESENTATIVE AND BUYER'S REPRESENTATIVE MUST SIGN THIS INVENTORY STATEMENT. IMMEDIATELY THEREAFTER, FAX BOTH THIS INVENTORY STATEMENT AND THE INVENTORY SERVICE FINAL DEPARTMENT SUMMARY TO BUYER'S FAX # WHICH IS (918) 227-1589 AND SELLER'S FAX # WHICH IS [●]. PLEASE INCLUDE A COVER PAGE SHOWING THE NAME OF EACH PERSON WHO SIGNED THE DOCUMENT AND THEIR TITLE, AS WELL AS THE STORE NUMBER AND ADDRESS OF THE CAPTIONED STORE LOCATION INVENTORIED. PLEASE CONTACT JOHN TRAINOR NAMIR (BUYER) AT (501) 773 0359 AND [●] (SELLER) AT [●] WITH ANY QUESTIONS.

| **SELLER:** | **BUYER:** |
|---|---|
| By:_________________________________<br>Authorized Representative | By: _________________________________<br>Authorized Representative |

**EXHIBIT C-1**

**[FORM OF TRANSFER INSTRUMENT]**

BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "***Agreement***"), dated as of [_______], 2019, is entered into by Fred's Stores of Tennessee, Inc., a Delaware corporation ("***Assignor***") and [Buyer], a Delaware limited liability company (the "***Assignee***"). Capitalized terms used herein without definition shall have the meaning ascribed to such terms in the Asset Purchase Agreement (as defined herein).

**WHEREAS,** pursuant to that certain Asset Purchase Agreement (the "***Asset Purchase Agreement***"), dated as of [●], 2019, by and between the Assignor and Assignee, Assignor shall assign, transfer, convey and deliver to the Assignee all of its right, title and interest in and to the Purchased Assets of the Pharmacy or Pharmacies set forth on Schedule I attached hereto (the "***Applicable Purchased Assets***"), and Assignee shall assume and agree to pay, perform and discharge when due the Assumed Liabilities of the Pharmacy or Pharmacies set forth on Schedule I attached hereto (the "***Applicable Assumed Liabilities***"); and

**WHEREAS**, Assignor is executing and delivering this Agreement for the purpose of assigning, transferring, conveying and delivering all of Assignor's right, title and interest in and to the Applicable Purchased Assets; and

**WHEREAS**, Assignee is executing and delivering this Agreement for the purpose of accepting all of Assignor's right, title and interest in and to the Applicable Purchased Assets and assuming and agreeing to pay, perform and discharge when due the Applicable Assumed Liabilities.

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein and in the Asset Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. Assignment. Assignor hereby assigns, transfers, conveys and delivers (the "***Assignment***") to Assignee all of Assignor's respective right, title and interest in and to each of the Applicable Purchased Assets, including the Assumed Contracts and Assumed Real Estate Leases set forth on Schedule II, in accordance with the terms and conditions of the Asset Purchase Agreement.

2. Assumption. Assignee hereby accepts the Assignment, and assumes and agrees to pay, perform and discharge when due the Applicable Assumed Liabilities, including with respect to the Assumed Contracts and Assumed Real Estate Leases set forth on Schedule II.

3. Effective Time of the Assignment. The transactions contemplated by this Agreement will be effective immediately on the date hereof.

4. Successors. All of the terms, agreements, covenants, representations, warranties, and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the parties hereto and their respective successors.

5. Governing Law. This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions that would cause the application of the substantive Laws of any jurisdiction other than the State of Delaware.

6. Counterparts. This Agreement may be executed in any number of counterparts and delivered via facsimile or electronic mail, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.

7. Purchase Agreement. Sections 10.1, 10.3, 10.4, 10.6, 10.7(b), 10.8, 10.9, 10.10, 10.11 and 10.13 shall apply *mutatis mutandis* to this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed as of the day and year first above written.

**ASSIGNOR:**

FRED'S STORES OF TENNESSEE, INC.

By: _________________________________
Name:
Title:

STATE OF __________ )
) ss.
COUNTY OF ________ )

On the ______ day of ______ in the year 20__ before me, the undersigned, a Notary Public in and for said state, personally appeared _______________, proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_________________________________
Signature of Notary Public

**ASSIGNEE:**

SC PHARMACY GROUP ACQUISITION CO. LLC

By: ________________________________
Name:
Title:

STATE OF __________ )
) ss.
COUNTY OF ________ )

On the ______ day of ______ in the year 20__ before me, the undersigned, a Notary Public in and for said state, personally appeared _______________, proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

______________________________
Signature of Notary Public

**EXHIBIT C-2**

**[FORM OF ESTOPPEL CERTIFICATE AND AGREEMENT]**

ESTOPPEL CERTIFICATE AND AGREEMENT

___________________, 2019

TO: [*Insert Name and Address of applicable Buyer/tenant entity*]

Re: [*Insert Address of Premises*], (the "Premises")

We refer to the lease identified in Schedule A annexed hereto (the "Lease") between the undersigned (the "Landlord"), as lessor, and Fred's Stores of Tennessee, Inc. (the "Tenant"), as lessee, demising the Premises referenced above.

We understand that the interest of the Tenant under the Lease will be assigned to you (the "New Tenant"), effective as of a date to be specified in a notice from you to the undersigned Landlord (the "Assignment Date"), and that you intend to assume the obligations on the part of the lessee to be performed under the Lease from and after the Assignment Date.

In consideration of the foregoing, the undersigned Landlord certifies and agrees as follows:

1. Except as may be otherwise noted in Section 2 below, the Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way except as set forth in Schedule A annexed hereto, and represents the entire agreement between the Landlord and the Tenant regarding the Lease and the Premises. The documents listed in Schedule A are all of the documents that constitute the Lease and all amendments, modifications and supplements to the Lease, and there are no other agreements, written or oral, between the Landlord and the Tenant regarding the Lease or the Premises.

2. The commencement date of the Lease was ______________, 20__, and the expiration date of the initial term of the Lease is _____________, 20__ (the "Expiration

Date"). If the initial term has expired or is scheduled to expire prior to the Assignment Date, or the stated Expiration Date is earlier than one (1) year following the Assignment Date, then, effective as of the Assignment Date, the Lease shall be reinstated and amended such that the term thereof shall continue on all the same terms and conditions (including the same rental), and the expiration date thereof shall be one (1) year following the Assignment Date; and thereafter the New Tenant shall have the option to renew or further extend the term of the Lease as provided in Schedule B annexed hereto.

3. The Tenant has option(s) to renew or extend the term of the Lease as set forth in Schedule B annexed hereto.

4. The fixed monthly rent payable under the Lease is $________, and in addition, the lessee is responsible for payment of the items listed in Schedule C annexed hereto. The leased Premises thereunder consist of ____ square feet.

5. No notice of default has been given by the Landlord to the Tenant that has not been cured prior to the date hereof, and, to the best of the Landlord's knowledge, the Tenant is not in default in the performance of any of its obligations under the Lease (except as set forth in Schedule D annexed hereto). In any event, and notwithstanding the foregoing, the Landlord agrees to look solely to the current Tenant for the payment of rent and for the performance of any other obligations on the part of the lessee under the Lease arising or accruing prior to the Assignment Date; and any such obligations arising or accruing prior to the Assignment Date shall not be obligations of the New Tenant, nor constitute defaults under the Lease, from and after the Assignment Date.

6. Except as set forth in Schedule E hereto, there are no mortgages securing, or underlying leases affecting, Landlord's interest in the Premises.

7. The Lease and every term, condition, covenant and agreement therein, as amended hereby, are binding on the Landlord and fully enforceable in accordance with their respective terms.

8. The individual executing and delivering this certificate and agreement on behalf of the Landlord is fully authorized and empowered to do so.

The truth and accuracy of the certifications herein may be relied upon by the New Tenant, by each lender or investor of the New Tenant, and by their respective successors, participants, assignees, and transferees (collectively, the "Reliance Parties"), and shall be binding upon the Landlord and its successors and assigns and inure to the benefit of the Reliance Parties.

*[Signature page follows]*

WHEREFORE, the Landlord has executed this Estoppel Certificate and Agreement as of the date set forth above.

[*Signature block for the Landlord*]

[By:]________________________________
Name:
[Title:]

**SCHEDULE A**

**The Lease**

[*Identify the Lease and all amendments, modifications, supplements and related documents]*

**SCHEDULE B**

**Renewal Options**

[*List Renewal Option(s) provided for in the Lease, including revived Renewal Options from MTM leases, and new dates for Renewal Options for leases whose Expiration Dates have been postponed*]

**SCHEDULE C**

**Additional Rent**

[*List amounts payable by the Tenant in addition to fixed rent, for example: real estate taxes, insurance, utilities, operating expenses, etc.*]

## SCHEDULE D

## Outstanding Defaults

The Tenant is currently in default under the Lease in the following respects:

[*List outstanding defaults, if any*]

# SCHEDULE E

## Mortgages and Underling Leases(s)

[*List any mortgages securing, and/or underlying leases affecting, the Landlord's interest in the Premises; appropriate SNDAs required from each mortagee or lessor.*]

**EXHIBIT C-3**

**Subordination, Non-Disturbance and Attornment Agreement**

**MORTGAGEE SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "Agreement") is entered into as of ____________, 20__ (the "Effective Date") by and among ____________________________________________________________, a __________________________ having its principal address at ____________________________ (together with its successors and assigns, the "Mortgagee"), ______________________________, a ____________________ having its principal address at __________________________________ (the "Tenant") and ____________________________________, a _______________________ having its principal office at _______________________________ (the "Landlord").

WHEREAS, the Mortgagee is the holder of a mortgage or mortgages more particularly described in Schedule 1 annexed hereto (the "Mortgage") affecting the premises more particularly described in Schedule 2 annexed hereto (the "Premises"); and

WHEREAS, the Landlord and the Tenant are parties to a certain lease, more particularly described in Schedule 3 annexed hereto (the "Lease"), demising the Premises; and

WHEREAS, the Tenant has agreed to subordinate the Lease to the Mortgage and the lien thereof, and Mortgagee has agreed to grant non-disturbance rights to the Tenant under the Lease on the terms and conditions hereinafter set forth;

NOW, THEREFORE, for good and sufficient consideration, Tenant, Mortgagee and Landlord agree:

1. Definitions. The following terms shall have the following meanings for purposes of this Agreement.

    (a) *Foreclosure Event.* A "**Foreclosure Event**" means: (i) foreclosure under the Mortgage; (ii) any other exercise by Mortgagee of rights and remedies (whether under the Mortgage or under applicable law, including bankruptcy law) as holder of the Loan and/or the Mortgage, as a result of which a Successor Landlord becomes owner of the Property; (iii) delivery by Former Landlord to Mortgagee (or its designee or nominee) of a deed, assignment or other conveyance of Former Landlord's interest in the Property in lieu of any of the foregoing, or (iv) any other event in which Mortgagee or its designee shall succeed to the rights of Former Landlord under the Lease.

    (b) *Former Landlord.* A "**Former Landlord**" means Landlord and any other party that was landlord under the Lease at any time before the Takeover Date.

(c) *Offset Right*. An "**Offset Right**" means any right (including the Permitted Rights) or alleged right of Tenant to any offset, defense (other than one arising from actual payment and performance (which payment and performance would bind a Successor Landlord pursuant to this Agreement) or which Tenant might have to claims that accrued and relate to a period prior to the Takeover Date (but only to the extent the related prior claim against Tenant is pursued by Successor Landlord)), claim, counterclaim, reduction, deduction, or abatement against Tenant's payment of Rent or performance of Tenant's other obligations under the Lease arising (whether under the Lease or under applicable law) from Former Landlord's breach or default under the Lease.

(d) *Permitted Rights*. A "**Permitted Right**" means any abatement, offset, refund or credit expressly set forth in the Lease.

(e) *Rent*. The "**Rent**" means any fixed rent, base rent or additional rent under the Lease, and any other amount due by Tenant to Landlord under the Lease.

(f) *Successor Landlord*. A "**Successor Landlord**" means any party that becomes owner of Landlord's interest in the Property as the result of a Foreclosure Event.

(g) *Takeover Date*. "**Takeover Date**" means the date on which Successor Landlord shall have succeeded to the rights of the Former Landlord (including Landlord) under the Lease.

(h) *Termination Right*. A "**Termination Right**" means any right of Tenant to cancel or terminate the Lease or to claim a partial or total eviction arising (whether under the Lease or under applicable law) from Landlord's breach or default under the Lease.

(i) *Other Capitalized Terms*. If any capitalized term is used in this Agreement and no separate definition is contained in this Agreement, then such term shall have the same definition as is set forth in the Lease therefor.

2. Subordination. Subject to the terms of this Agreement, the Lease (as same may hereafter be modified, amended or extended) shall be, and shall at all times remain, subject and subordinate to the terms conditions and provisions of the Mortgage, the lien imposed by the Mortgage, and all advances made under the Mortgage and to all renewals, modifications, consolidations, replacements, substitutions, additions and extensions of the Mortgage and to any subsequent mortgages or assignments with which the Mortgage may be spread or consolidated; provided that, as between Landlord and Tenant, nothing contained in this Agreement shall be deemed to affect the obligations of Landlord or Tenant under the Lease.

3. Nondisturbance, Recognition and Attornment.

(a) No Exercise of Mortgage Remedies Against Tenant. So long as Tenant is not in default under the Lease beyond the expiration of any applicable notice and cure periods (an "**Event of Default**"), Mortgagee (i) shall not terminate or disturb

Tenant's possession of the Leased Premises under the Lease, except in accordance with the terms of the Lease and this Agreement and (ii) shall not name or join Tenant as a defendant in any exercise of Mortgagee's rights and remedies arising upon a default under the Mortgage unless applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Mortgagee may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease or otherwise adversely affect Tenant's rights under the Lease or this Agreement in such action.

(b) Recognition and Attornment. From and after the Takeover Date, (i) Successor Landlord shall be bound to Tenant under all the terms and conditions of the Lease (except as provided in this Agreement); (ii) Tenant shall recognize and attorn to Successor Landlord as Tenant's direct landlord under the Lease as affected by this Agreement; (iii) the Lease shall continue in full force and effect as a direct lease, in accordance with its terms (except as provided in this Agreement), between Successor Landlord and Tenant; and (iv) Successor Landlord shall have all the rights and remedies of the landlord under the Lease, including, without limitation, rights or remedies arising by reason of any default under or breach of the Lease by Tenant that has continued beyond the expiration of any applicable notice or cure periods, whether occurring before or after a Foreclosure Event. Each and every party deriving title to Leased Premises by, through, from or under the Mortgage and/or Mortgagee, shall be bound by the provisions of the Lease (subject to the terms of this Agreement), and the relationship between such party or parties and Tenant shall be that of landlord and tenant.

4. Protection of Successor Landlord. Notwithstanding anything to the contrary in the Lease or the Mortgage, Successor Landlord shall, subject to the terms of Section 7(j) hereof, not be liable for or bound by any of the following matters:

(a) Claims Against Former Landlord. Any Offset Right that Tenant may have against any Former Landlord relating to any event or occurrence before the Takeover Date, including any claim for damages of any kind whatsoever as the result of any breach by Former Landlord that occurred before the Takeover Date, subject to the terms below; provided that (1) the foregoing shall not limit Tenant's right to exercise against Successor Landlord any Permitted Rights and/or any Offset Right otherwise available to Tenant (i) because of events occurring after the Takeover Date, (ii) relating to any act or omission of Successor Landlord's obligation under the Lease to correct any conditions that existed as of the Takeover Date or continues thereafter, (iii) subject to the foregoing, any act or omission of Former Landlord which continues after the Foreclosure Event for which Mortgagee has received notice and opportunity to cure in accordance with the terms of this Agreement and Mortgagee failed to cure as permitted hereunder, or (iv) relating to a casualty or condemnation as provided in the Lease; and (2) to the extent any Permitted Right has not been applied in full on or prior to the Takeover Date, Successor Landlord shall recognize any such Permitted Right that has not been applied in full prior to the Takeover Date.

(b) Prepayments. Any payment of Rent that Tenant may have made to Former Landlord more than thirty (30) days before the date such Rent was first due and payable under the Lease with respect to any period after the Takeover Date other than, and only to the extent that, the Lease expressly required such a prepayment.

(c) Payment; Security Deposit. Any obligation: (i) to pay Tenant any sum(s) that any Former Landlord owed to Tenant unless such sums, if any, shall have been actually delivered to Mortgagee by way of an assumption of escrow accounts or otherwise; (ii) with respect to any security deposited with Former Landlord (if any), unless such security was actually delivered to Mortgagee; (iii) to commence or complete any initial construction of improvements in the Leased Premises or any expansion or rehabilitation of existing improvements thereon; or (iv) to reconstruct or repair improvements following a fire, casualty or condemnation except to the extent Landlord would have such an obligation under the Lease (but subject to Landlord's rights contained in the Lease).

(d) Modification, Amendment or Waiver. Any modification or amendment of the Lease or any waiver of the terms of the Lease made without Mortgagee's written consent, except that no such consent shall be required for any modification or amendment which is (i) entered into in connection with Tenant's exercise of express rights pursuant to the Lease, such as the renewal options set forth in the Lease, (ii) non-material and expressly contemplated to be entered into under the provisions of the Lease and related to the commencement date, rent commencement date or other dates, or (iii) to address a purely administrative matter (such as a change of notice address).

(e) Surrender, Etc. Any consensual or negotiated surrender, cancellation, or termination of the Lease, in whole or in part, agreed upon between Landlord and Tenant, unless effected unilaterally by Tenant pursuant to the express terms of the Lease.

5. Exculpation of Successor Landlord. Notwithstanding anything to the contrary in this Agreement or the Lease, Successor Landlord's obligations and liability under the Lease shall never extend beyond Successor Landlord's (or its successors' or assigns') interest in the Property from time to time, including insurance and condemnation proceeds, security deposits, escrows, Successor Landlord's interest in the Lease, and the proceeds from any financing, sale, lease or other disposition of the Property (or any portion thereof) by Successor Landlord (collectively, the "**Successor Landlord's Interest**"). Tenant shall look exclusively to Successor Landlord's Interest (or that of its successors and assigns) for payment or discharge of any obligations of Successor Landlord under the Lease as affected by this Agreement. If Tenant obtains any money judgment against Successor Landlord with respect to the Lease or the relationship between Successor Landlord and Tenant, as landlord and tenant, then Tenant shall look solely to Successor Landlord's Interest (or that of its successors and assigns) to collect such judgment. Tenant shall not collect or attempt to collect any such judgment out of any other assets of Successor Landlord.

6. Mortgagee's Right to Cure. Notwithstanding anything to the contrary in the Lease or this Agreement, before exercising any Offset Right or Termination Right:

(a) Notice to Mortgagee. Tenant shall provide Mortgagee with notice of the breach or default by Former Landlord giving rise to same (the "**Default Notice**") and, thereafter, the opportunity to cure such breach or default as provided for below.

(b) Mortgagee's Cure Period. After Mortgagee receives a Default Notice, Mortgagee shall have a period of thirty (30) days beyond the time available to Landlord under the Lease in which to cure the breach or default by Landlord (it being agreed that if the Lease does not have such a time period, the time period available under the Lease shall be deemed to be (i) ten (10) days in the case of a monetary default and (ii) thirty (30) days in the case of a non-monetary default). If any default requires possession and control of the Property, then, provided Mortgagee undertakes by written notice to Tenant to exercise reasonable efforts to cure or cause to be cured by a receiver such breach or default within the period permitted by this Section 6(b), Mortgagee's cure period shall continue for such additional time as Mortgagee may reasonably require to either: (A) obtain possession and control of the Property with due diligence and thereafter cure the breach or default with reasonable diligence and continuity; or (B) obtain the appointment of a receiver and give such receiver a reasonable period of time in which to cure such default, provided in no event shall such additional cure period exceed one hundred eighty (180) days after Tenant sends the Default Notice to Mortgagee or the expiration of Landlord's cure period under the Lease the subject of the Default Notice, if later. Mortgagee shall have no obligation to cure (and shall have no liability or obligation for not curing) any breach or default by Landlord, except to the extent that Mortgagee agrees or undertakes otherwise in writing to Tenant.

7. Miscellaneous.

(a) Notices. Any notice or request given or demand made under this Agreement by one party to the other shall be in writing, and may be given or be served by hand delivered personal service, or by depositing the same with a reliable overnight courier service or by deposit in the United States mail, postpaid, registered or certified mail, and addressed to the party to be notified, with return receipt requested. Notice deposited in the mail in the manner hereinabove described shall be effective from and after the expiration of three (3) Business Days after it is so deposited; however, delivery by overnight courier service shall be deemed effective on the next succeeding business day after it is so deposited and notice by personal service shall be deemed effective when delivered to its addressee unless given after 5:00 p.m. on a business day, in which case it shall be deemed effective at 9:00 a.m. on the next business day. For purposes of notice, the addresses of the parties shall, until changed as herein provided, be as follows:

1. If to the Mortgagee, at:

With a copy to:

2. If to the Tenant, at:

With a copy to:

3. If to the Landlord, at:

With a copy to:

(b) Successors and Assigns. This Agreement shall bind and benefit the parties, their successors and assigns, any Successor Landlord, and its successors and assigns. If Mortgagee assigns the Mortgage, then upon delivery to Tenant of written notice thereof, accompanied by the assignee's written assumption of all obligations under this Agreement, all liability of the Mortgagee with respect to obligations under this Agreement shall terminate.

(c) Entire Agreement. This Agreement and the Lease (subject to the limitations contained herein) constitute the entire agreement between Mortgagee and Tenant regarding the subordination of the Lease to the Mortgage and the rights and obligations of Tenant and Mortgagee as to the subject matter of this Agreement.

(d) Interaction with Lease and with Mortgage. If this Agreement conflicts with the terms of the Lease, then this Agreement shall govern as between the parties and any Successor Landlord, including upon any attornment pursuant to this Agreement,

but the foregoing shall not modify any of the rights or obligations between Landlord and Tenant under the Lease prior to the Takeover Date. This Agreement supersedes, and constitutes full compliance with, any provisions in the Lease that provide for subordination of the Lease to, or for delivery of nondisturbance agreements by the holder of, the Mortgage.

(e) Mortgagee's Rights and Obligations. Except as expressly provided for in this Agreement, Mortgagee shall have no obligations to Tenant with respect to the Lease. If an attornment occurs pursuant to this Agreement, then all rights and obligations of Mortgagee under this Agreement shall terminate, without thereby affecting in any way the rights and obligations of Successor Landlord provided for in this Agreement.

(f) Interpretation; Governing Law. The interpretation, validity and enforcement of this Agreement shall be governed by and construed under the internal laws of the State in which the Leased Premises are located, excluding such State's principles of conflict of laws.

(g) Amendments. This Agreement may be amended, discharged or terminated, or any of its provisions waived, only by a written instrument executed by the parties hereto.

(h) Due Authorization. Each party to this Agreement represents and warrants to each other party hereto that the execution and delivery of this Agreement has been duly authorized and that this Agreement shall be binding upon such party in accordance with the terms of this Agreement and the undersigned signatory is a duly authorized officer, member or partner (as applicable) of such party.

(i) Execution. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

(j) Affiliate Limitations. Notwithstanding anything to the contrary contained herein, if Landlord or any Affiliate of Landlord is the holder of the Mortgage, then the provisions of Sections 4 and 6 hereof shall be of no force or effect.

(k) Attorneys' Fees. In the event of any dispute between any of the parties in any way related to this Agreement, the non-prevailing party shall pay to the prevailing party all reasonable attorneys' fees and disbursements incurred by the prevailing party in connection with any action or proceeding (including any appeal and the enforcement of any judgment or award), whether or not the dispute is litigated or prosecuted to final judgment. The "prevailing party" shall be determined based upon an independent assessment of which party's major arguments or positions taken in the action or proceeding could fairly be said to have prevailed (whether by compromise, settlement, abandonment, final decision, after any appeals, or otherwise) over the other party's major arguments or positions on major disputed issues.

(l) Headings. The headings in this Agreement are intended to be for convenience of reference only, and shall not define the scope, extent or intent or otherwise affect the meaning of any portion hereof.

[*Signatures Appear on Following Page*]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

MORTGAGEE:

[*Insert signature block for Mortgagee*]

STATE OF ___________ )
) ss.
COUNTY OF _________ )

On the ______ day of ______ in the year 20__ before me, the undersigned, a Notary Public in and for said state, personally appeared ________________, proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

______________________________
Signature of Notary Public

TENANT:

[*Insert signature block for Tenant*]

STATE OF __________ )
) ss.
COUNTY OF ________ )

On the ______ day of ______ in the year 20__ before me, the undersigned, a Notary Public in and for said state, personally appeared _______________, proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

______________________________
Signature of Notary Public

LANDLORD:

[*Insert signature block for Landlord*]

a Delaware limited liability company

By: ________________________________
Name:
Title:

STATE OF __________ )
) ss.
COUNTY OF ________ )

On the ______ day of ______ in the year 20__ before me, the undersigned, a Notary Public in and for said state, personally appeared ________________, proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

________________________________
Signature of Notary Public

Schedule 1

Description of Mortgage

Schedule 2

Description of the Premises

Schedule 3

The Lease

# EXHIBIT C-4

## Lease Reinstatement Terms

If the initial term has expired or is scheduled to expire prior to the Closing Date of the Pharmacy, or the stated expiration date of the Assumed Real Property Lease is earlier than one (1) year following the applicable Closing Date, then, effective as of applicable Closing Date, the Assumed Real Property Lease shall be reinstated and amended such that the term thereof shall continue on all the same terms and conditions (including the same rental), and the expiration date thereof shall be one (1) year following the Closing Date; and thereafter the Buyer shall have the option to renew or further extend the term of the Lease in accordance with the renewal options set forth in the Lease (with such dates revised, on terms consistent with the existing Assumed Real Property Lease).

# **EXHIBIT 2**

## Pharmacy Asset Sale Schedule

ExpressRx - Pharmacies

| Pharmacy Store # | Rx # | City | State | Address | Zip |
|---|---|---|---|---|---|
| 3725 | 3726 | MORGANTOWN | KY | 211 SOUTH MAIN STREET | 42261 |
| 3957 | 3958 | LAKE PROVIDENCE | LA | 303 N. HOOD STREET | 71254 |
| 3925 | 3926 | VARDAMAN | MS | 101 W SWEET POTATO ST | 38878 |
| 3920 | 3921 | UNION | MS | 801 E JACKSON RD | 39365 |
| 3885 | 3886 | RIPLEY | TN | 251 S WASHINGTON ST | 38063 |
| 3860 | 3861 | SAINT JOSEPH | LA | 705 PLANK RD HIGHWAY 128 | 71366 |
| 3700 | 3701 | HAMILTON | AL | 1360 MILITARY STREET S | 35570 |
| 3603 | 3604 | TUNICA | MS | 1068 HWY 61 N. | 38676 |
| 3568 | 3569 | FAYETTE | AL | 1128 SECOND AVE. NE | 35555 |
| 3230 | 3231 | WINNFIELD | LA | 2001 W COURT ST | 71483 |

# EXHIBIT 3

## Lease Assumption and Assignment Schedule

| Location of Lease to be Assumed and Assigned | Pharmacy Store # |
|---|---|
| 1128 Second Ave. NE<br>Fayette, AL 35555 | 3568 |
| 211 South Main Street<br>Morgantown, KY 42261 | 3725 |
| 251 S Washington St.<br>Ripley, TN 38063 | 3885 |
| 801 E Jackson Rd.<br>Union, MS 39365 | 3920 |