**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| FRED'S, INC., *et al.*,[1] | ) ) ) | Case No. 19-11984 (CSS) |
| Debtors. | ) ) ) ) | Jointly Administered<br>Obj. Deadline: Oct. 9, 2019 at 4:00 p.m. (ET)<br>Hearing Date: Oct. 16, 2019 at 3:00 p.m. (ET) |

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE FOR ENTRY OF AN ORDER AUTHORIZING THE (I) SALE OF CERTAIN PHARMACY ASSETS TO WALGREEN CO. FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases (the "Chapter 11 Cases") respectfully state as follows in support of this motion (the "Motion"):

**RELIEF REQUESTED**

1. By this Motion, the Debtors seek entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, authorizing the sale ("the "Transaction") of certain pharmacy assets (the "Contracted Pharmacy Assets"), located at the pharmacies (the "Pharmacies") designated in that certain Asset Purchase Agreement, (the "Agreement") between the Debtors and Walgreen Co. (the "Buyer"), attached to the Order as **Exhibit 1**, pursuant to (a) sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6004 and 2002(a)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Store, Inc. (4510); Summit

Bankruptcy Court for the District of Delaware (the "Local Rules") free and clear of all liens, claims, interests, and encumbrances to the Buyer.

## JURISDICTION AND VENUE

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory and other legal predicates for the relief sought herein are Bankruptcy Code sections 105 and 363, Bankruptcy Rules 2002(a)(2) and 6004, and Local Rule 6004-1.

## BACKGROUND

A. **General Background.**

4. On September 9, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request for the appointment of a trustee or

---

Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 2001 Bryan Street, Suite 1550, Dallas, TX 75201.

examiner has been made in these Chapter 11 Cases. An unsecured creditors' committee was appointed on September 18, 2019.

5. A detailed description of the Debtors' business, their capital structure, and the facts and circumstances leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Mark A. Renzi, Chief Restructuring Officer of Fred's, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [D.I. 17].

B. **Overview of the Prepetition Pharmacy Assets Marketing Process**

6. Throughout the past year, the Debtors have worked closely with their advisors to stabilize their business and improve their financial condition. As part of this process, the Debtors' sought to enhance their liquidity through a complete divestment of their legacy pharmacy business. To date, the Debtors' months-long marketing process has been quite successful, having monetized a substantial number of pharmacies and bolstered its liquidity position. The Debtors remain engaged in further monetizing their pharmacy holdings.

7. The Debtors' pharmacy holdings consist of the stock of prescription pharmaceutical inventory located in the remaining pharmacies in each of the Debtors' stores (the "Pharmacy Inventory") and/or the prescription files and records, pharmacy customer lists and patient profiles (the "Pharmacy Files" and, together with the Pharmacy Inventory, the "Pharmacy Assets"). The Debtors' remaining Pharmacy Assets are mainly housed at locations where front-store operations have already closed or are in the process of closing.

C. **The Prepetition Marketing Process for the Contracted Pharmacy Assets**

8. The execution of the Agreement was the culmination of a comprehensive and intensive marketing process led by independent financial advisor PJ Solomon ("Solomon"). This

process took place over many months prior to the commencement of the Chapter 11 Cases and resulted in the highest and best bid for the Contracted Pharmacy Assets.

9. The Debtors engaged Solomon in February 2018 as their investment banking advisor to advise the company on strategic alternatives for its pharmacy business, including a potential sale of some or all of its Pharmacy Assets located in 347 separate locations. Solomon researched the potential the universe of buyers who would have an interest in purchasing the Pharmacy Assets.

10. For its initial sale process, Solomon contacted 21 strategic buyers. Of the 21 parties contacted, six signed a Non-Disclosure Agreement ("NDA") and four submitted preliminary proposals. In September 2018, Walgreen and the Debtors executed a contract for the sale of Pharmacy Assets located at 185 of the Debtors' pharmacies. After transaction adjustments required by the FTC that excluded six pharmacies from the transaction, Walgreen acquired the Pharmacy Assets of 179 pharmacies for a total consideration of approximately $177 million. These closings occurred on a rolling basis from November 2018 through January 2019.

11. In September 2018, the Debtors directed Solomon to conduct another sale process for the remaining Pharmacy Assets. In connection with this second sales effort, Solomon contacted 33 strategic buyers. Of the 33 parties contacted, thirteen signed an NDA and three submitted proposals. These proposals were received from Walgreen, CVS and ExpressRx. In July 2019, CVS and the Debtors executed a contract for the sale of certain Pharmacy Assets from 38 pharmacies for a total consideration of approximately $12 million plus inventory.

12. In September 2019, Walgreen determined to purchase the Contracted Pharmacy Assets for a total consideration of approximately $9.4 million.

13. Given their current liquidity positon and existing milestones in the DIP Facility, the Debtors are under pressure to monetize the Pharmacy Assets as quickly as possible. Moreover, specifically with respect to the Pharmacy Assets, time is of the essence as their value diminishes by the day. Specifically, an extended lag time between the commencement of these Chapter 11 Cases and the sale of the Pharmacy Assets increases the risk that pharmacy customers migrate, significantly reducing the value that the Debtors can realize from script and related sales. Indeed, in the recent ShopKo case (*In re Specialty Retail Shops Holding Corp.*, Case No. 19-80064, Bankr. D. Nebraska (Jan. 16, 2019)), where the debtors sought to sell their pharmacy assets via an expedited auction process, the value of the debtors' pharmacy assets plummeted postpetition because they were not sold quickly enough. Here, the Debtors' aggressive prepetition efforts to sell their Pharmacy Assets and the relief sought herein are an attempt to avoid that same fate.

D. **The Agreement**

14. As more fully described in the Agreement, the Debtors propose to enter into a transaction whereby the Buyer will make a series of payments, not to exceed $9,385,000, and outlined in the below chart, to acquire substantially all of the Debtors' Pharmacy Assets at the Pharmacies specified in the Agreement. The following chart summarizes the terms and conditions of the proposed sale and discloses certain information required pursuant to Local Rule 6004-11:

| **Summary of Significant Terms of the Agreement** | |
|---|---|
| *Parties* | The parties to the Walgreen APA (the "Walgreen APA") will include (i) Walgreen Co. ("Purchaser"), and (ii) the Debtors ("Sellers"). |
| *Structure of Transaction* | Upon the terms and subject to the conditions set forth in the Walgreen APA, at the closing and upon payment of the Purchase Price, Sellers will sell, and Purchaser will purchase from Sellers, all of Seller's right, title and interest in |

| | |
|---|---|
| Section 2.1(a) | and to the applicable Purchased Assets (as more fully described below) free and clear of all encumbrances (subject to certain exceptions). |
| *Structure of Transaction; Acquired Assets;*<br><br>Section 2.1(b) | "Purchased Assets" include the following assets of the Pharmacies:<br><br>1. prescription files, prescription records and related data ("Script Assets");<br><br>2. retail prescription and pharmaceutical inventory having an aggregate Inventory Value not to exceed $8,935,000 ("Inventory");<br><br>Purchased Assets do not include, among other things, any other assets of Sellers (collectively, the "Excluded Assets"), do not include, among other items, cash, cash equivalents, or securities of Sellers, accounts receivable or proceeds thereof, Sellers' intellectual property, fixtures or any real property. |
| *Purchase Price:*<br><br>Section 2.2 | Purchase Price. The aggregate purchase price to be paid by Buyer to Sellers with respect to the Purchased Assets is equal to (i) $450,000.00 (the "Script Purchase Price"), as adjusted pursuant to the Walgreen APA *plus* (ii) the aggregate value of the Inventory at all Pharmacies, as determined pursuant to audits described below (the "Inventory Purchase Price" and together with the Script Purchase Price, the "Purchase Price"); *provided, however*, the Inventory Purchase Price shall not exceed $8,935,000.00 in the aggregate and, with respect to each Pharmacy, the Inventory Purchase Price for such Pharmacy shall not exceed a pharmacy specific cap.<br><br>The Script Purchase Price is subject to proportional adjustment based on a comparison of the Pharmacies' prescription volume as set forth in the Walgreen APA (the "Weekly Volume Amount") and the average weekly prescription volume at the respective Pharmacy for the trailing four (4) week period ending on the Saturday prior to such measurement date (such count each a "Closing Script Volume"), provided that no adjustment will be made unless the applicable Closing Volume is more than 110%, or less than 90%, of, the applicable Base Volume<br><br>The Script Purchase Price will be payable at Closing and the Inventory Purchase Price will be payable within 5 business days of the determination of the final Inventory Purchase Price. |
| *Representations and Warranties of the Seller:*<br><br>*Article III; IV* | The Sellers are giving customary representations, including regarding: (i) organization and qualification; (ii) authorization and enforceability; (iii) governmental authorizations; (iv) non-contravention; (v) title to assets; (vi) employee matters; (vii) script volume; (viii) inventory; (ix) compliance with laws and regulations relating to the Script Assets; (x) the accuracy of the books and records of the Pharmacies and financial information with respect to the Purchased Assets and the related business; (xi) taxes; and (xii) no broker fees, and such other representation and warranties as may be agreed |

| | |
|---|---|
| | to<br><br>The Purchaser is giving customary representations, including regarding (i) organization and qualification; (ii) authorization and enforceability; (iii) governmental authorizations; (iv) non-contravention; (v) absence of litigation; (vi) no brokers fees; and (vii) Purchaser's investigation. |
| *Covenants:*<br><br>*Article V* | The parties have agreed to customary covenants, including covenants relating to the operation of the pharmacies during the executory period, efforts to consummate the transactions and the parties obligations related to the data included in the Script Assets.<br><br>Sellers have agreed to a two-year non-competition covenant relating to the operation of the pharmaceutical business within a 5-mile radius of the Pharmacies, subject to certain exceptions. |
| *Closing Conditions:*<br><br>*Article VIII* | The Closing is subject to certain closing conditions including (i) the receipt of the Order, (ii) no other order enjoining the consummation of the transactions, (iii) the accuracy of the parties' representations, and (iv) the parties' compliance with their covenants.<br><br>The Walgreen APA may be terminated if the initial closing has not occurred prior to November 1, 2019 (subject to certain exceptions). |

## BASIS FOR RELIEF

15. Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

16. As an initial matter, the prepetition marketing process described in herein featured the typical characteristics of any legitimate corporate asset sale process: (i) identifying the universe of buyers, (ii) contacting those buyers; (iii) receiving bids in a fair, arms-length and open process; and (iv) selecting the highest-bid with the most certainty of closing. Indeed, the Debtors were hard-pressed to maximize returns from each prepetition transaction, as they were seeking to avoid bankruptcy.

17. Furthermore, the Debtors determined in the beginning of 2019 to liquidate the Pharmacy Assets and have successfully engaged in such efforts.

18. The Debtors do not believe that the cost and delay arising from a competitive auction process or pursuing a potential transaction with an entity other than the Buyer with respect to the Contracted Pharmacy Assets would be reasonably likely to increase value for the estates—particularly given the extensive prepetition marketing efforts conducted by the Debtors prior to the date hereof. As a result, the Debtors respectfully submit that it is an exercise of their sound business judgment to sell the Contracted Pharmacy Assets to the Buyer pursuant to the Agreement via a private sale, which will maximize the value of these assets for the benefit of all creditors. Accordingly, the Debtors respectfully request that the Court enter the proposed order authorizing the Agreement and the Transaction contemplated thereby.

### A. A Private Sale of the Contracted Pharmacy Assets is Appropriate Under Bankruptcy Rule 6004

19. Bankruptcy Rule 6004(f) and Local Rule 6004-11 (b)(iv)(D) permit a debtor to conduct a private sale pursuant to section 363. Specifically, Bankruptcy Rule 6004(f) provides that "…sales not in the ordinary course of business may be by private sale or by public auction." Fed. R. Bankr. P. 6004(f)(1) (emphasis added). *See In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del 1981) (holding that manner of sale is within the debtor's discretion); *In re Bakalis*, 220 B.R. 525, 531-32 (Bankr. E.D.N.Y. 1998) (stating that debtor has authority to conduct public or private sales of estate property).

20. Courts have in the past approved private sales or non-ordinary course sales that maximize creditor returns. *See In re Specialty Retail Shops Holding Corp.*, Case No. 19-80064, Bankr. D. Nebraska (Jan. 16, 2019). Indeed, the Debtors are wary of the complications that could arise should the Transaction not be approved, where, ironically, the bidders would

likely be exactly the same as the prepetition bidders, but, because of the potential for rapid decline of asset values in a liquidation, bid offers may be substantially less. *See In re Woodruff*, 580 B.R. 291, 297 (Bankr. M.D. Ga. 2018) ("Because Chapter 11 liquidation plans are particularly dependent on the value of estate assets, courts must be intensely mindful of diminishing asset values in these cases"); *See also In re Washington Mut.*, Inc., No. 08-12229 MFW, 2012 WL 1563880, at *23 (Bankr. D. Del. Feb. 24, 2012) (creditors would suffer diminished recoveries in a liquidation scenario or "fire-sale" because such circumstances "substantially reduce the potential value of this asset"). By conducting the comprehensive marketing process, instead of "failing…to explore its market alternatives," the Debtors will avoid "a situation of distress" where assets can be purchased at "a fire sale price." *In re HomeBanc Mortg. Corp.*, 573 B.R. 495, 516 (Bankr. D. Del. 2017), aff'd, 590 B.R. 69 (D. Del. 2018). Indeed, the sale of a chapter 11 debtor's assets to a specific Buyer outside of the ordinary course of business was appropriate under the circumstances, especially where "[m]ost significantly, the assets of the Debtor are declining in value." *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998). Here, marketing the Contracted Pharmacy Assets for a second time risks inviting bids that are substantially lower than the currently contemplated sales price, not to mention that the Debtors' estates will incur additional costs by running a duplicative sales process which will involve the exact same assets and (likely) the exact same bidders.

21.     Where there was competitive bidding, aggressive marketing, and a "need for speed" private sale of assets was appropriate: "Thus, for each day that this Court does not approve the sale, significant interest is accruing and the closing on the sale to [the Buyer] is further delayed….there is one less dollar available to pay other creditors. All of these

circumstances underscore that there is a need for speed with respect to this Court approving the sale of the [assets]. *In re 9 Houston LLC*, 578 B.R. 600, 614 (Bankr. S.D. Tex. 2017).

22. The Debtors believe that the marketing process has allowed the Debtors to obtain fair and reasonable purchase prices for the Contracted Pharmacy Assets and to effectuate the Transaction in an efficient and streamlined process. The Transaction undoubtedly serves the important objectives of obtaining not only a fair and reasonable purchase price for the Contracted Pharmacy Assets, but also the highest or otherwise best value for the Contracted Pharmacy Assets, which will inure to the benefit of all parties in interest in the Chapter 11 Cases.

23. In addition, based on the thorough prepetition marketing of the assets, there is a strong likelihood that the proposed purchase price is the best offer the Debtors' will receive, particularly because the sale of the Contracted Pharmacy Assets is a package deal. "It is a well-established principle of bankruptcy law that the…Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate. *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992).

24. In light of Bankruptcy Rule 6004(f) and case law regarding section 363 sales, a debtor may conduct a private sale if a good business reason exists. *See, e.g., In re Pritam Realty, Inc.*, 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *Condere*, 228 B.R. at 629 (authorizing private sale of debtors' tire company where "[d]ebtor has shown a sufficient business justification for the sale of the assets to the [p]urchaser"); *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in determining whether a private sale should be approved. The court should exercise its discretion based upon the facts

and circumstances of the proposed sale"); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale). Finding a good business reason is a low bar, and courts have generally prevented private sales only when there was a total lack of effort to market the assets or when courts suspect that the private sale would benefit an insider to the detriment of the estate: "As for the suggestion that [there is only one] possible Buyer, the court is skeptical given (1) the absence of any effort to market the assets to an entity other than the proposed Buyer, and (2) the potential impact of the agreement to employ [an insider] on the Debtors' decision to enter into the private sale without exploring alternatives" and so the Court would not approve asset sale outside the ordinary course of business. *In re P.D.M. Co.*, 523 B.R. 558, 559 (Bankr. W.D. Mich. 2015). Here, the Debtors decision to arrange a prepetition marketing process for the Contracted Pharmacy Assets, overseen by an independent financial advisor, to monetize the assets and improve the financial position of the Debtors in the hope of avoiding bankruptcy, certainly qualifies as an exercise of sound business judgment.

25. Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action *appears* to enhance the debtor's estate." *Crystalin, L.L.C. v. Selma Props. Inc.* (*In re Crystalin, L.L.C.*), 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (emphasis in original, internal alterations and quotations omitted)). Courts require only that the debtors "show that a sound business purpose justifies such actions." *See In re Montgomery Ward Holding Corp.*, 242 B.R. at 153 (citations omitted); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729, 2003 WL 22316543, at *31 (Bankr. S.D.N.Y. Mar. 4, 2003); *In re Lionel Corp.*, 722 F.2d at 1071. *See also In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct" (citation omitted).

26.     In addition, a sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *Four B. Corp. v. Food Barn Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 566 n.16 (8th Cir. 1997) (recognizing the paramount goal of any proposed sale of property of estate is to maximize value). Here, where the private sale is a result of a robust marketing process to non-insider Buyers, overseen by an independent and well-regarded financial advisor retained for the very purpose of garnering the best price for the Contracted Pharmacy Assets, the Debtors can demonstrate that the resulting Transaction has a justifiable business purpose. It is an exercise of the Debtors' business judgment.

27.     Indeed, courts in this and other districts have approved private sales of estate property pursuant to section 363(b)(1) when there has been a valid business reason for not conducting an auction. *See, e.g., Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. Feb. 3, 2009) (approving the private sale of real property for approximately $2.4 million); *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. Dec. 18, 2008) (approving the private sale of real property for approximately $3.8 million); *In re Wellman, Inc.*, No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2008) (approving private sale of industrial complex capable of converting recycled carpet into nylon engineered resins for $17.9 million); *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. July 23, 2007) (authorizing private sale of business line which designs and manufactures materials used in catalytic converters to remove pollutants

produced by engines for approximately $22 million); *In re Solutia, Inc.*, No. 03-17949 (SCC) (Bankr S.D.N.Y. Dec. 28, 2006) (approving private sale of real property for approximately $7.1 million).

### B. Approval of the Transaction is in the Best Interest of the Debtors, Their Estates, and All Parties in Interest.

28. Courts have approved the authorization of a sale of a debtor's assets under section 363 of the Bankruptcy Code if such sale is based upon the sound business judgment of the debtor. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983).

29. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, as exists with respect to the Transaction, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Van Gorkom*, 488 A.2d at 872).

30. As set forth in detail above, a strong business justification exists for the sale of Contracted Pharmacy Assets. An orderly but expeditious sale of Contracted Pharmacy Assets is

critical to maximizing the value of the Debtors assets and recoveries for the Debtors' economic stakeholders.

### C. The Assets Should Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances.

31. In the interest of attracting the best offers, the Contracted Pharmacy Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the applicable sale. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following conditions is satisfied:

> i. applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> ii. such entity consents;
>
> iii. such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> iv. such interest is in bona fide dispute; or
>
> v. such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

32. Here, the Debtors believe that any of the parties holding liens in the Pharmacy Assets could be compelled to accept a monetary satisfaction of such interests. Where the purchase price for a debtor's assets is the best available purchase price under the circumstances,

a court may authorize the sale free and clear of existing liens, claims, and encumbrances pursuant to section 363(f)(3) of the Bankruptcy Code even if the purchase price is less than the face amount of liens, claims, and encumbrances. *See In re Boston Generating*, LLC, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010). Accordingly, the Debtors believe that the sale of the Pharmacy Assets will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code and the Transaction should be approved free and clear of all liens, claims, and encumbrances against the Pharmacy Assets.

### **WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(H)**

33. The Debtors also request that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to maximize the value of their assets and recoveries for their economic stakeholders. Accordingly, the Debtors respectfully request that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

### **NOTICE**

34. Notice of this Motion shall be given to: (a) the Office of the United States Trustee for the District of Delaware; (b) the official committee of unsecured creditors; (c) counsel to the DIP Agent; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) any party required to be provided notice under Local Rule 9013-1(m); and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service. A copy of this Motion and

any order approving it will also be made available on the Debtors' case information website located at https://dm.epiq11.com/freds.  The Debtors respectfully submit that no further notice is required.

## NO PREVIOUS REQUEST

35. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[*remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the proposed order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: September 25, 2019
      Wilmington, Delaware

/s/ Joseph C. Barsalona II
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Matthew B. Harvey (No. 5186)
Joseph C. Barsalona II (No. 6102)
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: dabbott@mnat.com
      aremming@mnat.com
      mharvey@mnat.com
      jbarsalona@mnat.com

- and -

Adam L. Shiff (*pro hac vice* motion pending)
Robert M. Novick (*pro hac vice* motion pending)
Matthew B. Stein (*pro hac vice* motion pending)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
Email: AShiff@kasowitz.com
      RNovick@kasowitz.com
      MStein@kasowitz.com

**COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**