**<u>Exhibit A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FRED'S, Inc., *et al.*,[1] | ) | Case No. 19-11984 (CSS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

### ORDER (I) AUTHORIZING THE SALE OF CERTAIN PHARMACY ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363 AND (II) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion") of the above captioned debtors and debtors in possession (the "Debtors") for the entry of an order (this "Order"): (a) authorizing the sale (the "Transaction") of certain Script Assets, Inventory and Inventory Documentation (each as defined in the Asset Purchase Agreement by and among the Debtors and Walgreen Co. (the "Buyer"), in substantially the form attached hereto as **Exhibit 1** (the "Agreement"))[2] located at the pharmacies (the "Pharmacies") listed in the Pharmacy Asset Sale Schedule attached hereto as **Exhibit 2**, free and clear of liens, claims, interests, and encumbrances (collectively, the "Encumbrances") upon payment therefor in accordance with the terms of the Agreement, with any such Encumbrances to attach to the proceeds thereof with the same validity and priority (under the Bankruptcy Code) as such Encumbrances had immediately prior to the consummation of the Transaction; and (b) granting related relief, all as more fully described in the Motion; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Stores, Inc. (4510); Summit Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 2001 Bryan Street, Suite 1550, Dallas, Texas 75201.

§ 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the Debtors provided due and proper notice that is adequate and appropriate under the particular circumstances; and the Court having held a hearing to consider the relief requested in the Motion and any objections or other responses to the relief requested therein (the "Hearing") at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and upon consideration of the record of the Hearing, and all proceedings had before the Court, the arguments of counsel made, and the evidence proffered and adduced, at the Hearing; and it appearing that due notice of the Motion and the form of this Order has been provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and that the legal and factual bases set forth in the Motion and presented at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and any objections or other responses to the relief requested herein having been withdrawn, resolved, or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY FOUND THAT**:

      A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

---

[2]    Capitalized terms used but not defined herein have the meaning assigned to such terms in the Agreement.

B.    The statutory and other legal predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1.

C.    A fair and reasonable opportunity to object to and to be heard with respect to the Motion, the Transaction, and the relief requested in the Motion has been given, as required by the Bankruptcy Code and the Bankruptcy Rules, to all Persons[3] entitled to notice, including the following: (a) all parties who have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 and (b) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in any of the Pharmacy Assets.

D.    The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for this Court to grant the relief requested in the Motion.  The Debtors' entry into and performance under the Agreement: (a) constitutes a sound and reasonable exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest; (b) provides value to and is beneficial to the Debtors' estates; and (c) is reasonable and appropriate under the circumstances. Business justifications for the Transaction include the following:  (a) the Agreement constitutes the highest and best offer received for the Pharmacy Assets; (b) the Agreement present the best opportunity to maximize the value of the Pharmacy Assets; (c) unless the Transaction is consummated expeditiously in accordance with the terms of the Agreement, recoveries to the Debtors' creditors may be materially diminished; and (d) the value of the Debtors' estates will be maximized through the sale of the Pharmacy Assets pursuant to the Agreement.

---

[3]    "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any other entity, including any governmental authority (meaning any federal, state, local, or foreign government or governmental or regulatory

E.      This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  If any inconsistency arises between this Order and the Agreement, this Order shall control.

F.      The Debtors and their advisors (i) engaged in a robust and extensive marketing and sale process for the Pharmacy Assets prior to the Petition Date, and (ii) determined that the Buyer's offer to purchase the Pharmacy Assets pursuant to the Agreement represents the highest and best offer the Debtors have received for the Pharmacy Assets.  The marketing and sale process was non-collusive, pursued diligently and in good faith, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Pharmacy Assets.  The marketing and sale process conducted by the Debtors obtained the highest and best value for the Pharmacy Assets for the Debtors and their estates, and any other transaction would not have yielded as favorable an economic result.  Accordingly, the total consideration provided by the Buyer, upon the terms and conditions set forth in the Agreement (including the form and total consideration to be realized by the Debtors pursuant to the Agreement), is the highest and best offer received by the Debtors and constitutes fair value, fair, full, and adequate consideration, reasonably equivalent value and reasonable market value for the Pharmacy Assets.

G.      Under the facts and circumstances of these chapter 11 cases, the purchase price for the Pharmacy Assets is fair and reasonable.

H.      The Agreement was proposed, negotiated, and will be entered into based upon arm's length bargaining, without collusion or fraud, and in good faith as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code.

---

authority, agency, board, bureau, commission, court, department, or other governmental entity) or any group of any of the foregoing.

I.      The Buyer is a Buyer in good faith with respect to the Pharmacy Assets, as that term is used in sections 363(m) and 364(e) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.  The Debtors were free to deal with any other party interested in buying or selling some or all of the Pharmacy Assets on behalf of the Debtors' estates.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or that would prevent the application of section 363(m) of the Bankruptcy Code.  The Buyer has not acted in a collusive manner with any entity and the marketing and sale process for the Pharmacy Assets was not controlled by any agreement among bidders.  The Buyer's prospective performance and payment of amounts owing under the Agreement is in good faith and for valid business purposes and uses.  The Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Buyer and the Debtors.

J.      The Agreement and the Transaction contemplated therein were negotiated, proposed, and entered into by the Debtors and the Buyer in good faith, without collusion and from arm's-length bargaining positions.

K.      The Buyer is not, and will not be, a mere continuation of, or a successor to, and is not holding itself out as a mere continuation of, or successor to, the Debtors in any respect, and there is no continuity of enterprise between the Debtors and the Buyer.  The Transaction does not amount to a consolidation, merger, or *de facto* merger of the Buyer and the Debtors.  Neither the Buyer nor any of its Affiliates[4] and their respective successors, assigns,

---

[4]     "Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person,

members, partners, principals, and shareholders (or equivalent) shall assume or in any way be responsible for any obligation or liability of any Debtor (or any Affiliates thereof) and/or any Debtor's estate, including any obligation under any labor practice agreement, except as expressly provided in the Agreement or herein.

L.      All of the requirements of section 363 of the Bankruptcy Code have been met with respect to the sale of the Pharmacy Assets pursuant to the Agreement.

M.      The Debtors may sell the Pharmacy Assets, upon payment therefor in accordance with the terms of the Agreement, free and clear of all Encumbrances, including all liens (including, to the extent permitted under the Bankruptcy Code, those related to the so-called "bulk sales," "bulk transfer" and similar laws), claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights (including reclamation rights, rights of first refusal, rights of first offer, or consent rights), liabilities, judgments, servitudes, encumbrances, options, purchase options, mortgages, subleases, charges, hypothecations, indentures, security interests, security agreements, loan agreements, instruments, conditional sale or other title retention agreements, pledges, demands, offsets, recoupment, rights of recovery, decrees of any court or foreign or domestic governmental entity, and other interests of any kind or nature whatsoever against the Debtors or the Pharmacy Assets, including any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee pension or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance claims or claims for taxes of or against the Debtors, and any derivative, vicarious, transferee, or successor liability claims, rights or causes of action

---

where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

(whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, and whether imposed by agreement, understanding, law, equity, or otherwise arising under or out of, in connection with, or in any way related to the Debtors, the Debtors' interests in the Pharmacy Assets, the operation of the Debtors' businesses before the Closing (throughout this Order, as defined in the Agreement), or the transfer of the Debtors' interests in the Pharmacy Assets to the Buyer, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Without limiting the generality of the foregoing, "Encumbrances" shall include any and all liabilities or obligations whatsoever arising under or out of, in connection with, or in any way relating to: (a) any of the Debtors' employee benefit plans, including any Encumbrances related to unpaid contributions or current or potential withdrawal or termination liability; (b) the Worker Adjustment and Retraining Notification Act of 1988; or (c) any of the Debtors' current and former employees. Those holders of Encumbrances who did not object (or who ultimately withdrew their objections, if any) to the Transaction or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances who did object that have an interest in the Pharmacy Assets fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Encumbrances that constitute interests in the Pharmacy Assets, if any, attach solely to the

proceeds of the Transaction ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force, and effect that such holders had prior to the Transaction, subject to any defenses that may be available to the Debtors. All Persons having Encumbrances of any kind or nature whatsoever against the Debtors or the Pharmacy Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Encumbrances against the Buyer or any of its assets, property, Affiliates, successors, assigns, or the Pharmacy Assets.

N.      The Buyer has not agreed to assume and shall have no obligations with respect to any Encumbrances. The Buyer would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors and their estates and their creditors, if the Transaction of the Pharmacy Assets were not free and clear of all Encumbrances, or if the Buyer would, or in the future could, be liable for any such Encumbrances, including, as applicable, any liabilities related to the operation of the Pharmacies by the Debtors that will not be assumed by the Buyer, as described in the Purchase Agreement.

O.      The total consideration to be provided to the Debtors by the Buyer, upon the terms and conditions set forth in the Agreement (including the form and total consideration to be realized by the Debtors pursuant to the Agreement), reflects the Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Pharmacy Assets free and clear of all Encumbrances upon payment therefor in accordance with the terms of the Agreement (including any potential derivative, vicarious, transferee, or successor liability claims).

P.      The transfer of the Pharmacy Assets to the Buyer in accordance with the terms of the Agreement will be a legal, valid, and effective transfer of the Pharmacy Assets, and,

upon payment therefor in accordance with the terms of the Agreement, will vest the Buyer with all right, title, and interest of the Debtors in and to the Pharmacy Assets free and clear of all Encumbrances.

Q.      The Debtors (a) have full corporate or limited liability company (as applicable) power and authority to execute the Agreement and all other documents contemplated thereby, and the Transaction has been duly and validly authorized by all necessary corporate action of the Debtors, (b) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the Agreement, and (c) upon entry of this Order, other than any consents or approvals identified in the Agreement (including with respect to antitrust matters), need no consent or approval from any other Person to consummate the Transaction.

R.      The Pharmacy Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of the Pharmacy Assets, and no other Person has any ownership right, title, or interests therein.

S.      The Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms.  The Agreement, the Transaction and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

T.      The Transaction of the Pharmacy Assets must be approved and consummated promptly in order to preserve the value of the Pharmacy Assets.  Therefore, time is

of the essence in consummating the Transaction, and the Debtors and Buyer intend to close the Transaction as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Transaction as contemplated by the Agreement. Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regards to the transactions contemplated by this Order.

U.      The legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      Any responses or objections to, unless otherwise adjourned, or reservations of rights regarding, the entry of this Order or the relief granted herein or requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice. All holders of Encumbrances or other persons and entities that failed to timely object, or withdrew their objections, to the Motion or this Order are deemed to consent to the relief granted herein for all purposes, including pursuant to sections 363(f)(2) of the Bankruptcy Code.

3.      Each holder of any Encumbrances against the Debtors, their estates, or any of the Pharmacy Assets: (a) has, subject to the terms and conditions of this Order, consented to the Transaction or is deemed to have consented to the Transaction; (b) could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such Encumbrance; or (c) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.

4.      Notice of the Hearing was fair and equitable under the circumstances and complied in all respects with the Bankruptcy Code and the Bankruptcy Rules.

5.      The Agreement and the ancillary documents thereto and the consummation thereof, and the Transaction itself shall not be avoided under section 363(n) or chapter 5 of the Bankruptcy Code.   The consideration provided by the Buyer under the Agreement is fair and reasonable.   Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.

6.      The Agreement, any schedules or exhibits thereto, and all transactions contemplated therein, and all of the terms and conditions thereof are hereby approved and are incorporated herein by reference, and the Debtors are authorized to take any and all actions necessary or appropriate to consummate the Agreement.   The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be approved in its entirety.

7.      Pursuant to sections 105,  363,  and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to execute, deliver and perform their obligations under and comply with the terms of the Agreement and to consummate the Transaction, pursuant to, and in accordance with, the terms and conditions of the Agreement and this Order.  The provisions of this Order shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate and implement the provisions of this Order.

8.      The Debtors, their Affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and

implement all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and to take all further actions as may be: (a) reasonably requested by the Buyer for the purpose of assigning, transferring, and conveying to the Buyer or reducing to possession, the applicable Pharmacy Assets; or (b) necessary or appropriate to the performance of the obligations contemplated by the Agreement, all without further order of the Court.

9.      All Persons that are currently, or are on or after the Closing, in possession of some or all of the applicable Pharmacy Assets are hereby directed to surrender possession of such Pharmacy Assets to the Buyer as of the Closing or at such time as the Buyer requests.

10.      Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby directed to accept this Order and any and all other documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

11.      Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Pharmacy Assets in accordance with the terms of the Agreement.  The Pharmacy Assets shall be transferred to the Buyer (or its Affiliates), and upon payment therefor in accordance with the terms of the Agreement, such transfers shall:  (a) be valid, legal, binding, and effective, (b) vest the Buyer with all right, title, and interest of the Debtors in the Pharmacy Assets, and (c) be free and clear of all Encumbrances in accordance with section 363(f) of the Bankruptcy Code, with all Encumbrances that represent interests in property to attach to the net proceeds of the Transaction, in the same amount and order of their priority, with the same validity, force, and effect which they have against the Pharmacy Assets,

and subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately prior to the Closing; with the proceeds of such sale to be first applied to the Obligations and the Pre-Petition Lender Debt in accordance with the Post-Petition Credit Agreement (as "Obligations" and "Pre-Petition Lender Debt" are defined in the Post-Petition Credit Agreement) until all such Obligations and the Pre-Petition Lender Debt are satisfied in full, and thereafter to satisfy any junior liens, claims, interests, or encumbrances had on the Assets sold in the order of priority that existed prior to the Petition Date

12.    Except as otherwise provided in the Agreement, all Persons (and their respective successors and assigns) including all debtholders, equityholders, governmental, tax and regulatory authorities, lenders, employees, former employees, pension plans, multiemployer pension plans, labor unions, trade creditors, and any other creditors holding Encumbrances against the Debtors or the Pharmacy Assets, are hereby forever barred, estopped and permanently enjoined from asserting or pursuing such Encumbrances against the Buyer, their Affiliates, successors or assigns, their property or the Pharmacy Assets, including taking any of the following actions with respect to an Encumbrance (other than any liability expressly assumed under the Agreement):   (a) commencing or continuing in any manner any action or other proceeding against the Buyer, its Affiliates, successors or assigns, assets or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer, its Affiliates, successors or assigns, assets, or properties; (c) creating, perfecting, or enforcing any Encumbrances against the Buyer, its successors or assigns, assets or properties; (d) asserting an Encumbrance as a setoff, right of subrogation, or recoupment of any kind against any obligation due the Buyer or its successors or assigns; (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the

provisions of this Order or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, failing, or refusing to renew any license, permit, or authorization to operate any of the Pharmacy Assets or conduct any of the business operated with such assets. No such Persons shall assert or pursue against the Buyer or its Affiliates, successors or assigns any such Encumbrance.

13.     This Order (a) shall be effective as a determination that, as of the transfer of the Pharmacy Assets and payment therefor in accordance with the Agreement, all Encumbrances have been unconditionally released, discharged, and terminated as to the Buyer and the Pharmacy Assets, and that the conveyances and transfers described herein have been effected, and (b) is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any asset; and each of the foregoing Persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

14.     Following the transfer of the Pharmacy Assets and payment therefor in accordance with the Agreement, no holder of any Encumbrance shall interfere with the Buyer's title to or use and enjoyment of the Pharmacy Assets based on or related to any such Encumbrance or based on any actions the Debtors may take in these chapter 11 cases.

15.    Except as expressly set forth in the Agreement, the Buyer and its successors and assigns shall have no liability for any Encumbrance, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee or successor or otherwise, of any kind, nature or character whatsoever, including Encumbrance arising under:   (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including any pension plan of or related to any of the Debtors or any Debtor's Affiliates or predecessors or any current or former employees of any of the foregoing, or the termination of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; (e) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law (including claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Multiemployer Pension Plan Amendments Act of 1980, (xi) state and local discrimination laws, (xii) state and local unemployment compensation laws or any other similar state and local laws, (xiii) state workers' compensation laws, (xiv) any other state, local, or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors); (f) any

15

antitrust laws; (g) any product liability or similar laws, whether state or federal or otherwise; (h) any environmental laws, rules, or regulations, including under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (i) any bulk sales or similar laws; (j) any federal, state, or local tax statutes, regulations or ordinances, including the Internal Revenue Code of 1986, as amended; and (k) any common law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory, or any other theory of successor liability.

16.     The Debtors are hereby authorized to take all actions necessary to implement and effectuate the terms of this Order and the relief granted pursuant to this Order, the Transaction, and the Agreement.

17.     Notwithstanding the applicability, or the possible applicability, of Bankruptcy Rules 4001, 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.  This Order constitutes a final order.

18.     The terms and provisions of the Agreement and this Order shall be binding in all respects upon, or shall inure to the benefit of, the Debtors, their estates and their creditors (whether known or unknown), the Buyer and its Affiliates, successors and assigns, and any affected third parties, including all Persons asserting an Encumbrance (collectively, the "Bound Parties"), notwithstanding any subsequent appointment of any trustee, examiner, receiver, party, entity, or other fiduciary under any chapter of the Bankruptcy Code or any other law with respect to any of the Bound Parties, and all such provisions and terms shall likewise be binding on such trustee, examiner, receiver, party, entity, or other fiduciary, and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, or any trustee, examiner or receiver,

party, entity, or other fiduciary.  The provisions of this Order and the terms and provisions of the

Agreement, and any actions taken pursuant hereto or thereto as of the date of the entry of such

Order shall survive the entry of any order that may be entered confirming or consummating any

plan(s) of the Debtors or converting the Debtors' cases from chapter 11 to chapter 7, and the

terms and provisions of the Agreement, as well as the rights and interests granted pursuant to this

Order and the Agreement, shall continue in these or any superseding cases and shall be binding

upon the Bound Parties and their respective successors and permitted assigns, including any

trustee, party, entity, or other fiduciary hereafter appointed as a legal representative of the

Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

19.      Nothing contained in any chapter 11 plan hereinafter confirmed in these

chapter 11 cases, or any order confirming such plan, or any other order in these chapter 11 cases

(including any order approving the wind-down or dismissal of these chapter 11 cases or any

order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy

Code) shall alter, conflict with, or derogate from the provisions of the Agreement or the terms of

this Order.  This Order shall survive any dismissal of any of these chapter 11 cases.

20.      The Agreement and any related agreements, documents or other

instruments may be modified, amended or supplemented by the parties thereto, in a writing

signed by each party, and in accordance with the terms thereof, without further order of the

Court; provided that any such modification, amendment or supplement does not materially

change the terms of the Agreement or any related agreements, documents, or other instruments.

21.      This Court shall retain jurisdiction (to the greatest extent allowed by

applicable law) with respect to all matters arising from or related to the implementation,

interpretation, or enforcement of this Order, the Agreement, all amendments thereto, and any

waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to this Order or the Agreement (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

Wilmington, Delaware
Dated: _____, 2019

_____
THE HON. CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 1

**(Agreement)**

**ASSET PURCHASE AGREEMENT**

**by and between**

**WALGREEN CO.**

**and**

**FRED'S STORES OF TENNESSEE, INC., FRED'S, INC., FRED'S STORES OF TENNESSEE, INC., NATIONAL EQUIPMENT MANAGEMENT AND LEASING, INC., NATIONAL PHARMACEUTICAL NETWORK, INC., REEVES-SAIN DRUG STORE, INC., SUMMIT PROPERTIES-JACKSBORO, LLC, SUMMIT PROPERTIES-BRIDGEPORT, LLC, AND 505 N. MAIN OPP, LLC**

Dated as of September [25], 2019

# TABLE OF CONTENTS

**Page**

**ARTICLE I** DEFINITIONS .................................................................................................. 1

**ARTICLE II** PURCHASE AND SALE OF ASSETS ........................................................ 8
    **Section 2.1**    **Purchase and Sale of Assets.** ................................................ 8
    **Section 2.2**    **Purchase Price.** ..................................................................... 11
    **Section 2.3**    **Closing.** .................................................................................. 12
    **Section 2.4**    **Deliveries at the Closings.** ................................................... 13
    **Section 2.5**    **Allocation of the Purchase Price.** ........................................ 14

**ARTICLE III** REPRESENTATIONS AND WARRANTIES CONCERNING SELLERS ...... 14
    **Section 3.1**    **Organization; Qualification** ................................................ 14
    **Section 3.2**    **Power and Authority; Enforceability.** ................................ 14
    **Section 3.3**    **Non-Contravention; Governmental Authorizations.** ................. 15
    **Section 3.4**    **Title to Purchased Assets.** ................................................... 15
    **Section 3.5**    **Script Volume.** ...................................................................... 15
    **Section 3.6**    **Inventory.** .............................................................................. 15
    **Section 3.7**    **Compliance with Laws related to the Script Assets.** ........... 16
    **Section 3.8**    **Absence of Litigation** ........................................................... 16
    **Section 3.9**    **Books and Records of the Pharmacies.** ............................... 16
    **Section 3.10**    **Tax Matters.** ........................................................................ 16
    **Section 3.11**    **Employee Matters.** .............................................................. 16
    **Section 3.12**    **Brokers' Fees.** ...................................................................... 17
    **Section 3.13**    **No Additional Representations.** ........................................... 17

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES CONCERNING BUYER .......... 18
    **Section 4.1**    **Organization; Qualification** ................................................ 18
    **Section 4.2**    **Power and Authority; Enforceability.** ................................ 18
    **Section 4.3**    **Non-Contravention; Governmental Authorizations.** ................. 18
    **Section 4.4**    **Absence of Litigation** ........................................................... 19
    **Section 4.5**    **Brokers' Fees.** ...................................................................... 19
    **Section 4.6**    **Buyer's Investigation.** .......................................................... 19

**ARTICLE V** PRE-CLOSING COVENANTS ..................................................................... 19
    **Section 5.1**    **Operation of Pharmacies.** .................................................... 20
    **Section 5.2**    **Approvals; Reasonable Best Efforts.** .................................. 21
    **Section 5.3**    **Notices.** .................................................................................. 22
    **Section 5.4**    **Employee Matters.** .............................................................. 22
    **Section 5.5**    **Access and Information.** ....................................................... 23
    **Section 5.6**    **Confidentiality; Publicity.** ................................................... 24
    **Section 5.7**    **Restrictive Covenants.** ......................................................... 24
    **Section 5.8**    **Exclusivity.** ........................................................................... 25
    **Section 5.9**    **Script Assets.** ........................................................................ 25
    **Section 5.10**    **Telephone and Facsimile Numbers.** .................................... 27

**ARTICLE VI** POST-CLOSING COVENANTS ................................................................. 28
    **Section 6.1**    **General.** ................................................................................. 28

i

**Section 6.2**    **Transfer Taxes.**.................................................................................... 28
**Section 6.3**    **Tax Matters.**........................................................................................... 28
**ARTICLE VII** CONDITIONS PRECEDENT TO CLOSING .................................... 28
**Section 7.1**    **Conditions Precedent to Obligations of the Parties.** .................... 28
**Section 7.2**    **Conditions Precedent to Obligation of Buyer.**.............................. 29
**Section 7.3**    **Condition Precedent to Obligation of Sellers**............................... 29
**Section 7.4**    **Frustration of Closing Conditions.** .............................................. 30
**ARTICLE VIII** TERMINATION ............................................................................... 30
**Section 8.1**    **Termination of Agreement.** .......................................................... 30
**Section 8.2**    **Effect of Termination.** .................................................................. 31
**ARTICLE IX** MISCELLANEOUS............................................................................. 31
**Section 9.1**    **Entire Agreement.** ........................................................................ 31
**Section 9.2**    **Successors.** ................................................................................... 31
**Section 9.3**    **Assignments.** ................................................................................ 32
**Section 9.4**    **Notices.**......................................................................................... 32
**Section 9.5**    **Counterparts.** ............................................................................... 33
**Section 9.6**    **Headings.** ...................................................................................... 33
**Section 9.7**    **Governing Law; Consent to Jurisdiction.** ..................................... 33
**Section 9.8**    **Amendments and Waivers.**............................................................ 34
**Section 9.9**    **Severability.**.................................................................................. 34
**Section 9.10**   **Expenses.** ..................................................................................... 34
**Section 9.11**   **Construction.**................................................................................ 34
**Section 9.12**   **Bulk Transfer Laws.**.................................................................... 35
**Section 9.13**   **No Third Party Beneficiaries.** ..................................................... 35
**Section 9.14**   **Schedules.** .................................................................................... 35
**Section 9.15**   **Time is of the Essence.** ................................................................. 35
**Section 9.16**   **Survival.**....................................................................................... 35

## LIST OF EXHIBITS AND SCHEDULES

| | | |
|---|---|---|
| Exhibit A | — | 3T Documentation |
| Exhibit B | — | Inventory Statement |
| Exhibit C | — | Transfer Instrument |
| Exhibit D | — | Tax Allocations |
| Exhibit E | | Customer Letter |
| Exhibit F | | Sale Order |
| Schedule 2.1(c) | — | Excluded Assets |
| Schedule 2.2(b)(i) | — | Pharmacy Asset Sale Schedule |
| Schedule 2.2(b)(ii) | — | Adjustment Ratio Illustrative Example |
| Schedule 2.2(c) | — | Inventory Valuation Procedures |

## BUYER DISCLOSURE SCHEDULES

| | | |
|---|---|---|
| Schedule 4.3 | — | Buyer Governmental Authorizations |

## SELLERS DISCLOSURE SCHEDULES

| | | |
|---|---|---|
| Schedule 3.3(a) | — | Non-Contravention |
| Schedule 3.3(b) | — | Governmental Authorizations |
| Schedule 3.4 | — | Title to Purchased Assets |
| Schedule 3.5 | — | Script Volume |
| Schedule 3.8 | — | Litigation |
| Schedule 3.9 | — | Books and Records of the Pharmacies |
| Schedule 3.11(a) | — | Pharmacy Employees |
| Schedule 3.11(c) | — | Terminated Employees |
| Schedule 3.11(d) | — | Retention Bonuses |
| Schedule 3.12 | — | Brokers' Fees |
| Schedule 5.1 | — | Operation of Pharmacies |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "***Agreement***"), dated as of September [25], 2019, is by and between Walgreen Co., an Illinois corporation ("***Buyer***") and Fred's, Inc., a Tennessee corporation, Fred's Stores Of Tennessee, Inc., a Delaware corporation, National Equipment Management And Leasing, Inc., a Tennessee corporation, National Pharmaceutical Network, Inc., a Florida corporation, Reeves-Sain Drug Store, Inc., a Tennessee corporation, Summit Properties-Jacksboro, LLC, an Arkansas limited liability company, Summit Properties-Bridgeport, LLC, an Arkansas limited liability company, and 505 N. Main Opp, LLC, a Delaware limited liability company (collectively, "***Sellers***", and together with Buyer, the "***Parties***").

**WHEREAS**, on September 9, 2019, Sellers filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"), which are being jointly administered under the caption *In re Fred's Inc.*, Case No. 19-11984-CSS (the date of such filing, the "***Petition Date***" and Sellers' Chapter 11 cases administered in respect of such filing, the "***Bankruptcy Cases***").

**WHEREAS**, Sellers are continuing to manage their properties and operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code.

**WHEREAS**, Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order (as defined below) by the Bankruptcy Court.

**WHEREAS**, Buyer desires to purchase the Purchased Assets (as defined below) from Sellers, and Sellers desire to sell, convey, and transfer to Buyer the Purchased Assets in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

**WHEREAS**, the Purchased Assets shall be purchased by Buyer pursuant to the Sale Order free and clear of all claims and encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court; and

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants contained herein, Buyer and Sellers agree as set forth below.

## ARTICLE I
## DEFINITIONS

"***3T Documentation***" means the transaction history, transaction information and transaction statements required by Law to transfer the Inventory from Sellers to Buyer in connection with this Agreement, which will include the information set forth on <u>Exhibit A</u> (except to the extent that a specific field set forth on <u>Exhibit A</u> with respect to certain Inventory is not required under applicable Law).

"***Action***" means any action, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, inquiry, investigation or similar event, occurrence, or proceeding.

"***Adjustment Ratio***" means, with respect to a Pharmacy, an adjustment ratio of such Pharmacy's Script Purchase Price, which shall be determined by dividing (A) the Closing Script Volume by (B) the Weekly Volume Amount. An illustrative example of such calculation is set forth on <u>Schedule 2.2(b)(ii)</u>.

"***Affiliate***" or "***Affiliated***" with respect to any specified Person, means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such specified Person.  For this definition, "control" (and its derivatives) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person.

"***Agreement***" has the meaning set forth in the Preamble.

"***Allocation Schedule***" has the meaning set forth in <u>Section 2.5</u>.

"***Alternative Transaction***" means, directly or indirectly, any sale, lease, exchange, transfer or other disposition of all or substantially all of the Purchased Assets, in any transaction or series of related transactions, other than any transaction or series of related transactions with or by Buyer or any of its Affiliates.

"***Applicable Pharmacy Inventory Cap***" has the meaning set forth in <u>Section 2.1(b)(ii)</u>.

 "***Assumed Liabilities***" has the meaning set forth in <u>Section 2.1(d)</u>.

"***Business Day***" means a day on which banks are ordinarily open for transaction of normal banking business in Chicago, Illinois or Dallas, Texas.

"***Buyer***" has the meaning set forth in the Preamble.

"***Buyer Disclosure Schedule***" has the meaning set forth in <u>Article IV</u>.

"***Buyer Material Adverse Effect***" means any event, change, circumstance, effect or other matter that has, or could reasonably be expected to have, either individually or in the aggregate with all other events, changes, circumstances, effects or other matters, with or without notice, lapse of time or both, a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or to consummate the Transactions.

"***Confidential Information***" means any information concerning the businesses and affairs of Buyer or Seller, as the case may be.

"***Consent***" means any consent, approval, notification or waiver.

"***Covered Entities***" has the meaning set forth in <u>Section 5.9</u>.

"***Closing***" has the meaning set forth in <u>Section 2.3</u>.

"***Closing Date***" has the meaning set forth in <u>Section 2.3</u>.

"***Closing Script Volume***" has the meaning set forth in <u>Section 2.2(b)</u>.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"***Compliance Notice***" has the meaning set forth in <u>Section 5.2(c)</u>.

"*Data Converter*" has the meaning set forth in <u>Section 5.9(d)</u>.

"***DEA***" has the meaning set forth in the definition of Healthcare Law.

"***Employees***" has the meaning set forth in <u>Section 3.11</u>.

"***Encumbrance***" means any encumbrance, security interest, lien, option, adverse claim, restriction, mortgage, pledge and claim, whether voluntarily incurred or arising by operation of law (including any agreement to give any of the foregoing in the future).

"***Excluded Assets***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Excluded Liabilities***" has the meaning set forth in <u>Section 2.1(d)</u>.

"***Expiration Date***" has the meaning set forth in <u>Section 8.1(a)(ii)</u>.

"***Fraud***" means (i) a false representation of material fact, circumstance or condition with respect to the matters contemplated by the representations and warranties set forth in this Agreement; (ii) made with actual Knowledge that such representation and warranty is false; (iii) with an intention to induce the Party to whom such representation is made to act or refrain from acting to its detriment; and (iv) causing such Party to suffer damage by reason of such misrepresentation.

"***Fundamental Representations***" has the meaning set forth in <u>Section 7.2(a)(i)</u>.

"***GAAP***" means United States generally accepted accounting principles as in effect as of the date hereof.

"***Governmental Entity***" shall mean any and all federal, state or local governments, governmental institutions, public authorities and governmental entities of any nature whatsoever, and any subdivisions or instrumentalities thereof, including departments, boards, bureaus,

commissions, agencies, courts, arbitrals, administrations and panels, and any divisions or instrumentalities thereof, whether permanent or ad hoc.

"*Healthcare Law*" means the following laws or regulations relating to the regulation of the health care industry or to payment for services rendered by healthcare providers: (i) Sections 1877, 1128, 1128A or 1128B of the Social Security Act; (ii) any prohibition on the making of any false statement or misrepresentation of material facts to any Governmental Entity that administers a federal or state health care program (including but not limited to Medicare, Medicaid and the Military Health System ("*TRICARE*")); (iii) the licensure, certification or registration requirements of health care facilities, services or equipment; (iv) any criminal offense relating to the delivery of, or claim for payment for, a healthcare item or service under any federal or state health care program; (v) any federal or state law relating to the interference with or obstruction of any investigation into any criminal offense; (vi) any criminal offense under federal or state law relating to the unlawful manufacture, distribution, prescription or dispensing of a controlled substance; or (vii) applicable record keeping, inventory and other requirements and regulations of the Federal Food and Drug Administration ("*FDA*"), the Federal Drug Enforcement Agency ("*DEA*") and state pharmacy boards.

"*HIPAA*" means the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act of 2009, altogether with their implementing regulations.

 "*Insolvency and Equity Exceptions*" has the meaning set forth in Section 3.2.

"*Inventory*" has the meaning set forth in Section 2.1(b)(ii).

"*Inventory Audit*" has the meaning set forth in Section 2.2(c)(i).

"*Inventory Documentation*" means, with respect to any Inventory at a Pharmacy, the applicable 3T Documentation and all of Sellers' controlled substance invoices, DEA 222 forms (blue copies), and annual controlled substance inventory logs dated within the last twenty-four (24) months prior to the Closing.

"*Inventory Purchase Price*" has the meaning set forth in Section 2.2(a).

"*Inventory Value*" has the meaning set forth in Section 2.2(c)(i).

"*IRS*" has the meaning set forth in Section 2.5.

"*Knowledge*" means (i) when used with respect to Buyer, "Knowledge" means the actual Knowledge of Carmine Bartucci and Sean Bauer; and (ii) when used with respect to Sellers, "Knowledge" means the actual knowledge of the following individuals: Joseph Anto, Benjamin Morgan, Wendy Sellers and Patrick O'briant.

"*Law*" means any applicable statute, rule, regulation, administrative requirement, code or ordinance of any Governmental Entity, each as amended and now in effect.

4

"***Liability***" or "***Liable***" means any liability or obligation, whether known or unknown, asserted or unasserted, absolute or contingent, matured or unmatured or conditional or unconditional.

"***Medicare***" means Title XVIII of the Social Security Act, as amended.

"***Medicaid***" means Title XIX of the Social Security Act, as amended.

"***Non-standard Business***" means (i) delivering prescriptions by mail or courier (in each case, including prescriptions filled via the Internet), (ii) compounding, including both sterile and non-sterile compounding, (iii) filling prescriptions that involve any unique, customized or non-standard packaging, including prescriptions filled for patients in independent living, assisted living, nursing home, long-term care or hospice facilities, (iv) any business conducted pursuant to Section 340B of the Public Health Service Act, (v) any non-prescription business (including durable medical equipment) done through the pharmacy computer and included in the prescription count or (vi) any prescriptions filled pursuant to any contract (other than a standard contract with any third party payor or government payor providing health care coverage to individuals).

"***Offered Employee***" has the meaning set forth in <u>Section 5.4(a)</u>.

"***Ordinary Course of Business***" means the ordinary course of business consistent with past custom and practice of the relevant Person and its Subsidiaries, except as required or contemplated by the Transactions or applicable Law.

"***Organizational Documents***" means the articles of incorporation, certificate of incorporation, charter, bylaws, articles of formation, regulations, operating agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the creation, formation, or organization of a Person, including any amendments thereto.

"***Parties***" has the meaning set forth in the Recitals.

"***Permit***" means any permit, license, order, certificate, approval, registration, filing, accreditation, certification or other similar authorization required by any Law or Governmental Entity.

"***Permitted Encumbrances***" means (i) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures, (ii) mechanics' and other statutory liens which are not material in amount relative to the property affected, (iii) imperfections of title which are not material in amount relative to the property affected and which do not materially interfere with the present use of the property subject thereto or affected thereby, and (iv) restrictions on transfer generally arising under Law.

"***Person***" means any individual, partnership, limited liability company, corporation, association, joint stock company, entity, joint venture, unincorporated organization or Governmental Entity.

"*Pharmacy*" means each of the retail pharmacies set forth on the Pharmacy Asset Sale Schedule.

"*Pharmacy Asset Sale Schedule*" has the meaning set forth in <u>Section 2.2(b)</u>.

"*Purchase Price*" has the meaning set forth in <u>Section 2.2(a)</u>.

"*Purchased Assets*" has the meaning set forth in <u>Section 2.1(b)</u>.

"*Representatives*" means Persons acting on behalf of another Person, including such Person's officers, directors, employees, representatives, agents, independent accountants, investment bankers and counsel.

"*Restricted Period*" has the meaning set forth in <u>Section 5.4(b)</u>.

"*Sale Order*" means an order, substantially in the form attached hereto as Exhibit F and otherwise reasonably acceptable to Buyer and entered by the Bankruptcy Court granting approval of the sale of Purchased Assets by Seller to Buyer on the terms and conditions set forth herein, free and clear of all liens, claims, interests and encumbrances (other than Permitted Encumbrances and the Assumed Liabilities).

"*Schedules*" means the scheduled disclosures included in each of Buyer Disclosure Schedule and the Sellers Disclosure Schedule, as the case may be.

"*Script Assets*" has the meaning set forth in <u>Section 2.1(b)(i)</u>.

"*Script Purchase Price*" has the meaning set forth in <u>Section 2.2(a)</u>.

"*Script Purchase Price Allocation*" has the meaning set forth in <u>Section 2.2(b)</u>.

"*Sellers*" has the meaning set forth in the Preamble.

"*Sellers Disclosure Schedule*" has the meaning set forth in <u>Article III</u>.

"*Sellers Material Adverse Effect*" means any event, change, circumstance, effect or other matter that has, or could reasonably be expected to have, either individually or in the aggregate with all other events, changes, circumstances, effects or other matters, with or without notice, lapse of time or both, a material adverse effect on (a) the Purchased Assets, taken as a whole, or (b) the ability of Sellers to perform its obligations under this Agreement or to consummate the Transactions, in each case after giving effect to any available indemnification, insurance, or other recoveries; *provided*, *however*, that in no event shall any of the following constitute a Material Adverse Effect or be taken into account in determining whether a Material Adverse Effect has occurred:

(a)     any event, change, circumstance, effect or other matter resulting from or relating to changes in economic or financial conditions generally (except to the extent that such change has had a materially disproportionate negative effect on Sellers (solely with respect to the Purchased Assets, taken as a whole) relative to other similarly situated Persons in its industry);

(b)     any event, change, circumstance, effect or other matter that affects Sellers' industry generally (except to the extent that such event, change, circumstance, effect or other matter has had a materially disproportionate negative effect on Sellers (solely with respect to the Purchased Assets, taken as a whole) relative to other similarly situated Persons in their industry);

(c)     any fact, event, series of events, change, effect or circumstance resulting from or relating to the public announcement, the execution of or the pendency or consummation of this Agreement;

(d)     any national or international political or social conditions, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States;

(e)     any action taken by Buyer or any of its Affiliates or any omission to act or action taken with the consent of or at the request of Buyer or any of its Affiliates (including those omissions to act or actions taken which are permitted by or are otherwise in compliance with this Agreement);

(f)     any matter that has been cured by Sellers;

(g)     changes in Laws of general applicability or accounting principles (including GAAP) or the enforcement, implementation or interpretation thereof (or proposals related to the foregoing) (except to the extent that such change has had a materially disproportionate negative effect on Sellers (solely with respect to the Purchased Assets, taken as a whole) relative to other similarly situated Persons in its industry);

(h)     any epidemics, natural disasters (including hurricanes, tornadoes, floods or earthquakes) or any other force majeure events (except to the extent that such change has had a materially disproportionate negative effect on Sellers (solely with respect to the Purchased Assets, taken as a whole) relative to other similarly situated Persons in its industry);

(i)     taking any action permitted or contemplated by, or the failure to take any action prohibited by, this Agreement, or the taking of any action or refraining from taking any action at Buyer's request; or

(j)     any reasonably anticipated event, change, circumstance, effect or other matter of the filing, commencement or prosecution of the Bankruptcy Case.

"*Subsidiary*" means, with respect to any Person: (i) any corporation of which 50% or more of the total voting power of all classes of the equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors is owned by such Person directly or through one or more other Subsidiaries of such Person and (ii) any Person other than a corporation of which at least a majority of the equity interests (however designated) entitled (without regard to the occurrence of any contingency) to vote in the election of the governing

body, partners, managers or others that will control the management of such entity are owned by such Person directly or through one or more other Subsidiaries of such Person.

"***Tax***" means all federal, state, local, non-U.S. and other income, gross receipts, sales, use, production, franchise, registration, profits, license, lease, service, service use, withholding, alternative or add-on minimum, ad valorem, value-added, transfer, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, escheat payment, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"***Tax Return***" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes filed or required to be filed with any Governmental Entity, including any schedule or attachment thereto, and including any amendment thereof.

"***Third Party Valuator***" has the meaning set forth in Section 2.2(c)(i).

"***Transaction Documents***" means this Agreement and the Transfer Instruments.

"***Transactions***" means all of the transactions contemplated by this Agreement and the other Transaction Documents, including: (i) the sale of the Purchased Assets by Sellers to Buyer and Buyer's delivery of the Purchase Price therefor; (ii) the assumption of the Assumed Liabilities by Buyer, (iii) the execution, delivery and performance of all of the documents, instruments and agreements to be executed, delivered and performed in connection herewith; and (iv) the performance by Buyer and Sellers of their respective covenants and obligations (pre- and post-Closing) under this Agreement.

"***Transfer Taxes***" has the meaning set forth in Section 6.2.

"***WARN***" has the meaning set forth in Section 3.11.

"***Weekly Volume Amount***" has the meaning set forth in Section 2.2(b).

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

**Section 2.1    Purchase and Sale of Assets**.

(a)    Upon the terms and subject to the conditions of this Agreement, at the Closing and upon payment of the Purchase Price, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets free and clear of all Encumbrances (other than Permitted Encumbrances), but excluding the Excluded Assets, for the Purchase Price; *provided*, *however*, the transfer of Seller's respective right, title and interest in and to the Inventory, and the release of any Encumbrances (other than Permitted Encumbrances) thereon, shall remain in escrow pending receipt of the Inventory Purchase Price applicable to such Inventory and shall be

deemed automatically and immediately transferred and released upon receipt by Seller of such Inventory Purchase Price, effective as of the Closing.

(b)    "***Purchased Assets***" means, with respect to a Pharmacy, at the time of the Closing:

(i)    all of Sellers' prescription files and prescription records, data and patient refill history with respect to prescriptions filled by Sellers at the Pharmacies or otherwise utilized, maintained and/or generated by Sellers in the course of operating its business at the Pharmacies, including all hard copy prescriptions, patient profiles, signature logs, customer lists, all electronic data and all other related data utilized by Sellers in the course of operating the Pharmacies for the last two (2) years prior to the Closing Date (collectively, the "***Script Assets***") and all Inventory Documentation; and

(ii)    retail pharmaceutical inventory located at the Pharmacies (the "***Inventory***") having an aggregate Inventory Value not to exceed $8,935,000 and, with respect to each Pharmacy, having an Inventory Value not to exceed the amount set forth on the Pharmacy Asset Sale Schedule (the "***Applicable Pharmacy Inventory Cap***").

(c)    <u>Excluded Assets</u>.  Notwithstanding the provisions of <u>Section 2.1(a)</u>, the Purchased Assets shall not include any other assets of Sellers (collectively, the "***Excluded Assets***"), including:

(i)    any of Sellers' or its Affiliates' retail operations (including retail operations located at the same locations as the Pharmacies), and all assets or properties located thereon or used in connection therewith, and rights appurtenant thereto, including equipment, inventory, records, supplies, manufacturer warranties, Permits, prepaid expenses, deferred charges, advance payments, security deposits and prepaid items, goodwill and other assets;

(ii)    over-the-counter merchandise or over-the-counter inventory, including over-the-counter merchandise or over-the-counter inventory located behind the Pharmacy counter, and durable medical equipment;

(iii)    any computer equipment and systems, order-entry devices, point-of-sale systems, surveillance systems, and alarm systems;

(iv)    any of Sellers' licenses, permits, contracts, employee benefit plans and programs and computer hardware, software programs and systems;

(v)    any of Sellers' websites, trademarks, trade names, intellectual property and other intangible property or rights;

(vi)    Inventory located at the Pharmacies having an aggregate Inventory Value in excess of $8,935,000 or, with respect to each Pharmacy, having a value in excess of the Applicable Pharmacy Inventory Cap;

(vii)    any books and records related to Taxes of Sellers (including accounting records and Tax Returns) and all financial and Tax records relating to the Pharmacies

9

that form part of Sellers' or any of Sellers' Affiliates' or any of their respective Affiliates' general ledger other than, in each case, Tax records prepared solely with respect to the Purchased Assets;

(viii)    cash, cash equivalents, or securities of Sellers or any of Sellers' Affiliates (including any drawer cash), accounts receivable or proceeds thereof, trade receivables, refunds or credits, claims for refunds or credits or rights to receive refunds or credit related to Taxes that are an Excluded Liability;

(ix)    other than any Script Assets, any (A) registration information and customer data and other information derived from customer loyalty cards, promotions, co-branded credit card programs and the like, (B) customer lists (including email addresses) related to Sellers' or any of Sellers' Affiliates' internet business operations, (C) guest data related to the non-Pharmacy operations of Sellers or any of Sellers' Affiliates, and (D) equipment related to the fredsinc.com and fredsmeds.com business operations;

(x)    all claims, to the extent arising out of, relating to or in respect of any other Excluded Asset and Excluded Liability or the operation of the Pharmacies prior to Closing, including (A) any such items arising under insurance policies, and (B) all guarantees, warranties, indemnities, and similar rights in favor of Sellers or any of Sellers' Affiliates in respect of any Excluded Asset, any Excluded Liability or the operation of the Pharmacies prior to the Closing;

(xi)    shelving and similar fixtures, all real property owned, leased, subleased or otherwise occupied by Sellers or any of Sellers' Affiliates, together with all buildings, fixtures, structures, and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto;

(xii)    insurance policies; and

(xiii)    any other assets identified on Schedule 2.1(c).

(d)    Assumed Liabilities.    Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume and agrees to pay, perform and discharge when due any and all Liabilities of Sellers arising, after the Closing, out of or in connection with (i) the ownership or operation of the Purchased Assets to be transferred at the Closing and (ii) all Transfer Taxes and Taxes relating to ownership or operation of the Purchased Assets for any taxable year or period (or portion thereof) ending after the Closing Date (collectively, the "***Assumed Liabilities***").

(e)    Excluded Liabilities. Notwithstanding anything contained in this Agreement to the contrary, Buyer shall not assume or be liable for any Liabilities of Sellers (other than the Assumed Liabilities), including all Liabilities arising out of the ownership or operation of the Purchased Assets or the Pharmacies prior to the Closing and all Taxes (other than Transfer Taxes) applicable to the Purchased Assets attributable to any taxable year or period (or portion thereof) ending on or prior to the Closing Date (collectively, the "***Excluded Liabilities***"). The Excluded Liabilities shall include all Liabilities arising out of, accruing, relating to, or in connection with the employment by Sellers or Sellers' Affiliates of any

10

employee of Sellers or Sellers' Affiliates or services of any employee of, or service provider to, Sellers or Sellers' Affiliates, or the termination by Sellers or Sellers' Affiliates of such employment or services, including any compensation, bonuses, incentives, benefits, vacation or severance payable with respect to such employment or services.

**Section 2.2    Purchase Price.**

(a)    **Purchase Price**.  The aggregate purchase price to be paid by Buyer to Sellers with respect to the Purchased Assets is equal to (i) Four Hundred Fifty Thousand and No/100 Dollars ($450,000.00) (the "***Script Purchase Price***"), as adjusted pursuant to Section 2.2(b) *plus* (ii) the aggregate Inventory Value for the Inventory at all Pharmacies, as determined pursuant to Section 2.2(c) (the "***Inventory Purchase Price***" and together with the Script Purchase Price, the "***Purchase Price***"); *provided*, *however*, the Inventory Purchase Price shall not exceed Eight Million Nine Hundred Thirty-Five Thousand and No/100 Dollars ($8,935,000.00) in the aggregate and, with respect to each Pharmacy, the Inventory Purchase Price for such Pharmacy shall not exceed the Applicable Pharmacy Inventory Cap.

(b)    **Script Purchase Price**. Schedule 2.2(b)(i) (the "***Pharmacy Asset Sale Schedule***") sets forth, with respect to each Pharmacy, (i) the portion of the Script Purchase Price allocated for such Pharmacy (without giving effect to any adjustment at the Closing pursuant to the last sentence of this Section 2.2(b)) (each a "***Script Purchase Price Allocation***"), (ii) a defined weekly script volume for such Pharmacy based on a trailing four (4) week average as of August 30, 2019 (the "***Weekly Volume Amount***") and (iii) the Applicable Pharmacy Inventory Cap. At least one (1) day prior to the Closing, the parties shall cooperate in good faith to measure, using the same procedures as used in measuring the Weekly Volume Amount for each Pharmacy, the average weekly prescription volume at the respective Pharmacy for the trailing four (4) week period ending on the Saturday prior to such measurement date (such count each a "***Closing Script Volume***"). With respect to any Pharmacy, in the event that such Pharmacy's Closing Script Volume is equal to greater than 110% of the Weekly Volume Amount, then such Pharmacy's Script Purchase Price Allocation payable by Buyer to Sellers at such Pharmacy's Closing shall be adjusted upwards and equal the product of (w) the Script Purchase Price Allocation and (x) the Adjustment Ratio. With respect to any Pharmacy, in the event that such Pharmacy's Closing Script Volume is equal to less than 90% of the Weekly Volume Amount, then such Pharmacy's Script Purchase Price Allocation payable by Buyer to Sellers at such Pharmacy's Closing shall be adjusted downwards and equal the product of (y) the Script Purchase Price Allocation and (z) the Adjustment Ratio.

(c)    **Inventory Purchase Price**.

(i)    Prior to the Closing, the Parties shall commission RGIS, LLC or such other mutually agreed upon valuator (the "***Third Party Valuator***") to conduct a valuation of the applicable Pharmacy's Inventory (each an "***Inventory Audit***"), and at the Closing, Sellers shall deliver to Buyer Inventory Documentation with respect to all Inventory in Sellers' possession for each Pharmacy.  Sellers and Buyer shall be permitted to each have one or more representatives present to observe each Inventory Audit.  Each Inventory Audit shall be performed as soon as practicable following the Closing on dates mutually agreed by the parties, but in no event later than ten (10) days after the Closing Date, with respect to Inventory in the

applicable Pharmacy as of the close of business on the day prior to the Closing Date (or, in the case of a 24-hour Pharmacy, with respect to Inventory as of 11:59 p.m. (in such Pharmacy's time zone) on the day prior to the Closing Date). Each Inventory Audit shall be conducted, and the value ascribed to each item of Inventory by the Third Party Valuator in determining the aggregate value of the applicable Pharmacy's Inventory (the "***Inventory Value***") shall be determined, in accordance with the inventory count and valuation procedures set forth on Schedule 2.2(c). The costs and expenses of the Third Party Valuator are to be paid 50% by Sellers and 50% by Buyer.

(ii)     At the conclusion of each Inventory Audit, the Third Party Valuator, Buyer and Sellers will prepare with a physical inventory valuation report in the form attached hereto as Exhibit B (the "***Inventory Statement***") setting forth the Inventory Value with respect to the applicable Pharmacy's Inventory to be transferred at the Closing.  The Inventory Statement shall be final and binding on the Parties other than in the event of fraud or manifest error; *provided*, *however*, that (A) in the event a Party determines within five (5) Business Days of the applicable Inventory Audit that there was a manifest error in an Inventory Statement, the discovering Party shall provide the other Party with prompt written notice and (B) the applicable Inventory Value shall be reduced by any Inventory that is not accompanied by sufficient Inventory Documentation as determined in accordance with clause (iii) below, and in each case the Inventory Statement shall be deemed to be modified to reflect the foregoing.  If the Inventory Statement as finally determined reflects an Inventory Value that is less than the Applicable Pharmacy Inventory Cap, Buyer shall promptly (and in any event within five (5) Business Days of the Inventory Audit) pay an amount equal to the actual Inventory Value by wire transfer of immediately available funds to an account specified by Sellers, or notify Sellers of a dispute with respect to such calculation; *provided*, *however,* that in the event a Party has notified the other Party of a dispute, the Parties shall negotiate in good faith to resolve the dispute, and shall use reasonable best efforts to resolve such dispute within three (3) Business Days, and within two (2) Business Days of the day the dispute is resolved, Buyer shall pay any agreed amount of any such difference by wire transfer of immediately available funds to an account specified by Sellers.

(iii)     At the Closing, Sellers shall provide Buyer with updated Inventory Documentation with respect to the applicable Inventory, and Buyer shall review the Inventory Documentation to confirm such Inventory Documentation is sufficient to comply with applicable Law and notify Sellers if, acting in good faith, it identifies any deficiencies.  Buyer shall have the right to reject any Inventory that lacks sufficient Inventory Documentation at the Closing.  In the event Sellers has notified Buyer of a dispute over the sufficiency of the applicable Inventory Documentation, the Parties shall negotiate in good faith to resolve the dispute, and shall use reasonable best efforts to resolve such dispute within three (3) Business Days.

### Section 2.3     Closing.

The closing of the Transactions will take place on October 17, 2019, or on another mutually acceptable date, subject to satisfaction of the conditions set forth in Article VII (the "***Closing Date***").  The Closing Date shall be subject to further update to the extent the Sale Order is not entered on or prior to the anticipated date of the Closing, subject to the termination rights under Section 8.1(a)(ii).  On the Closing Date, the sale and purchase of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement with respect to the

Pharmacies on <u>Schedule 2.3</u> shall take place as soon as possible, and in any event within two (2) Business Days, upon entry of the Sale Order (or satisfaction of the conditions set forth in <u>Article VII</u>), (the "***Closing***") that will be held at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York, at 9:00 a.m., New York City time, or such other time, place and date as Buyer and Sellers may agree in writing or remotely via the exchange of executed documents or closing deliverables.

Section 2.4    **Deliveries at the Closings**.

(a)    <u>Sellers deliveries to Buyer</u>:

Prior to or at the Closing, Sellers will make the following deliveries to Buyer:

(i)    a counterpart to a bill of sale and assignment and assumption agreement, substantially in the form of <u>Exhibit C</u> (a "***Transfer Instrument***"), duly executed by Sellers, conveying the Purchased Assets and Assumed Liabilities to be transferred at the Closing; and

(ii)    a certificate, duly executed by Sellers, dated as of the Closing Date, confirming the satisfaction of the conditions set forth in <u>Section 7.2(a)(i)</u> and <u>Section 7.2(a)(ii)</u> with respect to the Purchased Assets being transferred at the Closing;

(b)    <u>Buyer deliveries to Sellers</u>:

Prior to or at the Closing, Buyer will make the following deliveries to Sellers:

(i)    a counterpart to the applicable Transfer Instrument, duly executed by Buyer, accepting the Purchased Assets and Assumed Liabilities to be transferred at the Closing; and

(ii)    a certificate, duly executed by Buyer, dated as of the Closing Date, confirming the satisfaction of the conditions set forth in <u>Section 7.3(a)(i)</u> and <u>Section 7.3(a)(ii)</u>.

(c)    <u>Closing Payments</u>.

(i)    At the Closing, Buyer shall pay by wire transfer of immediately available funds to Sellers an amount equal to the aggregate Script Purchase Price Allocations of the Pharmacies (as adjusted pursuant to <u>Section 2.2(b)</u>).

(ii)    Within five (5) business days of the determination of the Inventory Value for a Pharmacy (which shall occur according to the dates on the Pharmacy Asset Sale Schedule, but subject to delays in the Closing and in no case later than ten (10) days after the Closing Date), Buyer shall pay the applicable Pharmacy's Inventory Purchase Price as finally determined pursuant to <u>Section 2.2(c)</u>, including the audit provisions in <u>Section 2.2(c)</u>, by wire transfer of immediately available funds to an account specified by Sellers.

13

**Section 2.5      Allocation of the Purchase Price.**

Buyer and Sellers each agree that for federal income Tax purposes, the Purchase Price (including any Assumed Liabilities treated as consideration for the Purchased Assets for Tax purposes) shall be allocated among (i) the covenants set forth in Section 5.7, (ii) the Inventory transferred at the Closing, and (iii) the Script Assets, in a manner consistent with the schedule attached as Exhibit D.

# ARTICLE III
# REPRESENTATIONS AND WARRANTIES
# CONCERNING SELLERS

Except as is provided in the disclosure letter delivered at or prior to the execution of this Agreement by Sellers (the "***Sellers Disclosure Schedule***"), Sellers represent and warrant to Buyer as set forth below.

**Section 3.1      Organization; Qualification**.

Subject to the applicable provisions of the Bankruptcy Code, Sellers are respectively each corporations or limited liability companies that is duly organized, validly existing, and in good standing under the Laws of the State of Delaware.  Subject to the applicable provisions of the Bankruptcy Code, Sellers are each duly authorized to own, lease and operate its applicable Purchased Assets and to carry on its business as presently conducted with respect to the Purchased Assets.

**Section 3.2      Power and Authority; Enforceability**.

Subject to entry of the Sale Order, Sellers each have the corporate power and authority necessary to execute and deliver each Transaction Document to which it is a party and to perform and consummate the Transactions.  Subject to entry of the Sale Order, Sellers have each taken all action necessary to authorize its execution and delivery of each Transaction Document to which it is a party, its performance of its obligations hereunder and thereunder, and the consummation of the Transactions.  Sellers each have duly and validly executed and delivered this Agreement and, on or prior to the Closing, subject to entry of the Sale Order, Sellers will each have duly and validly executed and delivered each other Transaction Document applicable to the Closing to which it is party. Subject to the entry of the Sale Order, this Agreement constitutes, and upon execution and delivery of each other Transaction Document to which such Seller is a party will constitute, a valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms, assuming due authorization, execution and delivery by the other parties thereto, and except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the enforcement of creditors' rights generally and by general equitable principles (the "***Insolvency and Equity Exceptions***").  Sellers have not entered into any arrangement with creditors that would impede, prohibit or govern the disposition of the Purchased Assets (other than as set forth on Section 3.3(a) or Section 3.3(b) of the Sellers Disclosure Schedule).

Section 3.3    **Non-Contravention; Governmental Authorizations**.

(a)    Except as set forth on <u>Section 3.3(a)</u> of the Sellers Disclosure Schedule, the execution and the delivery of the applicable Transaction Documents by Sellers and the performance of its obligations hereunder and thereunder, and consummation of the Transactions by Sellers will not, after giving effect to the Sale Order, (i) violate any of the provisions of the Organizational Documents of Sellers; (ii) assuming that all Consents set forth on <u>Section 3.3(b)</u> of the Sellers Disclosure Schedule have been obtained and any notifications described on <u>Section 3.3(b)</u> of the Sellers Disclosure Schedule have been delivered and any waiting periods thereunder have terminated or expired, violate any Law to which Sellers are subject; and (iii) breach any contract or Permit to which Sellers are a party or by which it is bound or to which any of the Purchased Assets is subject that would reasonably be expected to result in the imposition of any Encumbrance upon any of the Purchased Assets other than Permitted Encumbrances, except, in the case of clauses (ii) and (iii), where such violation or Encumbrance, respectively, would not reasonably be expected to materially interfere with or restrict the use or sale of the Purchased Assets from and after the Closing Date.

(b)    Except the entry of the Sale Order and as set forth on <u>Section 3.3(b)</u> of the Sellers Disclosure Schedule, no Consent of any Governmental Entity is required by or with respect to the execution, delivery and performance of this Agreement, the Transaction Documents and the Transactions by Sellers.

Section 3.4    **Title to Purchased Assets.**

(a)    Except as set forth on <u>Section 3.4</u> of the Sellers Disclosure Schedule, Sellers have, and on the Closing Date, will transfer to Buyer, good and valid title to all of the Purchased Assets free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)    As of the date of the Closing, subject to the entry of the Sale Order, none of the Purchased Assets to be conveyed hereunder at the Closing will be subject to any lien, mortgage or encumbrance (other than Permitted Encumbrances), and, subject to the entry of the Sale Order, all of said property shall be conveyed free and clear of any right, title or interest of any entity or person, to the extent allowed under the Bankruptcy Code.

Section 3.5    **Script Volume.**

The Weekly Script Volume for each Pharmacy as set forth on the Pharmacy Asset Sale Schedule is an accurate calculation in all material respects of such Pharmacy's average retail prescription volume for the four (4) week period ended August 30, 2019 and each Weekly Script Volume has been calculated from and is consistent with the books and records of Sellers.  Except as set forth on <u>Section 3.5</u> of the Sellers Disclosure Schedule, none of the prescriptions filled during the four (4) week period ended August 30, 2019 at the Pharmacies and included in the Weekly Script Volume resulted from any Non-standard Business.

Section 3.6    **Inventory.**

The Inventory at each Pharmacy is of a quantity, quality and mix consistent with the past practices of such Pharmacy and at levels historically maintained by Sellers at such Pharmacy, in

each case in all material respects.  The Inventory is, in all material respects, usable, merchantable and saleable in the Ordinary Course of Business of the applicable Pharmacy, except the obsolete Inventory previously disclosed to Buyer.

**Section 3.7    Compliance with Laws related to the Script Assets**.

The Script Assets included in the Purchased Assets have arisen from bona fide, legal transactions in all material respects.

**Section 3.8    Absence of Litigation**.

As of the date hereof, none of the Sellers is (x) subject to any outstanding order, writ, injunction, judgment or decree of any Governmental Entity or (y) a party to, the subject of, or to Sellers' Knowledge, threatened to be made a party to or the subject of, any Action, in each case, solely with respect to the Purchased Assets, except, in each case, as would not reasonably be expected to have a Sellers Material Adverse Effect or as set forth on <u>Section 3.8</u> of the Sellers Disclosure Schedule. As of the date hereof, there are no Actions by any Governmental Entity pending or, to Sellers' Knowledge, threatened against Sellers relating to or affecting the Purchased Assets, except, in each case, as would not reasonably be expected to have a Sellers Material Adverse Effect or as set forth on <u>Section 3.8</u> of the Sellers Disclosure Schedule.

**Section 3.9    Books and Records of the Pharmacies**.

Except as set forth on <u>Section 3.9</u> of the Sellers Disclosure Schedule, since January 1, 2016, Sellers' Script Assets have been accessed, collected, compiled, disclosed, maintained, and stored in material compliance with all Healthcare Laws and all books and records included in the Script Assets are materially complete and accurate.

**Section 3.10   Tax Matters**.

(a) All material Tax Return required to have been filed prior to the date of this Agreement with respect to the Purchased Assets have been filed on or prior to the date of this Agreement, (b) all such Tax Returns are complete and accurate in all material respects, (c) all material Taxes with respect to the Purchased Assets shown thereon as owing have been paid, and (d) there is no action, suit, investigation, audit, claim or assessment pending or proposed or threatened that could reasonably be expected to result in a Tax lien on the Purchased Assets.  The representations and warranties set forth in this <u>Section 3.10</u> are Sellers' sole and exclusive representations and warranties regarding Tax matters.

**Section 3.11   Employee Matters**.

(a)    <u>Section 3.11(a)</u> of the Sellers Disclosure Schedule contains a list of all employees of Sellers and their Affiliates as of the date hereof who are employed in a Pharmacy (collectively, the "<u>Employees</u>"), including employees who are receiving short-term disability benefits or are on a leave of absence, which includes for each such Employee (i) name, (ii) title or current position and location, (iii) date of hire, (iv) current salary or hourly wage, (v) bonus arrangement, (vi) whether such Employee is currently active at work and, if not, the nature of

such Employee's leave and the date on which the Employee is expected to return to active service, (vii) status as exempt or non-exempt and (viii) status as full-time or part-time.

(b)    Neither Sellers nor any of Sellers' Affiliates is or within the past three (3) years has been a party to, or is currently negotiating, any collective bargaining agreement or other labor union agreement applicable to any Employees. There is not and within the past three (3) years there has not been (i) any strike or material work stoppage by, or lockout of, the Employees or (ii) any material Action involving Sellers or any of its Affiliates with any Employees or with any union, workers' council or other body of employee representatives pending before any Governmental Entity which relates to labor relations or employment matters (including mass lay-offs or unfair labor practices) with respect to any Employees.

(c)    Sellers and their Affiliates are in compliance in all material respects with all applicable Law relating to the employment of the Employees including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, workplace safety, discrimination, immigration and the payment of social security and other employment taxes. Sellers and their Affiliates are in compliance with the Workers Adjustment and Retraining Notification Act and comparable state laws ("*WARN*") and have no liabilities pursuant to WARN.  Set forth on Section 3.11(c) of the Sellers Disclosure Schedule sets forth a list of employees of the Pharmacies terminated by Sellers and their Affiliates during the 90-day period prior to the date of this Agreement.

(d)    Except as set forth on Section 3.11(d) of the Sellers Disclosure Schedule, the execution, delivery and performance by Sellers of this Agreement do not, and the consummation of the transactions contemplated hereby and compliance with the terms hereof (whether alone or in connection with any subsequent other event(s)) will not, (i) entitle any Employee to any severance, transaction bonus, change in control, retention or other payment, or (ii) accelerate the time of payment or vesting or trigger any payment or funding, through a grantor trust or otherwise, of compensation or benefits under, increase the amount payable or trigger any other material obligation pursuant to, any plan, program, policy or agreement.

**Section 3.12   Brokers' Fees**.

No agent, broker, investment banker or other firm or Person is or will be entitled to any broker's or finder's fee or any other commission or similar fee from Sellers in connection with the Transactions.

**Section 3.13   No Additional Representations**.

EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III, THE PURCHASED ASSETS TO BE TRANSFERRED HEREUNDER WILL BE TRANSFERRED "AS IS, WHERE IS," IN THEIR PRESENT CONDITION AND STATE OF REPAIR, WITH ALL FAULTS, LIMITATIONS AND DEFECTS (HIDDEN AND APPARENT).  WITHOUT LIMITATION, BUYER ACKNOWLEDGES THAT, EXCEPT AS SPECIFICALLY SET FORTH TO THE CONTRARY IN THIS AGREEMENT, NO WARRANTIES OR REPRESENTATIONS, EXPRESSED OR IMPLIED, OF ANY KIND WHATSOEVER (INCLUDING ANY IMPLIED

WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE) HAVE BEEN MADE BY SELLERS, ANY OF ITS AFFILIATES OR REPRESENTATIVES OR ANY OTHER PERSON, OR WILL BE RELIED UPON BY BUYER.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES
## CONCERNING BUYER

Except as is provided in the disclosure letter delivered at or prior to the execution of this Agreement by Buyer (the "***Buyer Disclosure Schedule***"), Buyer represents and warrants to Sellers as follows:

### Section 4.1     Organization; Qualification.

Buyer is an Illinois corporation duly created, formed or organized, validly existing and in good standing under the Laws of the State of Illinois.  Buyer is duly authorized to own, lease and operate its properties and assets and to carry on its business as presently conducted.

### Section 4.2     Power and Authority; Enforceability.

Buyer has the corporate power and authority necessary to execute and deliver each Transaction Document to which it is a party and to perform and consummate the Transactions. Buyer has taken all action necessary to authorize the execution and delivery of each Transaction Document to which it is a party, the performance of Buyer's obligations hereunder and thereunder, and the consummation of the Transactions.  Buyer has duly and validly executed and delivered this Agreement and, on or prior to the Closing, Buyer will have duly and validly executed and delivered each other Transaction Document applicable to the Closing to which it is party. This Agreement constitutes, and upon execution and delivery each other Transaction Document to which Buyer is a party will constitute, a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, assuming due authorization, execution and delivery by the other parties thereto, and except as such enforcement may be limited by the Insolvency and Equity Exceptions.

### Section 4.3     Non-Contravention; Governmental Authorizations.

(a)     The execution and the delivery of the applicable Transaction Documents by Buyer and the performance of its obligations hereunder and thereunder, and consummation of the Transactions by Buyer will not (i) violate any of the provisions of the Organizational Documents of Buyer; (ii) assuming that all Consents set forth on Section 4.3(b) of the Buyer Disclosure Schedule have been obtained and any notifications described on Section 4.3(b) of the Buyer Disclosure Schedule have been delivered and any waiting periods thereunder have terminated or expired, materially violate any Law to which Buyer is subject, except where such violation would not, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the Transaction or to perform its obligations under the Transaction Documents; and (iii) breach any contract or Permit to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject that would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair

Buyer's ability to consummate the Transactions or to perform its obligations under the Transaction Documents.

(b)    Except as set forth on <u>Section 4.3(b)</u> of the Buyer Disclosure Schedule, no Consent of any Governmental Entity is required by or with respect to the execution, delivery and performance of this Agreement, the Transaction Documents and the Transactions.

**Section 4.4    Absence of Litigation**.

As of the date hereof, Buyer is not (x) subject to any outstanding order, writ, injunction, judgment or decree of any Governmental Entity or (y) a party to, the subject of, or, to Buyer's Knowledge is threatened to be made a party to or the subject of, any Action, in each case, solely with respect to the Purchased Assets, except, in each case, as would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the Transactions or to perform its obligations under the Transaction Documents. As of the date hereof, there are no Actions by any Governmental Entity pending or, to Buyer's Knowledge, threatened against Buyer that would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair Buyer's ability to consummate the Transactions or to perform its obligations under the Transaction Documents.

**Section 4.5    Brokers' Fees**.

No agent, broker, investment banker or other firm or Person is or will be entitled to any broker's or finder's fee or any other commission or similar fee from Buyer in connection with the Transactions.

**Section 4.6    Buyer's Investigation**.

Buyer has conducted such investigation of the Purchased Assets as it has deemed necessary in order to make an informed decision concerning the Transactions. Buyer has reviewed all of the documents, records, reports and other materials identified in the Sellers Disclosure Schedule or disclosed to Buyer prior to the date of this Agreement, and is familiar with the content thereof. Buyer acknowledges that it has been given access to and has visited and examined the Purchased Assets and is familiar with the condition thereof. For the purpose of conducting these investigations, Buyer has employed the services of its own Representatives. In all matters affecting the condition of the properties and assets and the contents of the documents, records, reports or other materials in connection with the Transactions, Buyer is relying upon the advice and opinion offered by its own Representatives. All materials and information requested by Buyer have been provided to Buyer to Buyer's satisfaction. None of Sellers or any of their Affiliates or Representatives shall have or be subject to any liability to Buyer or any other Person resulting from the distribution to Buyer, or Buyer's use of, any such information, including any information, documents or material disclosed or made available to Buyer and its representatives, management presentations or in any other form in expectation of the Transactions.

## ARTICLE V
## PRE-CLOSING COVENANTS

**Section 5.1     Operation of Pharmacies**.

(a)     Between the date hereof and the Closing Date, Sellers shall operate the Pharmacies in the Ordinary Course of Business.  Sellers shall use its commercially reasonable efforts to maintain the Inventory and staffing of employees at levels and on such other terms and conditions historically maintained by Sellers at each applicable Pharmacy in the Ordinary Course of Business, in each case in all material respects; *provided*, *however*, Sellers may utilize, to the extent reasonably necessary, temporary staffing arrangements to maintain any such staffing levels so long as Sellers has provided Buyer with at least one day's advanced written notice thereof, and Buyer has not objected in its reasonable discretion within such time period.  Without limiting the generality of the foregoing, except as required by applicable Law, as otherwise contemplated by or necessary to effectuate the Transactions or as set forth on Section 5.1 of the Sellers Disclosure Schedule, unless Buyer otherwise consents in advance (which consent shall not be unreasonably withheld, conditioned or delayed) Sellers shall not and Sellers shall cause its Affiliates (with respect to the Purchased Assets) not to, until the Closing Date:

(i)     except in the Ordinary Course of Business, grant any new Encumbrance (other than a Permitted Encumbrance) on any Purchased Asset;

(ii)     close any Pharmacy or sell, transfer, lease, sublease or otherwise dispose of any of the Purchased Assets other than sales or disposition of Inventory in the Ordinary Course of Business and transfers of prescriptions to other pharmacies at any customer's request (not otherwise in violation of this Agreement);

(iii)     intentionally encourage any customer of any Pharmacy to transfer such customer's prescription away from such Pharmacy;

(iv)     manage the levels and selections of Inventory and Script Assets at each Pharmacy in a manner other than in the Ordinary Course of Business (provided, Sellers shall be permitted to make reasonable transfers of inventory from other pharmacies to a Pharmacy, subject to the Applicable Pharmacy Inventory Caps and with prior notice to Buyer);

(v)     display any signs or conduct any advertising (e.g., direct mailing, point-of-purchase coupons) that indicates that Sellers or any of Sellers' Affiliates is moving its operations at any of the Pharmacies to another location or indicating that such Pharmacy will close;

(vi)     conduct any "going out of business," "close-out," "liquidation," or similar sales or promotions at or relating to any Pharmacy (provided, Buyer acknowledges and agrees that any "going out of business," "close-out," "liquidation," or similar sale or promotion at or relating to any other store or pharmacy of Sellers shall not be deemed a violation hereunder);

(vii)     except in the Ordinary Course of Business or as required by Law or contract, increase the compensation or employee benefits of any Employees; or

(viii)     enter into any legally binding commitment with respect to any of the foregoing, except in the Ordinary Course of Business.

(b)     Buyer agrees that, in the event, prior to the Closing, any Seller receives from any Pharmacy customer any instruction from a Pharmacy customer to transfer said Pharmacy customer's prescription records to a pharmacy other than Buyer's pharmacy, Sellers shall be entitled to comply with such request.

(c)     Except as may otherwise be required by Law, for a period commencing not more than three (3) days prior to the Closing and ending the lesser of (x) ninety (90) days after the Closing and (y) the date on which Seller ceases to have an owned or leased real property interest in the applicable premises, Sellers shall permit Buyer to place signage provided by Buyer at the front entrance of such Pharmacy (and at the Pharmacy itself) announcing the Closing and transfer of the Script Assets to a pharmacy designated by Buyer, *provided*, *however*, the content, size and placement of the signage shall be subject to Sellers' approval, which approval shall not be unreasonably withheld, conditioned or delayed.

(d)     Buyer acknowledges and agrees that (a) nothing in this Agreement shall give Buyer, directly or indirectly, the right to control or direct the operations of Sellers or the Purchased Assets prior to the Closing, (b) Sellers shall exercise complete control and supervision over its operations and (c) notwithstanding anything to the contrary set forth in this Agreement, no consent of Buyer shall be required with respect to any matter set forth in this Section 5.1 or elsewhere in this Agreement to the extent the requirement of such consent would reasonably be expected to conflict with or violate any Law.

(e)     Buyer shall not and shall cause its Affiliates not to intentionally encourage any customer of any Pharmacy to transfer such customer's prescription away from such Pharmacy prior to the Closing; *provided, however,* that nothing in this Agreement shall prevent or restrict Buyer or any of its Affiliates from (i) competing for any business of such customers in the Ordinary Course of Business; (ii) displaying signage in accordance with Section 5.1(c); (iii) responding to unsolicited requests from such customers or (iv) making any communication to the extent required by Law or pursuant to Section 5.6(b).

(f)     Prior to the Closing, Sellers agree to continue to take reasonable steps to safeguard the integrity of the Script Assets until they are transferred to Buyer.

**Section 5.2     Approvals; Reasonable Best Efforts**.

(a)     On the terms and subject to the conditions of this Agreement, each of Sellers and Buyer will use its reasonable best efforts to (i) take, or cause to be taken, all actions, and do, or cause to be done, all things, necessary, proper or advisable to cause the conditions to the Closing to be satisfied as promptly as practicable (and in any event no later than the Expiration Date) and to consummate and make effective, in the most expeditious manner practicable, the Transactions, including preparing and filing promptly and fully all documentation to effect all necessary filings, notifications, notices, petitions, statements, registrations, submissions of information, applications and other documents , (ii) obtain as promptly as practicable (and in any event no later than the Expiration Date) all approvals, consents, clearances, expirations or terminations of waiting periods, registrations, permits, authorizations and other confirmations from any Governmental Entity or third party necessary, proper or advisable to consummate the Transactions (including Sellers obtaining the Bankruptcy

Court's entry of the Sale Order and in contesting any objections to transactions contemplated hereby, including furnishing affidavits or other documents or information as may be reasonably needed for filing with and appearing for testimony at the Bankruptcy Court), (iii) defend any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Transactions (and in any event no later than the Expiration Date), and (iv) obtain as promptly as practicable all necessary consents, approvals or waivers from third parties. Sellers and Buyer shall (and shall cause their respective Subsidiaries to use) its reasonable best efforts to cooperate in all respects with each other in connection with any filing or submission with a Governmental Entity in connection with the Transactions.

**Section 5.3    Notices**.

(a)    Each Party shall promptly notify the other of any action, suit or proceeding that shall be instituted or threatened against such Party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement.

(b)    At the time and to the extent required by applicable Law, Buyer will notify customers, state boards of pharmacy, the DEA, and all other applicable authorities of the sale, transfer, acquisition, and possession of the Purchased Assets; *provided*, *however*, that prior to notifying customers, Buyer must obtain written approval from Sellers of the notice content; and *provided*, *further*, that Sellers shall submit any of such notifications that Sellers is required to submit under applicable Law. Buyer will be responsible for determining what change of ownership requirements, new licensure requirements, and notice requirements are necessary for Buyer to obtain all licenses and other Permits desired by Buyer in connection with the sale of the Purchased Assets. Upon reasonable request by Buyer and reasonable notice to Sellers, Sellers shall use commercially reasonable efforts to cooperate with Buyer to effect the application for, licenses and all pharmacy and other Permits desired by Buyer in connection with the sale of the Purchased Assets hereunder.

(c)    Each Party will make the Script Assets, as applicable, available for access to patients, or will disclose them to other authorized third parties to the extent required by HIPAA and other applicable Laws. Buyer will respond to any inquiries relating to patient rights under HIPAA after the Closing; *provided*, that if Buyer's non-receipt from Sellers of any Script Assets prevents Buyer from providing a complete response to such inquiries, then Sellers will, upon written request from Buyer, reasonably cooperate with Buyer in preparing a response.

**Section 5.4    Employee Matters**.

(a)    At Buyer's election, prior to or following the Closing, Buyer may elect to make an offer of employment to any employee of Sellers employed in such Pharmacy for employment with Buyer in a manner determined by Buyer in its sole discretion and subject to Buyer's standard onboarding procedures, and Sellers shall use commercially reasonable efforts to (i) provide Buyer with written documentation and information regarding the Pharmacy's employees as reasonably requested by Buyer, to the extent permitted under applicable Law, including any validated service crediting information and any agreements between Sellers or any of its Affiliates and any Employee that contain confidentiality, nondisclosure, noncompetition, nonsolicitation, non-disparagement or other similar agreements, and (ii) assist Buyer in

delivering any applicable offer to such Offered Employees, as reasonably requested by Buyer; *provided*, all interviews and other employee screening activities shall be conducted outside of the employees' applicable working hours.  For a period of one year following an acceptance of an offer of employment, Buyer shall provide each Offered Employee, or shall cause to be provided, compensation and employee benefits which are no less favorable, in the aggregate, than the compensation and benefits provided by Buyer to similarly situated employees of Buyer and its Affiliates.  Buyer shall be solely responsible for any obligations or liability arising out of or related to Buyers' interview or evaluation of any of Sellers' employees (including the decision to offer employment to such employees), any offer of employment to any of Sellers' employees (any such employee, an "***Offered Employee***"), and the employment of Offered Employees by Buyer or its Affiliates ("***Buyer Employee Liabilities***").

(b)    During the period beginning as of the date of this Agreement and ending on the date that is one (1) year from the Closing Date (the "***Restricted Period***"), (i) Sellers shall not, and shall cause its Subsidiaries not to, directly or indirectly, solicit, or otherwise attempt to induce any Offered Employee, who is offered employment not later than 30 days after the Closing, who accepted his or her employment offer with Buyer pursuant to Section 5.4(a) to terminate his or her employment with Buyer nor induce any Offered Employees to reject such offer; *provided, however*, that nothing in this Section 5.4 shall prohibit Sellers or any of its Subsidiaries from taking the following actions:

(i)    advertising for employees in newspapers, trade publications, or other media, or engaging recruiters to conduct general employee search activities, in either case not targeted specifically at the Offered Employees;

(ii)    hiring or communicating with any Offered Employee who applies for employment with Sellers or any of their Subsidiaries, whether or not such employee was involuntarily terminated, so long as such employee was not solicited by Sellers or any of their Subsidiaries in violation of this Section 5.4(b); or

(iii)    subject to Section 5.6 and Section 5.7, continuing to or offering to employ any person who is an employee of a Pharmacy and either does not receive an employment offer from Buyer or rejects an offer from Buyer (*provided* that Sellers did not induce such Offered Employee to reject such employment offer in violation of this Section 5.4(b)).

**Section 5.5    Access and Information**.

During the period commencing on the date hereof and ending on the Closing Date for each applicable Pharmacy, to the extent permitted under applicable Law, Sellers will permit Buyer and its Representatives to have reasonable access (including site visits to Pharmacies including for the purpose of verification of due diligence) during normal business hours, and in a manner so as not to interfere with the normal business operations of Sellers, to all properties, personnel, books, records, contracts, and documents pertaining to the Purchased Assets and will furnish copies of all such books, records, contracts and documents and other information as Buyer may reasonably request with respect to the Purchased Assets.  Buyer acknowledges that certain information contained in Sellers' files may constitute information protected by HIPAA or

other applicable privacy or security Laws, and the Parties shall use commercially reasonable efforts to agree on a form or manner of access or conduct that will (to the extent practicable) both grant Buyer access to such information and/or documentation and comply with applicable Law.

**Section 5.6    Confidentiality; Publicity**.

(a)    Except as may be required by Law, stock exchange or as otherwise expressly contemplated herein, no Party nor their respective Affiliates and Representatives will disclose to any third party any Confidential Information concerning the business or affairs of any other Party that it may have acquired from such Party in the course of pursuing the Transactions without the prior written consent of such other Party; *provided*, *however*, any Party may disclose any such Confidential Information as follows: (i) to such Party's Affiliates and its or its Affiliates' Representatives, the actions for which the applicable Party will be responsible, to the extent reasonably necessary to fulfill such disclosing Party's obligations under Section 5.2, Section 5.3(b) and Section 5.3(c); (ii) to comply with any Law or order, provided that prior to making any such disclosure the Party making the disclosure notifies the other Party of any Action of which it is aware which may result in disclosure and uses its commercially reasonable efforts to limit or prevent such disclosure; (iii) to the extent that the Confidential Information is or becomes generally available to the public through no fault of the Party or its Affiliates making such disclosure; (iv) to the extent that the Party that received the Confidential Information can demonstrate that it independently developed the same information without in any way relying on any Confidential Information; or (v) to the extent that the same information becomes available to the Party making such disclosure on a non-confidential basis from a source other than a Party or its Affiliates, which source, to the disclosing Party's Knowledge, is not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation to the other Party.  If the Transactions are not consummated, each Party will return or destroy as much of the Confidential Information concerning the other Party as the Parties that have provided such information may reasonably request, to the extent permitted under applicable Law, to the extent related to a Transaction that has not been consummated (including de-identified and aggregated data related to a Pharmacy for which no Closing occurs, and in the case of such data, such return or destruction to be certified by Buyer in writing).

(b)    Except as may be required by Law, stock exchange or as otherwise expressly contemplated herein, neither Buyer nor Sellers shall issue any press release or otherwise publicly disclose this Agreement or the Transactions or any dealings between or among the Parties in connection with the subject matter hereof without the prior approval of the other Party, which approval shall not be unreasonably withheld.  In the event that any such press release or other public disclosure shall be required, the Party required to issue such release or other disclosure shall consult in good faith with the other Party hereto with respect to the form and substance of such release or other disclosure prior to the public dissemination thereof.  The Parties will use good faith efforts to agree upon the text of a joint announcement to be made by the Parties at or after Closing.

**Section 5.7    Restrictive Covenants**.

(a)    For a period commencing on the Closing Date with respect to a Pharmacy and ending on the second anniversary of the Closing Date, Sellers shall not, and shall cause its

24

Subsidiaries not to, directly or indirectly, operate, own, lease (as landlord or tenant), or engage or participate in as an owner, partner, joint venturer or shareholder of any retail drug store, clinic pharmacy or pharmacy or other similar pharmaceutical business within a 5-mile radius of such Pharmacy; *provided*, *however*, subject to Section 5.7(b), neither Sellers nor any of its Subsidiaries shall be prohibited from (i) continuing to own and/or operate any retail pharmacy (other than a Pharmacy) owned and operated by Sellers or its Subsidiaries or as of the date of this Agreement, (ii) directly or indirectly, operating, owning, leasing (as landlord or tenant), or engaging or participating in as an owner, partner, joint venturer or shareholder of any retail business that does not offer prescription pharmaceuticals or (iii) engaging or participating in any Internet or e-commerce pharmacy business.

(b)     For a period commencing on the Closing Date with respect to a Pharmacy and ending on the second anniversary of the Closing Date, Sellers shall not, and shall cause its Subsidiaries not to, solicit any retail prescription drug customers of such Pharmacy as of the Closing Date to transfer such customer's prescription away from Buyer; *provided*, that the foregoing shall not be deemed to prohibit generalized solicitations through media advertisements that are not specifically targeted at such customers.

### Section 5.8     Exclusivity.

(a)     Except as otherwise set forth in this Section 5.8, until the Closing has been consummated or earlier termination of this Agreement, or as expressly required by the Bankruptcy Code, Sellers and its Representatives will not (and will not cause or permit any of its Affiliates (or any of the Representatives thereof to), directly or indirectly:

(i)     initiate, solicit, endorse, cooperate with or otherwise knowingly facilitate (including by way of furnishing non-public information or data) any inquiry, proposal or offer with respect to, or the making or completion of, any Alternative Transaction or any inquiry, proposal or offer that could reasonably be expected to lead to any Alternative Transaction;

(ii)     conduct or participate in discussions or negotiations with, or provide any information (including information concerning the Purchased Assets) or assistance to, any Person (other than Buyer and its Representatives) concerning any Alternative Transaction, or otherwise knowingly facilitate any Alternative Transaction; or

(iii)     enter into any letter of intent or definitive acquisition agreement or any other contract, agreement or arrangement relating to an Alternative Transaction.

(b)     Upon execution of this Agreement, Sellers shall, and shall cause its Representatives to immediately cease, any existing activities, discussions or negotiations with any Persons conducted prior to the date hereof with respect to any of the foregoing.

### Section 5.9     Script Assets.

(a)     The Parties acknowledge that Buyer and Sellers are each a "***Covered Entity***" as that term is defined under HIPAA.  To facilitate the transition of care from Sellers to

Buyer, it is necessary that Buyer have access to electronic patient records prior to the Closing Date.

(b)    On the Closing Date for a Pharmacy, Sellers will deliver the originals of any Script Assets required by applicable state or federal Law to be maintained onsite in hard copy form to Buyer.

(c)    Except to the extent prohibited under HIPAA or other applicable Laws, Buyer agrees to make available to Sellers, in a form reasonably determined by Buyer, copies of the Script Assets, including all Inventory Documentation, if, after the Closing Date and for a legitimate business reason, Sellers requires copies of the Script Assets, including all Inventory Documentation, transferred to Buyer pursuant to this Agreement.

(d)    Buyer will engage Infowerks Data Services, Inc. or another a firm reasonably acceptable to Sellers (the "*Data Converter*") to convert the books and records included in the Script Assets and all Inventory Documentation that may be transferred or assigned to Buyer under applicable Law to a format specified by Buyer, with all costs and expenses of the Data Converter to be borne by Buyer. Buyer will cause the Data Converter to enter into a legally-sufficient business associate agreement with Buyer (and upon Sellers' request, to enter into a legally-sufficient business associate agreement with Sellers) in connection with the conversion of such books and records under this <u>Section 5.9</u>. Sellers will, or will cause its Affiliates to, provide such access, information, and cooperation to the Data Converter as may be reasonably required to enable the Data Converter to deliver the books and records included in the Script Assets to Buyer prior to the Closing Date and in any event no less than seven (7) Business Days prior to the Closing Date. The Data Converter may, in turn, provide Buyer with access to such books and records for the purposes contemplated by this Agreement and the Transactions. Sellers may retain a copy of all books and records included in the Script Assets as reasonably necessary for regulatory, insurance, defense of claims purposes, or as permitted or required by applicable Law, and its custodian of record with respect thereto is Ben Morgan, located at 2001 Bryan Street, Dallas, Texas 75201 (which may be modified by Sellers from time to time upon written notice to Buyer). Buyer agrees that is has implemented and will maintain reasonable and appropriate physical, technical and administrative safeguards to protect the Script Assets from any unauthorized access, use, or disclosure in the same manner as Buyer safeguards its comparable assets, and will restrict access and use of the Script Assets, which shall prior to the Closing be used solely for data migration and integration purposes. Buyer agrees that it is undertaking the responsibility for custody and maintenance of the Script Asset records related to controlled substance invoices, DEA 222 forms (blue copies), and annual controlled substance inventory logs. If for whatever reason the Transactions or any portion thereof do not close, Buyer agrees to take reasonable steps to permanently remove the Script Assets (or any portion thereof that did not close), any related aggregate or de-identified information provided by or on behalf of Sellers to Buyer, any related analysis thereof (excluding, for the avoidance of doubt, any proprietary analysis developed by Buyer without reference to, use of, or reliance upon the Script Assets or any related aggregate or de-identified information), and the related 3T Documentation provided by Sellers to Buyer, from its systems, servers and dispensing system, and to require any vendors, including the Data Converter, to return any Script Assets to Sellers and destroy any copies thereof, such destruction, at Sellers' request, to be certified by the Buyer in writing. Sellers' point of contact for all inquiries related to the Script Assets is Trey Hensley.

(e)     Prior to the Closing Date, Buyer may use the Script Assets solely for purposes of ensuring that Buyer is ready and able to fill prescriptions services as of the Closing; *provided, however*, that Buyer (i) may only use the minimally necessary Script Assets to accomplish such purpose, and (ii) may only use aggregated or de-identified data related to the Script Assets in connection with Buyer's due diligence and integration planning.

(f)     If Sellers receives payment from any patient, third-party payor, or other source for any prescription filled by Buyer on or after the Closing Date or Buyer receives payment from any patient, third-party payor, or other source for any prescription filled by Sellers or an Affiliate of Sellers before the Closing Date, the receiving Party will report to the other Party in reasonable detail within 60 days of receipt and will, simultaneously with or promptly after each report, pay to the other Party the aggregate amount of the misdirected payments reflected in such report.

(g)     Sellers shall, and shall cause its Affiliates to, use commercially reasonable efforts to separate prior to the Closing all customer billing records, manuals, files and Script Assets owned by Sellers or any of its Affiliates that are used or held for use exclusively in, or that arise exclusively out of, the operation or conduct of the Pharmacies from documents or databases that are not used or held for use exclusively in, or that do not arise exclusively out of, the operation or conduct of the Pharmacies.

(h)     Buyer may engage a distributor selected by Buyer at Buyer's expense, to notify each customer of the Pharmacy who has had a prescription filled or refilled at the Pharmacy within the one year prior to the Closing Date by mailing each of them a letter on Sellers' letterhead in the form attached hereto as <u>Exhibit E</u> (as may be modified by mutual agreement of Sellers and Buyer), with such letters to be mailed after the Closing at such time and in such manner as reasonably designated by Buyer.

**Section 5.10    Telephone and Facsimile Numbers**.

(a)     Upon the Closing, Sellers shall have arranged (with such cooperation from Buyer as set forth herein) for remote call forwarding for all patients, doctors, and fax telephone lines of the Pharmacy to a drug store or other location designated by Buyer for a period of no less than 90 days following Closing. For the period starting on the 91st day following the Closing and ending on the 180th day following Closing, Sellers shall disconnect existing telephone and fax lines and terminate any existing telephone or fax account for such Pharmacy. Sellers shall arrange for call referral for all calls to the number so canceled to a drug store or other location designated by Buyer for a period of 90 days.  The cost of the foregoing shall be borne 50% by Buyer and 50% by Sellers; <u>provided</u> that in no event shall Seller be required to incur in excess of an aggregate amount of $10,000. Buyer shall cooperate in the establishment of such call forwarding for each Pharmacy's telephone and facsimile numbers to the Buyer's designated pharmacy telephone and facsimile numbers as set forth in this <u>Section 5.10</u>.

(b)     The parties agree that following the Closing, Buyer shall arrange to have Sellers' electronic prescription service forwarded to Sellers' pharmacy Fax Number utilizing the SureScript NCPDP Transition Assist Process. In accordance with <u>Section 5.10(a)</u>, the SureScript

shall be faxed from Sellers' fax machine to Buyer's drug store or other location designated by Buyer.

## ARTICLE VI
## POST-CLOSING COVENANTS

**Section 6.1    General**.

The Parties will cooperate reasonably with each other and with their respective Representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and will: (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transactions.

**Section 6.2    Transfer Taxes**.

All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement ("***Transfer Taxes***") shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Sellers shall cooperate with respect thereto as necessary). Sellers and Buyer shall, and shall cause their respective Affiliates to, cooperate in preparing and filing, and join in the execution of, any such Tax Returns.  Buyer and Sellers shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under applicable Law.

**Section 6.3    Tax Matters.**

The Parties shall, and shall cause their respective Affiliates to, cooperate reasonably with each other to: (a) assist the other party in preparing any Tax Returns which such other party is responsible for preparing and filing in respect of the Purchased Assets, (b) make available to the other and to any taxing authority as reasonably requested all information, records, and documents relating to the Purchased Assets, and (c) provide timely notice to the other in writing of any pending or threatened Tax audits or assessments relating to the Purchased Assets for taxable periods for which the other may have a liability.

## ARTICLE VII
## CONDITIONS PRECEDENT TO CLOSING

**Section 7.1    Conditions Precedent to Obligations of the Parties**.

The obligations of each Party to consummate the Transactions are subject to the satisfaction (or waiver by Buyer and Sellers) on or prior to the Closing Date of the conditions below.

(a)    <u>Bankruptcy Court Approvals</u>.  The Bankruptcy Court shall have entered the Sale Order and there shall not be any objections to the transactions contemplated hereby pending in the Bankruptcy Case.

(b)    <u>No Injunction</u>.    No law, order, injunction, judgment, decree, ruling, assessment or award shall have been enacted, entered, issued or promulgated by a Governmental Entity (and be in effect) which prevents, makes illegal, prohibits, restrains or enjoins the consummation of the Transactions.

**Section 7.2    Conditions Precedent to Obligation of Buyer**.

(a)    The obligations of Buyer to consummate the Transactions contemplated by this Agreement to be consummated at the Closing are subject to the satisfaction (or waiver by Buyer) on or prior to the Closing Date of the conditions below.

(i)    <u>Accuracy of Representations and Warranties</u>.  (A)  The representation and warranty of Sellers set forth in <u>Section 3.3(c)</u> shall be true and correct at and as of the Closing Date as if made at and as of such time; and (B) with respect to each Pharmacy's Purchased Assets subject to the Closing; (1) the representations and warranties of Sellers set forth in <u>Article III</u> (other than the representations set forth in <u>Section 3.1</u>, <u>Section 3.2</u>, <u>Section 3.4</u>, <u>Section 3.7</u>, <u>Section 3.8</u>, <u>Section 3.10</u> and <u>Section 3.12</u> (collectively, the "***Fundamental Representations***"), shall be true and correct (disregarding all qualifications and limitations as to "materiality", "Sellers Material Adverse Effect" or words of similar import set forth therein) at and as of the Closing Date as if made at and as of such time (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period), except where the failure to be so true and correct would not reasonably be expected to have a Sellers Material Adverse Effect; and (2) the Fundamental Representations shall be true and correct (disregarding all qualifications and limitations as to "materiality", "Sellers Material Adverse Effect" or words of similar import set forth therein) in all material respects at and as of the Closing Date as if made at and as of such time (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period).

(ii)    <u>Compliance with Obligations</u>.    Each of the agreements and covenants of Sellers set forth in this Agreement to be performed or complied with at or prior to the Closing shall have been duly performed or complied with in all material respects.

(iii)    <u>Closing Deliveries</u>.  Sellers shall have duly delivered to Buyer each of the documents and instruments required to be delivered by <u>Section 2.4(a)</u>.

(iv)    <u>Objections</u>.  Sellers shall have duly delivered to Buyer evidence that no party in interest has timely objected to the Transactions (or that no such objections remain pending).

**Section 7.3    Condition Precedent to Obligation of Sellers**.

(a)    The obligations of Sellers to consummate the Transactions contemplated by this Agreement to be consummated at the Closing are subject to the satisfaction (or waiver by Sellers) on or prior to the Closing Date of the conditions below.

(i)    <u>Accuracy of Representations and Warranties</u>.  (A)  The representations and warranties of Buyer set forth in <u>Section 4.3</u> shall be true and correct (disregarding all qualifications and limitations as to "materiality", "Buyer Material Adverse Effect" or words of similar import set forth therein) at and as of the Closing Date as if made at and as of such time (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period), except where the failure to be so true and correct would not reasonably be expected to have a Buyer Material Adverse Effect and (B) the representations and warranties of Buyer set forth in <u>Article IV</u> (other than the representations set forth in <u>Section 4.3</u>) shall be true and correct (disregarding all qualifications and limitations as to "materiality", "Buyer Material Adverse Effect" or words of similar import set forth therein) in all material respects at and as of the Closing Date as if made at and as of such time (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period).

(ii)    <u>Compliance with Obligations</u>.    Each of the agreements and covenants of Buyer set forth in this Agreement to be performed or complied with at or prior to the Closing shall have been duly performed or complied with in all material respects.

(iii)    <u>Closing Deliveries</u>.    Buyer shall have duly delivered to Sellers each of the documents and instruments required to be delivered by <u>Section 2.4(b)</u> and made each of the payments required to be made by it at the Closing pursuant to <u>Section 2.4(c)</u>.

**Section 7.4    Frustration of Closing Conditions**.

Neither Buyer nor Sellers may rely on the failure of any condition set forth in this <u>Article VII</u> to be satisfied if such failure was caused by such Party's failure to act in good faith or to use its reasonable best efforts to cause the Closing to occur, as required by <u>Section 5.2</u>.

**ARTICLE VIII**
**TERMINATION**

**Section 8.1    Termination of Agreement**.

(a)    Prior to the Closing, this Agreement may be terminated only as follows:

(i)    by mutual written consent of Buyer and Sellers;

(ii)    by either Buyer or Sellers, by written notice to the other Party, if the Closing has not taken place on or before November 1, 2019 (or if the Closing has not occurred on or before such date, such later date as Buyer and Sellers may agree to in writing) (the "***Expiration Date***"); *provided*, *however*, that any Party that has breached this Agreement, which breach has resulted in the failure of a condition in <u>Article VII</u>, shall not be entitled to terminate this Agreement pursuant to this Section 8.1(a)(ii);

(iii)    by either Buyer or Sellers, by written notice to the other Party, if any event, fact or condition (including a breach of a material representation and warranty by the non-terminating Party) occurs or exists which otherwise makes a condition precedent to the terminating Party's obligations to consummate the Transactions not capable of being satisfied,

and such event, fact or condition, if of a type that can be cured, shall not have been cured by the non-terminating Party within thirty (30) days of notice thereof from the terminating Party, unless the occurrence or existence of such event, fact or condition shall be due to the failure of the terminating Party to perform or comply with any of the agreements or covenants in this Agreement or the other Transaction Documents to be performed or complied with by such Party prior to the Closing; or

(iv)    by either Buyer or Sellers, by written notice to the other Party, if a Governmental Entity will have issued a non-appealable final order, decree or ruling or taken any other action having the effect of permanently restraining, enjoining or otherwise prohibiting the Transactions, *provided*, that the Party seeking to terminate this Agreement pursuant to this Section 8.1(a)(iv) must have used its reasonable best efforts to have such order, decree or ruling removed prior to termination.

(b)    In the event that between the date of this Agreement and the Closing, a Pharmacy is closed or undergoes a total destruction caused by hurricane, tornado, flood, earthquake or other similar force majeure event, Sellers shall provide Buyer with prompt written notice of such closing or total destruction. Within five Business Days of receipt of such notice, Buyer may elect, by written notice to Sellers, to terminate the parties' rights and obligations under this Agreement solely with respect to consummating the Closing of such destroyed Pharmacy.

### Section 8.2    Effect of Termination.

Except for the obligations under Section 5.6, Section 5.9, this Article VIII and Article IX, if this Agreement is terminated under Section 8.1(a), then all further obligations of the Parties under this Agreement will terminate.  If any Party hereto terminates this Agreement pursuant to Section 8.1(a)(ii), Section 8.1(a)(iii), or Section 8.1(a)(iv) or the Parties' rights and obligations to consummate the Closing with respect to a particular Pharmacy pursuant to Section 8.1(b), which right of termination arises as a result of a breach of any representation, warranty or covenant, then the rights of the non-breaching Party(ies) to pursue all legal remedies for damages such Party(ies) suffer will survive such termination unimpaired and no election of remedies will have been deemed to have been made.

## ARTICLE IX
## MISCELLANEOUS

### Section 9.1    Entire Agreement.

This Agreement, together with the other Transaction Documents and the Exhibits and Schedules hereto and the certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the Parties in respect of its subject matter and supersedes all prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof or the Transactions.

### Section 9.2    Successors.

All of the terms, agreements, covenants, representations, warranties, and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the Parties and their respective successors.

**Section 9.3    Assignments**.

No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyer and Sellers; *provided*, *however*, that Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates (including the right to receive certain Purchased Assets) and (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless will remain responsible for the performance of all of its representations, warranties and obligations hereunder); *provided*, *however*, that no such assignment or transfer shall relieve Buyer of its obligations or agreements hereunder or require the other Parties hereto to resort to any such assignee or transferee prior to seeking any remedies against the assigning or transferring Party permitted under or pursuant to this Agreement.  Any attempted assignment or transfer in violation of this <u>Section 9.3</u> shall be void.

**Section 9.4    Notices**.

Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date sent by electronic mail, with confirmation of transmission, if sent during normal business hours of the recipient, if not, then on the next business day, or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications, to be valid, must be addressed as follows:

>    (i)    If to Buyer:
>
>    Walgreen Co.
>    Attn: Kristine Iida, Senior Counsel, Corporate and M&A Legal
>    Walgreen Co.
>    104 Wilmot Road, MS#1446, Deerfield, IL  60015
>    Email: kristine.iida@walgreens.com
>
>    With a copy to (which will not constitute notice):
>
>    Sidley Austin LLP
>    One South Dearborn Street
>    Chicago, IL 60603
>    Attention: Bojan Guzina
>    Email: <u>bguzina@sidley.com</u>
>
>    (ii)    If to Sellers:

Fred's Stores of Tennessee, Inc.
Attn:  Joseph Anto and Ben Morgan
2001 Bryan Street
Dallas, Texas 75201
Email: janto@fredsinc.com
            ben.morgan@fredsinc.com

With a copy to (which will not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
Attn:  David D'Urso, Esq.
One Bryant Park
New York, NY 10036
Email:ddurso@akingump.com

(iii)    or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice in accordance with this Section 9.4 to the sending Party (or in the case of counsel, to such other readily ascertainable business address as such counsel may hereafter maintain).  If more than one method for sending notice as set forth above is used, the earliest notice date established as set forth above shall control.

**Section 9.5    Counterparts**.

This Agreement may be executed in any number of counterparts and delivered via facsimile or electronic mail, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument.

**Section 9.6    Headings**.

The article and section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

**Section 9.7    Governing Law; Consent to Jurisdiction**.

(a)    This Agreement shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions that would cause the application of the substantive Laws of any jurisdiction other than the State of Delaware.

(b)    Each Party irrevocably submits to the exclusive jurisdiction of (a) the State of Delaware, and (b) the Bankruptcy Court, for the purposes of any action arising out of this Agreement or any transaction contemplated hereby.  Each Party agrees to commence any such action either in the Bankruptcy Court or if such action may not be brought in such court for jurisdictional reasons, in the state chancery courts of the State of Delaware.  Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth above shall be effective service of process for any action in

the State of Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 9.7. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action arising out of this Agreement or the Transactions in the State of Delaware, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action brought in any such court has been brought in an inconvenient forum. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF AND THEREOF.

### Section 9.8    Amendments and Waivers.

No amendment, modification, replacement, termination or cancellation of any provision of this Agreement will be valid, unless the same will be in writing and signed by Buyer and Sellers or is effectuated pursuant to Section 5.2(c). No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.

### Section 9.9    Severability.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided that if any provision of this Agreement, as applied to any Party or to any circumstance, is adjudged by a Governmental Entity not to be enforceable in accordance with its terms, the Parties agree that the Governmental Entity making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced.

### Section 9.10   Expenses.

Except as otherwise expressly provided in this Agreement, each Party will bear its own costs and expenses incurred in connection with the preparation, due diligence review, execution and performance of this Agreement and the Transactions including all fees and expenses of agents, Representatives, financial advisors, legal counsel and accountants.

### Section 9.11   Construction.

The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement. Any reference to any federal, state, local, or foreign Law will be deemed also to refer to Law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes," and "including" will be deemed to be followed by

"without limitation."  Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

**Section 9.12    Bulk Transfer Laws**.

Buyer hereby waives compliance by Sellers with the provisions of any so-called "bulk transfer laws" of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchases Assets to Buyer in connection with the Transactions.

**Section 9.13    No Third Party Beneficiaries**.

Nothing in this Agreement, express or implied, is intended to confer on any person other than the Parties or their respective successors or assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement and no Offered Employee or current or former employee of Sellers, or any beneficiary or dependent thereof, or any other person not a party to this Agreement shall be entitled to assert any claim hereunder.

**Section 9.14    Schedules**.

No reference to or disclosure of any information in the Schedules shall be construed as an admission or indication that such information is material or that such information is required to be referred to or disclosed in the Schedules, nor shall such information be deemed to establish a level or standard of materiality for purposes of this Agreement.  The Schedules are arranged in sections corresponding to the sections contained in this Agreement merely for convenience, and the disclosures made in any single Schedule shall be incorporated by this reference in each of the other Schedules to the extent that it is reasonably apparent that such incorporated disclosure relates to the subject matter of the Schedule into which it is being incorporated pursuant to this sentence.

**Section 9.15    Time is of the Essence**.

With respect to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**Section 9.16    Survival**.

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied or, if earlier, the dissolution of Sellers. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Action for damages in respect of any breach thereof.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

SELLERS:

**FRED'S STORES OF TENNESSEE, INC.**

By:_____
Name:
Title:

**FRED'S, INC.**

By:_____
Name:
Title:

**NATIONAL EQUIPMENT MANAGEMENT AND LEASING, INC.**

By:_____
Name:
Title:

**NATIONAL PHARMACEUTICAL NETWORK, INC.**

By:_____
Name:
Title:

**REEVES-SAIN DRUG STORE, INC.**

By:_____
Name:
Title:

**SUMMIT PROPERTIES-JACKSBORO, LLC**

By:_____
Name:
Title:

**SUMMIT PROPERTIES-BRIDGEPORT, LLC**

By:_____ Na
Title:

**505 N. MAIN OPP, LLC**

By:_____
Name:
Title:

BUYER:

**WALGREEN CO.**

By:_____
Name:
Title:

## **EXHIBIT 2**

**(Pharmacy Asset Sale Schedule)**

| Store # | Rx # | City | State |
|---|---|---|---|
| 2473 | 2474 | MANTACHIE, MS | MS |
| 1588 | 1589 | BALDWYN | MS |
| 1320 | 1321 | CAMDEN | TN |
| 1235 | 1236 | CENTREVILLE | MS |
| 1278 | 1279 | COLLINS | MS |
| 1408 | 1409 | DAINGERFIELD | TX |
| 1608 | 1609 | DUMAS | AR |
| 1700 | 1701 | FLORA | MS |
| 1640 | 1641 | FULTON | MS |
| 1865 | 1866 | HARRISBURG | AR |
| 1998 | 1999 | HOMER | LA |
| 2128 | 2129 | LEXINGTON | GA |
| 2717 | 2718 | MARKS | MS |
| 2395 | 2396 | MENDENHALL | MS |
| 2430 | 2431 | NEWTON | MS |
| 2533 | 2534 | OKOLONA | MS |
| 2590 | 2591 | PIKEVILLE | TN |
| 2695 | 2696 | PURVIS | MS |
| 2748 | 2749 | RICHTON | MS |
| 2758 | 2759 | ROGERSVILLE | AL |
| 3078 | 3079 | STERLINGTON | LA |
| 3210 | 3211 | WATER VALLEY | MS |
| 3220 | 3221 | WHITE BLUFF | TN |
| 3235 | 3236 | WIGGINS | MS |
| 3240 | 3241 | WINONA | MS |
| 2727 | 2728 | KENTWOOD | LA |
| 2895 | 2896 | SUMRALL | MS |
| 2243 | 2244 | MACON | MS |
| 1935 | 1936 | FERRIDAY | LA |
| 3010 | 3011 | TIPTONVILLE | TN |
| 6015 | 6016 | MIDDLETON, TN (GD&D) | TN |
| 1765 | 1766 | HENDERSON | TN |
| 1218 | 1219 | CADIZ, KY | KY |
| 1503 | 1504 | ALAMO | TN |
| 1660 | 1661 | BRINKLEY, AR | AR |
| 1095 | 1096 | BALD KNOB, AR | AR |
| 2150 | 2151 | LORETTO | TN |
| 1440 | 1441 | DOVER | TN |
| 1385 | 1386 | CLARKSVILLE, AR | AR |
| 2440 | 2441 | NASHVILLE, AR | AR |
| 3070 | 3071 | TYLERTOWN, MS | MS |
| 2365 | 2366 | MONTICELLO, MS | MS |
| 1323 | 1324 | BUNKIE, LA | LA |
| 1928 | 1929 | DEKALB, MS | MS |