**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FRED'S, INC., *et al.*,[1] | Case No. 19-11984 (CSS) |
| Debtors. | (Jointly Administered) |
| | **Objection Deadline: Feb. 18, 2020 at 4:00 p.m. (ET)**<br>**Hearing Date: Feb. 25, 2020 at 10:00 a.m. (ET)** |
| | **Re: Docket Nos. 755, 756, 813, 840, and 843** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING DISCLOSURE STATEMENT, (II) FIXING VOTING RECORD DATE, (III) APPROVING SOLICITATION MATERIALS AND PROCEDURES FOR DISTRIBUTION THEREOF, (IV) APPROVING FORMS OF BALLOTS AND ESTABLISHING PROCEDURES FOR VOTING ON PLAN, (V) SCHEDULING HEARING AND ESTABLISHING NOTICE AND OBJECTION PROCEDURES IN RESPECT OF CONFIRMATION OF PLAN, AND (VI) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its undersigned counsel, submits this objection (the "Objection") to the Debtors' motion (the "Motion") [Docket No. 813] for an order (the "Proposed Order"), *inter alia*, approving the Debtors' *Proposed Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code With Respect to the Debtors' Joint Plan* (the "Original Disclosure Statement") [Docket No. 756] as amended by the subsequently filed *Proposed Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code With Respect to the Debtors' Joint Plan* (the "Disclosure Statement") [Docket No. 843], which the Debtors intend to

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Store, Inc. (4510); Summit Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 6625 Lenox Park, Suite 200, Memphis, TN 38115.

use in soliciting votes on the *Joint Chapter 11 Plan for Fred's, Inc. and the Debtor Affiliates Set Forth Herein* (the "Original Plan") [Docket No. 755] as amended by the *Joint Chapter 11 Plan for Fred's, Inc. and the Debtor Affiliates Set Forth Herein* (the "Plan") [Docket No. 840].[2]  In support of this Objection, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT[3]

1.      As the Court knows well, the Debtors were once venerable retailers serving low, middle, and fixed-income families in rural "small town" America with more than 600 locations and annual sales exceeding $2 billion. Prior to the Petition Date, the Debtors dismantled themselves through a deliberate and expedited liquidation process which resulted in the Debtors arriving on the courthouse steps with approximately 80 locations remaining, all of which were already undergoing GOB sales. These last locations and all other remaining assets were promptly liquidated in the first 3 months of these Chapter 11 Cases.

2.      As a result, all secured debt has been repaid (or adequate funds exist to reserve for such claims), and all administrative claims are expected to be paid with excess funds remaining for distribution to general unsecured creditors. It is anticipated that the Debtors will have four (4) or fewer employees remaining as of the Effective Date of the plan, if confirmed. The only assets that remain are potential claims and causes of action to be asserted against the Debtors' former directors, officers, and insiders, which have been the subject of the Committee's Rule 2004 examinations. Essentially all issues that remain are issues that solely and exclusively impact general unsecured creditors.

3.      Despite this obvious reality, the Debtors have filed a Plan and Disclosure Statement that relinquishes the remaining assets for no value, substantively consolidates the Debtors' estates with no evidentiary support for such relief, empowers the Debtors to mutually

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan, Disclosure Statement, or Motion, as applicable.
[3] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to such terms below in this Objection.

select the Liquidating Trustee with the Committee, assumes financial obligations to indemnify targets of potential causes of action, and releases such targets for absolutely no consideration.

4.      While several of these issues can be considered "Plan issues," the Disclosure Statement cannot be approved, because the Plan is patently unconfirmable, regardless of the volume and substance of disclosure made by the Debtors.   Thus, the Disclosure Statement should not be approved and the Motion should be denied.

5.      The Plan is patently unconfirmable on its face for several reasons.  Primarily, the Plan's proposed grant of extremely broad releases to the Debtors' current and former officers and directors, and some employees of Alden Global Capital LLC ("Alden"), among numerous other parties, is unconscionable given the lack of consideration by the aforementioned Released Parties. The Plan effectively releases all claims of the Debtors and their Estates in favor of the Debtors' current and former officers and directors.   The proposed Releases are particularly egregious and inappropriate because the Debtors, who conducted no independent investigation or analysis of any potential Claims or Causes of Action, are on notice that the Committee believes – based on its 2004 investigation – that the Debtors' Estates hold valuable Claims against the Debtors' current and former officers and directors. These Claims may provide a meaningful source of recovery for unsecured creditors in these Chapter 11 Cases, as evidenced by the Committee's notice of claims sent to the Debtors' various insurance carriers in October 2019. The Plan also contains improper nonconsensual Third-Party Releases, overly broad exculpation provisions, and assumption of indemnification obligations to the proposed Released Parties.  Accordingly, the Plan cannot be confirmed without a complete overhaul of the Release, exculpation, and indemnification provisions.  Thus, approval of the Disclosure Statement must be denied.

6.      In addition, the Plan is patently unconfirmable because it improperly seeks to substantively consolidate General Unsecured Claims into one estate for purposes of distributions.  This substantive consolidation mechanism is impermissible under applicable law. The Disclosure Statement is silent as to why substantive consolidation is appropriate based on

the facts and circumstances of these Chapter 11 Cases.  At a minimum, if the Debtors believe substantive consolidation is appropriate, the Debtors should be required to inform creditors voting on the Plan why substantive consolidation is justified.

7.      Moreover, in yet another injustice for general unsecured creditors, the Plan does not allow the Committee to select the Liquidating Trustee. The Liquidating Trust will likely pursue various Claims and Causes of Action against the Debtors' officers and directors for their breach of fiduciary duties that arise from, *inter alia*, their mismanagement of the Debtors, the authorization of transfers and significant transactions that drained the Debtors' cash, and the failure to conduct due diligence or exercise appropriate oversight over the Debtors' affairs. Given the Fred's board of directors' (the "Board") obvious interest in avoiding liability, the Committee, and not the Debtors' Board, should select the Liquidating Trustee established under the Plan. Any provision to the contrary would undoubtedly give way to blatant self-dealing by the Debtors' Board and the failure to maximize the assets the Debtors' Estates.

8.      Clear and conspicuous language must be added to the Disclosure Statement informing creditors that the Committee: (i) does not support the Plan; (ii) does not believe the proposed Plan is fair or confirmable; and (iii) recommends that creditors vote against the Plan. As set forth below, the Committee requests that the Court direct the Debtors to include in the Plan's Solicitation Package a letter from the Committee, to convey the Committee's recommendation that creditors vote to reject the Plan.

9.      Finally, the Motion's proposed Solicitation Procedures, especially regarding the proposed Third-Party releases, are improper. The Debtors' proposed "opt out" provision – in the Solicitation Package's form Ballot – related to the Third-Party Release, is completely inappropriate, as made clear by this Court's jurisprudence. The Solicitation Procedures should be revised before the Plan solicitation process moves forward.

10.     For the foregoing reasons and the additional reasons set forth below, the Committee submits that the Disclosure Statement cannot be approved and, therefore, the Motion should be denied.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.    The Debtors' Businesses and Pre-Petition Activities.

12.    The Debtors served low, middle, and fixed-income families in towns of less than 15,000 in populations who "tend to be value-oriented and budget conscious" and who live in rural areas without easy access to large discount retailers.  Their stores stocked more than 14,000 items ranging from nationally-recognized brand name products, to proprietary "Fred's" labeled products and low-priced, off-brand products.  *See Declaration of Mark A. Renzi, Chief Restructuring Officer of Fred's Inc., In Support of Chapter 11 Petitions and First Day Motions* ("First Day Declaration") [Docket No. 17] at ¶ 6.

13.    Several years prior to these Chapter 11 Cases, the Debtors were operating a business that generated annual sales of well over $2,000,000,000.[4]  In December 2016, shares of Debtors' stock sold at or above $20.00.[5]

14.    In or around 2016, by funneling $158 million from its failing newspaper business, Alden acquired an interest in the Debtors.

15.    In or around December 2016, Fred's entered into negotiations regarding an asset purchase agreement with Rite Aid and Walgreen's (the "Rite Aid/Walgreen's APA"), in which, following the proposed merger of Rite Aid and Walgreens, a subsidiary of Fred's was to purchase 865 stores from the newly formed entity for $950 million.  However, on or around June 29, 2017, when the Rite Aid/Walgreen's APA was terminated following regulatory

---

[4] *See Fred's on a Decline, Chain Store Guide (April 19, 2019 at 12:55 pm)* http://newsroom.chainstoreguide.com/2019/04/freds-on-a-decline/.

[5] *Joe Nocera, Alden Global is Building a Tower of Companies It Can Cut Down, Bloomberg Opinion (Nov. 6, 2018, 1:58 PM)* https://www.bloomberg.com/opinion/articles/2018-11-06/dallas-move-by-fred-s-drugs-and-payless-has-hedge-fund-behind-it.

scrutiny related to the proposed merger, Alden had to find a way to ensure it received a return on its investment.

16.     Accordingly, in September 2017, Heath Freeman, Alden's managing partner, assumed the position of Chairman of the Fred's Board.  Freeman then began his strategic infiltration of the Fred's Board by replacing each of the previously sitting Board members with his Alden-friendly cronies. Alden used the Debtors' funds to award ousted Board members with above-market severance packages (replete with car allowances, benefits, and other perks) in exchange for their contractual vow of silence.  With Alden in full control of the Board, it could implement its plan to use Fred's for its direct benefit and to the detriment of Fred's customers, vendors, shareholders, creditors, and other stakeholders.

17.     Although the Board promised to generate growth at Fred's, it began a frenzied, full-scale liquidation, potentially giving rise to claims related to management  decisions dictated or enabled by Alden's control and/or influence over the Debtors, including the following:

    a.  The decision to award members of the Board substantial benefits and grant the Alden-affiliated executives of the Debtors pay raises while, among other things, the Debtors were terminating employees, closing stores, and incurring additional secured debt;

    b.  The payment of above-market severance packages to ousted pre-Alden Board members in exchange for the execution of non-disclosure agreements;

    c.  The prepetition sale of Debtors' pharmacy stores for $11.7 million to CVS, plus $3.5 million inventory;

    d.  The sale of prescription files and the related data and records, retail pharmaceutical inventory, and certain other assets from 179 of the Debtors' retail pharmacy stores to Walgreen Co. for $176.7 million in the fourth quarter of 2018;

    e.  The prepetition sale of Debtors' Memphis headquarters for $8,250,000 in early 2019 to a Canadian firm;

    f.  The decision to move Debtors' headquarters from Memphis to Dallas, to a building owned by Randall Smith, Alden's founder;

    g.  The rapid reduction of store footprint and mass liquidation of remaining assets in the months immediately preceding the Chapter 11 Cases, including the mass shutdown of 441 stores in the six (6) months prior to the Petition Date as follows:

     A.     159 stores on April 11, 2019;

     B.     104 stores on May 16, 2019;

     C.     49 stores on July 5, 2019; and

     D.     129 stores on July 12, 2019;

h.   The prepetition sale of certain of the Debtors' specialty pharmacy assets, consisting of three pharmacy locations, pharmaceutical inventory, and related intellectual property to Advance Care Scripts, Inc. for $40 million, plus up to an additional $5.5 million for inventory; and

i.   Numerous other instances of apparent corporate waste and breaches of fiduciary duties commencing at or after the time of Alden's takeover of the Debtors.

18.    With Alden at the helm, the Debtors' financial position completely deteriorated during the eighteen (18) months prior to the commencement of these Chapter 11 Cases.

19.    Under Alden's control, the value of the Debtors' stock plummeted, becoming virtually valueless.  Notably, Fred's 10-K/A filed on June 3, 2019  shows "that as Fred's laid off workers, shuttered stores and its shares tanked to nearly worthless, the Alden-controlled board gave substantial pay raises to the company's top executives — all while awarding themselves nearly a million dollars in stocks, cash and benefits."[6]

## II.    The Chapter 11 Cases.

20.    On September 9, 2019 (the "Petition Date"), each of the Debtors filed voluntary petitions with this Court pursuant to chapter 11 of the Bankruptcy Code ("Chapter 11 Cases"). The  Debtors are operating their businesses and managing their properties as debtors in possession under Sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed.

21.    On September 18, 2019, the Office of the United States Trustee appointed the Committee pursuant to Section 1102 of the Bankruptcy Code.  The Committee consists of the following members: (i) Bradley Wooldridge; (ii) BWI Companies, Inc.; and (iii) WIN Properties, Inc. *See Notice of Appointment of Creditors Committee. See* Docket No. 127.

---

[6] *Julie Reynnolds, The Alden Matters: Heat turned up on Alden Global Capital in federal court, DFM Workers (2020) https://dfmworkers.org/the-alden-matters-heat-turned-up-on-alden-global-capital-in-federal-court/.*

22.     Prior to these Chapter 11 Cases, the Debtors liquidated millions of dollars in assets and continued this trend throughout the life of the bankruptcy proceedings through three main sale mechanisms: going-out-of-business ("GOB") sales; pharmacy asset sales; and real estate asset sales.

23.     As of the Petition Date, certain sales of the Debtors' pharmacy assets were in the process of closing. Thus, the Debtors sought entry of an order authorizing the continuation of closing on those assets. *See* Docket No. 12. On September 26, 2019, the Court entered its final order approving these sales. *See* Docket No. 192. The Debtors concluded the sales of the pharmacy assets by October 16, 2019. *See* Docket Nos. 314 and 330.

24.     On September 27, 2019, the Court authorized the Debtors to conduct GOB sales through October 31, 2019 in order to monetize the Debtors' store inventory. *See* Docket No. 208. The Debtors retained SB360 Capital Partners, LLC to administer the GOB Sales, and by October 31, 2019, the Debtors concluded their GOB sales, effectively liquidating all of their non-pharmaceutical inventory.

25.     Also on September 27, 2019, the Court authorized the Debtors to sell sixty (60) real properties in which they had operated retail stores, and a distribution center. *See* Docket No. 204. By December 2019, sales on all of the Debtors' real estate properties subject to the Court's order had closed.

26.     Additionally, these Chapter 11 Cases saw two key employee retention programs ("KERP") and one key employee incentive program ("KEIP"). *See* Docket Nos. 328, 711. Numerous insiders, officers, and employees received generous bonuses in order to incentivize them to remain working for the Debtors and maintain operational integrity in the liquidation efforts. The second KERP was specifically tailored to retain employees to assist with the claims administration process, closing the Debtors' books and records, and other activities necessary to complete the winding down of the Debtors' affairs.

27.     A company that employed over 6,000 employees as little as one (1) year ago now currently employs eleven (11) individuals and is planning on only retaining four (4) employees

once the Plan is confirmed. *See* Disclosure Statement at 8; *see also* Docket No. 711. The Debtors' wind-down process is at a point where more than four (4) employees are simply not needed, as the only tasks remaining are: reconciling claims, distributing Estate assets to general unsecured creditors, and the prosecution of Causes of Action against the Debtors' current and former officers and directors.

28.    As to the prosecution of Causes of Action, during the course of these Chapter 11 Cases, **only** the Committee has been diligently and vigorously investigating the Debtors' history, the circumstances surrounding its financial deterioration, and various transactions by and between the Debtors, their insiders and affiliates, and other related third parties. *See* Docket Nos. 235, 327, 634, 661. Specifically, the Committee is in the process of reviewing over 30,000 pages of documents, and has interviewed, or is scheduled to examine, several key witnesses, including Heath Freeman and Mark Renzi, the Debtors' CRO. This investigation may result in several Claims and Causes of Action that will generate value for the Debtors' Estates (collectively, the "Litigation Claims").

29.    The Debtors have not taken any to steps investigate any pre-petition Causes of Action, and have not established any mechanism (*e.g.*, the appointment of independent directors) to do so. Nevertheless, the Debtors have filed the Plan proposing to release all Claims and Causes of Action.

## III.    The Debtors' Proposed Plan of Reorganization and Disclosure Statement.

30.    The Debtors filed the Original Plan and the Original Disclosure Statement on January 21, 2020, the Motion on February 7, 2020, and the Plan and Disclosure Statement on February 14, 2020.  A hearing on the Motion, including the adequacy of the Disclosure Statement, is currently scheduled for February 25, 2020.

31.    The Plan is proposed as a plan of liquidation of the Debtors and calls for the substantive consolidation of the Debtors' Estates. *See* Plan, Art. V.D.1 and Art. II. The Plan and Disclosure Statement are silent as to why it is appropriate to substantively consolidate General Unsecured Claims into one estate for purposes of distributions. *See* Plan, Art. II.

Essentially, the Debtors create a pot plan of any proceeds remaining after satisfaction of remaining secured and administrative claims.  Substantially all assets of the Debtors have been liquidated, with the exception of any Claims and Causes of Action that may exist against the Debtors' current and former directors, officers, and insiders, if such Claims and Causes of Action are not released by the Plan.

32.    Article X.F of the Plan, however, contains a deemed release (the "Third-Party Release") of numerous non-Debtors' claims against the Debtors and myriad other non-Debtors, which include, among others, the Debtors' current and former officers and directors (the "Released Parties").  *See* Plan, Art. I.A.91.

33.    The Estates and non-Estate parties (*i.e.*, the Releasing Parties) granting the Releases (defined below) include: (a) the Debtors; (b) the Liquidating Trust and Liquidating Trustee; (c) the DIP Lenders; (d) the Prepetition Lenders; (e) the Creditors' Committee; (f) each **Holder of a Claim entitled to vote to accept or reject the Plan that votes to accept or reject the Plan, or abstains from voting, and does not affirmatively elect to "opt out" of being a Releasing Party by marking the box on its ballot designated for such purpose**; (g) each Holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan; and (h) with respect to each of the foregoing Entities described in clauses (a) through (g), such Entities' current and former affiliates, and such Entities' and such affiliates' partners, subsidiaries, predecessors, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), members, officers, principals, employees, agents, managed accounts or funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, together with their respective successors and assigns, in each case in such capacities. *See* Plan, Art. I.A.92 (emphasis added)

34.    It is clear to the Committee, and will be evident to this Court, that ***all claims*** against the Debtors' current and former officers and directors must be carved out of the Third-Party Release. This is crucial because any such Claims and Causes of Action are likely the only

remaining assets of the Estates that may produce value to Holders of General Unsecured Claims.   Given that the Debtors' entire enterprise has been liquidated and wound down, distributions to general unsecured creditors will be the primary, if not exclusive, objective of the Liquidating Trustee and the post-confirmation Estates.

35.     Additionally, the Plan includes an exculpation provision (the "Exculpation") which further exacerbates the problem by including the Debtors' current and former officers, directors and managers, and a sweeping universe of individuals and entities defined only by categories as "Exculpated Parties" under the Plan. *See* Plan, Art. X.G; Plan, Art. I.A.45.

36.     To further pile on to the Debtors' attempts to insulate the "Released Parties" from potential causes of action, the Plan also proposes a plan injunction (the "Plan Injunction"), that broadly enjoins Holders of Claims from pursuing Claims against the Released Parties. *See* Plan, Art. X.H.

37.     As if these initial layers of protection are not already excessive, the Plan also seeks to assume all indemnification obligations that may exist under contract, the Debtors' articles of incorporation, or state law, essentially to burden the liquidating estates with covering the defense costs of putative defendants on any causes of action the Liquidating Trustee may seek to bring if the Releases are not approved. *See* Plan, Art. VI.D. This request is unprecedented and wholly inappropriate in a case where the debtors have substantially wound down and cease to exist.

38.     Lastly, the proposed Solicitation Package includes the form ballot (the "Ballot") that will be sent to creditors. *See* Motion, Exhibit B. The Ballot provides that Holders of Claims are deemed to grant a release without their consent if such creditor either: (i) abstains from voting on the Plan; (ii) votes to reject the Plan and does not opt out of the Third-Party Releases; or (iii) is a Holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan. *See* Plan, Art. I.A.92.

**OBJECTION**

39.    The Debtors' Disclosure Statement is deficient because it: (i) describes a Plan that is patently unconfirmable, and for which the solicitation of votes would therefore be a waste of estate resources; and (ii) does not contain adequate information to enable a hypothetical holder of a claim to cast an informed vote to accept or reject the Plan, as it does not reflect the current reality of the Debtors' expansive liquidation and corporate wind-down. Additionally, certain of the proposed voting and solicitation procedures (the "Solicitation Procedures") are improper and must be revised if the Plan confirmation process is allowed to move forward.

**I.    The Disclosure Statement Cannot be Approved Because the Plan it Describes is Patently Unconfirmable.**

40.    A disclosure statement describing a plan that cannot be confirmed must be denied, regardless of the extent of disclosure it contains.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012);  *see also In re Beyond.com*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (denying approval of disclosure statement where plan could not be confirmed); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. D. Pa. 2001) ("If the disclosure statement describes a plan that is so fatally flawed that confirmation is impossible, the court should exercise its discretion to refuse to consider the adequacy of disclosures.").

41.    The purpose behind this rule is common sense: courts will not permit a bankruptcy estate to incur the costs of soliciting votes for a plan that — even if unanimously accepted by creditors — could never be confirmed.  *See, e.g., In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the court will not subject the estate to the expense of soliciting votes and seeking confirmation.").

42.    In this instance, the Disclosure Statement cannot be approved because the Plan it describes is patently unconfirmable. Permitting the Debtors to go forward with the solicitation

process would serve only to waste estate resources. Accordingly, because the Debtors have proposed a Plan that cannot be confirmed, the Motion should be denied.

**A. The Debtors Should Not be Allowed to Select the Liquidating Trustee in Violation of the Bankruptcy Code.**

43. Perhaps the Plan's most troubling defect, given the skeletal state of the Debtors' businesses, is that it permits the Debtors to have control of their post-confirmation Estates by allowing them to have a say in the appointment of the Liquidating Trustee. As the intended beneficiaries of the Liquidating Trust, the unsecured creditors, through the Committee, should have the sole right to select the Liquidating Trustee, not the Debtors.

44. It is worth a brief reminder as to who constitutes the "Debtors" at this stage of these proceedings. First, as of the Petition Date, the Debtors' Board was comprised of Timothy A. Barton, Heath B. Freeman, Dana Goldsmith Needleman, Steven B. Rossi, and Thomas E. Zacharias, some of whom are Alden cronies and could be targets or putative defendants in Causes of Action the Liquidating Trustee may decide to commence. It is worth repeating that Alden's very acquisition of the Debtors was shrouded in suspicion, as it funneled $158 million from a floundering newspaper business in order to purchase the Debtors' now worthless stock (approximately $0.12 per share as of the Petition Date). Many of these individuals are directly tied to Alden. For example:

- As previously mentioned, Heath Freeman is Alden's managing partner and Chairman of the Debtors' Board.

- Additionally, upon information and belief, Joseph Anto, Alden's chief executive officer as of the Petition Date, formerly worked for Digital First Media, the company that operates Alden's newspaper business and from which Alden siphoned the funds needed to acquire a controlling interest in the Debtors.

- Lastly, Steven B. Rossi is Digital First Media's former chief executive officer.

45. Second, it is projected that the Debtors will have four (4) or fewer employees at or around the time of Plan confirmation and each of these remaining employees will have received two separate KERP bonuses from the Debtors' Board during the pendency of these

cases alone.

46.     Lastly, the Debtors' Chief Restructuring Officer's employment will terminate upon confirmation of a liquidating plan.

47.     None of the aforementioned entities or individuals should have a say in choosing the post-confirmation fiduciary of these Estates.

48.     Specifically, Art. VIII.D of the Plan improperly mandates that the "Liquidating Trustee shall be a Person or Entity mutually acceptable to the Debtors and the Creditors' Committee," in clear violation of the Bankruptcy Code. Specifically, section 1123(a)(7) of the Bankruptcy Code states that a plan shall " contain only provisions that are consistent with the interests of creditors . . . and with public policy with respect to the manner of selection of any officer, director, or *trustee* under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7) (emphasis added).

49.     The primary duty of the Liquidating Trustee (other than making distributions pursuant to the Plan) is to maximize the value of the Liquidating Trust Assets, and particularly the Causes of Action included therein, for the benefit of Holders of General Unsecured Claims. The Liquidating Trustee must objectively determine whether Causes of Action should be pursued against the Debtors' current and former officers and directors.  It does not take an enormous leap to guess whether a Liquidating Trustee appointed by the Debtors' Board decides to pursue any Causes of Action against the Debtors' Board.  Given that potential Causes of Action may present the only remaining asset of any value, the Debtors' should not be able to deprive general unsecured creditors of such value by influencing post-confirmation decision-making.

50.     Additionally, creditors commonly select liquidating trustees in chapter 11 cases in this jurisdiction. *See*, *e.g.*, *In re EBHI Holdings, Inc.*, No. 09-12099 (MFW), 2010 WL 3493027, at *3 (Bankr. D. Del. Mar. 18, 2010); *In re Ampace Corp.*, 279 B.R. 145, 147 (Bankr. D. Del. 2002), *In re Woodbridge Grp. of Companies, LLC*, 592 B.R. 761, 767 (Bankr. D. Del. 2018); *In re Insilco Techs.*, Inc., 480 F.3d 212, 214 (3d Cir. 2007). Time and time again**,** the

prosecution of causes of action are handed over to a liquidating trustee whose appointment is selected by the creditors committee. *See In re Bridgeport Holdings, Inc.*, 326 B.R. 312, 325 (Bankr. D. Del. 2005), *as amended* (Aug. 12, 2005), *amended*, No. 03-12825(PJW), 2005 WL 1943535 (Bankr. D. Del. Aug. 12, 2005).

51.     It is worth emphasizing that in these Chapter 11 Cases, the Liquidating Trustee will be working solely for the benefit of Holders of General Unsecured Claims, and, therefore, the Committee should be the party that ultimately selects the Liquidating Trustee. Simply put, the Disclosure Statement does not provide any justification for the Debtors being granted the right to select the Liquidating Trustee along with the Committee.

52.     Based on the foregoing, the Committee believes the manner of the Liquidating Trustee's selection is wholly improper under § 1123(a)(7) of the Bankruptcy Code. Thus, the Disclosure Statement should not be approved due to the Plan being patently unconfirmable as it violates § 1129(a)(1) and (a)(2) of the Bankruptcy Code.

53.     Based on the foregoing, a simple change to the first sentence of Art. VIII.D of the Plan would resolve the Committee's objection to the provision:

> The Liquidating Trustee shall be a Person or Entity appointed by the Creditors' Committee, which appointment shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

**B. The Releases Contained in the Plan are Not Approvable as a Matter of Law.**

54.     While the Third Circuit has intimated, in *dicta*, that releases of non-Debtors may be permissible if there are specific factual findings that they are fair and necessary to the debtor's reorganization, *see In re Continental Airlines*, 203. F.3d 203, 214 (3d Cir. 2000), the Releases proposed by the Debtors fail to meet this standard. The Releases here are neither fair nor necessary in the context of these Chapter 11 Cases, given that:  (i) the Debtors have sold substantially all of their assets and the Plan is a liquidating plan for the primary benefit of Holders of Allowed General Unsecured Claims; and (ii) the Debtors made no effort, whatsoever, to investigate the existence of any potential Claims and Causes of Action against

the Released Parties.

55.     Moreover, many of the proposed non-Debtor Released Parties, such as officers and directors, have made no contribution, let alone a substantial contribution, to the Debtors' liquidation process and the remaining assets available for distribution under the Plan. The Debtors have submitted **zero evidence** to even portend that **any** contribution has been made, let alone any substantial contribution.  Of course, it cannot be disputed that these Debtors are fully liquidated and have not, and are not, reorganizing by any interpretation of the definition.

56.     Specifically, the *Continental* court noted that there are three "hallmarks of permissible non-consensual releases - fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *Id*. at 214. As the Third Circuit recognized, provisions which amount "to nothing more than a lockstep discharge of non-debtor liability . . . fall squarely into the section 524(e) prohibition." *Id.* at 217.

57.     Courts consider five factors when determining whether Releases should be approved, as follows:

i.     the identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

ii.    substantial contribution by the non-debtor of assets to the reorganization;

iii.   the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

iv.    an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and

v.     provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*In re Zenith Elecs Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Exide Technologies*, 303

B.R. 48, 72 (Bankr. D. Del. 2003); *see also In re Saxby's Coffee Worldwide LLC*, 436 B.R. 331,

336 (Bankr. E.D. Pa. 2010) (quoting *In re S. Canaan Cellular Invs., Inc.*, 427 B.R. 44, 72 (Bankr. E.D. Pa. 2010).

58.    Here, none of these factors favor permitting the Releases proposed by the Debtors:

i.   The identities of potentially Released Parties and the Debtors are easily severable and Causes of Action can be brought against the proposed Released Parties without depleting assets of the estates absent approval of the Debtors' attempt to assume any and all indemnification obligations. Moreover, substantial D&O Insurance Liability Coverage exists to satisfy potential judgments against Released Parties. Therefore, the Debtors fail to comply with the *first* factor;

ii.  The Plan and Disclosure Statement are silent as to the Released Parties contribution to the Debtors' reorganization efforts. The Debtors have not satisfied, and cannot satisfy, this criteria, given they are liquidating their remaining assets through the Plan. To put a finer point on it, the Released Parties have not made any contribution to justify releasing non-Debtor claims held by creditors or other parties-in-interest. Specifically, with regard to the Debtors' officers and directors, the Debtors have failed to demonstrate what, if any, contribution they have provided throughout these Chapter 11 Cases. It is readily apparent that Debtors want to give their officers and directors the gift of a complete release after these individuals failed to contribute any cash or other value towards the Plan, which provides Holders of General Unsecured Claims with unknown distributions. Thus, the *second* factor cannot be satisfied;

iii. The Debtors have not made a showing that the Releases are essential to their reorganization. In fact, the Debtors are not reorganizing, having previously sold substantially of their assets pursuant to section 363 of the Bankruptcy Code. Given that the Debtors are liquidating their remaining limited assets for the benefit of general unsecured creditors through the Plan, it is difficult to see how the Releases are necessary or essential to the Debtors' non-existent reorganization efforts. Therefore the *third* factor is not satisfied;

iv.  Given that Debtors have not yet solicited the Plan, the *fourth* factor is not relevant for this discussion at this time; and

v.   As the Plan does not provide for payment of substantially all of the claims affected by the Releases (specifically those of the general unsecured creditors), the *fifth* factor is not satisfied.

59.    In short, the Releases provided under the Plan are impermissible and should be removed from the Plan prior to wasting the Estates' resources in the solicitation process. Removal now will also save substantial Estate resources that will be incurred in litigating these

Releases at the Plan's confirmation hearing.

**C.   The Non-Consensual Third-Party Releases Should by Stricken from the Plan.**

60.     Additionally, courts should not grant a third-party release of a non-debtor if it is not a consensual release. *See In re Washington Mutual, Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) (citing *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004)) (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties.")). Rather, third-party releases must be based on consent of the releasing party, be it by contract or voting in favor of the plan. *Washington Mut.*, 442 B.R. at 352*; Zenith Elecs.,* 241 B.R. at 111. The Debtors' have failed to demonstrate that the Holders of Claims that abstain from voting on the Plan, or that vote to reject the Plan and do not opt out of the Third-Party Releases, or those deemed to have rejected the Plan but fail to opt out of the Third-Party Releases, consented to the Third-Party Release. Therefore, the Third-Party Releases should be stricken from the Plan.

61.     Even when the Court finds that the hallmarks to permit non-consensual third party releases are present, the Court may nevertheless strike non-consensual third party releases from a plan absent extraordinary circumstances. *See, e.g.*, *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del. 2001); *In re Aegean Marine Petroleum Network, Inc.* 599 B.R. 717, 726-27 (Bankr. S.D.N.Y. 2019) ("[T]hird-party releases are not a merit badge that somebody gets in return for making a positive contribution to restructuring.  They are not a participation trophy, and they are not a gold star for doing a good job.").

62.     Two factors in particular are given the most scrutiny by this Court and other courts in this Circuit: substantial contribution by the released party that will provide a direct benefit to the objecting party, and necessity of the releases to a successful reorganization. *See, e.g.*, *In re Millennium Lab Holdings II, LLC, et al.* 945 F.3d 126 (3d Cir. 2019) (granting releases because without them "liquidation, not reorganization" would have been the only option); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014). However, the Debtors have failed to demonstrate

any reasoning for granting their current and former officers and directors the benefits of the Third-Party Releases, let alone justify any sort of substantial contribution by such current and former officers and directors.

63.     Moreover, the Debtors' Plan and Disclosure Statement fail to expound on the necessity of granting the Third-Party Releases in these chapter 11 liquidation proceedings. This does not come as a surprise, given that there is seldom an explanation for granting third-party releases when a debtor is not reorganizing. *See In re Berwick Black Cattle Co.*, 394 B.R. 448, 461 (Bankr. C.D. Ill. 2008) ("The rationale for granting third-party releases is far less compelling, if it exists at all, in a liquidation than in a reorganization."). As such, the Debtors cannot extend the Third-Party Releases to non-consenting third parties, especially when the Debtors' officers and directors unjustifiably benefit from such releases in light of the existence of Causes of Action or Litigation Claims.

### D.  The Exculpation Provision in the Plan Exceeds the Scope of 11 U.S.C. § 1125(e).

64.     The "fiduciary standard" underlying exculpation clauses "applies only to estate fiduciaries" and, therefore, "must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers." *Washington Mut.*, 442 B.R. at 350-51 (citing *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000)); *see also In re Tribune Co.*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (excluding non-fiduciaries from the exculpation provision of the plan).

65.     Section 1125(e) of the Bankruptcy Code provides as follows:

> A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

*See* 11 U.S.C. § 1125(e).

66.    As drafted, the Plan's Exculpation provision could exceed the parameters of section 1125(e) of the Bankruptcy Code because it may potentially include parties other than the estate fiduciaries, including the litany of unidentified parties in subsection (e) of the definition of Exculpated Parties. Therefore, the Plan is patently unconformable unless the exculpation provision is revised to conform to the parameters of section 1125(e) of the Bankruptcy Code.

**E.    The Plan's Indemnification Obligations Imposes Undue Burden and Risk on the Liquidating Trust.**

67.    Currently, Art. VI.D of the Plan dictates that the Debtors' Estates, and ultimately, the Liquidating Trust, shall bear the risk of any of the Debtors' indemnification obligations, regardless of the available coverage under the D&O Liability Insurance Policies. There is no basis in law or fact for a liquidating debtors' estate to assume any such obligations and burdens. The primary purpose of the estates is to make distributions, not to incur obligations.

68.    The deletion of Art VI.D and the inclusion of the following provision in the Plan, along with corresponding disclosure in the Disclosure Statement, would resolve the Committee's concerns with respect to the unnecessary burden imposed on the Debtors' Estates and Liquidating Trust:

> All indemnification provisions existing as of the Petition Date (whether in the by-laws, certificate of incorporation, board resolutions, contracts, or otherwise) shall be extinguished and discharged pursuant to the Plan except to the extent necessary to preserve coverage under the D&O Liability Insurance Policies for the current and former directors, managers, and officers of the Debtors.

**F.    The Substantive Consolidation of General Unsecured Claims into One Estate for Purposes of Distributions is Inappropriate.**

69.    The Plan effectively provides for substantive consolidation for purposes of distributions to Holders of Claims.  The Plan does not take into account the separate pool of assets and liabilities of each Debtor.

70.    The doctrine of substantive consolidation refers to the power of a court to

consolidate the assets and liabilities of separate but related debtors into a single virtual entity. *See* 2 Collier on Bankruptcy ¶ 105.09[3] (16th Ed. 2009) ("substantive consolidation results in the combination of the assets of [multiple] debtors into a single pool from which the claims of creditors of both debtors are satisfied ratably").

71.    Substantive consolidation is appropriate only in rare circumstances, because the doctrine carries the potential to impose harsh inequities on creditors holding claims against a debtor with a comparatively higher ratio of assets to liabilities than its affiliated entities. *See In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005) ("consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery"). It is appropriate in the limited circumstance where its application is *the only equitable way* to administer the Debtors' estates.

72.    As the Court noted, "[t]he *Owens Corning* court announced a hard and fast rule that substantive consolidation was never allowed where creditors were aware of and relied on the debtors' corporate separateness." *In re HH Liquidation, LLC*, 590 B.R. 211, 257 (Bankr. D. Del. 2018) (citing *Owens Corning*, 419 F.3d at 212). It is a fundamental ground rule that courts must limit the "the cross-creep of liability by respective entity separateness because the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances." *Id*. (citing *Owens Corning*, 419 F.3d at 211). The *HH Liquidation* Court further explained that "substantive consolidation is available when, prepetition, the debtors disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity." *Id.* at 258 (citing *Owens Corning*, 419 F.3d at 211).

73.    The proponent of substantive consolidation has the burden of showing one of two rationales for consolidation. *Id.* at 258. Namely, the proponent must prove: (a) that the parties' prepetition dealings reveal "corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity"; and/or (b) [p]roponents who are creditors must also show that, in their prepetition course of dealing, they actually and

reasonably relied on debtors' supposed unity." *Owens Corning*, 419 F.3d at 212 (citations omitted). "Creditor opponents of consolidation can nonetheless defeat a *prima facie* showing under the first rationale if they can prove they are adversely affected and actually relied on debtors' separate existence." *Id*. Substantive consolidation is also available "when postpetition [the debtors'] assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *HH Liquidation*, 590 B.R. at 258 (citing <u>Owens Corning</u>, 419 F.3d at 211). Finally, the Third Circuit Court of Appeals and Delaware bankruptcy courts instruct "that substantive consolidation is 'extreme' and 'imprecise,' and that this 'rough justice remedy should be rare' and 'one of last resort after considering and rejecting other remedies.'" *Id*. (citing *Owens Corning*, 419 F.3d at 211).

74.    Applying this standard here, it is clear that the extreme and imprecise "rough justice remedy" of substantive consolidation is not warranted because: (i) it appears that the Debtors operated as separate and distinct entities and their creditors did not treat them as one legal entity; and (ii) there is no evidence that the Debtors' affairs are scrambled in such a way that separating them is prohibitive and harmful to creditors.  Indeed, neither the Plan nor the Disclosure Statement provides any explanation for the contemplated substantive consolidation of the Debtors' assets for the purpose of funding of the Liquidating Trust and the distributions to Holders of General Unsecured Claims.  Thus, at a minimum, the Disclosure Statement should include the Debtors' basis for the proposed funding and distribution scheme.

75.    Given the Debtors' Plan seeks the substantive consolidation of the Debtors' estates without any factual basis or legal justification, the Disclosure Statement cannot be approved because it describes a patently unconfirmable Plan.

**G. Other Objectionable Plan Provisions.**

76.    The following Plan provisions must be modified before any potential Plan confirmation process is allowed to proceed:

- Article IX.G of the Plan improperly provides that:  "[a]ny Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy

Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Liquidating Trustee, as applicable." This provision is unduly prejudicial, overreaching, and unfair to Holders of General Unsecured Claims. The Plan cannot grant the Debtors greater rights than section 502(d) of the Bankruptcy Code provides. Claims should not be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code unless and until a Final Order is entered by the Bankruptcy Court disallowing such claims. If an adversary proceeding is commenced seeking to avoid a transfer to a claimant, the adversary proceeding may include an objection to that claimant's claim under section 502(d) of the Bankruptcy Code.

- Article VII.H of the Plan should be clarified to provide that setoff and recoupment should be treated in the same fashion and that the filing of a timely proof of claim should be sufficient to assert both a setoff and/or recoupment right.

- Article XII of the Plan concerns the "Modification, Revocation, or Withdrawal of the Plan" and should provide for Committee consultation rights to those matters concerning the treatment provided on account of Holders of General Unsecured Claims.

- Article XIV.I of the Plan concerns the "Nonseverability of Plan Provisions." The Committee should be provided unconditional consultation rights in connection with this provision.

## II.     The Court Should Not Approve the Debtors' Proposed Solicitation Procedures and Form of Ballot Because the "Opt Out" Provision Improperly Imposes Deemed Consent to the Third-Party Releases.

77.     The Debtors' proposed procedures for the solicitation and tabulation of votes to accept or reject the Plan (the "Solicitation Procedures") and the form of Ballot should require that creditors and other parties-in-interest specifically "opt *in*" to the Third-Party Releases set forth in the Plan to ensure that the Third-Party Release is consensual, especially for those creditors and other parties-in-interest that reject the Plan or otherwise abstain from voting on the same, or are deemed to reject the Combined Plan and Disclosure Statement (such as interest Holders).

78.     As a general rule, third-party releases of non-debtors may be allowed only if they are consensual. *See Washington Mut.*, 442 B.R. at 352 (citing, *inter alia, Coram*, 315 B.R. at

335 (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party)); *Exide*, 303 B.R. at 74 (approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan;) *Zenith.*, 241 B.R. at 111 (release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan).

79.     In the *Washington Mut.* chapter 11 proceedings, the Court ruled that an "opt out" mechanism, similar to the one presently proposed by the Debtors, was not consensual and was not acceptable:

> However, the Court concludes that the opt out mechanism is not sufficient to support the third party releases anyway, ***particularly with respect to parties who do not return a ballot*** (or are not entitled to vote in the first place). Failing to return a ballot is not a sufficient manifestation of consent to a third party release. *Zenith*, 241 B.R. at 111 (finding that a release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the Plan). Therefore, the Court concludes that any third party release is effective only with respect to those who affirmatively consent to it by voting in favor of the Plan and not opting out of the third party releases.

*Washington Mut.*, 442 B.R. at 355 (emphasis added).

80.     Additionally, courts in this District have rejected third-party release provisions that applied to "each entity that held, holds, or may hold a Claim or Interest (as applicable law allows) . . . of any and all claims existing as of the Plan's Effective Date" without regard to how a creditor voted. *See Spansion*, 426 B.R. at 143 (holding that non-consensual releases did not satisfy the requirements of *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203 (3d Cir. 2000)).

81.     The Motion's Solicitation Procedures and the proposed form of Ballot envisioned by the Plan should not be approved because they provide that creditors who fail to vote on the Plan, those who reject Plan and fail to "opt out" of the Third-Party Releases, and those who are deemed to reject the Plan, are deemed to accept the Third-Party Releases or Plan Injunction and are Releasing Parties. *See* Motion, Exhibits B and C; *see also* Plan, Art. X.

82.     It is abundantly clear that "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third party release." *See Washington Mut.*, 442 B.R. at 355. Accordingly, the Debtors' Solicitation Procedures and proposed form of Ballot should be amended to require creditors and parties-in-interest to specifically "opt *in"* to the Third-Party Releases, not "opt *out*."

### III.     The Disclosure Statement Cannot be Approved Because it Does Not Contain Adequate Information For a Hypothetical Creditor to Cast an Informed Vote.

83.     A chapter 11 debtor may only solicit votes to accept or reject a chapter 11 plan of reorganization once the court has approved the debtor's written disclosure statement for that plan as containing "adequate information."  11 U.S.C. § 1125(b).  Section 1125(a) of the Bankruptcy Code defines "adequate information" as follows:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to . . . a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]

11 U.S.C. § 1125(a).

84.     The Third Circuit has emphasized the importance of adequate disclosure, stating that, given the reliance creditors and bankruptcy courts place on disclosure statements, "we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information." *In re Oneida Motor Freight, Inc.*, 848 F.2d 414, 417 (3d Cir. 1988).

85.     Although courts assess adequacy on a case-by-case basis, a disclosure statement must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or reject the Plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).  In essence, a disclosure statement "must clearly and succinctly inform the average

unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

86.     Courts have identified numerous categories of information that should be included in a disclosure statement to satisfy section 1125(a). *See, e.g., In re U.S. Brass Corp.*, 194 B.R. 420, 424 (Bankr. E.D. Tex. 1996); *In re Ferretti*, 128 B.R. 16, 18-19 (Bankr. D.N.H. 1991); *In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); *In re Metrocraft Publ'g Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984). Courts' various formulations for assessing adequacy can be distilled into several broad groups:

(i)      historical information about the debtor and its businesses,

(ii)     an explanation of the debtor's pre- and post-petition restructuring efforts and the causes of its bankruptcy filing,

(iii)    details of the nature and value of a debtor's assets,

(iv)     a description of the proposed plan of reorganization, including financial information regarding claims and expenses, means of implementation, and a liquidation analysis demonstrating what creditors would receive in a chapter 7 case, and

(v)      future business projections.

87.     The information presented in a disclosure statement should not be interpretive, speculative, or opinion, but instead must be "uncontested, concrete facts" from which voting claimants can make their own informed decisions how to vote. *See Zenith Elecs.*, 241 B.R. at 99-100; s*ee also In re Unichem Corp.*, 72 B.R. 95 (Bankr. N.D. Ill. 1987); *In re Ligon*, 50 B.R. 127 (Bankr. M.D. Tenn. 1985); *In re Egan*, 33 B.R. 672 (Bankr. N.D. Ill. 1983); *In re Civitella*, 15 B.R. 206 (Bankr. E.D. Pa. 1981).

88.     The Committee believes that additional disclosures addressing each of the following matters are required in order for the Debtors to satisfy their burden of providing unsecured creditors with adequate information regarding the Plan:

- The Disclosure Statement should provide a meaningful description of the distributions to general unsecured creditors;

- The Disclosure Statement should provide a meaningful description of the steps undertaken by the Committee to investigate prepetition transactions and other prepetition actions of insiders and related parties.  Specifically, the Disclosure Statement should provide that on various dates, the Committee sought 2004 examinations and document productions from the Debtors, Alden, Heath Freeman, Mark Renzi, Timothy A. Barton, Dana Goldsmith Needleman, Steven B. Rossi, Joseph Anto, Ronald Kay, Lilia Lauren, Jimmie "Trey" Hensley, and Debbie Horn; that the Committee and these various parties thereafter entered into agreed scheduling orders governing the timing of discovery; that these parties have produced approximately 30,000 pages of documents to date which are being reviewed and analyzed by the Committee; that the parties continue to produce documents relevant to the Committee's investigation; that the Committee has identified witnesses it wishes to interview and that the Committee is in the process of scheduling interviews and interviewing witnesses and evaluating the viability of any potential claims against the Debtors, insiders or other related third parties – ***but that this process is ongoing and is not complete***;

- The Disclosure Statement should provide additional information about the Claims being Released, that the Plan grants releases to insiders of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code, and the effect of such Releases on creditors;

- The Disclosure Statement fails to provide wind-down projections;

- The Disclosure Statement does not adequately describe the preservation of the Debtors' books and records, electronically stored information, and other items of evidence that are potentially relevant to the Committee's investigation and any Causes of Action;

- The Disclosure Statement does not include any discussion about why the Released Parties or Exculpated Parties are entitled to be released or exculpated or the consideration they are providing in return for same;

- The Disclosure Statement does not include an adequate discussion of the amount and/or value of tax attributes (including net operating losses) that the Debtors expect they will be able to carry forward post-confirmation; and

- There is no discussion in the Disclosure Statement of any potential claims that would trigger coverage under the Debtors' D&O Insurance Liability Policies, such as the Litigation Claims.

## <u>COMMITTEE SOLICITATION LETTER</u>

89.    In the event the Court approves the adequacy of the Disclosure Statement, the Committee respectfully requests that the Court (a) approve a letter from the Committee, substantially in the form annexed hereto as **Exhibit A**, advising Holders of General Unsecured Claims that the Committee opposes confirmation of the Plan and recommends creditors vote to

reject the Plan and opt-out of the Third-Party Releases, and (b) direct the Debtors to include the Committee solicitation letter in their Solicitation Package. Consistent with the decision in *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94 (3d Cir. 1988), the Committee submits that it is appropriate to include the letter as part of the Solicitation Package.

90.    The Committee requests that the Court approve the Committee solicitation letter and direct the Debtors to include it in the Solicitation Package directly behind the Debtors' solicitation letter and in a different (yet legible) color paper so the Committee's letter is conspicuous and not relegated to the last document in the Debtors' Solicitation Package.

## RESERVATION OF RIGHTS

91.    To the extent any objection, in whole or in part, contained herein is deemed to be an objection to confirmation of the Plan rather than, or in addition to, an objection to the adequacy of the Disclosure Statement, the Committee reserves its right to assert such objection, as well as any other objections, to confirmation of the Plan. Furthermore, to the extent the Committee, any Committee member, or unsecured creditors generally are impacted in any way by the contents of any supplements or amendments to the Disclosure Statement or the Plan that may be filed after any Disclosure Statement or Plan confirmation objection deadline, the Committee reserves its right to object thereto. The Committee reserves the right to raise further and other objections to the Disclosure Statement prior to or at the hearing thereon.

## CONCLUSION

92.    For the foregoing reasons, the Committee submits that the Plan proposed by the Debtors is patently unconfirmable, rendering the Disclosure Statement describing the Plan moot. Accordingly, the Disclosure Statement should not be approved. Further, the Disclosure Statement does not contain adequate information as required by section 1125(a) of the Bankruptcy Code and therefore does not permit creditors to make an informed judgment in voting on the Plan. Based on the foregoing, the Committee respectfully requests that an order be entered (i) denying the Motion, and (ii) granting the Committee such further relief as the Court deems just and proper.

Dated:  February 18, 2020

Respectfully submitted,

*/s/ Ericka F. Johnson*

**WOMBLE BOND DICKINSON (US) LLP**
Matthew P. Ward, Esq. (DE Bar No. 4471)
Ericka F. Johnson, Esq. (DE Bar No. 5024)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail: matthew.ward@wbd-us.com
E-mail: ericka.johnson@wbd-us.com

-and-

**LOWENSTEIN SANDLER LLP**
Jeffrey L. Cohen, Esq. (admitted *pro hac vice*)
Lindsay Sklar, Esq. (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York
Telephone:  (212) 262-6700
Email: jcohen@lowenstein.com
       lsklar@lowenstein.com

-and-

Michael Kaplan, Esq. (admitted *pro hac vice*)
Nicole Fulfree, Esq. (admitted *pro hac vice*)
Colleen Maker, Esq. (admitted *pro hac vice*)
One Lowenstein Drive
Roseland, New Jersey
Telephone:  (973) 597-2502
Email: mkaplan@lowenstein.com
       nfulfree@lowenstein.com
       cmaker@lowenstein.com

*Counsel for the Official Committee Unsecured Creditors*