# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FRED'S, INC., *et al.*,[1] | ) | Case No. 19-11984 (CSS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## DISCLOSURE STATEMENT
## PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE
## WITH RESPECT TO THE DEBTORS' JOINT PLAN

Adam L. Shiff (admitted *pro hac vice*)
Robert M. Novick (admitted *pro hac vice*)
Shai Schmidt (admitted *pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800

Derek C. Abbott (No. 3367)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
**MORRIS, NICHOLS, ARSHT &
  TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989

*Attorneys for the Debtors and Debtors in Possession*

Dated:  March 5, 2020

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Store, Inc. (4510); Summit Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 6625 Lenox Park, Suite 200, Memphis, TN 38115.

**This Disclosure Statement and its related documents are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes accepting the Debtors' Joint Chapter 11 Plan disclosed herein (as may be amended, the "Plan"). No representations have been authorized by the Bankruptcy Court concerning the Debtors, their business operations or the value of their assets, except as explicitly set forth in this Disclosure Statement.**

**This Disclosure Statement contains only a summary of the Plan. The Disclosure Statement is not intended to replace careful and detailed review and analysis of the Plan, but to aid and supplement such review. This Disclosure Statement is qualified in its entirety by reference to the more detailed provisions set forth in the Plan (which is included as Exhibit A to this Disclosure Statement). In the event of a conflict between the Plan and the Disclosure Statement, the provisions of the Plan will govern. All Holders of Claims and Interests are encouraged to review the full text of the Plan and to read carefully this entire Disclosure Statement, including all exhibits annexed hereto, before deciding whether to vote to accept the Plan.**

**The statements contained in this Disclosure Statement are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstances, create any implication that the information contained herein is correct at any time after the date hereof.**

**Holders of Claims and Interests should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice. Each such Holder should, therefore, consult with his or her own legal, business, financial and tax advisors as to any such matters concerning the solicitation, the Plan and the transactions contemplated thereby.**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ - 1 -

    A.    General ......................................................................................... - 1 -

    B.    Disclosure Statement Enclosures .............................................. - 1 -

II. SOME FREQUENTLY ASKED QUESTIONS ................................................... - 3 -

    A.    What is Chapter 11? .................................................................. - 3 -

    B.    What is a Plan? ........................................................................... - 3 -

    C.    What is a Disclosure Statement? ............................................... - 3 -

    D.    How Does One Vote? ................................................................. - 4 -

    E.    Confirmation Hearing ............................................................... - 6 -

    F.    Recommendation ...................................................................... - 6 -

III. OVERVIEW OF THE PLAN ................................................................................ - 6 -

IV. BACKGROUND OF THE DEBTORS AND CERTAIN EVENTS PRECEDING
THE FILING OF THEIR CHAPTER 11 CASES ...................................................... - 11 -

    A.    Fred's Historical Business ....................................................... - 11 -

    B.    Prepetition Turnaround Efforts .............................................. - 12 -

    C.    The Debtors' Officers and Directors ...................................... - 13 -

    D.    The Debtors' Capital Structure; Prepetition Revolving Credit Facility and
Refinancing Efforts ................................................................. - 13 -

        1.    Corporate Structure .......................................................... - 14 -

        2.    The Prepetition Revolving Credit Facility; Prepetition Refinancing
Efforts .............................................................................. - 14 -

        3.    Other Financing Debts ...................................................... - 15 -

        4.    Equity Securities ............................................................... - 16 -

    E.    DIP Financing and Marketing Process .................................. - 16 -

    F.    Prepetition Litigation .............................................................. - 17 -

V. EVENTS DURING THE CHAPTER 11 CASES .............................................. - 18 -

    A.    Commencement of the Chapter 11 Cases ............................... - 18 -

B. First-Day Relief .................................................................................. - 19 -

C. Post-Petition Financing ...................................................................... - 20 -

D. Appointment of Creditors' Committee and Creditors' Committee
Professionals ........................................................................................ - 21 -

E. Debtors' Retention of Professionals and Claims and Noticing Agent............. - 21 -

F. Key Employee Incentive Plan and Key Employee Retention Plans................ - 22 -

G. Going-out-of-Business Sales and Store Closings ............................. - 23 -

H. Rejection of Executory Contracts and Unexpired Leases and Assumption
of Unexpired Leases ........................................................................... - 23 -

I. Creditors' Committee Investigations ................................................. - 23 -

J. Settlement with Workers United, Southern Regional Joint Board ................. - 24 -

K. Pharmacy Asset Sales ......................................................................... - 24 -

L. Real Estate Asset Sales ...................................................................... - 25 -

M. Certain Preservation of Net Operating Losses ("NOLs")................................. - 25 -

N. Schedules of Assets and Liabilities and Statements of Financial Affairs,
and Claims Bar Date ........................................................................... - 25 -

O. Dispute Regarding Cardinal Claims ................................................. - 26 -

P. Exclusivity Extension ......................................................................... - 28 -

VI. SUMMARY OF THE PLAN ............................................................................... - 28 -

A. Description, Classification and Treatment of Claims and Interests................ - 28 -

1. Administrative Expense Claims............................................. - 28 -

a. Professional Fee Claims.......................................... - 29 -

2. Priority Tax Claims................................................................ - 29 -

3. DIP Claims.............................................................................. - 29 -

4. Class 1 – Other Secured Claims........................................... - 29 -

5. Class 2 – Other Priority Claims ........................................... - 30 -

6. Class 3 – General Unsecured Claims ................................... - 30 -

7. Class 4 – Intercompany Claims ............................................ - 31 -

8. Class 5 – Section 510(b) Claims .......................................... - 31 -

9. Class 6 – Equity Interests...................................................... - 31 -

B.    Implementation of the Plan ....................................................................... - 32 -

    1.    General Settlement of Claims ............................................................ - 32 -

    2.    Substantive Consolidation ................................................................ - 32 -

    3.    Sources of Consideration for Plan Distributions ............................... - 33 -

    4.    Liquidating Trust .............................................................................. - 33 -

    5.    Dissolution and Board of Directors .................................................... - 34 -

    6.    Corporate Action .............................................................................. - 34 -

    7.    Cancellation of Notes, Instruments, Certificates, and Other
       Documents ........................................................................................ - 34 -

    8.    Exemption from Certain Taxes and Fees ............................................ - 34 -

C.    Liquidating Trust ........................................................................................ - 35 -

    1.    Purpose of the Liquidating Trust ........................................................ - 35 -

    2.    The Liquidating Trust Assets ............................................................. - 36 -

    3.    The Liquidating Trustee ..................................................................... - 36 -

    4.    Role of the Liquidating Trustee ......................................................... - 37 -

    5.    The Liquidating Trust Advisory Committee ....................................... - 38 -

    6.    Beneficiaries of the Liquidating Trust ................................................ - 38 -

    7.    Federal Income Tax Treatment of the Liquidating Trust Assets ......... - 39 -

    8.    Vesting and Transfer of Assets to Liquidating Trust .......................... - 39 -

    9.    Retention of Professionals by the Liquidating Trustee ....................... - 40 -

    10.    Liquidating Trust Expenses ............................................................... - 40 -

    11.    Wind Down ...................................................................................... - 40 -

    12.    Indemnification of the Liquidating Trustee ........................................ - 41 -

    13.    Term of the Liquidating Trust ............................................................ - 41 -

D.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims .... - 42 -

    1.    Allowance of Claims ......................................................................... - 42 -

    2.    Estimation of Claims ......................................................................... - 42 -

    3.    Disputed Claims ............................................................................... - 42 -

    4.    Objections to Claims and Resolution of Disputed Claims ................... - 42 -

5.    Disallowance of Claims ................................................................ - 43 -

6.    Amendments to Claims .................................................................. - 43 -

7.    Cardinal Claims Disputed ............................................................. - 43 -

E.    Distributions Under the Plan ....................................................................... - 44 -

1.    Timing and Calculation of Amounts to be Distributed ..................... - 44 -

2.    Distributions by the Liquidating Trustee ........................................ - 44 -

3.    Record Date for Distribution ......................................................... - 44 -

4.    Delivery of Distributions ............................................................... - 44 -

5.    Undeliverable Distributions and Unclaimed Property ...................... - 45 -

6.    Distribution .................................................................................. - 45 -

7.    Manner of Payment ...................................................................... - 45 -

8.    Compliance with Tax Requirements ............................................... - 45 -

9.    Allocations .................................................................................. - 45 -

10.   No Postpetition Interest on Claims ................................................ - 46 -

11.   Minimum Distributions ................................................................. - 46 -

12.   Rights of Action .......................................................................... - 46 -

F.    Unexpired Leases and Executory Contracts ................................................ - 46 -

1.    Assumption and Rejection of Executory Contracts and Unexpired
      Leases ........................................................................................ - 46 -

2.    Cure of Defaults for Assumed, or Assumed and Assigned,
      Executory Contracts and Unexpired Leases ................................... - 47 -

3.    Claims Based on Rejection of Executory Contracts or Unexpired
      Leases ........................................................................................ - 48 -

4.    Indemnification Obligations .......................................................... - 48 -

5.    Director and Officer Liability Insurance .......................................... - 48 -

6.    Modifications, Amendments, Supplements, Restatements, or Other
      Agreements ................................................................................. - 49 -

7.    Reservation of Rights ................................................................... - 49 -

8.    Nonoccurrence of Effective Date ................................................... - 49 -

9.    Contracts and Leases Entered Into After the Petition Date ............... - 49 -

G.      Retention of Jurisdiction ................................................................... - 49 -

H.      Conditions Precedent to the Effective Date ..................................... - 51 -

      1.      Conditions Precedent to Confirmation.................................. - 51 -

      2.      Conditions Precedent to the Effective Date ......................... - 52 -

      3.      Waiver .................................................................................. - 52 -

      4.      Effect of Nonoccurrence of Conditions to the Effective Date ............. - 52 -

I.      Modification, Withdrawal, or Revocation of the Plan ...................... - 52 -

      1.      Revocation or Withdrawal of the Plan.................................. - 52 -

      2.      Modification of the Plan ...................................................... - 52 -

J.      Dissolution of the Creditors' Committee ......................................... - 53 -

K.      Releases............................................................................................ - 53 -

      1.      Release of Liens .................................................................. - 55 -

      2.      Release by the Debtors......................................................... - 55 -

      3.      Release by Holders of Claims and Interests ........................ - 56 -

      4.      Exculpation and Limitation of Liability .............................. - 57 -

      5.      Injunction Related to Releases and Exculpation.................. - 58 -

      6.      Term of Injunctions and Stays ............................................ - 58 -

      7.      Preservation of Insurance or Other Indemnification........... - 58 -

      8.      Recoupment ......................................................................... - 59 -

      9.      Subordination Rights ........................................................... - 59 -

VII. VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE
PLAN ......................................................................................................... - 59 -

A.      Parties in Interest Entitled to Vote .................................................. - 60 -

B.      Classes Impaired Under the Plan ..................................................... - 60 -

C.      Voting Procedures and Requirements............................................... - 60 -

      1.      Ballots ................................................................................. - 60 -

      2.      Returning Ballots ................................................................ - 61 -

D.      Confirmation Hearing ....................................................................... - 62 -

E.      Confirmation ..................................................................................... - 62 -

F.    Acceptance of the Plan.................................................................... - 62 -

G.    Best Interests Test .......................................................................... - 63 -

H.    Feasibility........................................................................................ - 64 -

I.    The Liquidating Trust ..................................................................... - 65 -

J.    Compliance with the Applicable Provisions of the Bankruptcy Code ............ - 65 -

VIII. RISK FACTORS.................................................................................. - 66 -

A.    Certain Bankruptcy Considerations ................................................ - 66 -

1.    Parties in Interest May Object to the Debtors' Classification of Claims ..................................................................................... - 66 -

2.    The Debtors May Not be Able to Secure Confirmation of the Plan .... - 66 -

3.    The Confirmation and Consummation of the Plan Are Also Subject to Certain Conditions as Described in the Plan ................................... - 66 -

4.    The Debtors May Object to the Amount or Classification of a Claim or Interest ................................................................... - 67 -

B.    Risks Relating to the Administration of the Liquidating Trust....................... - 67 -

1.    Post-Confirmation Operations ............................................ - 67 -

C.    Risks Relating to the Tax Consequences of the Plan....................... - 67 -

IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................. - 68 -

A.    Federal Income Tax Consequences to U.S. Holders of Claims and Interests.. - 69 -

B.    Federal Income Tax Consequences to the Debtors......................... - 70 -

C.    Federal Income Tax Consequences to Beneficiaries of the Liquidating Trust. ................................................................................................ - 71 -

D.    Importance of Obtaining Professional Tax Assistance .................... - 73 -

X. RECOMMENDATION ................................................................................ - 74 -

XI. CONCLUSION.......................................................................................... - 75 -

# I.
# INTRODUCTION

## A.    General

On September 9, 2019 (the "Petition Date"), Fred's, Inc., Fred's Stores of Tennessee, Inc., National Equipment Management and Leasing, Inc., National Pharmaceutical Network, Inc., Reeves-Sain Drug Store, Inc., Summit Properties-Jacksboro, LLC, Summit Properties-Bridgeport, LLC, and 505 N. Main Opp, LLC filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

Debtors Fred's, Inc., Fred's Stores of Tennessee, Inc., National Pharmaceutical Network, Inc., Reeves-Sain Drug Store, Inc., and 505 N. Main Opp, LLC (the "Debtors"), jointly submit this *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to the Debtors' Joint Plan* dated March 5, 2020 (the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of acceptances or rejections of the *Joint Chapter 11 Plan for Fred's, Inc. and the Debtor Affiliates Set Forth Herein*, dated March 5, 2020 [D.I. 894] (the "Plan") from certain Holders of Claims against the Debtors.[2]  A copy of the Plan is annexed hereto as Exhibit A.  All capitalized terms used in this Disclosure Statement that are not otherwise defined herein have the meanings ascribed to them in the Plan.

The Debtors urge all voting creditors, all equity holders, and all other parties in interest to read this Disclosure Statement and the Plan carefully.  This Disclosure Statement does not include a description of each and every term of the Plan.  Accordingly, the description of the Plan set forth herein is qualified by the entirety of the Plan, which is incorporated by reference into this Disclosure Statement.

## B.    Disclosure Statement Enclosures

Accompanying this Disclosure Statement are copies of:

1.    The Plan.

2.    The Disclosure Statement.

3.    A notice (the "Confirmation Hearing Notice"), including, among other things:  (a) notice of the filing of the Disclosure Statement and Plan, and of approval of the Disclosure Statement; (b) the deadline for the submission of Ballots to vote to accept or reject the Plan (the "Voting Deadline"); (c) the deadline for filing a motion pursuant to Bankruptcy Rule 3018(a); (d) the deadline for objecting to confirmation of the Plan and information on how to object to Confirmation of the Plan; (e) the time, date, and place of the Confirmation Hearing; (f) information on releases and how to opt out of releases; and (g) instructions on how to obtain copies of the Disclosure Statement and the Plan.

4.    The *Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Solicitation Materials and Procedures for Distribution Thereof, (IV) Approving*

---

[2] This Disclosure Statement supersedes the proposed disclosure statements filed January 21, 2020 [D.I. 756] and February 14, 2020 [D.I. 843], and February 23, 2020 [D.I. 867].  The Plan attached as Exhibit A to the Disclosure Statement supersedes the proposed plans filed January 21, 2020 [D.I. 755] and February 14, 2020 [D.I. 841], and February 23, 2020 [D.I. 865].

*Forms of Ballots and Establishing Procedures for Voting on Plan, (V) Scheduling Hearing and Establishing Notice and Objection Procedures in Respect of Confirmation of Plan, and (VI) Granting Related Relief* [D.I. 892] (the "<u>Disclosure Statement Order</u>").

5.  A Ballot, with a preaddressed, postage-prepaid return envelope for creditors who may be entitled to vote to accept or reject the Plan.

## II.
## SOME FREQUENTLY ASKED QUESTIONS

**A.**    <u>What is Chapter 11?</u>

Chapter 11 is a chapter of the Bankruptcy Code permitting debtors a period in which to organize their affairs and to review their assets and obligations in order to reorganize and liquidate their businesses. The Debtors commenced their Chapter 11 Cases on the Petition Date (September 9, 2019) by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

The commencement of the Chapter 11 Cases triggered the application of the "automatic stay" under section 362 of the Bankruptcy Code. The automatic stay halts, with certain exceptions, nearly all attempts to collect prepetition claims from debtors to otherwise interfere with debtors' property.

**B.**    <u>What is a Plan?</u>

A primary purpose of a chapter 11 case is to permit the formulation of a plan of reorganization or liquidation. An orderly liquidation provides for the distribution of a debtor's assets to creditors, and sometimes, to its equity holders. The Plan proposed by the Debtors provides that their orderly liquidation will be accomplished principally through elimination of all existing equity interests, and the distribution of cash to the Debtors' creditors as set forth below and in the Plan.

The Plan proposed by the Debtors further provides, among other things, that after Confirmation and Consummation of the Plan, a Liquidating Trustee will administer the Debtors' liquidation and oversee distributions to creditors, with oversight from a Liquidating Trust Advisory Committee.

**C.**    <u>What is a Disclosure Statement?</u>

After a plan has been proposed, the holders of claims against, or equity interests in, the debtors that are impaired by the terms of the plan and are to receive distributions under the plan are entitled to vote on whether to accept or reject the plan. Section 1125 of the Bankruptcy Code requires disclosure of "adequate information" to all such voting creditors and equity holders by way of a court-approved "disclosure statement" before the Debtors (or anyone else) may solicit any votes on a plan. The Bankruptcy Code provides that a disclosure statement must contain "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." Following a hearing held on February 25, 2020, this Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code.

The Debtors present this Disclosure Statement to the voting Holders of Allowed Claims against the Debtors in order to satisfy the disclosure requirements of the Bankruptcy Code by providing each voting Holder of an Allowed Claim with sufficient information to make an informed decision as to whether to accept or reject the Plan.

D.    <u>How Does One Vote?</u>

> **THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS IS ONLY A SUMMARY.  PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ENCLOSED HEREWITH FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

To vote on the Plan, a holder of an Allowed Claim in a Class that is entitled to vote on the Plan must complete the Ballot (enclosed with this Disclosure Statement) and comply with the voting instructions outlined in Section VII of this Disclosure Statement.

Pursuant to the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" under the Plan may vote to accept or reject the Plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan.  Holders of claims or interests that are not impaired are presumed to accept the plan.  Holders of claims or interests in an impaired class that are not going to receive or retain any property under a plan on account of such claims or interests are deemed to have rejected the plan.  The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan.

Under the Plan, Claims in Classes 3, 4 and 5, and Interests in Class 6 are impaired.

Under the Plan, Holders of Claims in Class 4 and Class 5 and Holders of Interests in Class 6 will receive no distribution and, accordingly, such holders are deemed to reject the Plan.  Therefore, their votes are not being solicited.

Under the Plan, Claims in Classes 1 and 2 are Unimpaired, and, therefore, the Holders of Claims in Class 1 and Class 2 are presumed to have accepted the Plan.  Accordingly, a ballot to accept or reject the Plan is being provided only to Holders of Claims in Class 3.

For a summary of the treatment of each Class of Claims and Interests, see the section captioned "Overview of the Plan," below.

This Disclosure Statement, along with a Ballot or Ballots used for voting on the Plan, is being distributed to the Holders of Claims that may be entitled to vote to accept or reject the Plan.

The Bankruptcy Court has fixed February 25, 2020 as the "Voting Record Date."  Only Persons who hold Class 3 Claims on the Voting Record Date, are entitled to vote whether to accept the Plan.

Pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may temporarily allow a Claim for voting or other purposes.  Pursuant to the Disclosure Statement Order, voting tabulation procedures have been established, which include certain vote tabulation rules, that provide for temporary allowance or disallowance of certain Claims for voting purposes only.  These voting procedures, including the tabulation rules, are described in the solicitation materials provided with your Ballot.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from Holders of Claims within Class 3 who are entitled to a vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement. To be counted, please complete and sign your Ballot, and submit it so as to be received by 4:00 p.m. (Prevailing Eastern Time), on April 9, 2020 using <u>one</u> of the following methods:

**If by First Class Mail:**

        **Fred's, Inc. – Ballot Processing**
        **c/o Epiq Corporate Restructuring, LLC**
        **P.O. Box 4422**
        **Beaverton, OR 97076-4422**

**If by Overnight Courier or Hand Delivery:**

        **Fred's Inc. – Ballot Processing**
        **c/o Epiq Corporate Restructuring, LLC**
        **10300 SW Allen Boulevard**
        **Beaverton, OR 97005**

**If by Electronic, Online Submission:**

        **Please visit http://dm.epiq11.com/freds. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot. If you choose to submit your Ballot via Epiq's E-Ballot system (the "E-Ballot Portal"), you should <u>not</u> also return a paper copy of your Ballot.**

  **IMPORTANT NOTE: You will need the following information to retrieve and submit your customized E-Ballot:**

        **Unique E-Ballot ID#: _____**

        <u>**"E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile or email will not be counted.**</u>

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY TELECOPY, FACSIMILE, OR EMAIL BE ACCEPTED**. Following the Voting Deadline, the Notice and Claims Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan.

If you have any questions regarding the Ballot, did not receive a return envelope with your Ballot, did not receive an electronic copy of the Disclosure Statement and the Plan, or need physical copies of the Ballot or other enclosed materials, please contact the Debtors' solicitation and claims agent, Epiq Corporate Restructuring, LLC, in writing at Fred's, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005, or by email at tabulation@epiqglobal.com with a reference to "Fred's" in the subject line, or by calling 1-866-897-6433 (domestic, toll-free) or 1-646-282-2500 (international) and request to speak with a member of the solicitation team.

E.    **Confirmation Hearing**

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for April 28, 2020 at 10:00 a.m. (Prevailing Eastern Time), in the United States Bankruptcy Court, 824 N. Market St., Wilmington, DE 19801 (the "Confirmation Hearing").  The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be served and filed on or before April 9, 2020 at 4:00 p.m. (ET), in the manner described in the Confirmation Hearing Notice accompanying this Disclosure Statement.  The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned.

F.    **Recommendation**

**The Debtors Believe that the Plan Provides the Greatest Possible Recovery to Creditors.**

**The Debtors Urge All Creditors Entitled to Vote, to Vote in Favor of the Plan.**

**Notwithstanding the Debtors' recommendation, the Creditors' Committee states that it:  (i) does not support the Plan; (ii) does not believe the proposed Plan is fair or confirmable; and (iii) recommends that creditors vote against the Plan.**

**III.
OVERVIEW OF THE PLAN**

The following is a brief summary of the treatment of Claims and Interests under the Plan.  The description of the Plan set forth below constitutes a summary only.  Creditors and other parties in interest are urged to review the more detailed description of the Plan contained in this Disclosure Statement and the Plan itself, which is annexed as Exhibit A to this Disclosure Statement.

Set forth below is a table summarizing the classification and treatment of Claims and Interests under the Plan and the estimated distributions to be received by the Holders of such Claims and Interests thereunder.  The actual distributions may differ from the estimates set forth in the table depending on, among other things, variations in the amounts of Allowed Claims and the existence of Disputed Claims.

The Debtors seek, through confirmation of the Plan, to substantively consolidate their Estates.  That means, among other things, that all assets and liabilities of the Debtors (but not the Excluded Debtors) will be merged.  Substantive consolidation will avoid the need to use funds that would otherwise be available to distribute to creditors to pay the professional fees that would be required to resolve ownership of Estate assets as to which there is no clear Debtor-owner, to allocate expenses among multiple Debtors that may have benefited from the expenditures to different degrees, and to administer multiple pools of creditor Claims (not all of which were necessarily filed by creditors against the correct obligor Debtor).  At the same time, the Debtors' main Estates have roughly similar amounts of unsecured Claims and levels of insolvency.

The Debtors accordingly are seeking substantive consolidation because they project that the resulting administrative savings are likely to provide a net benefit to all general unsecured creditors, as indicated in footnote 6 below.  Substantive consolidation is discussed further in sections VI.B.1, VI.B.2, VI.I.1, VI.I.2, and VII.I of this Disclosure Statement.

In the event one or more parties objects to substantive consolidation at the Confirmation Hearing, and the Bankruptcy Court upholds such objection(s) and determines not to authorize substantive

consolidation, the Plan still may be confirmed with each of the Debtors' Estates remaining separate and non-consolidated (although creditor recoveries may be reduced).  Accordingly, the Debtors urge that all creditors entitled to vote, vote to accept the Plan.  The Debtors also believe that it would be in the best interest of creditors to support substantive consolidation.

### SUMMARY OF ESTIMATED DISTRIBUTIONS UNDER THE PLAN

| Description/Class | Estimated Allowed Amounts | Treatment under the Plan | Estimated Recovery | Impaired |
|---|---|---|---|---|
| Unclassified Administrative Expense Claims | $4.6 million – $5.6 million<br><br>(Estimated unpaid balance as of the Effective Date, excluding postpetition ordinary business payables) | Each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Administrative Expense Claim Cash equal to the full amount thereof, without interest either: (a) on the Effective Date; (b) if the Administrative Expense Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which an order allowing such Administrative Expense Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed Administrative Expense Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed Administrative Expense Claim, without any further action by the Holders of such Allowed Administrative Expense Claim, and without any further notice to, or action, order, or approval of, the Bankruptcy Court. | 100% | No |
| Unclassified Priority Tax Claims (any Claims entitled to payment pursuant to 11 U.S.C. §§ 502(i) or 507(a)(8) | $1.0 million – $1.9 million | Each Holder of an Allowed Priority Tax Claim shall receive, on account thereof, in respect of such Allowed Priority Tax Claim, unless the Holder of such Allowed Priority Tax Claim agrees to less favorable treatment, treatment in accordance with the terms set forth in section | 100% | No |

| Description/Class | Estimated Allowed Amounts | Treatment under the Plan | Estimated Recovery | Impaired |
|---|---|---|---|---|
| | | 1129(a)(9)(C) of the Bankruptcy Code, and for the avoidance of doubt, will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code. | | |
| Unclassified DIP Claims (any Claim in favor of the DIP Lenders against any of the Debtors arising under the DIP Agreement, the Payoff Letter Agreement, and/or the Financing Orders from the Petition Date) | $0 | DIP Claims, if any, shall be Allowed Administrative Expense Claims and shall be paid in full in Cash as soon as practicable upon occurrence of the Effective Date, except to the extent such claim is not due and payable until a later date, in which case, as soon as practicable upon the occurrence of such date. | 100% | No |
| Class 1 – Other Secured Claims (any Secured Claim (including a Secured Tax Claim and a Cardinal Secured Claim) other than DIP Claims) | $1.0 million – $23.5 million[3] | On, or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive on account of its Class 1 Claim and at the Debtors' or Liquidating Trust's exclusive election, except to the extent that any Holder of an Allowed Other Secured Claim agrees to less favorable treatment thereof, either:  (i) Cash equal to the amount of such Allowed Other Secured Claim, (ii) the Property which serves as security for such Allowed Other Secured Claim, or (iii) such other treatment that shall render such Allowed Other Secured Claims Unimpaired pursuant to section 1124 of the Bankruptcy Code (which may | 100% | No<br><br>(presumed to accept) |

---

[3] These amounts may be materially impacted by the ultimate resolution of the character and amount of the Cardinal Claims (as defined in Section IV.D.3) and will depend on the amount of the Cardinal Secured Claim ultimately allowed by the Bankruptcy Court, and this outcome could have a material impact on Class 3 recoveries.  See Section V.O, *infra*, for additional information.

| Description/Class | Estimated Allowed Amounts | Treatment under the Plan | Estimated Recovery | Impaired |
|---|---|---|---|---|
| | | include Reinstatement). | | |
| Class 2 – Other Priority Claims (any Claims other than Administrative Expense Claims or Priority Tax Claims, to the extent not already paid during the Course of the Chapter 11 Cases, and entitled to priority pursuant to 11 U.S.C. § 507(a) including section 503(b)(9) Claims) | $9.6 million – $13.7 million[4] | Each Holder of an Allowed Other Priority Claim shall receive on account thereof Cash equal to such Allowed Other Priority Claim on or as soon as practicable after the Effective Date, except to the extent the Holder of such Allowed Priority Other Priority Claim agrees to less favorable treatment. | 100% | No<br><br>(presumed to accept) |
| Class 3 – General Unsecured Claims (all General Unsecured Claims including any | $103.7 million – $108.5 million[5] | Each Holder of an Allowed General Unsecured Claim shall receive on account thereof its Pro Rata share of an amount equal to the Distribution Proceeds on or as | 4.0% – 8.8%[6] | Yes<br><br>(entitled to vote) |

[4] These amounts may be materially impacted by the ultimate resolution of the character and amount of the Cardinal Claims (as defined in Section IV.D.3), and will depend on the amount of the Cardinal Secured Claim ultimately allowed by the Bankruptcy Court, and this outcome could have a material impact on Class 3 recoveries.  See Section V.O, *infra*, for additional information.

[5] The State of Mississippi has filed Claims against Debtors Fred's, Inc., and Fred's Stores of Tennessee, Inc., each for approximately $25.4 billion.  The Claims are disputed, and relate to a litigation the Debtors have been defending since 2016.  *See* Section IV.F, *infra*.  The Debtors believe the Claims to be meritless and have estimated the Claims' amount as $0.  In the event the Claims are allowed at a higher amount, recoveries to Claims in Class 3 will be reduced accordingly.

[6] This estimate assumes substantive consolidation is granted.  If substantive consolidation is not granted, the Debtors project that the recovery range for Holders of General Unsecured Claims would be as follows per respective Debtor: (i) Fred's, Inc.: 2.2%-6.1%; (ii) Fred's Stores of Tennessee, Inc.: 3.1%-8.3%; (iii) National Pharmaceutical Network, Inc.: 0%; (iv) National Equipment Management and Leasing, Inc.: 0%; (v) Reeves-Sain Drug Store, Inc.: 0%; and (vi) 505 N. Main Opp, LLC: 0.3%-1.0%.  These projections assume, among other things, that (i) cash on hand and administrative expenses are divided Pro Rata in accordance with each Debtors' respective realized real estate sale proceeds; (ii) the miscellaneous remaining assets which in part could be subject to competing estate claims, are divided evenly between Fred's, Inc. and Fred's Stores of Tennessee, Inc.; and (iii) consolidation would avoid $500,000 of professional fees that otherwise would be spent to resolve inter-Estate disputes (*e.g.*, unclear ownership of major wind-down assets, allocations of professional fees and other expenses of administration (including post-Effective Date), other post-petition expenses, and potential inter-company claims), and to reconcile and administer multiple Claim pools.

| Description/Class | Estimated Allowed Amounts | Treatment under the Plan | Estimated Recovery | Impaired |
|---|---|---|---|---|
| deficiency claim held by a Holder of a Secured Claim) | | soon as practicable after the Effective Date, less any amounts that the Liquidating Trustee in its reasonable discretion determines to be necessary to be held to wind up the Debtors' affairs and administer the Liquidating Trust. | | |
| Class 4 – Intercompany Claims (any Claim held by a Debtor or Excluded Debtor against any other Debtor or Excluded Debtor) | $0 | All Intercompany Claims shall be eliminated and no Plan Distributions shall be made on account of such Claims. | 0% | Yes (deemed to reject) |
| Class 5 – Section 510(b) Claims (any Claim subject to subordination under section 510(b) of the Bankruptcy Code) | $0 | Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. | 0% | Yes (deemed to reject) |
| Class 6 – Equity Interests (any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor or Excluded Debtor) | $0 | All Interests in Fred's shall be canceled and extinguished, and shall be of no further force or effect (in addition, Intercompany Interests are eliminated by Substantive Consolidation). No Holder of Interests shall receive or retain any property under the Plan on account of such Interests. | $0 | Yes (deemed to reject) |

The treatment and distribution provided to Holders of Allowed Claims and Interests pursuant to the Plan are in full and complete satisfaction of the Allowed Claims and Interests, as the case may be.

## IV.
## BACKGROUND OF THE DEBTORS AND CERTAIN EVENTS
## PRECEDING THE FILING OF THEIR CHAPTER 11 CASES

**A.    Fred's Historical Business**

Fred's, Inc. ("Fred's") was founded in 1947.  Fred's stores generally served low-, middle- and fixed-income families located in small- to medium-sized towns (populations of 15,000 or less).  Its customers tended to be value-oriented and budget-conscious, and often lived in rural areas without easy access to large discount retailers.  Fred's stores stocked over 14,000 items that addressed the everyday needs of its customers, including nationally-recognized brand name products, proprietary "Fred's" label products and lower priced off-brand products.  Certain Fred's locations also contained a pharmacy department and offered healthcare services.

As of May 4, 2019, Fred's and its subsidiaries operated 556 general merchandise and pharmacy stores, including 11 franchised locations, in multiple states in the Southeastern United States.  Fred's company-owned, full-service stores had an average selling space of 14,684 square feet.  Fred's operations typically were managed at the individual store level, with primary operations at each of these locations consisting of general merchandise, or "front store" operations, and pharmacy operations.  Fred's front store merchandise strategy emphasized convenience and value.  Fred's maintained low opening price points and competitive prices on key products and regularly offered seasonal specials and promotions supported by direct mail, newspaper, social media and email advertising.  The selection of merchandise was supplemented by seasonal specials, private label products and closeout merchandise.  In 169 of its locations, front store operations were supplemented by a full-service pharmacy, sometimes the only pharmacy in the town.

The following table sets forth certain information with respect to stores and pharmacies during the Debtors' three fiscal years preceding the Petition Date:

| | 2018 | 2017 | 2016 |
|---|---|---|---|
| Full-service stores open at the beginning of the year | 536 | 573 | 581 |
| Full-service stores opened/acquired | 4 | 4 | 2 |
| Full-service stores closed | (6) | (41) | (10) |
| Full-service stores open at the end of the year | 534 | 536 | 573 |
| Xpress stores open at the beginning of the year | 48 | 55 | 60 |
| Xpress stores opened/acquired | — | — | 1 |
| Xpress stores closed | (23) | (5) | (5) |
| Xpress stores converted to full-service stores | (2) | (2) | (1) |
| Xpress stores open at the end of the year | 23 | 48 | 55 |
| **Total Company-owned stores** | **557** | **584** | **628** |
| Franchise stores at end of period | 11 | 12 | 16 |
| **Total Fred's retail stores** | **568** | **596** | **644** |
| Number of stores with pharmacies at the end of the year | 169 | 348 | 362 |
| Total selling square feet of full-service stores (in thousands) | 7,841 | 7,876 | 8,451 |
| Average selling square feet per full-service store | 14,684 | 14,694 | 14,749 |

As of February 2, 2019, Fred's had 2,642 full-time and 3,930 part-time employees, the majority of whom were store employees.  The number of employees varied seasonally.

**B.**     **Prepetition Turnaround Efforts**

For more than a year prior to the Petition Date, the Debtors had been executing turnaround strategies. During the 2018 fiscal year, the Debtors' management focused on creating value by monetizing non-core assets, reducing selling, general and administrative expenses, improving assortment and optimizing inventory levels, closing underperforming stores, and reducing debt levels. These efforts included, among other things: (a) "front store" optimizations such as reductions in workforce and other operating expenses to lower selling expenses and general and administrative expenses; (b) seeking growth in new categories such as closeouts, beer and wine, lottery and the expansion of private-brand offerings throughout many departments; (c) continued reductions in unproductive inventory and optimization of merchandise selection throughout the front store; and (d) planned investments in more efficient technology and systems.

As part of the Debtors' efforts to monetize non-core assets and reduce debt levels, the Debtors consummated a number of successful pharmacy sale transactions in 2018 and 2019. The Debtors' efforts included completing a sale within the month preceding the Petition Date of certain prescription files, pharmaceutical inventory and other related assets from 38 retail pharmacy stores to a subsidiary of CVS for a cash purchase price of $11.7 million, plus $3.5 million for inventory. Additionally, the Debtors completed a sale of certain prescription files, pharmaceutical inventory and other related assets from 179 of the Debtors' retail pharmacy stores to Walgreen Co. for a cash purchase price of approximately $176.7 million during the fourth quarter of fiscal 2018. In the second quarter of fiscal 2018, the Debtors completed the sale of the Debtors' specialty pharmacy business to an affiliate of CVS for $40.0 million, plus up to an additional $5.5 million for pharmaceutical inventory.

On April 11, 2019, the Debtors announced that they had retained PJ Solomon, L.P. ("PJS") to assist the Board in undertaking a comprehensive review of the full range of strategic alternatives available to the Debtors to maximize value. PJS' efforts included, among other things, the consideration of opportunities to: (a) engage in a sale, merger, consolidation or business combination; (b) conduct further store closures and asset divestitures; and (c) engage in financing transactions or restructurings.

In connection with their review of strategic alternatives, the Debtors undertook a comprehensive evaluation of their store portfolio, which examined historical and recent store performance and the timing of lease expirations, among other factors. The Debtors ultimately decided to close certain underperforming stores, including the following:

- On April 11, 2019, the Debtors announced that the Board had approved a plan to close 159 underperforming stores. The Debtors completed the closure of these stores by June 1, 2019.

- On May 16, 2019, the Debtors announced that the Board had approved a plan to close an additional 104 underperforming stores. The Debtors completed the closure of these stores by June 30, 2019.

- On July 5, 2019, the Debtors announced that the Board had approved a plan to close an additional 49 underperforming stores. The Debtors completed the closure of these stores by August 17, 2019.

- On July 12, 2019, the Debtors announced that the Board had approved a plan to close an additional 129 underperforming stores. The Debtors completed the closure of these stores by August 27, 2019.

Moreover, the Debtors continued to undertake further operational measures with the goal of enhancing the Debtors' cash position and improving profitability, including attempting to renegotiate leases with landlords to more favorable terms, further reducing corporate overhead, and reducing certain capital expenditures associated with information technology and real estate projects.

For additional information regarding the Debtors' prepetition turnaround efforts, please see the Debtors' SEC Form 10-K, as amended by the Debtors' Form 10-K/A, for the fiscal year ended February 2, 2019, the Debtors' SEC Form 10-Q for the quarterly period ended May 4, 2019, and the Debtors' other filings with the SEC, all of which may be accessed at www.sec.gov.

## C.     The Debtors' Officers and Directors

As of the Petition Date, the Debtors' Directors were Timothy A. Barton, Heath B. Freeman, Dana Goldsmith Needleman, Steven B. Rossi, and Thomas E. Zacharias, and the Debtors' Executive Officers were Joseph Anto, Chief Executive Officer, Mark Renzi, Chief Restructuring Officer, and Michael Ladd, Chief Stores Officer.  Mr. Anto served as Chief Executive Officer through November 30, 2019, and Mr. Ladd served as Chief Stores Officer through November 15, 2019.  The other Directors and Officers have continued to serve with the Debtors throughout the Chapter 11 Cases.  Prior to the Petition Date, the Debtors formed a restructuring committee comprised of Ms. Needleman, Mr. Zacharias, Mr. Rossi, and Mr. Barton (the "Restructuring Committee").  The Restructuring Committee's mission was, among other things, to evaluate – in consultation with the Debtors' financial advisors, Berkeley Research Group, LLC ("BRG") and PJS – strategic alternatives, and to determine the best path forward for the Debtors.

## D.     The Debtors' Capital Structure; Prepetition Revolving Credit Facility
       and Refinancing Efforts

The following description is intended to provide a synopsis of the Debtors' capital structure as of the Petition Date and the Debtors' Prepetition Revolving Credit Facility (defined below), including the Debtors' prepetition efforts to refinance such facility on an out-of-court basis.  For a more complete description, please see the information contained in the Debtors' SEC Form 10-K, as amended by the Debtors' Form 10-K/A, for the fiscal year ended February 2, 2019, the Debtors' SEC Form 10-Q for the quarterly period ended May 4, 2019, and the Debtors' other filings with the SEC, all of which may be accessed at www.sec.gov.

1.        **Corporate Structure**



2.        **The Prepetition Revolving Credit Facility; Prepetition Refinancing Efforts**

On April 9, 2015, the Debtors entered into a Revolving Loan and Credit Agreement (as subsequently amended and supplemented, the "Prepetition Revolving Credit Facility") with Regions Bank and Bank of America, N.A.  Under the Prepetition Revolving Credit Facility, draws were limited to the lesser of the commitment amount or the borrowing base, which was periodically determined by reference to the value of certain receivables, and inventory and scripts, less applicable reserves.

Under the Prepetition Revolving Credit Facility, the Debtors had a financial covenant to maintain at all times excess availability of at least 10% of the commitments, and if excess availability fell below such threshold, it would constitute an event of default under the Prepetition Revolving Credit Facility.

On April 15, 2019, Bank of America, N.A. imposed an additional reserve of $20.0 million in connection with the Debtors' announced planned closures of 159 stores (see above) and related matters, which reduced excess availability, and the administrative agent declared an "Account Control Event" and exercised control over the Debtors' collection accounts.  This reserve was in addition to a $5.0 million reserve previously imposed by Regions Bank.  Between these reserves and amounts required to maintain the excess availability financial covenant referenced above ($21.0 million of excess availability, at the time), the Debtors were effectively unable to access $46.0 million of borrowing capacity that would otherwise have been available based on the borrowing base at the time.

Thereafter, on May 15, 2019, the Debtors entered into a forbearance agreement (the "May 15 Forbearance Agreement") with the lenders under the Prepetition Revolving Credit Facility (the "Prepetition Credit Parties") pursuant to which such Prepetition Credit Parties agreed to not take action to accelerate any outstanding indebtedness or exercise other remedies with respect to certain stipulated events of default under the Prepetition Revolving Credit Facility, subject to the Debtors' satisfaction of certain conditions set forth in the May 15 Forbearance Agreement. Several of these conditions related to a refinancing of all loans under the Prepetition Revolving Credit Facility by July 22, 2019, along with certain other interim deadlines. The Debtors, in conjunction with PJS and their other advisors, conducted an extensive refinancing process throughout the summer of 2019, pursuant to which more than a dozen potential lenders signed NDAs and reviewed the Debtors' refinancing materials, and eight potential lenders submitted term sheets in connection with a potential refinancing. The Debtors solicited proposals for a refinancing from both large money-center banks and sophisticated alternative investment institutions familiar with the Debtors' capital structure. Despite this initial interest and the best efforts of the Debtors and their advisors, the Debtors were ultimately unable to consummate a refinancing on the terms set forth in the May 15 Forbearance Agreement. And despite these conditions in the May 15 Forbearance Agreement not being satisfied, the Debtors continued to work constructively with the Prepetition Credit Parties, who did not accelerate any outstanding indebtedness under the Prepetition Revolving Credit Facility or exercise other remedies. A more detailed description of the May 15 Forbearance Agreement, along with certain amendments to the May 15 Forbearance Agreement, the Prepetition Revolving Credit Facility and other related loan documents, can be found in the Debtors' SEC filings at www.sec.gov.

As of the Petition Date, outstanding borrowings under the Prepetition Revolving Credit Facility were approximately $15.1 million, and approximately $8.8 million of letters of credit were outstanding, having been reduced to such amounts largely by application of the proceeds of store closures and assets sales referenced above. *See also* Section IV.E, *infra*.

**3.      Other Financing Debts**

Prior to the Petition Date, the Debtors' prescription drugs were replenished through the pharmacy inventory management system and shipped directly from the Debtors' primary pharmaceutical wholesaler, Cardinal Health, Inc. (together with certain of its affiliates, "Cardinal"). During fiscal years 2018, 2017 and 2016, approximately 50.0%, 43.5%, and 43.2%, respectively, of the Debtors' total prescription drug purchases were made from Cardinal. The Debtors operated under a purchase and supply contract with Cardinal as their primary wholesaler, which, as of the Petition Date, was to continue through December 2021. Certain of the Debtors, including Fred's, Inc. and Fred's Stores of Tennessee, Inc., granted Cardinal liens on pharmaceuticals and non-pharmaceutical products supplied by Cardinal to secure the outstanding trade debt incurred in connection with the supply of these goods. Such liens were contractually subordinate to the security granted under the Prepetition Revolving Credit Facility. As of the Petition Date, the Debtors believe that the approximate outstanding balance due to Cardinal was $20.9 million. Cardinal has informed the Debtors that it disputes this amount, and Cardinal has filed proofs of claim asserting a prepetition balance of approximately $23.9 million

Additionally, prior to the Petition Date, GE Commercial Finance Business Property Corporation (the "Summit Lender") was granted a security interest in certain property (the "Summit Collateral") of (a) Debtor Summit Properties-Jacksboro, LLC in connection with that certain Promissory Note, Commercial Deed of Trust, Security Agreements, Assignment of Leases and Rents and Fixture Filing, dated December 29, 2006 (which rights, upon Debtors' information and belief, have been acquired by Fidelity Bank), and (b) Debtor Summit Properties-Bridgeport, LLC in connection with that certain Promissory Note, Commercial Deed of Trust, Security Agreements, Assignment of Leases and Rents and Fixture Filing dated September 7, 2007 (which rights, upon Debtors' information and belief, had been acquired by EverBank). As of the Petition Date, the Debtors estimated that Summit Properties-Jacksboro, LLC and

Summit Properties-Bridgeport, LLC owed the respective successors to or assignees of the Summit Lender approximately $700,000 each.

### 4. Equity Securities

As of, or shortly before, the Petition Date, the equity securities of Fred's, Inc. consisted of the following:

- Preferred stock, nonvoting, no par value, 10,000,000 shares authorized, none outstanding;

- Preferred stock, Series C junior participating nonvoting, no par value, 50,000 shares authorized, none outstanding;

- Common stock, Class A voting, no par value, 60,000,000 shares authorized, 39,060,971 shares issued and outstanding;

- Common stock, Class B nonvoting, no par value, 11,500,000 shares authorized, none outstanding; and

- Treasury Stock, 3,800,000 shares (as of May 4, 2019).

### E. DIP Financing and Marketing Process

In the months preceding the Petition Date, the Debtors' cash flows were severely constrained due to, among other things, negative cash flows from operations and reserves and other restrictions imposed by the Prepetition Credit Parties, and the Prepetition Revolving Credit Facility had been in an overadvance state. While the Prepetition Credit Parties had agreed to a series of contractual amendments and forbearance agreements and refrained from accelerating their debt, it was clear that an alternative source of financing was necessary. As described above under the heading "The Debtors' Capital Structure; Prepetition Revolving Credit Facility and Refinancing Efforts," the Debtors, along with PJS and the Debtors' other advisors, sought to refinance the business in an out-of-court context in early summer 2019, which efforts were not ultimately successful.

The Restructuring Committee instructed BRG and PJS to prepare a projection of postpetition cash flows for the Debtors for the initial nine (9) weeks of the Debtors' Chapter 11 Cases (the "Budget"). The Budget and projections with respect to the Debtors' funding requirements were prepared in good faith and based upon assumptions the Debtors believed to be reasonable. Also based on the foregoing, the Debtors determined that they required access to postpetition financing sufficient to provide liquidity to administer the Estates during the course of the Chapter 11 Cases.

In parallel with its ongoing search for viable refinancing and recapitalization options, the Restructuring Committee directed PJS to begin contacting parties regarding the terms of potential debtor-in-possession financing facilities that would provide the Debtors with sufficient liquidity to administer the Chapter 11 Cases. The Debtors and their advisors designed a competitive marketing process to obtain multiple bids and to provide the flexibility to use competing proposals to negotiate the most favorable terms possible.

The Debtors solicited proposals for postpetition financing from large money-center banks and sophisticated alternative investment institutions familiar with the Debtors' capital structure. By mid-August 2019, Debtors had received financing proposals from four entities. Over the following weeks, the Debtors, with the assistance of their professionals, continued their arm's-length and good faith

negotiations regarding each financing proposal. Importantly, none of these potential sources of financing was willing to provide financing on a junior basis. Thus, the Debtors were unable to obtain alternative postpetition financing through credit allowable only as an administrative expense or secured by liens on the Debtors' assets that are junior to the liens of the Prepetition Credit Parties.

On August 29, 2019, the Debtors signed a commitment letter with one of the foregoing alternative investment institutions, agreeing on the principal terms of a postpetition financing. On or about September 4, 2019, however, that institution announced that it did not intend to provide postpetition financing to the Debtors based on the Debtors' most recent cash flow forecasts and other factors. The Debtors' only viable option at that juncture was to negotiate the terms of a postpetition credit facility with the Prepetition Credit Parties. Having negotiated and analyzed those terms in consultation with their advisors, the Debtors determined that such a facility represented the best financing available to the Debtors under the circumstances, allowing them to repay the amounts outstanding under the Prepetition Revolving Credit Facility and administer the Chapter 11 Cases.

F.      **Prepetition Litigation**

The following summarizes the Debtors' significant prepetition litigation and governmental investigations.

On July 27, 2016, a lawsuit styled *The State of Mississippi v. Fred's Inc., et al.* was filed in the Chancery Court of Desoto County, Mississippi, Third Judicial District. The complaint alleges that the Debtors fraudulently reported their usual and customary prices to Mississippi's Division of Medicaid in order to receive higher reimbursements for prescription drugs. The complaint seeks declaratory and monetary relief for the profits alleged to have been unfairly earned as well as attorney costs. The Debtors have vigorously defended against these allegations, and believe that they acted appropriately in their dealings with the Mississippi Division of Medicaid. The State of Mississippi has filed Claims against Debtors Fred's, Inc., and Fred's Stores of Tennessee, Inc., each for approximately $25.4 billion. The Debtors believe the Claims to be meritless and have estimated the Claims' amount as $0. In the event the Claims are allowed at a higher amount, recoveries to Class 3 creditors will be reduced.

On September 29, 2016, the Debtors reported to the Office of Civil Rights ("OCR") that an unencrypted laptop containing clinical and demographic data for 9,624 individuals had been stolen from an employee's vehicle while the vehicle was parked at the employee's residence. On January 13, 2017, the OCR opened an investigation into the incident. The Debtors have fully complied with the investigation and timely responded to all requests for information from the OCR. The Debtors received several supplemental requests for information from the OCR during the third and fourth fiscal quarters of 2018, as well as two additional requests during the first fiscal quarter of 2019, to which the Debtors timely responded.

On March 30, 2017, a lawsuit styled *Tiffany Taylor, individually and on behalf of others similarly situated, v. Fred's, Inc. and Fred's Stores of Tennessee, Inc.* was filed in the United Stated District Court for the Northern District of Alabama Southern Division (the "*Taylor* Complaint"). The *Taylor* Complaint alleges that the Debtors wrongfully and willfully violated the Fair and Accurate Credit Transactions Act ("FACTA"). On April 11, 2017, a lawsuit styled *Melanie Wallace, Sascha Feliciano, and Heather Tyler, on behalf of themselves and all others similarly situated, v. Fred's Stores of Tennessee, Inc.* was filed in the Superior Court of Fulton County in the state of Georgia. The complaint alleges that the Debtors wrongfully and willfully violated FACTA. On April 13, 2017, a lawsuit entitled *Lillie Williams and Cussetta Journey, on behalf of themselves and all others similarly situated, v. Fred's Stores of Tennessee, Inc.* was filed in the Superior Court of Fulton County in the state of Georgia. That complaint also alleged that the Debtors wrongfully and willfully violated FACTA. The complaints were filed as putative class

- 17 -

actions, with the class being open for five (5) years before the date the complaint was filed.  The complaints sought statutory damages, attorney's fees, punitive damages, an injunctive order, and other such relief that the court may deem just and equitable.  The Debtors filed a Motion to Dismiss the *Taylor* Complaint, which was granted.  Plaintiff's counsel appealed.  The Debtors filed, and the Court granted motions to remove and motions to transfer the *Williams* and *Wallace* matters to the U.S. District Court for the Northern District of Alabama.  Since the *Williams* and *Wallace* matters were removed and transferred to the U.S. District Court for the Northern District of Alabama, the Debtors filed a Motion to Consolidate the *Williams* and *Wallace* matters.  When the court granted the Debtors' motion to dismiss in the *Taylor* case, the court simultaneously denied the Motion to Consolidate, in light of the dismissal in *Taylor*.  In the *Wallace* and *Williams* actions, the District Court entered an order staying both cases until the U.S. Court of Appeals for the 11th Circuit decides on the appeal.  Oral argument for the appeal was heard before the Court of Appeals for the 11th Circuit at the end of January 2019.

On March 16, 2018, a lawsuit captioned *Roxie Whitley, individually and as next friend of Baby Z.B.D., [et al.] v. Purdue Pharma L.P., [et al.] and Fred's Stores of Tennessee, Inc.* was filed in the Circuit Court of Fayette County, Tennessee for the 25th Judicial District at Somerville.  The complaint does not allege any wrong-doing by the Debtors.  On May 9, 2018, the proceeding was transferred to the United States District Court for the Northern District of Ohio as part of the National Prescription Opiate Litigation Multidistrict Litigation.  The Debtors have denied any liability.

On June 27, 2019, a lawsuit captioned *Theodore K. Zaller v. Fred's Inc., Michael K. Bloom, Walgreens Boots Alliance, Inc., and Stefano Pessina*, was filed in the United States District Court for the Western District of Tennessee, as amended on November 4, 2019, by the filing of an Amended Complaint (the "*Zaller* Complaint").  The *Zaller* Complaint alleges, *inter alia*, violations of sections 10(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10-b(5) promulgated thereunder, related to a proposed transaction for the Debtors to purchase stores from Rite-Aid Corporation, which was never consummated.  The *Zaller* Complaint asserts Claims against a former CEO and Board member of the Debtors, Michael K. Bloom.  Mr. Bloom is, or may be entitled to coverage under the Debtors' D&O Insurance Liability Policies.

In addition to the matters disclosed above, the Debtors are party to several pending legal proceedings and claims arising in the normal course of business.  On the Petition Date, all litigation against the Debtors with respect to any prepetition Claims was stayed pursuant to the section 362(a) of the Bankruptcy Code's automatic stay.  In the time since the Petition Date, the Debtors have entered into several stipulations with certain creditors providing for the automatic stay to be lifted.

## V.
## EVENTS DURING THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

On September 9, 2019, the Debtors each filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Chapter 11 Cases were assigned to Chief Bankruptcy Judge Christopher S. Sontchi.  The Debtors have continued in the management and possession of their businesses and properties as debtors in possession since the Petition Date.  No trustee or examiner has been appointed in the Chapter 11 Cases.  Set forth below is a summary of material events that have occurred since the Petition Date.

B.    **First-Day Relief**

On the Petition Date, the Debtors filed various motions or applications seeking typical "first-day" relief in their Chapter 11 Cases (collectively, the "First Day Motions"), as well as a declaration in support thereof, in order to ensure a smooth transition into bankruptcy and to allow the Debtors to continue to operate their businesses and administer their Estates.  On September 10, 2019, the Debtors obtained a number of final orders on the First Day Motions granting various forms of relief that the Debtors deemed essential to facilitating their transition into chapter 11:

- *Order Directing the Joint Administration of the Debtors' Chapter 11 Cases* [D.I. 52];

- *Order (I) Extending the Time to File Schedules of Assets and Liabilities of Financial Affairs, (II) Waiving the Requirements to File Equity List and Provide Notice to Equity Security Holders, and (III) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty Largest Creditors* [D.I. 53];

- *Order Pursuant to 28 U.S.C. § 156I, Bankruptcy Code Section 105(A), and Local Bankruptcy Rule 2002-1(F) Authorizing Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent to the Debtors' Nunc Pro Tunc to the Petition Date* [D.I. 54]; and

- *Order Authorizing Certain Procedures to Maintain the Confidentiality of Pharmacy Customers' Information as Required by Applicable Privacy Rules* [D.I. 55].

Other final orders on the First Day Motions were entered on September 26, 2019 or September 27, 2019 (except as otherwise noted):

- *Final Order (I) Authorizing, but not Directing, the Payment of Certain Prepetition Claims of Lien Claimants and (II) Granting Related Relief* [D.I. 187];

- *Final Order Authorizing, but not Directing, (I) the Debtors to Pay Certain Taxes and Fees (II) Financial Institutions to Honor all Related Checks and Electronic Payment Requests and (III) Granting Related Relief* [D.I. 188];

- *Final Order (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Benefits, and other Obligations and (B) Continue Employee Programs and (II) Granting Related Relief* [D.I. 189];

- *Final Order (I) Authorizing the Debtors to (A) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices and (B) Pay and Honor Related Prepetition Obligations and (II) Granting Related Relief* [D.I. 190];

- *Final Order (I) Authorizing the Debtors to (A) Continue Using Existing Centralized Cash Management System, (B) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (C) Maintain Existing Bank Accounts and Check Stock and (II) Granting Related Relief* [D.I. 191];

- *Final Order Approving Procedures for the Sale of De Minimis Pharmacy and Real Property Assets Free and Clear of Liens, Claims, Interests, and Encumbrances* [D.I. 192];

- *Final Order (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance,*

*and (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment* [D.I. 196];

- *Final Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* [D.I. 208];

- *Order (I) Authorizing the Debtors to Reject Certain Unexpired Leases of Nonresidential Real Property Nunc Pro Tunc to Rejection Date (II) Establishing Rejection Procedures, and (III) Granting Related Relief* [D.I. 209];

- *Order (I) Approving Debtors' Key Employee Incentive Plan and Key Employee Retention Plan (II) Granting Administrative Expense Priority Status to All Payments to be Made by the Debtors Pursuant thereto and (III) Granting Related Relief* [D.I. 328];[7] and

- *Final Order Granting Debtors' Motion to (I) Authorize Debtors in Possession to Obtain Postpetition Financing Pursuant to 11 U.S.C §§ 105, 362, 363, and 364; (II) Grant Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. §§ 364 and 507; (III) Provide Adequate Protection to Prepetition Credit Parties, Summit Lender, and Cardinal Vendors; (IV) Modify Automatic Stay Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507; and (V) Grant Related Relief* [D.I. 338].[8]

## C.    Post-Petition Financing

To ensure that the Debtors would be able to satisfy their immediate needs for access to cash after the Petition Date and to finance their operations during the course of these Chapter 11 Cases, the Debtors determined that it was essential and in the best interest of their Estates to enter into a debtor-in-possession credit facility, which they had been negotiating since prior to the Petition Date with Regions Bank and Bank of America, N.A. (collectively with their affiliates and issuers of letters of credit, the "DIP Lenders"), ultimately entering into that certain post-petition credit agreement, (the "DIP"), executed by and among the DIP Lenders and Debtors on September 11, 2019, to provide post-petition financing in support of the Debtors' wind-down of business operations.

On the Petition Date, the Debtors sought authority to enter into the DIP.  [D.I. 16].  On September 10, 2019, the Bankruptcy Court approved the DIP on an interim basis [D.I. 61] (the "Interim DIP Order"). To address formal and informal objections from creditors, the Debtors agreed to certain modifications in the final order on the DIP, which was entered on October 17, 2019 [D.I. 338] (the "Final DIP Order").

Under the DIP, the DIP Lenders agreed to provide the Debtors a superpriority, asset-based revolving credit facility in the principal amount of up to $35,000,000 under the DIP, subject to certain carve-outs (the "Carve-Outs") and a section 506(c) waiver.  To resolve objections from certain landlords, the Final DIP Order provided for a stub rent carve-out of $1 million of cash collateral or proceeds of cash collateral (the "Stub Rent Carve-Out") into escrow.  Additionally, the Final DIP Order resolved informal objections from Cardinal regarding the applicability of sections 506(c) and 552(b) of the Bankruptcy Code by allowing all parties to reserve all rights regarding the applicability and impact of those sections. The DIP also contained various case milestones requiring the completion of various critical events in the Chapter 11 Cases on an expedited basis.  In or about December 2019, the Debtors, after discussions with the DIP Lenders informing them that the Debtors intended to have the DIP repaid no later than December

---

[7] Entered October 16, 2019.

[8] Entered October 17, 2019.

13, 2019 (other than with respect to contingent Claims), the Debtors coordinated with the DIP Lenders on obtaining a payoff letter. Following these discussions, the Debtors entered into a stipulation with the DIP Lenders authorizing the Debtors to enter into a payoff letter (the "Payoff Letter Agreement") with the DIP Lenders on December 11, 2019 [D.I. 587] (the "Payoff Stipulation"). The Payoff Stipulation was so-ordered by the Bankruptcy Court on December 16, 2019. [D.I. 610]. The Payoff Letter Agreement, executed pursuant to the Payoff Stipulation on December 17, 2019, generally released the DIP Lenders' collateral, including with respect to liens on the Debtors' real property, though the DIP Lenders retained certain liens including with respect to certain cash collateral and letters of credit.

## D.    Appointment of Creditors' Committee and Creditors' Committee Professionals

On September 28, 2019, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [D.I 127], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases. The Creditors' Committee is comprised of: (1) Bradley Wooldridge; (2) BWI Companies, Inc.; and (3) WIN Properties, Inc. On September 25, 2019, the Creditors' Committee sought approval from the Bankruptcy Court to retain and employ Lowenstein Sandler LLP ("Lowenstein") as counsel [D.I. 172], and the Court approved Lowenstein's retention and employment on October 15, 2019 [D.I. 310]. In addition, on October 18, 2019, the Creditors' Committee sought to employ and retain Womble Bond Dickinson (US) LLP ("Womble Bond") as Delaware counsel [D.I. 352], and the Bankruptcy Court approved Womble Bond's retention and employment on November 18, 2019 [D.I. 520]. Finally, on October 9, 2019, the Creditors' Committee sought to employ and retain Alvarez & Marsal North America LLC ("A&M") as financial advisor [D.I. 263], and A&M's retention was approved on October 30, 2019 [D.I. 407]. Throughout the Chapter 11 Cases, the Debtors and their advisors have engaged with the Creditors' Committee and its advisors on a range of issues, including with respect to certain investigations, and have sought to obtain the Creditors' Committee's support wherever possible.

## E.    Debtors' Retention of Professionals and Claims and Noticing Agent

On September 25, 2019, the Debtors filed: (1) an Application for an Order Authorizing the Retention and Employment of Kasowitz Benson Torres LLP as co-counsel for the Debtors and Debtors in Possession [D.I. 175]; (2) an Application for an Order Authorizing the Employment and Retention of Morris, Nichols, Arsht & Tunnell LLP as co-counsel for the Debtors and Debtors in Possession [D.I. 170]; (3) a Motion for an Order Authorizing the Employment and Retention of Akin Gump Strauss Hauer & Feld LLP as Special Corporate Counsel for the Debtors and Debtors in Possession [D.I. 179]; and (4) an Application for an Order Authorizing the Employment and Retention of BRG as Financial Advisors to the Debtors and Debtors in Possession [D.I. 173]. The Bankruptcy Court granted these motion by orders entered on October 15, 2019 [D.I. 306, 307 312, 313].

On September 25, 2019, the Debtors filed a motion seeking authorization to retain certain other professionals utilized by the Debtors in the ordinary course of business as of the Petition Date and thereafter. [D.I. 174]. The Bankruptcy Court granted this motion by order entered October 15, 2019. [D.I. 311]. An order establishing procedures for interim compensation and reimbursement of expenses for all retained professionals was also entered on October 15, 2019. [D.I. 316].

On the Petition Date, the Debtors filed an application to retain Epiq Corporate Restructuring, LLC ("Epiq") to serve as official claims and noticing agent to the Debtors. [D.I. 4]. Epiq was retained to, among other duties, notify creditors of the filings of the Debtors' petitions, send out proofs of claim forms and the notice of the claims bar date to the Debtors' creditors, maintain the official claims register, send out Ballots with respect to the proposed Plan, and tabulate the voting results. The Bankruptcy Court granted the Debtors' application by order entered September 10, 2019. [D.I. 54]. In addition, due to the

expansion of its duties beyond its work as a claims and noticing agent, including assisting with balloting and voting procedures in connection with a plan of liquidation, on September 25, 2019, the Debtors' filed an application to retain Epiq as Administrative Advisor for the Debtors and Debtors in Possession. [D.I. 176]. The Bankruptcy Court granted this application by order entered October 15, 2019. [D.I. 304].

F.      **Key Employee Incentive Plan and Key Employee Retention Plans**

Prior to the Petition Date, the Debtors determined, in consultation with their professionals and the DIP Agent, that the best way to maximize value in the Chapter 11 Cases for all parties in interest was through the continued liquidation of the Debtors' assets, including going-out-of-business sales, pharmacy script and inventory sales, and the sale of real estate assets. To ensure maximum recoveries for all stakeholders in these areas, the Debtors recognized the need to implement appropriate incentives for driving performance and maintaining operational integrity during the liquidation process. To accomplish these goals, the Debtors carefully and diligently crafted a key employee incentive program (the "KEIP") as an incentive program tied to achieving critical milestones related to the Debtors' liquidation efforts with the input of their advisors, to incentivize performance from senior management. The Debtors also recognized a need to incentivize valuable, non-insider management personnel to remain employed with the Debtors during the initial stages of Chapter 11 Cases, and to avoid the costs and disruption associated with attrition and turnover. To accomplish these goals, with the assistance of their advisors, the Debtors designed an initial key employee retention program (the "First KERP"). The participants in the First KERP were key employees who worked in the Debtors' corporate offices, and whose responsibilities encompassed critical aspects of the Debtors' business, including positions within accounting, logistics, HR and other business operations.

To effectuate the important goals of the KEIP and the First KERP, the Debtors filed a motion seeking the authority to implement the KEIP and the First KERP on the Petition Date. [D.I. 26]. Subsequently, the Debtors conferred with the U.S. Trustee and the Creditors' Committee regarding certain issues in the KEIP and the First KERP. Following those discussions, the Debtors modified the amounts payable under the KEIP and restricted the Debtors' Chief Executive Officer Joe Anto, and Chief Operating Officer Mike Ladd, from receiving compensation after November 30, 2019, or November 15, 2019, respectively. Following the resignation of Mr. Anto effective November 30, 2019, Mark A. Renzi, the Debtors' Chief Restructuring Officer, assumed Mr. Anto's and Mr. Ladd's responsibilities. The First KERP was also modified to reflect the departure of certain employees proposed to be subject to the First KERP. On October 16, 2019, the Bankruptcy Court entered an order reflecting these amendments by approving: (i) the KEIP for four key employees in a maximum amount of $1,017,500 in the aggregate; and (ii) the First KERP for 25 key participants, providing a total award pool of approximately $255,743, among other relief. [D.I. 328]. Together, the KEIP participants and First KERP participants played vital roles in ensuring the smooth wind-down and liquidation of the Debtors' businesses.

After the Debtors had wound down most of their operations, to ensure that key non-executive personnel remained to handle the claims administration process, closing the Debtors' books and records, the preservation of the Debtors' books and records, and other critical activities necessary to complete the winding down of their affairs, following extensive consultation with the Creditors' Committee, the Debtors sought to implement a wind-down key employee retention program (the "Wind-Down KERP"). Accordingly, on January 10, 2020, the Debtors filed a wind-down key employee retention program for 11 key non-insider employees. [D.I. 711]. On January 27, 2020, the Bankruptcy Court entered an order approving of a revised Wind-Down KERP, as modified by the Debtors in consultation with the Creditors' Committee. [D.I. 779].

G.     **Going-out-of-Business Sales and Store Closings**

In the months preceding the Petition Date, the Debtors had closed hundreds of stores.  To monetize the Debtors' inventory, the Debtors sought authority on the Petition Date through a motion (the "GOB Motion") to continue going-out-of-business sales (the "GOB Sales") at all of their remaining locations by October 31, 2019.  [D.I. 15].  This resulted in interim and final orders entered on September 11, 2019 and September 27, 2019, respectively [D.I. 82, 208] (collectively, the "GOB Orders").  Pursuant to the GOB Orders, the Debtors retained SB360 Capital Partners, LLC to administer the GOB Sales.  By October 31, 2019, the Debtors had concluded their GOB Sales and liquidated all of their non-pharmaceutical inventory, which yielded approximately $25.7 million in gross proceeds into their Estates.  Additionally, the Debtors obtained authorization from the Bankruptcy Court to retain Hilco IP Services, LLC d/b/a Hilco Streambank to sell their intellectual property, and filed a motion seeking to sell such intellectual property.  [D.I. 264, 375, 549].  On January 28, 2020, the Court entered an order approving the motion, with certain modifications, primarily to account for changes to the asset purchase agreement between the Debtors and the purchaser of their intellectual property assets.  [D.I. 782].  The sale closed on February 11, 2020.

H.     **Rejection of Executory Contracts and Unexpired Leases and Assumption of**
        **Unexpired Leases**

As of the Petition Date, the Debtors were parties to hundreds of leases, most of which were burdensome to the Debtors' Estates and needed to be rejected to conserve resources for the benefit of the Debtors' creditors and other parties in interest.  Accordingly, the Debtors filed a motion on the Petition Date seeking authority to implement procedures for the rejection of Unexpired Leases (the "Rejection Procedures Motion").  [D.I. 20].  On September 27, 2019, the Bankruptcy Court entered a final order authorizing the rejection of certain Unexpired Leases, and establishing procedures for the rejection of additional Unexpired Leases going forward.  [D.I. 209].  In total, the Debtors rejected approximately 450 leases through Bankruptcy Court orders entered following the initial Rejection Procedures Motion and 14 subsequent rejection notices.  *See* [D.I. 20, 221, 223, 238, 239, 244, 294, 301, 434, 450, 466, 503, 557, 559,[9] 581].  On or prior to January 7, 2020, all of the Debtors' outstanding leases not assumed or noticed for assumption had been rejected.  The Debtors have also rejected Executory Contracts after liquidation of their operating assets rendered them no longer necessary.  [D.I. 509].

The Debtors assumed and assigned certain leases in the Chapter 11 Cases, primarily in connection with the sale of their pharmacy assets.  *See* Section V.K, *infra*.  On December 30, 2019, the Debtors sought authority to assume a lease in Memphis, Tennessee and relocated their corporate headquarters there following the liquidation of most of their assets, to use for the final phases of their Chapter 11 Cases and through the confirmation of a plan.  [D.I. 666].

I.     **Creditors' Committee Investigations**

Shortly after the appointment of the Creditors' Committee, counsel to the Creditors' Committee initiated an investigation into Alden Global Capital LLC ("Alden"), the controlling equity owner of the Debtors prior to the Petition Date, pursuant to section 1103(c)(2) of the Bankruptcy Code and Bankruptcy Rule 2004.  On October 4, 2019, the Creditors' Committee filed a motion [D.I. 235] (the "Alden 2004 Motion"), pursuant to which the Creditors' Committee sought, among other things, the examination of Timothy A. Barton, Heath B. Freeman, Dana Goldsmith Needleman, Steven B. Rossi, and Joseph Anto.

---

[9] The Debtors believe that these leases terminated prepetition but filed a rejection notice out of an abundance of caution.

Following Alden's objection to the Alden 2004 Motion [D.I. 290], the Creditors' Committee and Alden consented to an order resolving the motion [D.I. 327] (the "Alden 2004 Order").

Additionally, shortly following the appointment of the Creditors' Committee, counsel to the Creditors' Committee issued informal discovery requests to the Debtors as part of its investigation. The Debtors cooperated extensively with the Creditors' Committee on these requests. During the course of this investigation, on December 23, 2019, the Creditors' Committee filed a motion pursuant to Bankruptcy Rule 2004 and section 1103(c)(2) of the Bankruptcy Code [D.I. 634] (the "Debtor 2004 Motion") seeking discovery similar in nature to that requested in the Alden 2004 Motion. The Debtor 2004 Motion also sought to interview certain former employees of the Debtors (the "Former Employee Recipients"). On December 30, 2019, the Creditors' Committee and the Debtors entered a stipulation regarding the Debtors 2004 Motion in which the Debtors agreed to use their reasonable best efforts to assist the Creditors' Committee with interviews of the Former Employee Recipients, and which the Bankruptcy Court ordered on December 30, 2019. [D.I. 659, 660]. The Creditors' Committee states that its investigation remains ongoing and is not complete. *See also* Section VI.K, *infra*.

## J.    Settlement with Workers United, Southern Regional Joint Board

On November 14, 2019, the Bankruptcy Court entered the *Order Approving Motion of the Debtors Pursuant to Bankruptcy Rule 9019, Local Rule 9013-1, and 11 U.S.C. §§ 105(a) and 363(b), for Entry of an Order Authorizing Settlement with Workers United, Southern Regional Joint Board* [D.I. 510] (the "Workers United Settlement Order"). The Workers United Settlement Order approved a stipulation of settlement between the Debtors and Workers United, Southern Regional Joint Board ("Workers United"), which had executed a three-year collective bargaining agreement ("CBA") with the Debtors on August 16, 2017, governing the terms and conditions of bargaining unit employees at the Debtors' Memphis Distribution Center. The Debtors and Workers United agreed, among other things, that (i) the Debtors would pay severance to workers who were terminated on or about August 9, 2019 and subject to the CBA an amount equal to one week base salary for each year of such employee's employment with the Debtors up to a maximum of four weeks and (ii) severance payments would be treated as Claims subject to priority under section 507(a)(4) of the Bankruptcy Code.

## K.    Pharmacy Asset Sales

The Debtors operated pharmacies in certain of their retail locations. As of the Petition Date, certain sales of the Debtors' pharmacy assets were either still in negotiation or in the process of closing, and the Debtors therefore sought entry of an order authorizing the continuation of the sale of those assets, subject to certain limitations, in addition to the authorization of the sale of real estate assets of up to $1.5 million in value, without the need for filing a formal motion. [D.I. 12]. On September 11, 2019, and September 26, 2019, respectively, the Bankruptcy Court entered interim and final orders approving such relief [D.I. 81, 192], pursuant to which the Debtors sold certain pharmacy assets to various purchasers.

To provide for consummation of the sale of approximately $5.8 million in pharmacy assets to Walgreen Co., and the sale of the pharmacy assets at 10 pharmacies along with the assumption of four pharmacy-store leases for approximately $6.1 million to ExpressRx Co., the Debtors filed motions for the Bankruptcy Court's approval of each transaction's respective asset purchase agreement, and, where applicable, assumption of leases. [D.I. 177, 180]. An order approving the Walgreen Co. sale was entered on October 16, 2019, and an order approving the ExpressRx Co. sale was entered on October 15, 2019. [D.I. 314, 330].

**L.**     **Real Estate Asset Sales**

As of the Petition Date, the Debtors owned more than 60 real properties in which they had operated retail stores, and a distribution center.  To monetize these assets, the Debtors, in consultation with their advisors, sought to implement bidding procedures to maximize recoveries for their Estates.  Accordingly, on September 17, 2019, the Debtors filed a motion to, among other things, establish bidding procedures, approve stalking horse protections, and to approve the sale of their real estate assets free and clear of encumbrances pursuant to section 363 of the Bankruptcy Code [D.I. 112] (the "Real Estate Procedures Motion").  Following discussions with the Creditors' Committee and certain modifications to the relief requested in the Real Estate Procedures Motion, on September 27, 2019, the Bankruptcy Court entered an order granting the Real Estate Procedures Motion [D.I. 204] (the "Real Estate Procedures Order").

Thereafter, the Debtors received bids from numerous parties for the purchase of their real estate assets.  Pursuant to the Real Estate Procedures Order, the Debtors announced stalking horse bidders on October 11, 2019.  [D.I. 286].  The Debtors held an auction for the sale of most of their real properties on October 28, 2019.  R.E. Wilson Enterprises, Inc. was the winning bidder for the Debtors' retail store real properties, with a bid of $22,300,000.  Perry Ellis International, Inc. was the winning bidder for the Debtors' distribution center, with a bid of $15,700,000.  The Bankruptcy Court entered orders authorizing the sale of most of the Debtors' store properties and distribution center free and clear of encumbrances to the winning bidders on October 30, 2019.  [D.I. 411, 412].

**M.**     **Certain Preservation of Net Operating Losses ("NOLs")**

On November 26, 2019, the Debtors filed the *Debtors' Motion for Entry of Order Establishing Notice and Objection Procedures for Transfers of Equity Securities, and Granting Related Relief* [D.I. 554] (the "Equity Transfer Motion").  The Equity Transfer Motion sought entry of an order establishing notice and objection procedures for transfers of Debtor Fred's, Inc.'s equity securities, to prevent the transfer of equity securities from resulting in a change of control that could jeopardize the Debtors' ability to use NOL tax attributes under section 382 of the Internal Revenue Code.  Although it was unclear if the tax attributes had any value, to avoid any diminishment in the value of the Estates due to loss of such tax attributes, the Debtors' motion provided that any sale of equity securities resulting in a third-party acquiring a beneficial ownership interest of 4.9% of Fred's Inc.'s outstanding shares would need to seek permission from the Bankruptcy Court to consummate such a transaction.  On December 16, 2019, the Bankruptcy Court entered the *Order Establishing Notice and Objection Procedures for Transfers of Equity Securities, and Granting Related Relief* [D.I. 609] (the "Equity Transfer Order"), approving the relief sought in the Equity Transfer Motion.  Following entry of the Equity Transfer Order, Alden filed a transfer notice.  [D.I. 619].  For additional discussion of the Debtors' NOLs, see Section IX, *infra*.

**N.**     **Schedules of Assets and Liabilities and Statements of Financial Affairs, and Claims Bar Date**

On November 11, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs, listing over $180 million in scheduled liabilities.  [D.I. 475-490].  Shortly thereafter, on November 18, 2019, the Debtors sought entry of certain bar date orders [D.I. 528] (the "Bar Date Motion").  On December 4, 2019, the Bankruptcy Court entered an order on the Bar Date Motion (the "Bar Date Order") and established January 13, 2020 at 5:00 P.M. (Prevailing Eastern Time) as the last date by which creditors asserting prepetition claims (including section 503(b)(9) Claims) were required to file proofs of claim, with certain exceptions (the "General Bar Date").  The Bar Date Order also established a bar date of March 9, 2020 for governmental units, and established variable bar dates for:  (i) creditors asserting claims regarding Executory Contracts and Unexpired Leases; and (ii) creditors

affected by any amendments to the Debtors' Schedules of Assets and Liabilities.  Pursuant to the Bar Date Order, the Debtors completed service of the Bar Date Order on known creditors by December 11, 2019. The Debtors also ran a publication in the national edition of *USA Today* as required under the Bar Date Order on December 12, 2019.  The Debtors are reviewing and reconciling the recently filed Claims.

## O.    **Dispute Regarding Cardinal Claims**

The following discussion is qualified in its entirety by the terms of the relevant agreements between the parties, including the Interim DIP Order and the Final DIP Order.  In addition, the following discussion refers to matters that are disputed.  It is intended to provide a general overview to provide adequate information for creditors entitled to vote on the Plan.  It is not intended to constitute an admission of any kind, or a waiver of any rights of the Debtors, the Excluded Debtors, their Estates, or any third parties, with respect to any of the matters in dispute.

Prior to the Petition Date, Cardinal, a pharmaceutical wholesaler, was the primary pharmaceutical supplier to the Debtors.  Pursuant to an intercreditor agreement with Regions Bank, as administrative agent under the Prepetition Revolving Credit Facility (the "Intercreditor Agreement") and other subordinated security agreements with certain of the Debtors (the "Cardinal Security Agreements"), Cardinal had a security interest, junior to the Prepetition Credit Parties, on certain of the Debtors' assets including inventory, accounts receivable, pharmacy scripts and customer lists, investment property, general intangibles, chattel paper, securities accounts, other bank accounts, cash investments collateral, instruments and supporting obligations, cash, and unearned premiums with respect to insurance policies (as more specifically set forth in the relevant documents, the "Cardinal Collateral").  The Cardinal Collateral did not include the Debtors' real estate assets.

The Final DIP Order provided, among other things:

8.    **Adequate Protection of Cardinal Vendors**.  As adequate protection of their interests in the Cardinal Collateral, the Cardinal Vendors are entitled, pursuant to sections 105, 361, 363 and 364 of the Bankruptcy Code, to claims and other protections in an amount equal to the Cardinal Collateral Diminution in respect of the Cardinal Liens (the "Cardinal Adequate Protection Claims," together with the Prepetition Lender Adequate Protection Claims, the "Adequate Protection Claims").  As used in this Final Order, "Cardinal Collateral Diminution" shall mean an amount equal to the aggregate diminution in the value of the Cardinal Vendors' interest in the Cardinal Collateral from and after the Petition Date for any reason, including, without limitation, any such diminution resulting from the use of Cash Collateral including for the funding of "stub rent" payments to landlords; the priming of the Cardinal Liens in the Cardinal Collateral by the DIP Liens pursuant to this Final Order; the depreciation, sale, loss, use, or collection by any Debtor (or any other decline in value) of such Cardinal Collateral; the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; or the subordination of liens and priority claims in connection with the Carve-Out, in each case to the fullest extent provided under the Bankruptcy Code. The Cardinal Vendors are hereby granted, as adequate protection but subject to the rights of third parties preserved under paragraph 23 hereof, the following:

(a) Cardinal Adequate Protection Liens.  The Cardinal Vendors are hereby granted (effective and perfected upon the date of entry of the Interim Order, without the necessity of the execution, filing or recording by any Debtor or

the Cardinal Vendors of any security agreements, pledge agreements, mortgages, deeds of trust, financing statements or other agreements) replacement security interests in and liens (the "Cardinal Adequate Protection Liens" (and collectively with the Prepetition Lender Adequate Protection Liens, the "Adequate Protection Liens") on (i) all Cardinal Collateral already or hereafter acquired and the proceeds thereof and (ii) any DIP Collateral that does not otherwise constitute Cardinal Collateral (*e.g.*, the Debtors' owned real estate) in an amount equal to the Cardinal Collateral Diminution. The Cardinal Adequate Protection Liens shall be junior and subordinate to (i) the Carve-Out and Stub Rent Carve-Out, (ii) the DIP Liens, (iii) any valid, perfected, enforceable, and unavoidable security interest in or lien upon any Prepetition Collateral that, on the Petition Date, was senior to and had priority over the Cardinal Liens in such Prepetition Collateral, and (iv) the Prepetition Security Interests, and the Adequate Protection Liens in the DIP Collateral.

(b)  Priority of Cardinal Adequate Protection Claims. The Cardinal Adequate Protection Claims are to be allowed as priority administrative claims pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, and, subject to the Carve-Out and the Superpriority Claims, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, including, without limitation, the rights of each Debtor and any successor trustee in these Chapter 11 Cases or any Successor Case.

(c)  Additional Provision. Notwithstanding anything set forth in this Final Order or the Interim Order to the contrary, all parties reserve all rights with respect to (i) the application of sections 506(c) or 552(b) of the Bankruptcy Code to the Cardinal Vendors, and (ii) the amount of the Cardinal Adequate Protection Liens and/or the Cardinal Adequate Protection Claims, including whether, and to what extent, if any, such Liens and/or Claims may be offset or reduced by the amount of any payments made on account of the Carve-Out or the Stub Rent Carve-Out.

[D.I. 338] at 36-37.

Cardinal has asserted secured Claims in the amount of $23,891,634.50. Cardinal has claimed that the entire amount is secured. Further, Cardinal has claimed that $10,829,467.49 of such amount is in respect of goods delivered within 20 days of the Petition Date and entitled to priority under section 503(b)(9) of the Bankruptcy Code.

The Debtors and the Creditors' Committee vigorously dispute the calculation and characterization of the Cardinal Claims, and believe they are subject to certain claims and defenses. The parties have been engaged in discussions and informal discovery to attempt to resolve these issues. The ultimate resolution, whether through settlement or adjudication, could have a material effect on the amounts available for distribution to Class 3 General Unsecured Claims.

P.      **Exclusivity Extension**

On January 6, 2020, the Debtors sought authorization from the Bankruptcy Court to extend the periods during which the Debtors have the exclusive right to file a chapter 11 plan in connection with the Chapter 11 Cases by 120 days, from January 7, 2020, through and including May 6, 2020 and solicit votes thereon and also extend the exclusive filing period for such a plan by 120 days, from March 9, 2020 through and including July 7, 2020 [D.I. 686] (the "Exclusivity Motion").  The Bankruptcy Court entered an order approving the Exclusivity Motion on January 23, 2020.  [D.I. 769].

VI.
**SUMMARY OF THE PLAN**

**THE FOLLOWING IS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN.  IT IS NOT A COMPLETE STATEMENT OF THE PLAN OR ITS OPERATION AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.  IN CERTAIN RESPECTS, THE PLAN DEALS WITH SOPHISTICATED LEGAL CONCEPTS AND INCORPORATES THE DEFINITIONS AND REQUIREMENTS OF THE BANKRUPTCY CODE.  THEREFORE, YOU MAY WISH TO CONSULT WITH COUNSEL OF YOUR CHOICE BEFORE VOTING ON THE PLAN.**

A.      **Description, Classification and Treatment of Claims and Interests**

Among the various categories of Claims and Interests are:  (i) Administrative Expense Claims; (ii) Priority Tax Claims; (iii) DIP Claims; (iv) Other Secured Claims; (v) Other Priority Claims; (vi) General Unsecured Claims; (vii) Intercompany Claims; (viii) Section 510(b) Claims; and (ix) Interests.

1.      **Unclassified Administrative Expense Claims**

Administrative Claims are Claims for costs or expenses of the Chapter 11 Cases that are allowed under sections 503(b) (other than section 503(b)(9)), and sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including all actual and necessary costs and expenses relating to the preservation of the Estates or the liquidation of the Debtors' businesses, all allowances of compensation or reimbursement of expenses to the extent Allowed by the Bankruptcy Court, all Allowed Claims for reclamation pursuant to section 546(c) of the Bankruptcy Code, and all Allowed Claims for cure payments arising from the assumption of Executory Contracts or Unexpired Leases pursuant to section 365(b)(1) of the Bankruptcy Code to the extent such cure payments have not already been paid.  Administrative Expense Claims also consist of fees and expenses of Professionals employed in the Chapter 11 Cases, salaries of employees of the Debtors, and other ongoing expenses of operation, including rent.

The Plan provides that, except with respect to Administrative Expense Claims that are Professional Fee Claims or are subject to section 503(b)(1)(D) of the Bankruptcy Code, and except to the extent that an Administrative Expense Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim has agreed to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall receive in full satisfaction of its Administrative Expense Claim, Cash equal to the full amount thereof, without interest either:  (a) on the Effective Date; (b) if the Administrative Expense Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which an order allowing such Administrative Expense Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed Administrative Expense Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed Administrative Expense Claim, without any further action by the Holders of such Allowed Administrative

Expense Claim, and without any further notice to, or action, order, or approval of, the Bankruptcy Court. The Debtors estimate the total amount of Administrative Expense Claims will be between approximately $4.6 million and $5.6 million.

### a.    Professional Fee Claims

The Plan provides that all final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Confirmation Date shall be Filed no later than 45 days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be paid within five (5) Business Days from the Professional Fee Escrow Account in the full Allowed amount.

The Plan further provides that, to the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, and the Debtors or the Liquidating Trustee, as applicable, shall pay the full unpaid amount of such Allowed Administrative Claim in Cash.

### 2.    Priority Tax Claims

Priority Tax Claims are Claims against the Debtors that are entitled to priority in accordance with section 507(a)(8) of the Bankruptcy Code.  The Plan provides that, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.  The Debtors estimate that the total amount of Priority Tax Claims will be between approximately $1.0 million and $1.9 million.

### 3.    DIP Claims

The Plan provides that DIP Claims, if any, shall be Allowed Administrative Expense Claims and shall be paid in full in Cash as soon as practicable upon the occurrence of the Effective Date, except to the extent such Claim is not due and payable until a later date, in which case as soon as practicable upon the occurrence of such date.  The Debtors estimate that the total amount of DIP Claims will be approximately $0.

### 4.    Class 1 – Other Secured Claims

a.    *Classification*:  Class 1 consists of any Claim that is secured by a lien on property of the Debtors' Estates, other than DIP Claims (including a Secured Tax Claim and a Cardinal Secured Claim), to the extent of the value of such property, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff, or Allowed pursuant to the Plan or separate order of the Bankruptcy Court as a Secured Claim.

b.  *Treatment*:  Under the Plan, or as soon as practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive on account of such Claim and at the Debtors' or Liquidating Trust's exclusive election, except to the extent that any Holder of an Allowed Other Secured Claim agrees to less favorable treatment thereof, either:  (i) Cash equal to the amount of such Allowed Other Secured Claim; (ii) the property that serves as security for such Allowed Other Secured Claim; or (iii) such other treatment that shall render such Allowed Other Secured Claims Unimpaired pursuant to section 1124 of the Bankruptcy Code (which may include Reinstatement).  The Debtors estimate that the total amount of Other Secured Claims will be between $1.0 million and $23.5 million, depending on the resolution of the disputes with Cardinal over the amount and characterization of the Cardinal Claims.[10]  *See* Section V.O, *infra*.

c.  *Voting*:  Class 1 Claims are Unimpaired under the Plan, and solicitation of acceptances of the Plan with respect to Holders of such Class 1 Claims is not required.

5.  **Class 2 – Other Priority Claims**

a.  *Classification*:  Class 2 consists of Claims against the Debtors that are entitled to priority in accordance with section 507(a) of the Bankruptcy Code, other than:  (a) Administrative Expense Claims; or (b) Priority Tax Claims, to the extent such Claim has not already been paid during the Chapter 11 Cases.  Other Priority Claims include Claims arising under section 503(b)(9) of the Bankruptcy Code.

b.  *Treatment*:  Under the Plan, or as soon as practicable after the Effective Date, each Holder of an Allowed Other Priority Claim shall receive on account thereof Cash equal to such Allowed Other Priority Claim or in the ordinary course of business as and when due, or otherwise receive treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code, except to the extent the Holder of an Allowed Other Priority Claim agrees to less favorable treatment.  The Debtors estimate that the total amount of Other Priority Claims will be between $9.6 million and $13.7 million.[11]

c.  *Voting*:  Class 2 Claims are Unimpaired under the Plan and are presumed to accept the Plan.

6.  **Class 3 – General Unsecured Claims**

a.  *Classification*:  Class 3 consists of all General Unsecured Claims.  Class 3 General Unsecured Claims shall include any deficiency claim held by a Holder of a Secured Claim.

---

[10] These amounts may be materially impacted by the ultimate resolution of the character and amount of the Cardinal Claims, and will depend on the amount of the Cardinal Secured Claim ultimately allowed by the Bankruptcy Court, and this outcome could have a material impact on Class 3 recoveries.  See Section V.O, *supra*, for additional information.

[11] These amounts may be materially impacted by the ultimate resolution of the character and amount of the Cardinal Claims, and will depend on the amount of the Cardinal Secured Claim ultimately allowed by the Bankruptcy Court, and this outcome could have a material impact on Class 3 recoveries.  See Section V.O, *supra*, for additional information.

    b.   *Treatment*:  Under the Plan, on or as soon as practicable after the Effective Date, and from time to time where practicable thereafter, each Holder of an Allowed General Unsecured Claim shall receive (i) if substantive consolidation is granted, its Pro Rata share of an amount equal to the Distribution Proceeds, less any amounts that the Liquidating Trustee in its reasonable discretion determines to be necessary to be held to wind up the Debtors' affairs and administer the Liquidating Trust; or (ii) if substantive consolidation is not granted, its Pro Rata share of an amount equal to the Distribution Proceeds attributable to the Debtor against which such Holder has an Allowed General Unsecured Claim, less any amounts that the Liquidating Trustee in its reasonable discretion determines to be necessary to be held to wind up such Debtor's affairs and administer the Liquidating Trust in respect of such Debtor's Estate.[12]

    c.   *Voting*:  Class 3 Claims are Impaired under the Plan, and Holders of Class 3 Claims are entitled to vote on the Plan.

**7.**    **Class 4 – Intercompany Claims**

    a.   *Classification*:  Class 4 consists of all Intercompany Claims.

    b.   *Treatment*:  The Plan provides that all Intercompany Claims shall be eliminated.  (In addition, Intercompany Claims would be eliminated by substantive consolidation if granted.)  No Plan distributions shall be made on account of such Claims.

    c.   *Voting*:  Class 4 Claims are Impaired under the Plan and deemed to reject the Plan.

**8.**    **Class 5 – Section 510(b) Claims**

    a.   *Classification*:  Class 5 consists of Claims subject to subordination to General Unsecured Claims pursuant to section 510(b) of the Bankruptcy Code.

    b.   *Treatment*:  The Plan provides that Section 510(b) Claims will be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim.  The Debtors are not aware of any valid Section 510(b) Claims and believe that no such Section 510(b) Claims exist.

    c.   *Voting*:  Holders of Class 5 Claims, if any, are Impaired under the Plan and deemed to reject the Plan.

**9.**    **Class 6 – Equity Interests**

    a.   *Classification*:  Class 6 consists of all Interests in any Debtor.

---

[12] The State of Mississippi has filed Claims against Debtors Fred's, Inc., and Fred's Stores of Tennessee, Inc., each for approximately $25.4 billion.  The Claims are disputed, and relates to a litigation the Debtors have been defending since 2016.  *See* Section IV.F, *infra*.  The Debtors believe the Claims to be meritless and have estimated the Claims' amount as $0.  In the event the Claims are allowed at a higher amount, recoveries to Class 3 creditors will be reduced.

     b.    *Treatment*:  The Plan provides that all Interests shall be canceled and extinguished, and shall be of no further force or effect.  (In addition, Intercompany Interests would be eliminated by substantive consolidation if granted.)  No Holder of Interests shall receive or retain any property under the Plan on account of such Interests.

     c.    *Voting*:  Holders of Interests are Impaired under the Plan and deemed to reject the Plan.

## B.    Implementation of the Plan

### 1.    General Settlement of Claims

The Plan provides that, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including substantive consolidation (if granted), and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

### 2.    Substantive Consolidation

The Plan provides for, but is not predicated upon, the substantive consolidation of the Chapter 11 Cases of the Debtors (but not any Excluded Debtors)[13] into a single Chapter 11 Case after entry of a Confirmation Order for purposes of the Plan and the distributions to be made under the Plan.  Upon substantive consolidation, (i) all assets and liabilities of the Debtors shall be merged, (ii) any obligations of any Debtor shall be deemed to be one obligation of the Debtors, (iii) any Claims Filed or to be Filed in connection with any such obligation shall be deemed one claim against the Debtors, (iv) each Claim Filed in the Chapter 11 Cases of any Debtor shall be deemed Filed against the Debtors in the consolidated Chapter 11 Case, in accordance with the substantive consolidation of the assets and liabilities of the Debtors and (v) all transfers, disbursements and distributions made by any Debtor shall be deemed to be made by all of the Debtors.  Holders of Allowed Claims in each Class shall be entitled to their Pro Rata share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim.

The Debtors believe that substantive consolidation will provide administrative efficiency and convenience that likely will outweigh any detriment to creditors of any Debtors' Estates.   The Debtors believe this for the following reasons:

- Of the two Estates with significant creditors and assets (Fred's, Inc. and Fred's Stores of Tennessee, Inc.), neither is materially more solvent than the other, such that the very modest disparity in potential recoveries for creditors of the more solvent Estate likely could be consumed by the administrative expense of separately administering the Estates, including for the reasons below.

---

[13] The excluded Debtors do not have material assets available for distribution to unsecured creditors.

- Certain material assets of the Debtors are not clearly owned by any one Debtor or Estate. These include in excess of $2 million of cash collateral securing letters of credit; certain valuable litigation claims that the Debtors have marketed for sale; various cash deposits; and any post-confirmation affirmative claims that the Liquidation Trust may monetize. These assets may comprise a material portion of the value available for distribution to unsecured creditors.  It is unclear as a matter of law which Estate would be entitled to them, and in what proportions, such that in the absence of substantive consolidation, a mechanism would have to be created so non-conflicted parties could advocate for each respective Debtor.  The costs required to resolve disputed ownership among competing Estates would be disproportionate to the amount of value at issue, to the likely detriment of all unsecured creditors.

- There would be significant costs to attempt to allocate post-petition expenses among the Estates, some of which, such as professional fees, might be inseparable.

- Administering multiple separate pools of claims, including objecting to claims that are seemingly filed improperly against multiple debtors, or against a different debtor than that reflected in the Debtors' books and records, and all of the additional associated record-keeping, would likely reduce recoveries for creditors of all Debtors.

- The Debtors have no ongoing business operations other than wind-down activities.

- All of the Debtors' assets will be vested in a single Liquidating Trust after the Effective Date.

Thus, while it is sometimes the case that one estate is benefitted and another burdened by the merging effects of substantive consolidation, here, the Debtors believe that all of their Estates will benefit from substantive consolidation as a result of the expenses and risks that it would avoid.

Nonetheless, in the event that the Court does not approve substantive consolidation at the Confirmation Hearing, the Debtors likely will continue to seek Confirmation of the Plan without substantive consolidation.  Substantive consolidation is not a condition to Confirmation of the Plan.

**3.**    **Sources of Consideration for Plan Distributions**

The Plan provides that the Liquidating Trust will fund distributions under the Plan with Distribution Proceeds.

**4.**    **Liquidating Trust**

The Plan provides that on the Effective Date, the Debtors and the Liquidating Trustee shall enter into the Liquidating Trust Agreement.  Additionally, on the Effective Date, the Debtors irrevocably shall transfer and shall be deemed to have transferred to the Liquidating Trust all right, title and interest in and to the Liquidating Trust Assets in accordance with the Plan.  In his, her, or its capacity as Liquidating Trustee, the Liquidating Trustee shall accept all Liquidating Trust Assets on behalf of the beneficiaries thereof, and be authorized to obtain, seek the turnover, liquidate, and collect all of the Liquidating Trust Assets not in his, her, or its possession.  The Liquidating Trust will be deemed created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date.

The Liquidating Trust also shall succeed to the Debtors with respect to any non-expired key employee retention programs authorized by the Bankruptcy Court in the Chapter 11 Cases.

5.      **Dissolution and Board of Directors**

The Plan provides that on the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor. Subject in all respects to the terms of the Plan, the Debtors and the Excluded Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases, in accordance with Article VIII.Q of the Plan.

6.      **Corporate Action**

The Plan provides that on the Effective Date, all other actions contemplated by the Plan shall be authorized and approved in all respects. All matters provided for in the Plan involving the corporate structure of the Debtors or the Liquidating Trust, and any corporate action required by the Debtors or the Liquidating Trust in connection with the Plan, shall be deemed to have occurred and shall be in effect on the Effective Date without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Liquidating Trust. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Liquidating Trust, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Liquidating Trust. The referenced authorizations and approvals shall be effective notwithstanding any requirements under non-bankruptcy law.

7.      **Cancellation of Notes, Instruments, Certificates, and Other Documents**

The Plan provides that on the Effective Date, except as otherwise specifically provided for in the Plan, the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be canceled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder.

8.      **Exemption from Certain Taxes and Fees**

The Plan provides that to the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant thereto, or the issuance, transfer or exchange of any security under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

9.      **Preservation of Books and Records**

The Debtors' remaining employees will preserve the Debtors' books and records through the Effective Date, at which point their continued preservation will become the responsibility of the Liquidating Trust.  The Debtors are also seeking bids for vendors to preserve pharmaceutical records as required by law and regulation, and have included such expenses in their wind-down estimates.

C.      **Liquidating Trust**

The Plan provides that the Liquidating Trust shall be formed on the Effective Date, and shall continue in existence for the benefit of the Liquidating Trust beneficiaries.  The powers, authority, responsibilities, and duties of the Liquidating Trust, the Liquidating Trust Advisory Committee and the Liquidating Trustee are set forth in and shall be governed by the Plan and the Liquidating Trust Agreement.  The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, without limitation, any and all provisions necessary to ensure the continued treatment of the Liquidating Trust as a grantor trust and the beneficiaries of the Liquidating Trust as the grantors and owners thereof for federal income tax purposes.  The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

The Plan further provides that on the Effective Date, the Liquidating Trustee, on behalf of the Debtors, shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement and consistent with the Plan.

1.      **Purpose of the Liquidating Trust**

The Plan provides that the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the sole purpose of liquidating and administering the Liquidating Trust Assets and making distributions on account thereof as provided for under the Plan in accordance with Treas. Reg. § 301.7701-4(d).  The Liquidating Trust is intended to qualify as a liquidating trust pursuant to Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.  The Liquidating Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Liquidating Trust Agreement.  Pursuant to such purpose, the Liquidating Trust shall engage in (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims, (c) prosecuting Causes of Action, (d) making distributions on account of Allowed Claims as provided hereunder, (e) maximizing recovery of the Liquidating Trust Assets for the benefit of the beneficiaries thereof, (f) distributing the proceeds of the Liquidating Trust Assets to the beneficiaries in accordance with the Plan and the Liquidating Trust Agreement, (g) establishing and funding the Distribution Account, (h) filing appropriate tax returns for the Debtors and for the Liquidating Trust, (i) complying with any continuing obligations under the Financing Orders, (j) administering the Plan in an efficacious manner, and (k) all other matters detailed in the Liquidating Trust Agreement.  The Liquidating Trust shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, Financing Orders (as applicable) and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Liquidating Trust to file motions or substitutions of parties or counsel in each such matter.

2.    **The Liquidating Trust Assets.**

The Liquidating Trust Assets are comprised of (i) all Causes of Action of the Debtors, including, without limitation, any and all Litigation Claims and rights and claims under the D&O Liability Insurance Policies, and (ii) all other unencumbered assets of the Debtors' Estates remaining after all payments have been made pursuant to the Plan, Confirmation Order, and Liquidating Trust Agreement, as applicable, on the Effective Date.

The Plan provides that on the Effective Date, and in accordance with sections 1123 and 1141 of the Bankruptcy Code and pursuant to the terms of the Plan, all title and interest in all of the Liquidating Trust Assets, as well as the rights and powers of each Debtor in such Liquidating Trust Assets, shall automatically vest in the Liquidating Trust, free and clear of all Claims and Interests for the benefit of the Liquidating Trust beneficiaries.  Upon the transfer of the Liquidating Trust Assets, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their predecessors, successors and assigns, shall be discharged and released from all liability with respect to the delivery of such distributions and shall have no reversionary or further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations which otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.  The Liquidating Trustee shall agree to accept and hold the Liquidating Trust Assets in the Liquidating Trust for the benefit of the beneficiaries of the Liquidating Trust, subject to the terms of the Plan and the Liquidating Trust Agreement.

The Debtors, the Liquidating Trustee, the Liquidating Trust Advisory Committee, the Liquidating Trust beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as reasonably necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust.

3.    **The Liquidating Trustee**

The Plan provides that the Liquidating Trustee shall be a Person or Entity mutually acceptable to the Debtors and the Creditors' Committee, whose appointment shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.  Following appointment, the Liquidating Trustee shall act in accordance with the Plan and Liquidating Trust Agreement, and in such capacity shall have the same powers as the board of directors and officers of the Debtors (and all bylaws, articles of incorporation, and related corporate documents are deemed amended by the Plan to permit and authorize the same).  The Liquidating Trustee may be removed at any time by the Liquidating Trust Advisory Committee, with or without cause, upon at least ten (10) days' prior written notice to the U.S. Trustee and the Liquidating Trustee.  In the event of resignation or removal, death or incapacity of the Liquidating Trustee, the Liquidating Trust Advisory Committee shall designate another Person or Entity to serve as Liquidating Trustee and thereupon the successor Liquidating Trustee, without any further act or need for an order of the Bankruptcy Court, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor; *provided*, *however*, that the Liquidating Trustee shall be deemed removed on the date the Chapter 11 Cases are closed, and no successor thereto shall be designated.  All fees and expenses incurred by the Liquidating Trustee and its professionals (which the Liquidating Trustee may retain in accordance with Article VIII.I of the Plan) following the Effective Date shall be paid from the Liquidating Trust Assets as set forth in the Liquidating Trust Agreement.

4.      **Role of the Liquidating Trustee**

The Plan provides that the Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust and the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3) as well as the representative of the Estates appointed pursuant to section 1123(b)(3) of the Bankruptcy Code regarding all Liquidating Trust Assets.  The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include, without limitation, the authority and responsibility to:  (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets, including through the creation of reserves as provided for under the Plan; (b) file tax returns or other reports required by governmental entities and pay taxes or other obligations incurred by the Debtors, the Estates, and Liquidating Trust to the extent payable consistent with the Plan, the Bankruptcy Code, or order of the Bankruptcy Court; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals (which may include Professionals retained during the Chapter 11 Cases), and consultants to advise and assist in the administration, prosecution, and distribution of Liquidating Trust Assets; (d) calculate and implement distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement, Causes of Action vested in the Liquidating Trust; (f) address and resolve issues involving objections, reconciliation, and allowance of Claims in accordance with the Plan; and (g) undertake all administrative functions of the Plan and the Debtors' Chapter 11 Cases.  The Liquidating Trust is the successor to the Debtors and their Estates.

The Plan provides that on the Effective Date, the Liquidating Trustee shall:  (a) take possession of all books, records, and files of the Debtors and their respective Estates; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trust determines, in accordance with the Liquidating Trust Agreement, and applicable law and regulation, that retention of same is no longer necessary or required.

The Plan provides that the Liquidating Trustee may, but shall not be required to, invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, *provided*, *however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation § 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service ("IRS") guidelines, rulings, or other controlling authorities.

The Plan provides that the Liquidating Trustee shall administer each Debtor's and each Excluded Debtor's tax obligations, including (a) filing tax returns and paying tax obligations, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its Estate under section 505(b) of the Bankruptcy Code for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws, and (c) representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.  The Liquidating Trustee shall have the same authority in respect of all taxes of the Debtors, and to the same extent, as if the Liquidating Trustee were the Debtors.

The Plan provides that the Liquidating Trustee shall administer the Liquidating Trust's tax obligations, including (a) filing tax returns as a grantor trust pursuant to Treasury Regulation § 1.671-4(a) including, to the extent applicable, for any disputed claims reserve pursuant to Treasury Regulation § 1.468B-9; (b) paying the Liquidating Trust's tax obligations; (c) requesting, if necessary, an expedited determination of any unpaid tax liability of the Liquidating Trust for all taxable periods of the Liquidating Trust through the dissolution of the Liquidating Trust, as determined under section 505(b) of the Bankruptcy Code and applicable tax laws; and (d) representing the interest and account of the Liquidating Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding

or audit.  The Liquidating Trust also shall annually (for tax years in which distributions from the Liquidating Trust are made) send to each known beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction, or credit and all such holders shall report such items on their federal income tax returns; *provided*, *however*, that no such statement need be sent to any Class that is not expected to receive any distribution from the Liquidating Trust.  The Liquidating Trust's taxable income, gain, loss, deduction, or credit will be allocated to the Liquidating Trust's beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust.  As soon as practicable after the Effective Date, the Liquidating Trustee shall make a good faith valuation of assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes.  The Liquidating Trustee also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any governmental unit for taxing purposes.  The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements.

The Plan also provides that the Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtors and the Excluded Debtors, and any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets.

The Plan further provides that the Liquidating Trustee shall always act consistently with, and not contrary to, the purpose of the Liquidating Trust as set forth in Article VIII.B of the Plan.  The Liquidating Trustee and the members of the Liquidating Trust Advisory Committee shall have fiduciary duties to the Liquidating Trust beneficiaries consistent with the fiduciary duties that a member of an official committee appointed pursuant to section 1102 of the Bankruptcy Code has to the creditor constituents represented by such committee and shall exercise his, her or its responsibilities accordingly; *provided, however*, that the Liquidating Trustee and the members of the Liquidating Trust Advisory Committee shall not owe fiduciary obligations to any defendants or potential defendants of Causes of Action in their capacities as such, it being the intent of such fiduciary duties to ensure that the Liquidating Trustee's and the Liquidating Trust Advisory Committee members' obligations are to maximize the value of the Liquidating Trust Assets, including the Causes of Action.

## 5.    The Liquidating Trust Advisory Committee

The Plan provides that a Liquidating Trust Advisory Committee shall be a three-member committee established under the Liquidating Trust Agreement.  The members of the Liquidating Trust Advisory Committee shall be designated by the Creditors' Committee and reasonably acceptable to the Debtors.  The Liquidating Trust Advisory Committee shall provide input to the Liquidating Trustee on certain matters, and shall have certain rights and authority as set forth in the Liquidating Trust Agreement.  All fees and expenses incurred by the Liquidating Trust Advisory Committee shall be paid from the Liquidating Trust Assets, in accordance with the Liquidating Trust Agreement.  The Liquidating Trust Advisory Committee may authorize its own dissolution by filing with the Bankruptcy Court an appropriate notice that its responsibilities hereunder and under the Liquidating Trust Agreement have concluded.  Unless already dissolved, the Liquidating Trust Advisory Committee shall be dissolved as of the date the Chapter 11 Cases are closed.

## 6.    Beneficiaries of the Liquidating Trust

The Plan provides that the holders of Allowed General Unsecured Claims shall be the beneficiaries of the Liquidating Trust.  Such beneficiaries shall be bound by the Liquidating Trust Agreement.  The interests of the beneficiaries in the Liquidating Trust shall be uncertificated and nontransferable except upon death of the interest holder or by operation of law.

7. **Federal Income Tax Treatment of the Liquidating Trust Assets**

The Plan provides that subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust beneficiaries) shall treat the transfer of Liquidating Trust Assets to the Liquidating Trust as (1) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the Liquidating Trust of Liquidating Trust Assets in exchange for Liquidating Trust Interests. Accordingly, except in the event of contrary definitive guidance, Liquidating Trust beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

The Plan provides that allocations of Liquidating Trust taxable income among Liquidating Trust beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable to Disputed Claims) to the holders of Liquidating Trust interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of Liquidating Trust Assets for the purpose of this paragraph shall equal their fair market value on the date Liquidating Trust Assets are transferred to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Plan provides that subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), the Liquidating Trustee (i) may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9, and (ii) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Liquidating Trustee and Liquidating Trust beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

The Plan further provides that the Liquidating Trust shall be responsible for payment, out of Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust (including any Cash reserved for future payment of Disputed Claims in accordance with Article IX.D of the Plan) or the Liquidating Trust Assets.

8. **Vesting and Transfer of Assets to Liquidating Trust**

The Plan provides that pursuant to section 1141(b) of the Bankruptcy Code, the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Liens, Claims, and Interests, except as otherwise specifically provided in the Plan or in the Confirmation Order; *provided*, *however*, that the

Liquidating Trustee may abandon or otherwise not accept any non-Cash Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, have no value or are burdensome to the Liquidating Trust. Any non-Cash Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust.

9. **Retention of Professionals by the Liquidating Trustee**

The Plan provides that the Liquidating Trustee may, in connection with the performance of his, her, or its functions, in the Liquidating Trustee's sole and absolute discretion, retain, consult with, and compensate attorneys, accountants, advisors, or agents to assist in his, her, or its duties on such terms (including on a contingency or hourly basis) as he, she, or it deems reasonable and appropriate without Bankruptcy Court approval. The Liquidating Trustee may assert the reasonable reliance on the advice of counsel as a defense to any claim asserted against the Liquidating Trustee. Notwithstanding such authority, the Liquidating Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors, or agents, and his, her, or its determination not to do so shall not result in the imposition of liability on the Liquidating Trustee or his, her, or its members unless such determination is based on willful misconduct, gross negligence, or fraud.

10. **Liquidating Trust Expenses**

The Plan provides that, subject to the provisions of the Liquidating Trust Agreement, all costs, expenses, and obligations incurred by the Liquidating Trustee in administering the Plan, the Liquidating Trust, or in any manner connected, incidental, or related thereto, in effecting distributions from the Liquidating Trust shall be a charge against the Liquidating Trust Assets remaining from time to time in the hands of the Liquidating Trustee. Such costs, expenses, and obligations shall be paid in accordance with the Liquidating Trust Agreement, which shall provide for an initial distribution to the Distribution Account to fund a prompt distribution to Holders of Allowed General Unsecured Claims in accordance with the Plan.

11. **Wind Down**

The Plan provides that on and after the Effective Date, the Liquidating Trustee shall be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court. The Liquidating Trustee shall have the power and authority to take any action necessary to wind down and dissolve the Debtors, the Excluded Debtors, and their respective Estates, without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtors or the Excluded Debtors.

The Plan provides that as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases, the Liquidating Trustee shall: (1) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors and the Excluded Debtors under the applicable laws of their state of incorporation or formation (as applicable); (2) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors and the Excluded Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors, the Excluded Debtors or their respective Estates for any tax incurred during the administration of such Debtor's or Excluded Debtor's Chapter 11 Case, as determined under applicable tax laws; and (3) take such other actions as the Liquidating Trustee may determine to be necessary or desirable to carry out the purposes of the Plan. Any certificate of dissolution or equivalent document may be executed by the Liquidating Trustee without need for any additional action or approval by any Person or Entity. From and after the Effective

Date, except with respect to the Liquidating Trust as set forth in the Plan, the Debtors and the Excluded Debtors (1) for all purposes shall be deemed to have withdrawn their business operations (if any) from any state in which the Debtors and Excluded Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to the Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding the Debtors' and Excluded Debtors' dissolution, the Debtors and Excluded Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Liquidating Trustee.

## 12.    Indemnification of the Liquidating Trustee

The Plan provides that the Liquidating Trust shall indemnify the Indemnified Persons for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost, or expense (including, without limitation, the reasonable fees and expenses of their respective professionals) incurred without gross negligence, willful misconduct, or fraud on the part of the Indemnified Persons (which gross negligence, willful misconduct, or fraud, if any, must be determined by Final Order of a court of competent jurisdiction) for any action taken, suffered, or omitted to be taken by the Indemnified Persons in connection with the acceptance, administration, exercise, or performance of their duties under the Plan or the Liquidating Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will conclusively be deemed not to constitute gross negligence, willful misconduct, or fraud. In addition, the Liquidating Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Indemnified Persons from and against and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, without limitation, to attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust or the implementation or administration of the Plan if the Indemnified Person acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Liquidating Trust. To the extent that the Liquidating Trust indemnifies and holds harmless the Indemnified Persons as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as expenses of the Liquidating Trust. The costs and expenses incurred in enforcing the right of indemnification in this section shall be paid by the Liquidating Trust. The Plan provides that this provision shall survive the termination of the Liquidating Trust Agreement and the resignation, replacement, or removal of the Liquidating Trustee.

## 13.    Term of the Liquidating Trust

The Plan provides that the Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidating Trust Assets have been liquidated or abandoned, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all distributions required to be made by the Liquidating Trust under the Plan and the Liquidating Trust Agreement have been made, and (v) the Debtors' Chapter 11 Cases have been closed; *provided, however*, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period

approved by the Bankruptcy Court), determines that an extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets and/or distributions in accordance with the Plan.

### D.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

#### 1.    Allowance of Claims

The Plan provides that after the Effective Date, the Liquidating Trust shall have and retain any and all rights and defenses the Debtors had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

#### 2.    Estimation of Claims

The Plan provides that before, on, or after the Effective Date, the Debtors or the Liquidating Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason. Notwithstanding any provision in the Plan to the contrary, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or the Liquidating Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

#### 3.    Disputed Claims

The Plan provides that on or after the Effective Date, the Debtors or the Liquidating Trustee, as applicable, shall retain funds for potential payment of Disputed Claims in the event such Disputed Claims, or the disputed portion thereof, is Allowed, in an amount or amounts as reasonably determined by the Debtors or the Liquidating Trustee, as applicable, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim.

#### 4.    Objections to Claims and Resolution of Disputed Claims

The Plan provides that, except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Liquidating Trustee shall have the sole authority to File and prosecute objections to Claims on behalf of the Liquidating Trust, and the Liquidating Trustee shall have the sole authority, on behalf of the Liquidating Trust, to: (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to, or action, order, or approval of, the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to, or action, order, or approval of, the Bankruptcy Court; *provided*, *however*, that nothing in the Plan shall preclude the U.S. Trustee or other parties with requisite standing from objecting to any Claim. On and after the Effective Date, the Liquidating Trustee shall use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise.

Objections to the allowance of a Claim shall be Filed by 120 days after the Effective Date, *provided*, *however*, that the Debtors or the Liquidating Trustee may seek extensions of this date from the Bankruptcy Court, with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

## 5.    Disallowance of Claims

The Plan provides that pursuant to section 502(d) of the Bankruptcy Code, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall not be deemed Allowed, and Holders of such Claims may not receive any distributions on account of such Claims until such time as (i) such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Liquidating Trustee, as applicable, or (ii) such Claims are allowed by a Final Order of the Bankruptcy Court.  All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

**Except as otherwise provided in the Plan or as agreed to by the Debtors or the Liquidating Trustee, as applicable, any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Liquidating Trustee and without further notice to any party or action, approval, or order of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims.  A Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.**

## 6.    Amendments to Claims

The Plan provides that on or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Liquidating Trust, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court to the maximum extent provided by applicable law.

## 7.    Cardinal Claims Disputed

The Plan provides that the Cardinal Claims shall be deemed Disputed by the Debtors and the Liquidating Trust, without need to file a separate objection, until such time as (i) the Bankruptcy Court enters an order providing for the Allowance or Disallowance of the Cardinal Claims or (ii) the Debtors or Liquidating Trust, as applicable, agree that the Cardinal Claims are no longer disputed.  On or promptly after the Effective Date, the Liquidating Trustee shall segregate Cash in a non-interest bearing reserve in the initial amount of $12 million (the "Cardinal Reserve") in respect of any portion of the Cardinal Claims that may become Allowed as a Secured Claim, an Administrative Expense Claim, or an Other Priority Claim pending further order of the Bankruptcy Court, and which shall be without prejudice to the rights of Cardinal or any other party with respect to the amount, characterization and priority of the Cardinal Claims, or to seek to increase or decrease the amount of the aforesaid reserve.  Cardinal has informed the Debtors that it believes that the full amount of the Cardinal Claims are Allowed Claims, and that the Cardinal Reserve should be funded in an amount equal to the full amount of the Cardinal Claims

as asserted by Cardinal of approximately $23.9 million.  Cardinal reserves all rights to dispute the amount of the Cardinal Reserve as it deems appropriate.

**E.    Distributions Under the Plan**

**1.    Timing and Calculation of Amounts to be Distributed**

The Plan provides that unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Allowed Interest (or such Holder's affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

**2.    Distributions by the Liquidating Trustee**

The Plan provides that distributions under the Plan shall be made by the Liquidating Trustee.

**3.    Record Date for Distribution**

The Plan provides that on the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

**4.    Delivery of Distributions**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Liquidating Trustee:  (a) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Liquidating Trust has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf.  Subject to the provisions of the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Liquidating Trustee or the Liquidating Trust, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

5.        **Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Liquidating Trustee has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest. Notwithstanding the foregoing, the Plan provides that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Liquidating Trust, without need for any further order of the Bankruptcy Court (notwithstanding any applicable law to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

6.        **Distribution**

After funding of the Professional Fee Escrow Account in accordance with the Plan, any funds in the Distribution Account shall be allocated and paid in the following priority (in each case on a Pro Rata basis): *first*, on account of all Other Secured Claims; *second*, on account of all Allowed Administrative Claims; *third*, on account of the Allowed Priority Claims; and *fourth*, on account of all Allowed General Unsecured Claims.

7.        **Manner of Payment**

The Plan provides that, unless as otherwise set forth in the Plan, all distributions of Cash to the Holders of Allowed Claims under the Plan shall be made by the Liquidating Trustee. At the option of the Liquidating Trustee, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

8.        **Compliance with Tax Requirements**

The Plan provides that, to the extent applicable, the Liquidating Trust shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Any taxes withheld and deposited with the appropriate Governmental Unit shall be treated as if distributed to the applicable Holder for purposes of determining the distributions to which such Holder is entitled to receive. Notwithstanding any provision in the Plan to the contrary, the Liquidating Trust shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including (i) liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, (ii) withholding distributions pending receipt of information necessary to facilitate such distributions, (iii) establishing any other mechanisms it believes are reasonable and appropriate, or (iv) obtaining, if such information is not already in the possession of the Liquidating Trust, (A) in the case of a U.S. Holder, a properly executed Internal Revenue Service Form W-9, and (B) in the case of a non-U.S. Holder, a properly executed applicable Internal Revenue Service Form W-8 and any other forms required by any applicable law (or in each of the cases of clauses (A) and (B) above, such Holder otherwise establishes eligibility for an exemption). The Liquidating Trust reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

9.        **Allocations**

The Plan provides that distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent

the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed under the Plan.

### 10.    No Postpetition Interest on Claims

Unless otherwise specifically provided for or contemplated in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

### 11.    Minimum Distributions

The Plan provides that, except as otherwise provided in the Plan, Holders of Allowed Claims entitled to distributions of $50 (whether Cash or otherwise) or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article X of the Plan and its Holder shall be forever barred pursuant to Article X of the Plan from asserting that Claim against the Debtors or the Liquidating Trust, as applicable, or their property, *provided*, *however*, that distributions that would otherwise be made to such Holder shall carry over until the next date of a distribution to such Holder (on account of a Disputed Claim or otherwise) until the cumulative amount of Allowed Claims held by such Holder is more than $50, at which time such cumulative amount shall be paid to such Holder.

### 12.    Rights of Action

The Plan provides that any rights or causes of action accruing to the Debtors or Liquidating Trust, including those arising under or pursuant to the Bankruptcy Code, shall remain assets of, or vest in, the Liquidating Trust.  Any distributions provided for therein and the allowance of any Claim for the purpose of voting on the Plan is and shall be without prejudice to the rights of the Liquidating Trust to pursue and prosecute any reserved rights of action, including without limitation, those arising under or pursuant to the Bankruptcy Code.

## F.    Unexpired Leases and Executory Contracts

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be deemed **rejected**, effective as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than:  (1) those that are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) those that have been previously assumed or rejected by a Final Order; (3) those that are the subject of a motion to assume or reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (4) those that are subject to a motion to assume or reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such assumption or rejection is after the Effective Date; or (5) D&O Liability Insurance Policies.  Except as otherwise provided in the Plan, the Debtors shall assume, assume and assign, or reject, as the case may be, Executory Contracts and Unexpired Leases set forth on the Schedules of Assumed Executory Contracts and Unexpired Leases.  Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order.  Unless otherwise

indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall vest or re-vest, as applicable, in and be fully enforceable by the Liquidating Trust in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease.  Notwithstanding anything in the Plan to the contrary, the Debtors or the Liquidating Trust, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases, at any time through and including 30 days after the Effective Date.

2.      **Cure of Defaults for Assumed, or Assumed and Assigned, Executory Contracts and Unexpired Leases**

The Plan provides that any monetary defaults under an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice or as otherwise agreed or determined by a Final Order of the Bankruptcy Court, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described in the Plan, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.  In the event of a dispute regarding:  (1) the amount of any Cure Claim; (2) the ability of the Liquidating Trust or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment.  Notwithstanding the foregoing, nothing in the Plan shall prevent the Liquidating Trust from settling any Cure Claim without further notice to or action, order, or approval of the Bankruptcy Court.

The Plan provides that the Debtors will file a Schedule of Assumed Executory Contracts and Unexpired Leases (the "Assumption Schedule") with the Plan Supplement, at least seven (7) days prior to the deadline for objecting to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to Parties in Interest, and serve the Assumption Schedule to each party to an Executory Contract or Unexpired Lease listed thereon.  Additionally, at least seven (7) days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, the Debtors shall distribute, or cause to be distributed, Cure Notices to applicable third parties.

Any objections by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption and assignment, or related Cure Claim must be Filed by the Cure/Assumption Objection Deadline.  Any party to an assumed Executory Contracts or Unexpired Lease that has not filed an appropriate pleading with the Bankruptcy Court on or before the applicable Cure/Assumption Objection Deadline shall be deemed to have consented to such assumption or assumption and assignment, or Cure Claim.  To the extent that the Debtors seek to assume and assign an Executory Contract or Unexpired Lease pursuant to the Plan, the Debtors will identify the assignee in the applicable Cure Notice and/or Schedule and provide "adequate assurance of future performance" for such assignee (within the meaning of section 365 of the Bankruptcy Code) under the applicable Executory Contract or Unexpired Lease to be assumed and assigned.

3.     **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

The Plan provides that Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the latest to occur of:  (1) 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) 30 days after the Debtors provide notice of surrender of possession to a landlord of a rejected lease where surrender occurs after entry of an order approving such rejection; and (3) 30 days after notice of any rejection that occurs after the Effective Date.  **Any Holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely Filed shall not (1) be treated as a creditor with respect to such Claim, (2) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (3) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Debtors' Estates, the Liquidating Trust, or the property for any of the foregoing without the need for any objection by the Debtors or Liquidating Trust, as applicable, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims.

Counterparties to Executory Contracts or Unexpired Leases shall be served with a notice substantially in the form approved by the Bankruptcy Court, pursuant to the Bankruptcy Court order approving the Disclosure Statement, as soon as reasonably practicable following entry of the Bankruptcy Court order approving the Disclosure Statement.

4.     **Indemnification Obligations**

The Plan provides that all indemnification obligations in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed by the Liquidating Trust and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.  All indemnification obligations of the Debtors arising under or pursuant to the DIP Agreement shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

5.     **Director and Officer Liability Insurance**

The Plan provides that, to the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Debtors shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, and coverage for defense and indemnity under any of the D&O Liability Insurance Policies shall remain available to all individuals and entities covered

thereby, including those within the definition of "Insured Person" in any of the D&O Liability Insurance Policies. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

### 6.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

The Plan provides that modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 7.    Reservation of Rights

The Plan provides that neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Liquidating Trust has any liability thereunder.

### 8.    Nonoccurrence of Effective Date

The Plan provides that in the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Executory Contracts or Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 9.    Contracts and Leases Entered Into After the Petition Date

The Plan provides that contracts and leases entered into after the Petition Date by any Debtor, including any Assumed Executory Contracts or Unexpired Leases, will be performed by the Liquidating Trust, in the ordinary course of their business. Accordingly, any such contracts and leases (including any Assumed Executory Contracts or Unexpired Leases) that have not been rejected as of the date of the Confirmation Date shall survive and remain unaffected by entry of the Confirmation Order.

## G.    Retention of Jurisdiction

The Plan provides that notwithstanding the occurrence of the Confirmation Order and occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan, to the fullest lawful extent, including jurisdiction to:

(a)      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

(b)      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

(c)      resolve any matters related to (i) the assumption or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease, (ii) the Liquidating Trust amending, modifying or supplementing, after the Effective Date, pursuant to Article VI.A of the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

(d)      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f)      adjudicate, decide, or resolve any and all matters related to Causes of Action;

(g)      adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;;

(h)      enter and implement such orders as may be necessary or appropriate to execute, implement, or Consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

(i)      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(j)      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(k)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

(l)        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article X of the Plan and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

(m)      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII of the Plan;

(n)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(o)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

(p)     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

(q)     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(r)     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

(s)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(t)     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

(u)     enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

(v)     hear any other matter not inconsistent with the Bankruptcy Code;

(w)     enter an order closing the Chapter 11 Cases; and

(x)     enforce the injunction, release, and exculpation provisions provided in Article X of the Plan.

**H.     Conditions Precedent to the Effective Date**

The Plan contains certain conditions that must occur or be waived prior to Confirmation and the Effective Date.

**1.     Conditions Precedent to Confirmation**

The Plan provides that, unless waived pursuant to the provisions of Article XI of the Plan, it shall be a condition to Confirmation that the Confirmation Order has been entered by the Bankruptcy Court and shall provide that:

(i)     the Debtors and Liquidating Trust are authorized to take all actions necessary or appropriate to enter into, implement and Consummate the contracts, instruments, releases, leases, and other agreements or documents to be executed and/or delivered in connection with the Plan; and

(ii)     the provisions of the Confirmation Order are nonseverable and mutually dependent.

2.      **Conditions Precedent to the Effective Date**

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article XI of the Plan):

    (i)     the Confirmation Order shall not have been subject to any reversal, stay, modification, or vacatur;

    (ii)    all actions, documents, authorizations, consents, regulatory approvals, rulings or agreements necessary to implement the Plan shall have been obtained, effected or executed; and

    (iii)   all Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court.

3.      **Waiver**

The Plan provides that the conditions to the Confirmation and the Effective Date of the Plan may be waived by the Debtors without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to Confirm or Consummate the Plan.

4.      **Effect of Nonoccurrence of Conditions to the Effective Date**

The Plan provides that if the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

I.      **Modification, Withdrawal, or Revocation of the Plan**

1.      **Revocation or Withdrawal of the Plan**

The Plan provides that the Debtors reserve the right to revoke or withdraw the Plan before the Effective Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

2.      **Modification of the Plan**

The Plan provides that, subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan, including, but not limited to, by (i) changing the treatment applicable to any

Class of Claims; and (ii) adding a Debtor to the Excluded Debtors.  The Debtors also reserve the right to cease seeking the substantive consolidation of the Chapter 11 Cases of the Debtors through Article II of the Plan, and seek Confirmation of the Plan with some or all of the Debtors remaining non-consolidated. The Debtors further reserve the right to seek Confirmation of a modified Plan consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors or the Liquidating Trust, as applicable, expressly reserve their right to alter, amend, or modify materially the Plan, one or more times, after Confirmation and before the Effective Date, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### J.        Dissolution of the Creditors' Committee

The Plan provides that on the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals.  The Liquidating Trust and Liquidating Trustee shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

### K.        Releases

The Plan contains release, exculpation, and injunction provisions, referenced herein.  The release, exculpation, and injunction provisions extend to, among others, parties that are insiders as that term is defined pursuant to section 101(31) of the Bankruptcy Code.  Under applicable law, the Debtors' release of the Released Parties[14] is appropriate where:  (a) there is an identity of interest between the debtor and the third party, such that a suit against the released non-debtor party is, in essence, a suit against the debtor or will deplete assets of the Estate; (b) there is a substantial contribution by the non-debtor of assets to the reorganization; (c) the injunction is essential to the reorganization; (d) there is overwhelming creditor support for the injunction; and (e) the chapter 11 plan will pay all or substantially all of the claims affected by the injunction.  These factors are neither exclusive nor are they a list of conjunctive requirements, but are helpful in weighing the equities of the particular case after a fact-specific review. Courts also consider the merits of any potential identified claim.

The Debtors, in their business judgment, believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, they are narrowly tailored.  Additionally as described below, the Debtors have concluded that any potential claims should be released inasmuch as,

---

[14] **A "Released Party" is defined in the Plan to encompass each of the following in their capacity as such:  (a) the Debtors; (b) the Debtors' current and former officers, directors and managers who served in such positions at any time on or after the Petition Date; (c) the DIP Lenders; (d) the Prepetition Lenders; (e) the Creditors' Committee and each of its members; and (f) each of the foregoing Entities' respective predecessors, successors and assigns, and its and their subsidiaries, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, chief restructuring officers, accountants, investment bankers, and consultants, in each case solely in their capacity as such, but excluding the Debtors' former officers, directors and managers who did not serve in such positions at any time on or after the Petition Date.**

after months of costly investigation of potential claims, led by the Creditors' Committee, in which the Debtors participated, the investigation has not resulted in the Debtors identifying, or the Creditors' Committee identifying to the Debtors, any viable Causes of Action that could be asserted against any of the Released Parties. Since September 2019, the Creditors' Committee has been investigating the pre-petition conduct of the Debtors. The Debtors have cooperated with the Creditors' Committee and produced in excess of 40,000 pages to its professionals. The Creditors' Committee has also conducted multiple witness interviews, and performed additional related diligence, including obtaining documents from third parties, including the Pre-Petition Credit Parties and the Debtors' largest equity holder. The Debtors, through their professionals, have also reviewed the documents produced in the Chapter 11 Cases, and attended the Creditors' Committee interviews of former employees J. Trey Hensley (Senior Vice President, Pharmacy), Ronald T. Kay (Vice President of Finance & Treasurer), and Lilia Lauren (Senior Vice President, Finance).

The Debtors also believe that the Released Parties contributed significantly to the success and administrative efficiency of the Chapter 11 Cases, and the wind down of the Debtors' business and operations both prepetition and postpetition. Accordingly, the Released Parties' prepetition and postpetition efforts resulted in the success of the Debtors' liquidation and facilitated the ultimate recoveries for Unimpaired creditors and Class 3 creditors under the Plan, and by doing so prepetition in effect contributed the protections they gave up and would have otherwise received if they had pursued the wind down solely postpetition, thereby constituting a substantial contribution to support the releases.

The Creditors' Committee states that in its view, the investigation remains ongoing and is not complete. The Creditors' Committee also states that the Debtors' Estates hold valuable Claims against the Debtors' current and former officers and directors, that these Claims may provide may provide a meaningful source of recovery for unsecured creditors in these Chapter 11 Cases, and that these assets are the only remaining assets of any value to be liquidated by the Debtors. The Creditors' Committee states that this is evidenced by the Creditors' Committee's notice of claims sent to certain of the Debtors' insurance carriers in October 2019. The Creditors' Committee also states that the Plan's release, exculpation, and injunction provisions are improper, overly broad, and render the Plan unconfirmable.

However, for the reasons stated above, the Debtors believe that the foregoing statements of the Creditors' Committee are unsupported, and the Debtors believe that the pursuit of any speculative claims will deplete Estate resources and diminish recoveries for Class 3 creditors. The Debtors also believe that it is not in the best interests of creditors and the Estates for the limited funds available for distribution to creditors to be used to pursue speculative claims instead of paid to creditors, or for distribution to creditors to be delayed while such claims are pursued. The Debtors believe that they will be able to establish the legal and factual justification for the Plan's release, exculpation, and injunction provisions at the Confirmation Hearing. The various release, exculpation, and injunction provisions are discussed below.

1.    **Compromise and Settlement of Claims, Interests, and Controversies**

The Plan provides that, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including substantive consolidation, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the

Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

The Plan provides that the Debtors shall not receive a "discharge" in violation of section 1141(d)(3) of the Bankruptcy Code; *provided*, *however*, that no Person or Entity may assert any Claim, seek or receive any payment from, or seek recourse against, any of the Estates, the Liquidating Trust, the Liquidating Trustee and/or their respective successors, assigns and/or property, except as expressly provided in the Plan.

The Plan also provides that notwithstanding anything to the contrary in the Plan, no provision of the Plan shall (i) preclude the SEC from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-Debtor Person or non-Debtor Entity in any forum.

## 2.      Release of Liens

**The Plan provides that, except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Liquidating Trust and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Liquidating Trust, as applicable.**

## 3.      Release by the Debtors

**The Plan provides, that, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, their Estates and the Liquidating Trust from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, their Estates or the Liquidating Trust would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, running from the beginning of time until the Effective Date, including Causes of Action based on or relating to, or in any manner arising from, in whole or in part:**

**(a)      the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Plan Documents;**

**(b)      any Plan Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;**

**(c)      the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Prepetition Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan,**

or the distribution of property under the Plan or any other related agreement other than the Payoff Letter Agreement; or

(d)    the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Plan Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (ii) any of the Debtors' obligations under the Payoff Letter Agreement.

The Plan provides that entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth above, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the releases set forth above are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases set forth above; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases set forth above against any of the Released Parties.

4.    <u>Release by Holders of Claims or Interests</u>

The Plan provides that as of the Effective Date, each Releasing Party[15] is deemed to have released and discharged each Debtor, and all other Released Parties from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), running from the beginning of time until the Effective Date, including Causes of Action based on or relating to, or in any manner arising from, in whole or in part:

(a)    the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Plan Documents;

---

[15] The term "Releasing Party" is defined in the Plan to mean "collectively, and in each case solely in its capacity as such:  (a) the Debtors; (b) the Liquidating Trust and Liquidating Trustee; (c) the DIP Lenders; (d) the Prepetition Lenders; (e) the Creditors' Committee and each of its members; (f) each Holder of a Claim entitled to vote to accept or reject the Plan that votes to accept or reject the Plan, or abstains from voting, and does not affirmatively elect to "opt out" of being a Releasing Party by marking the box on its ballot designated for such purpose; (g) each Holder of a Claim or Interest that is Unimpaired and presumed to accept the Plan; and (h) with respect to each of the foregoing Entities described in clauses (a) through (g), such Entities' current and former affiliates, and such Entities' and such affiliates' partners, subsidiaries, predecessors, current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly, but excluding Holders of Interests), members, officers, principals, employees, agents, managed accounts or funds, advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, together with their respective successors and assigns, in each case in such capacities."

(b)    any Plan Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan;

(c)    the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the Prepetition Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement other than the Payoff Letter Agreement; or

(d)    the business or contractual arrangements between any Debtor and any Released Party, and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, any Plan Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (ii) subject to Article X.F of the Plan, claims against any Exculpated Party related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; or (iii) any obligations of any Entity under the Payoff Letter Agreement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third-party release set forth above, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the third-party release set forth above is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Releasing Parties; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim released by the third-party release set forth above against any of the Released Parties.

5.    **Exculpation**

Under the Plan, except as expressly provided therein, no Exculpated Party[16] shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission occurring from the Petition Date through the Effective

---

[16] The term "Exculpated Party" is defined in the Plan to mean "collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Debtors' current and former officers, directors, and managers, who served in such positions at any time on or after the Petition Date; (c) the Liquidating Trust and Liquidating Trustee; (d) the Creditors' Committee and each of its members; and (e) with respect to each of the foregoing Entities and Persons, except with respect to the Persons described in clause (b), such Entities' and Persons' respective predecessors, successors and assigns, and current and former stockholders, members, limited partners, general partners, equity holders, Affiliates and its and their subsidiaries, principals, partners, parents, equity holders, members, employees, agents, officers, directors, managers, trustees, professionals, representatives, advisors, attorneys, financial advisors, chief restructuring officers, accountants, investment bankers, and consultants, in each case solely in their capacity as such."

Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, or any Plan Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.    **Injunction**

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors or the Liquidating Trust, or the other Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve, any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  For the avoidance of doubt and notwithstanding anything else in the Plan, the Debtors are not receiving a discharge under section 524(a) of the Bankruptcy Code and the injunction set forth herein shall, at least with respect to the Debtors, terminate upon the later of the distribution of all of the Debtors' property under the Plan and the closing of the Chapter 11 Cases.

7.    **Term of Injunctions and Stays**

The Plan provides that unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any

injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect through the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

The Plan further provides that the Debtors shall not receive a "discharge" in violation of section 1141(d)(3) of the Bankruptcy Code; *provided*, *however*, that no Person or Entity may assert any Claim, seek or receive any payment from, or seek recourse against, any of the Estates, the Liquidating Trust, the Liquidating Trustee and/or their respective successors, assigns and/or property, except as expressly provided in the Plan.

Furthermore, notwithstanding anything to the contrary in the Plan, no provision of the Plan shall (i) preclude the SEC from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-Debtor Person or non-Debtor entity in any forum.

### 8.  Preservation of Insurance or Other Indemnification

The Plan provides that the Debtors' release from all Claims as provided in the Plan shall not diminish or impair the enforceability of any insurance policy or other indemnification that may cover claims by or against the Debtors (including, without limitation, their officers or directors) or any other Person or Entity.

The Chubb Companies ("Chubb") have stated that they believe the Plan should: (1) provide clarification that the Debtors' successors will be liable for the Debtors' insurance, to the extent that the Debtors seek to retain benefits under their insurance policies; (2) clarify that nothing in the Plan impairs Chubb's collateral or the insurance policies or agreements; and (3) provide that workers' compensation claims and direct action claims may continue to be administered and/or paid in the ordinary course pursuant to the terms of applicable Chubb insurance policies and non-bankruptcy law.

### 9.  Setoffs and Recoupment

The Plan provides that in no event shall any Holder of a Claim be entitled to set off or recoup against such Claim any claim, right, or Cause of Action of the Debtors or the Liquidating Trust, as applicable, unless such Holder actually has provided notice of such setoff or recoupment in writing to the Debtors on or before the Confirmation Date, which notice may be provided in a timely filed Proof of Claim.

### 10.  Subordination Rights

The Plan provides that any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

### VII.
### VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires that, in order to Confirm the Plan, the Bankruptcy Court must

make a series of findings concerning the Plan and the Debtors, including that (i) the Plan has classified Claims and Interests in a permissible manner, (ii) the Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Debtors have complied with applicable provisions of the Bankruptcy Code, (iv) the Debtors have proposed the Plan in good faith and not by any means forbidden by law, (v) the disclosure required by section 1125 of the Bankruptcy Code has been made, (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (vii) the Plan is feasible and Confirmation is not likely to be followed by liquidation  other than liquidation as provided for in the Plan, (viii) the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to such Holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim or Interest in such Class has accepted the Plan, and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

**A.      Parties in Interest Entitled to Vote**

Pursuant to the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan.  A Class is impaired if the legal, equitable or contractual rights to which the Claims or Interests of that Class entitle the Holders of such Claims or Interests are modified, other than by curing defaults and reinstating the debt.  Classes of Claims and Interests that are not impaired are not entitled to vote on the Plan and are presumed to have accepted the Plan.  In addition, Classes of Claims and Interests that receive no distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

**B.      Classes Impaired Under the Plan**

Acceptances of the Plan are being solicited only from those Holders of Claims in impaired Classes that will or may receive a distribution under the Plan.  Accordingly, the Debtors are soliciting acceptances from Holders of Claims in Class 3 only.  The Holders of Claims in the other impaired Classes – Class 4 Claims, Class 5 Claims, and Class 6 Equity Interests – will not receive any distributions under the Plan, are deemed to reject the Plan, and the Debtors will therefore not be soliciting acceptances from those Classes.

**C.      Voting Procedures and Requirements**

> **THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCESS IS ONLY A SUMMARY.  PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ENCLOSED HEREWITH FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

**1.      Ballots**

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement.  **If you have any questions regarding the Ballot, did not receive a return envelope with your ballot, did not receive an electronic copy of the Disclosure Statement and the Plan, or need physical copies of the Ballot or other enclosed materials, please contact the Debtors'**

solicitation and claims agent, Epiq Corporate Restructuring, LLC, in writing at Fred's, Inc., c/o Epiq Corporate Restructuring, LLC, 10300 SW Allen Blvd., Beaverton, OR 97005, or by email at tabulation@epiqglobal.com with a reference to "Fred's" in the subject line, or by calling 1-866-897-6433 (domestic, toll-free) or 1-646-282-2500 (international) and request to speak with a member of the solicitation team.

In most cases, each Ballot enclosed with this Disclosure Statement has been encoded with the amount of your Claim for voting purposes (if your Claim is a Disputed Claim this amount may not be the amount ultimately allowed for purposes of distributions under the Plan) and the Class in which your Claim has been classified. **YOU MUST FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY. IF YOU FAIL TO DO SO, YOUR VOTE MAY NOT BE COUNTED.**

    2.    <u>Returning Ballots</u>

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from Holders of Claims within Class 3 who are entitled to a vote with respect thereto. **Accordingly, in voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement.** Please complete and sign your Ballot and return it to it in accordance with the voting instructions provided with the Ballot.

**To be counted, your Ballot or Ballots must be received by 4:00 p.m. (Prevailing Eastern Time), on April 9, 2020 using _one_ of the following methods:**

<u>If by First Class Mail:</u>

        **Fred's, Inc. – Ballot Processing**
        **c/o Epiq Corporate Restructuring, LLC**
        **P.O. Box 4422**
        **Beaverton, OR 97076-4422**

<u>If by Overnight Courier or Hand Delivery:</u>

        **Fred's Inc. – Ballot Processing**
        **c/o Epiq Corporate Restructuring, LLC**
        **10300 SW Allen Boulevard**
        **Beaverton, OR 97005**

<u>If by Electronic, Online Submission:</u>

        **Please visit http://dm.epiq11.com/freds. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit your E-Ballot. If you choose to submit your Ballot via Epiq's E-Ballot system (the "<u>E-Ballot Portal</u>"), you should <u>not</u> also return a paper copy of your Ballot.**

  **IMPORTANT NOTE: You will need the following information to retrieve and submit your customized E-Ballot:**

Unique E-Ballot ID#: _____

**"E-Balloting" is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile or email will not be counted.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY TELECOPY, FACSIMILE, OR EMAIL BE ACCEPTED**.  Following the Voting Deadline, the Notice and Claims Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan.

## D.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing regarding whether the Debtors and the Plan have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.

The Confirmation Hearing has been scheduled for April 28, 2020 at 10:00 a.m. (Prevailing Eastern Time), before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement at the Confirmation Hearing of the date to which the Confirmation Hearing has been adjourned.

## E.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will Confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for Confirmation are that the Plan (i) is accepted by the requisite holders of Claims and Interests or, if not so accepted, is "fair and equitable" and "does not discriminate unfairly" as to the non-accepting Class of Claims or Interests, (ii) is in the "best interests" of each holder of a Claim or Interest that does not vote to accept the Plan in each impaired class under the Plan, (iii) is feasible, and (iv) complies with the applicable provisions of the Bankruptcy Code.

## F.    Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each class of impaired claims or interests vote to accept the Plan, except under certain circumstances.  A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half in number of claims of that class vote to accept the plan.  A plan is accepted by an impaired class of interests if holders of at least two-thirds of the number of shares in such class vote to accept the plan.  Only those holders of claims or interests who actually vote count in these tabulations.  Holders of claims who fail to vote are not counted as either accepting or rejecting a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a Plan be accepted by each holder of a claim or interest in an impaired class or that the Plan otherwise be found by the bankruptcy court to be in the best interests of each holder of a claim or interest in such class.  See "Best Interests Test" below.  In addition, each impaired class must accept the Plan for the Plan to be Confirmed without application of the "fair and equitable" and "unfair discrimination" tests in section 1129(b) of the Bankruptcy Code discussed below.

## G.    Best Interests Test

The "best interests" test requires that the Bankruptcy Court find either that all members of each impaired class have accepted a plan, or that, as of the effective date of the plan, each holder of an allowed claim or interest of each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that the holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on that date.

To calculate what Holders of Allowed Claims and Allowed Interests would receive if the Debtors were hypothetically liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be realized from the liquidation (the "Liquidation Fund") of the Debtors. The Liquidation Fund would consist of the net proceeds from the disposition of the Debtors' assets (after satisfaction of all valid liens) augmented by the Cash held by the Debtors and recoveries on actions against third parties, if any. The Liquidation Fund would then be reduced by the costs of the liquidation. The costs of liquidation under chapter 7 would include the fees and expenses of a trustee, as well as those of counsel and other professionals that might be retained by the trustee, selling expenses, any unpaid expenses incurred by the Debtors during their cases (such as fees for attorneys, financial advisors and accountants) which would be allowed in the chapter 7 proceeding, interest expense on secured debt and claims incurred by the Debtors during the pendency of the case. These claims would be paid in full out of the Liquidation Fund before the balance of the Liquidation Fund, if any, would be made available to holders of unsecured Claims. In addition, other claims which would arise upon conversion to a chapter 7 case (e.g., the costs and expenses of the liquidation, and such additional administrative expenses and priority Claims that may result from the use of chapter 7 for purposes of liquidation) would dilute the balance of the Liquidation Fund available to holders of Claims. Moreover, additional Claims against the Debtors' Estates may be filed as the result of the establishment of a new bar date for the filing of claims in chapter 7 cases for the Debtors. The present value of the distributions out of the Liquidation Fund (after deducting the amounts described above) are then compared with the present value of the property offered to each of the Classes of Claims under the Plan to determine if the Plan is in the best interests of each holder of a Claim.

The Debtors believe that a chapter 7 liquidation of the Debtors' remaining assets would result in substantially less value to be realized by holders of Claims than they would claim under the Plan. That belief is based upon, among other factors: (a) the additional administrative expenses involved in the appointment of a trustee, attorneys, accountants, and other chapter 7 professionals; (b) the substantial time which would elapse before creditors would receive any distribution in respect of their Claims due to a trustee's need to become familiar with the Debtors' bankruptcy cases, and the Debtors' books and records, and his duty to conduct his own investigations; (c) the additional unsecured Claims that may be asserted against the Debtors; (d) the substantial cost and delay which can be avoided by a largely consensual Plan; (e) the potential for lower returns on the Debtors' assets in a chapter 7 proceeding, as compared to the value of such assets to the Liquidating Trust; (f) the disruption related to a change in management and other personnel; (g) turmoil in the record-keeping and information systems involved in the administration of the Debtors' Estates; and (h) the potential for diminished recoveries on any causes of action of the Debtors, given the potential difficulties in managing related legal actions and marshaling and presenting required evidence without the presence of any members of the Debtors' prior management.

The Debtors' analysis under the Best Interest Test is annexed hereto as Exhibit B.

## H.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).  Because the Plan proposes a liquidation of all the Debtors' assets, for purposes of determining whether the Plan meets this requirement, the Debtors' management analyzed the Liquidating Trust's ability to meet its respective obligations under the Plan.  Based on the Debtors' analysis, including the information contained in Exhibit B regarding recoveries available to creditors under the Plan, the Liquidating Trust will have sufficient assets to accomplish its tasks under the Plan.  Therefore, the Debtors believe that their liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.  As of February 21, 2020, the Debtors held approximately $30.6 million in cash.  Additionally, as of the General Bar Date, there were approximately $141.3 million in General Unsecured Claims asserted against the Debtors.[17]  The Debtors have estimated the Allowed amounts of the General Unsecured Claims to be between $103.7 million and $108.5 million.

In the event that the actual distributions to Holders of Claim differ from those assumed by the Debtors in their recovery analysis, the actual recoveries realized by Holders of Claims in those Classes could be significantly higher or lower than estimated by the Debtors.

Set forth below is a summary of the projected recoveries to Holders of Claims and Interests that result from such liquidation values and projected recoveries to Holders of Claims and Interests pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

| | | Summary of Projected Recoveries | |
| Description | Class No. | Under the Plan | Chapter 7 |
| --- | --- | --- | --- |
| Administrative Expense Claims | N/A | 100% | 100% |
| Priority Tax Claims | N/A | 100% | 100% |
| DIP Claims | N/A | 100% | 100% |
| Other Secured Claims | 1 | 100% | 100% |
| Other Priority Claims | 2 | 100% | 100% |
| General Unsecured Claims | 3 | 4.0% - 8.8%[18] | 2.7% - 7.8% |
| Intercompany Claims | 4 | 0% | 0% |
| Section 510(b) Claims | 5 | 0% | 0% |
| Equity Interests | 6 | 0% | 0% |

---

[17] This amount does not include Claims filed by the State of Mississippi against Debtors Fred's, Inc., and Fred's Stores of Tennessee, Inc., each for approximately $25.4 billion.  The Claims are disputed, and relate to a litigation the Debtors have been defending since 2016.  *See* Section IV.F, *infra*.  The amount also excludes any Claims in connection with the *Zaller* Complaint, which are classified as Class 5 Claims pursuant to 11 U.S.C. § 510(b).

[18] This estimate assumes substantive consolidation is granted.  If substantive consolidation is not granted, the Debtors project that the recovery range for Holders of General Unsecured Claims would be as follows per respective Debtor:  (i) Fred's, Inc.: 2.2%-6.1%; (ii) Fred's Stores of Tennessee, Inc.: 3.1%-8.3%; (iii) National Pharmaceutical Network, Inc.: 0%; (iv) National Equipment Management and Leasing, Inc.: 0%; (v) Reeves-Sain Drug Store, Inc.: 0%; and (vi) 505 N. Main Opp, LLC: 0.3%-1.0%.  These projections assume, among other things, that (i) cash on hand and administrative expenses are divided Pro Rata in accordance with each Debtors' respective realized real estate sale proceeds; (ii) the miscellaneous remaining assets which in part could be subject to competing estate claims, are divided evenly between Fred's, Inc. and Fred's Stores of Tennessee, Inc.; and (iii) consolidation would avoid $500,000 of professional fees that otherwise would be spent to resolve inter-Estate disputes (*e.g.*, unclear ownership of major wind-down assets, allocations of professional fees and other expenses of administration (including post-Effective Date), other post-petition expenses, and potential inter-company claims), and to reconcile and administer multiple Claim pools.

**THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED LIQUIDATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.**

## I.     The Liquidating Trust

The Plan provides for, but is not predicated upon, entry of a Confirmation Order providing for the substantive consolidation of the Chapter 11 Cases of the Debtors (but not any Excluded Debtors) into a single Chapter 11 Case for purposes of the Plan and the distributions under the Plan.  Upon substantive consolidation, (i) all assets and liabilities of the Debtors shall be merged, (ii) any obligations of any Debtor shall be deemed to be one obligation of the Debtors, (iii) any Claims Filed or to be Filed in connection with any such obligation shall be deemed one claim against the Debtors, (iv) each Claim Filed in the Chapter 11 Cases of any Debtor shall be deemed Filed against the Debtors in the consolidated Chapter 11 Case, in accordance with the substantive consolidation of the assets and liabilities of the Debtors and (v) all transfers, disbursements and distributions made by any Debtor shall be deemed to be made by all of the Debtors.  Holders of Allowed Claims in each Class shall be entitled to their Pro Rata share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim.  The Debtors believe that such substantive consolidation will provide administrative efficiency and convenience, and will not prejudice any parties in interest, for the reasons discussed above at Section VI.B.2.

The Plan provides that on and after the Effective Date, the Liquidating Trust shall continue in existence for purposes of (a) winding down the Debtors' business and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims, (c) prosecuting Causes of Action, (d) making distributions on account of Allowed Claims as provided hereunder, (e) maximizing recovery of the Liquidating Trust Assets for the benefit of the beneficiaries thereof, (f) distributing the proceeds of the Liquidating Trust Assets to the beneficiaries in accordance with the Plan and the Liquidating Trust Agreement, (g) establishing and funding the Distribution Account, (h) filing appropriate tax returns, (i) complying with the Debtors' continuing obligations under the Financing Orders (if any), (j) administering the Plan in an efficacious manner, and (k) all other matters detailed in the Liquidating Trust Agreement. The Liquidating Trust shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court; (ii) Financing Orders (as applicable); and (iii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Liquidating Trustee to file motions or substitutions of parties or counsel in each such matter.

The Plan further provides that the Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Liquidating Trust Assets have been liquidated or abandoned, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all distributions required to be made by the Liquidating Trust under the Plan and the Liquidating Trust Agreement have been made, and (v) the Debtors' Chapter 11 Cases have been closed; *provided*, *however*, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that an extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets and/or distributions in accordance with the Plan.

## J.     Compliance with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable

provisions of the Bankruptcy Code. The Debtors have considered each of these issues in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

**VIII.**
**RISK FACTORS**

**ALL IMPAIRED HOLDERS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

**A.    Certain Bankruptcy Considerations**

**1.    Parties in Interest May Object to the Debtors' Classification of Claims**

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may place a class or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**2.    The Debtors May Not be Able to Secure Confirmation of the Plan**

There can be no assurance that the Debtors will receive the requisite acceptances to Confirm the Plan. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will Confirm the Plan. A non-accepting creditor or equity holder of the Debtors might challenge the adequacy of this Disclosure Statement or contend that the balloting procedures and results do not comply with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to Confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes, Confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and the value of distributions to non-accepting Holders of Claims or Interests within a particular Class under the Plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the Debtors believe that the Plan will not be followed by a need for further liquidation or reorganization and that non-accepting Holders within each Class under the Plan will receive distributions at least as great as they would receive following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case. The Debtors believe that Holders of Interests would receive no distribution under a liquidation pursuant to either chapter 7 or chapter 11.

**3.    The Confirmation and Consummation of the Plan Are Also Subject to Certain Conditions as Described in the Plan**

If the Plan is not Confirmed, it is unclear whether another Plan could be implemented and what distributions Holders of Claims ultimately would receive with respect to their Claims. If an alternative Plan could not be agreed to, it is possible that the Debtors would have to liquidate their assets under

chapter 7, in which case it is likely that Holders of Claims would receive substantially less favorable treatment than they would receive under the Plan.

### 4.    The Debtors May Object to the Amount or Classification of a Claim or Interest

The Debtors and the Liquidating Trust reserve and retain the right to object to the amount or classification of any Claim or Interest.  The estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose Claim is subject to an objection.  Any such Claim Holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

## B.    Risks Relating to the Administration of the Liquidating Trust

### 1.    Post-Confirmation Operations

The ultimate amount of Cash available to satisfy the Allowed amount of Claims in Class 3 depends, in part, on the success of the Liquidating Trust in monetizing its remaining assets, and the expense required to do so.  To the extent that the Liquidating Trust's expenses exceed current expectations, the amount of Cash remaining to satisfy Allowed Claims in Class 3 will decrease.

The ultimate amount of Cash available for distribution to holders of Allowed Claims in Class 3 also will be affected by the performance and relative success of the Liquidating Trustee in pursuing preference, fraudulent conveyance, setoff and other claims against potential parties under the Bankruptcy Code.  The less successful the Liquidating Trust is in pursuing such matters, the less Cash there will be available for distribution to satisfy Allowed Claims.  However, the Debtors have not assumed any recovery on account of such potential Causes of Action in estimating the recoveries to Allowed Claims under the Plan.

## C.    Risks Relating to the Allowance of Certain Claims under the Plan

Approximately $141.3 million in General Unsecured Claims were asserted as of the General Bar Date.[19]  While the Debtors believe that the actual amounts to be Allowed will be substantially less, if the Claims asserted against the Debtors are Allowed at or near the full asserted amounts, this could substantially reduce recoveries for creditors.  In particular, the State of Mississippi has filed $25.4 billion unsecured Claims against Debtors Fred's, Inc. and Fred's Stores of Tennessee, Inc.  Additionally, Cardinal has filed a proof of claim asserting that the amount of the Cardinal Secured Claim is approximately $23.9 million, and has asserted a $10.8 million section 503(b)(9) priority Claim.  Although the Debtors believe the State of Mississippi's Claim and the Cardinal Claim and Cardinal Secured Claim to be substantially less, if such Claims are allowed in the full amount and character asserted, recoveries to other creditors would be substantially reduced.

## D.    Risks Relating to the Tax Consequences of the Plan

The U.S. federal income tax consequences to Holders of Claims or Interests as a result of Consummating the Plan are complex and subject to uncertainty.  Holders of Claims or Interests should carefully review Section IX ("Certain Federal Income Tax Consequences of the Plan"), below.

---

[19] This amount does not include Claims filed by the State of Mississippi against Debtors Fred's, Inc., and Fred's Stores of Tennessee, Inc., each for approximately $25.4 billion.  The Claims are disputed, and relates to a litigation the Debtors have been defending since 2016.  *See* Section IV.F, *infra*.  The amount also excludes any Claims in connection with the *Zaller* Complaint, which are classified as Class 5 Claims pursuant to 11 U.S.C. § 510(b).

Certain U.S. tax attributes of the Debtors, including net operating loss carryovers, may be reduced or eliminated as a consequence of the Plan.  In addition, the Debtors' subsequent utilization of any net operating loss carryforwards remaining, and possibly certain other U.S. tax attributes, may be restricted following the Consummation of the Plan.  The elimination, reduction and/or restriction on the use of net operating loss carryovers and/or such other tax attributes may increase the amount of tax payable by the Liquidating Trust following the Effective Date as compared with the amount of tax payable without such reduction having been required.  For further discussion, Holders should refer to Section IX ("Certain Federal Income Tax Consequences of the Plan"), below.

Additionally, the Debtors have not yet prepared their state and local taxes for the years 2018 and 2019.  To the extent that taxes are owed in excess of estimated amounts, this will diminish recoveries available for Class 3 Allowed Claims.

Holders of Claims are strongly urged to consult with their tax advisors as to the U.S. federal income tax consequences of Consummating the Plan.

*       *       *

**THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND THE LIQUIDATING TRUST, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, THE PRICES AT WHICH THE DEBTORS AND LIQUIDATING TRUST CAN SELL THEIR PRODUCTS AND SERVICES, CURRENCY EXCHANGE RATE FLUCTUATIONS, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES, AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.**

**IX.**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion addresses certain United States federal income tax consequences of the Consummation of the Plan to U.S. Holders (defined below) and to the Debtors.  This discussion is for informational purposes only and is not tax advice.  This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed regulations thereunder, current administrative rulings, and judicial decisions as in effect on the date hereof, all of which are subject to change, possibly retroactively.  No rulings or determinations by the Internal Revenue Service have been obtained or sought by the Debtors with respect to the Plan.  An opinion of counsel has not been obtained with respect to the tax aspects of the Plan.  This discussion does not purport to address the federal income tax consequences of the Plan to particular classes of taxpayers (such as partnerships and partners therein, Non-US Holders (as defined below), S corporations, mutual funds, small business investment companies, regulated investment companies, broker-dealers, insurance companies, tax-exempt organizations and

financial institutions) or the state, local or foreign income and other tax consequences of the Plan.

For purposes of this summary, a "U.S. Holder" is a beneficial owner of a Claim or Interest that is (1) a citizen or individual resident of the United States, (2) a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in the United States or under the laws of the United States or any political subdivision thereof, (3) an estate the income of which is subject to United States federal income taxation regardless of its source, or (4) a trust if:  (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust or (ii) the trust was in existence on August 20, 1996 and properly elected to be treated as a United States person.  A "Non-U.S. Holder" means a Holder of a Claim or Interest that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of a Claim or Interest, the tax treatment of a partner in such partnership will generally depend on the status of the partner and the activities of the partnership.  Partners of partnerships holding Claims or Interests are encouraged to consult their independent tax advisors regarding the tax consequences to them of the Plan.

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

A.    **Federal Income Tax Consequences to U.S. Holders of Claims and Interests**

The following discusses certain U.S. federal income tax consequences of the transactions contemplated by the Plan to "U.S. Holders."  Generally, a Holder of a Claim will recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim.  The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim.  For this purpose, the value of the portion of the assets transferred to the Liquidating Trust that are deemed transferred to such Holder are treated as part of the amount realized by such Holder (discussed below in Federal Income Tax Consequences to Beneficiaries of the Liquidating Trust).  The tax basis of a Holder in a Claim will generally be equal to the Holder's cost therefore.

The character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the origin of the Claim, nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.  Class 3 Claims are generally ordinary course claims and will likely be treated as ordinary income by most Holders.  If the Claim is a capital asset in the Holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.  There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

The Plan provides that to the extent that any Allowed Claim entitled to a distribution is comprised of indebtedness and accrued but unpaid interest, such distribution shall be allocated to the principal amount of the Claim first and then, to the extent the distribution exceeds the principal amount of the

- 69 -

Claim, to the portion of such Claim representing accrued but unpaid interest. The IRS, however, could take the position that the distribution should be allocated first to interest and then to principal repayment. A Holder will generally recognize ordinary income to the extent that the amount of cash or property received (or to be received) under the Plan is attributable to accrued but unpaid interest not previously included in income by such Holder. Holders previously required to include in their gross income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan. U.S. Holders should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

In the event of the subsequent disallowance of any Disputed General Unsecured Claim or the reallocation of undeliverable distributions, it is possible that a Holder of a previously Allowed Claim may receive additional distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a Holder with respect to an Allowed General Unsecured Claim may be deferred until all General Unsecured Claims are Allowed or Disallowed. Alternatively, it is possible that a Holder will have additional gains in respect of any additional distributions received.

A Holder of a Claim constituting any installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the Tax Code.

A Holder of an Interest may be entitled to a worthless securities deduction under section 165(g) of the Tax Code. The rules governing the character, timing, and amount of this deduction depends upon the facts and circumstances of the Holder with respect to which is claimed. Accordingly, Holders are urged to consult their tax advisors with respect to their ability to take such a deduction.

The tax treatment of a Holder of an Allowed Claim or Interest will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims or Interests. Accordingly, Holders of Claims and Interests should consult their own tax advisors.

Under backup withholding rules, a Holder may be subject to backup withholding with respect to payments made pursuant to the Plan unless such Holder (a) is a corporation or is otherwise exempt from backup withholding and, when required, demonstrates this fact or (b) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of failure to report all dividend and interest income. Any amount withheld under these rules will be credited against the Holder's federal income tax liability. Holders of Claims may be required to establish an exemption from backup withholding or to make arrangements with regard to payment thereof.

## B.    <u>Federal Income Tax Consequences to the Debtors</u>

Each of the Debtors is a member of an affiliated group of corporations that files a consolidated federal income tax return with Fred's, Inc. as the common parent (the "<u>Fred's Tax Group</u>") or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Fred's Tax Group. The Debtors believed that, as of the Commencement Date, the Fred's Tax Group had accumulated a large amount of consolidated net operating losses ("<u>NOLs</u>") and other tax attributes.

The Fred's Tax Group's ability to utilize its NOLs and certain other tax attributes could be subject to limitation if the Fred's Tax Group underwent or were to undergo an ownership change within

the meaning of section 382 of the Tax Code after the Commencement Date.  Accordingly, the Debtors obtained a Bankruptcy Court order, effective as of the Commencement Date, imposing certain restrictions with respect to trading in Fred's stock so as to avoid such an ownership change.  The Debtors believe that no ownership change of the Fred's Tax Group for section 382 purposes has occurred to date and expect that no such ownership change will occur prior to the liquidation of the Debtors as of the Effective Date.

The Debtors will generally realize cancellation of indebtedness ("COD") income as a result of a Consummation of the Plan.  Such amount will depend on a number of considerations including the value of consideration distributed to the Holders of Claims, the nature of the Claims and the amounts owed in respect thereof.

COD income is, however, generally excluded from the gross income of a debtor if the discharge of indebtedness is granted by a bankruptcy court or pursuant to a plan approved by the bankruptcy court in a case under chapter 11 of the Bankruptcy Code.  Such COD income would be excluded under the Tax Code and would reduce the Debtors' tax attributes following the calculation of their tax liability for that year.

Pursuant to the Plan, on or before the Effective Date, a single Liquidating Trust will be established for all Debtors for which there are remaining assets (including reserves) as of the end of the Effective Date, and on the Effective Date, all of the Liquidating Trust Assets of each Debtor will be transferred to the Liquidating Trust.  The Debtors will thereafter be dissolved.  Accordingly, as of the end of the Effective Date, all of the Debtors should be treated as having completely liquidated for U.S. federal income tax purposes.  For U.S. federal income tax purposes, the transfer of the Liquidating Trust Assets to the Liquidating Trust generally is treated as equivalent to a sale of the assets at their then fair market value.  It is not known at the present time whether the transfer of the Debtors' assets will result in any gain to the Debtors or whether the Debtors will have sufficient losses or loss carryforwards to offset any such gain.  If the transfer results in gain and the Debtors do not have sufficient NOLs or other tax attributes to offset that gain, the transfer of such assets could result in federal income tax liability to the Debtors.  Given that the Debtors will be dissolved in connection with the Plan and will not be in existence at the end of their taxable year, they will not suffer consequences from the reduction of its tax attributes after calculating its taxable income for the year.  The Debtors believe that once the Debtors liquidate and transfer the Liquidating Trust Assets to the Liquidating Trust, it is unlikely that any NOL carryforwards that may remain after calculating their taxable income for the year will be available to be used.  The Debtors also believe it is unlikely that any NOL carryforwards will be available to reduce any income or gain of the Liquidating Trust.

**C.**    **Federal Income Tax Consequences to Beneficiaries of the Liquidating Trust.**

The Liquidating Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Thus, the Liquidating Trust is intended to be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations § 301.7701-4(d).  The provisions of the Liquidating Trust Agreement and the Plan are intended to satisfy the guidelines for classification as a liquidating trust that are set forth in Revenue Procedure 94-45, 1994-2 C.B. 684.  Under the Plan, all parties are required to treat the Liquidating Trust as a liquidating trust, subject to contrary definitive guidance from the IRS.  In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to sections 671 through 679 of the Tax Code, owned by the persons who are treated as transferring assets to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax).

Pursuant to the Plan, all of the Debtors' remaining assets other than those sold prior to the Effective Date will be transferred directly or indirectly to Holders of Allowed Claims in liquidation of the Debtor. For federal income tax purposes, any such assets transferred to the Liquidating Trust will be treated by the Debtor and by the Beneficiaries as having been transferred to the Beneficiaries, with such Beneficiaries then transferring the assets to the Liquidating Trust in exchange for beneficial interests in the Liquidating Trust. The Debtors will not retain a beneficial interest in the Liquidation Trust; instead, the beneficial interest in the Liquidating Trust will be held by the Beneficiaries. It is intended that the Liquidating Trust be treated, for U.S. federal income tax purposes, as a liquidating trust and as a grantor trust, with the Beneficiaries receiving Liquidating Trust interests being treated as the grantors and deemed owners of the Liquidating Trust Assets.

Each Beneficiary holding a beneficial interest in the Liquidating Trust must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidating Trust. None of the Debtors' loss carryforwards will be available to reduce any income or gain of the Liquidating Trust. Moreover, upon the sale or other disposition (or deemed disposition) of any Liquidating Trust Asset, each Beneficiary holding a beneficial interest in the Liquidating Trust must report on its federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Liquidating Trust Asset so sold or otherwise disposed of, and (2) such Beneficiary's adjusted tax basis in its share of the Liquidating Trust Asset. The character of any such gain or loss to the Beneficiary will be determined as if such Beneficiary itself had directly sold or otherwise disposed of the Liquidating Trust Asset. The character of items of income, gain, loss, deduction and credit to any Beneficiary holding a beneficial interest in the Liquidating Trust, and the ability of the Beneficiary to benefit from any deductions or losses, may depend on the particular circumstances or status of the Beneficiary.

Given the treatment of the Liquidating Trust as a grantor trust, each Beneficiary holding a beneficial interest in the Liquidating Trust has an obligation to report its share of the Liquidating Trust's tax items (including gain on the sale or other disposition of a Liquidating Trust Asset) which is not dependent on the distribution of any cash or other Liquidating Trust Assets by the Liquidating Trust. Accordingly, a Beneficiary holding a beneficial interest in the Liquidating Trust may incur a tax liability as a result of owning a share of the Liquidating Trust Assets, regardless of whether the Liquidating Trust distributes cash or other assets. Although the Liquidating Trust Agreement provides that the Liquidating Trust will generally make distributions of cash at least quarterly, due to the requirement that the Litigation Trust maintain certain reserves, the Liquidating Trust's ability to make current cash distributions may be limited or precluded. In addition, due to possible differences in the timing of income on, and the receipt of cash from the Liquidating Trust Assets, a Beneficiary holding a beneficial interest in the Liquidating Trust may be required to report and pay tax on a greater amount of income for a taxable year than the amount of cash received by the Beneficiary during the year.

The Liquidating Trustee (A) may elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims (*i.e.*, a disputed claim reserve) as a "disputed ownership fund" governed by section 1.468B-9 of the Treasury Regulations, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes. Accordingly, if a "disputed ownership fund" election is made with respect to a disputed claim reserve, such reserve will be

subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets (including any gain recognized upon the disposition of such assets). All distributions from such reserves (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust beneficiaries) will be required to report for tax purposes consistently with the foregoing.

A disputed claim reserve will be responsible for payment, out of the assets of the disputed claim reserve, of any taxes imposed on the disputed claim reserve or its assets. In the event, and to the extent, any Cash in the disputed claim reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the disputed claim reserve may be sold to pay such taxes.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each Beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Beneficiaries who received their interests in the Liquidating Trust in connection with the Plan.

## D.    **Withholding on Distribution and Information Reporting**

All distributions to Holders of Allowed General Unsecured Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed General Unsecured Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a Holder of an Allowed General Unsecured Claim or a Liquidating Trust Beneficiary that is a a Non-U.S. Holder may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtors even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A Non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to Non-U.S. Holders. Non-U.S. Holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtors or payments from the Liquidating Trust.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

E.    **Importance of Obtaining Professional Tax Assistance**

The foregoing is intended to be only a summary of certain of the U.S. federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**NO STATEMENT IN THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE.  THE DEBTORS AND THEIR PROFESSIONALS DO NOT ASSUME ANY RESPONSIBILITY OR LIABILITY FOR THE TAX CONSEQUENCES THE HOLDER OF A CLAIM MAY INCUR AS A RESULT OF THE TREATMENT AFFORDED ITS CLAIM UNDER THE PLAN AND DO NOT REPRESENT WHETHER THERE COULD BE ADDITIONAL TAX EXPOSURE TO THEMSELVES OR THEIR NON-DEBTOR AFFILIATES AS A RESULT OF THE PLAN.**

## X.
## RECOMMENDATION

The Debtors strongly recommend that all creditors receiving a Ballot vote in favor of the Plan.  The Debtors believe that the Plan is in the best interests of creditors.  The Plan as structured, among other things, allows creditors to participate in distributions believed to be in excess of those which would otherwise be available were the Chapter 11 Cases dismissed or converted under chapter 7 of the Bankruptcy Code, and minimizes delays in initiating recoveries to creditors.

Notwithstanding the Debtors' recommendation, the Creditors' Committee states that it:  (i) does not support the Plan; (ii) does not believe the proposed Plan is fair or confirmable; and (iii) recommends that creditors vote against the Plan.

**XI.**
**CONCLUSION**

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and Consummation of the Plan is preferable to all other alternatives.  The Debtors urge all creditors entitled to vote, vote to accept the Plan to return their Ballots so that they will be received by 4:00 p.m. (Prevailing Eastern Time) on April 9, 2020.

DATED:  March 5, 2020