**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRED'S, INC., *et al.*,[1] | ) | Case No. 19-11984 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | **Obj. Deadline: May 15 at 4:00 p.m. (ET)** |
| | ) | **Hearing Date: May 27, 2020 at 10:00 a.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT
TO SECTION 363 OF THE BANKRUPTCY CODE, (I) AUTHORIZING THE
SALE OF CERTAIN CLAIMS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES, AND OTHER INTERESTS, (II) AUTHORIZING THE
REJECTION OF CERTAIN EXECUTORY CONTRACTS IN CONNECTION
THEREWITH, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] in these jointly administered chapter 11 cases (the "Chapter 11 Cases") hereby submit this motion (the "Motion") for the entry of an order, substantially in the form attached hereto as Exhibit A, pursuant to sections 363 and 365 of the Bankruptcy Code, rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (i) authorizing the sale (the "Sale") of the Claims (as defined herein) that the Debtors own in connection with the Litigation (as defined herein), pursuant to the Asset Purchase and Sale Agreement executed between Debtor Fred's, Inc. ("Fred's") and Optium Fund 3, LLC ("Optium") attached hereto as Exhibit B (the "Sale Agreement") on an "as is, where is" basis, free and clear of all mortgages, pledges liens, claims,

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Fred's, Inc. (4010); Fred's Stores of Tennessee, Inc. (9888); National Equipment Management and Leasing, Inc. (4296); National Pharmaceutical Network, Inc. (9687); Reeves-Sain Drug Store, Inc. (4510); Summit Properties-Jacksboro, LLC (9161); Summit Properties-Bridgeport, LLC (2200); and 505 N. Main Opp, LLC (5850). The Debtors' address is 6625 Lenox Park, Suite 200, Memphis, TN 38115.

[2] Terms not defined herein shall have the meaning ascribed them in the Sale Agreement.

encumbrances, and interests ("Interests"), and (ii) granting related relief.  In support of this Motion, the Debtors submit the Declaration of Mark A. Renzi (the "Renzi Declaration"), attached hereto as Exhibit C, and respectfully represent as follows:

## JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over the Chapter 11 Cases, the Debtors, property of the Debtors' estates and this matter under 28 U.S.C. § 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).

2.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4.     The statutory and legal bases for the relief requested herein is sections 363 and 365 of the Bankruptcy Code, as well as Bankruptcy Rules 2002, 6004, and 9014, and Local Rule 6014-1.

## BACKGROUND

A.     **General Background**.

5.     On September 9, 2019 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has

been made in these Chapter 11 Cases.  On September 18, 2019, an official committee of unsecured creditors (the "Committee") was appointed.  [D.I. 127].

6.      On January 21, 2020, the Debtors filed (a) the *Joint Chapter 11 Plan for Fred's, Inc. and the Debtor Affiliates Set Forth Herein* [D.I. 755] (as subsequently amended, the "Plan") and (b) the *Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code with Respect to the Debtors' Joint Plan* [D.I. 756] (as subsequently amended, the "Disclosure Statement"). Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these Chapter 11 Cases is contained in the Disclosure Statement.

7.      On March 3, 2020, the Court approved the Disclosure Statement [D.I. 892] (the "Disclosure Statement Order").  On March 5, 2020, the Debtors filed solicitation versions of the Plan [D.I. 894] and Disclosure Statement [D.I. 896].

8.      A telephonic and/or electronic hearing to consider confirmation of the Plan is scheduled for May 15, 2020.

**B.      The Claims.**

9.      Prior to the commencement of the Chapter 11 Cases, the Debtors became members or putative class members in various class action litigation matters arising out of their business operations in the ordinary course of business.  The types of cases in which the Debtors are or may be class members or putative class members include a class action captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation* MDL 1720 (MKB) (JO), filed in the United States District Court for the Eastern District of New York (the "Interchange Litigation"), as well as the other actions referenced in Exhibit A to the Sale Agreement (together with the Interchange Litigation, the "Litigation").  Pursuant to the Sale Agreement, the Debtors are seeking to sell, among other things, proceeds the Debtors may be

3

entitled to receive related to the Litigation (as defined more specifically in the Sale Agreement, the "Claims").[3]

10.     Although the Debtors may stand to benefit from the Claims in the future, uncertainty exists with respect to:  (i) whether and when the Debtors will realize on the Claims; and (ii) the amount that the Debtors will stand to receive if and when the Debtors realize on the Claims.  (Renzi Decl., ¶ 8).

11.     Accordingly, the Debtors, at the direction of Mark A. Renzi, Chief Restructuring Officer, led a marketing and sale process for the Claims, with the assistance of the Debtors' General Counsel Ben Morgan, Berkeley Research Group ("BRG"), financial advisor to the Debtors.  (*Id.*, ¶ 9).

12.     Prior to the commencement of the Claims sale process, Mr. Morgan assisted Mr. Renzi and the Debtors in determining which Claims the Debtors owned and therefore should be marketed and sold.  (*Id.*).  Also prior to the commencement of the Claims Sale Process, the Debtors and BRG analyzed valuation and other issues to assist them in evaluating bids once the sale process commenced.  (*Id.*).

C.     **The Sale Process**.

13.     As set forth in the Renzi Declaration, the Debtors commenced the sale process on January 24, 2020, by sending an email and a "teaser" letter (the "Teaser"), attached as Exhibit 1 to the Renzi Declaration, outlining the procedures through which bidding would be conducted (the "Bidding Procedures"), as well as the conditions required for submitting a bid (the "Bidding

---

[3] As defined in the Sale Agreement, the Claims consist of "benefits to which [Debtor Freds, Inc.]," may have a right to, now or in the future, "arising from and/or relating to the Litigation and the injuries alleged therein, encompassing all rights, title, and ownership interest of any kind, now existing or arising hereafter, to which [Debtor Freds, Inc.] or its affiliates may be entitled, arising in any way or form, from the Litigation, or the operative facts alleged in the Litigation, including but not limited to the right to monetary benefits, or benefits that may be monetized, from settlements, judgments, or any other form of resolution of the Litigation or the operative facts alleged."

<u>Conditions</u>").  (Renzi Decl., ¶ 11).  The Teaser and accompanying emails were distributed to thirty-seven potential bidders (the "<u>Potential Bidders</u>").[4]  (*Id.*, ¶¶ 10-11).  BRG assisted the Debtors in developing a list of the Potential Bidders, based on research of reputable market participants that focused on the purchase of litigation assets, from BRG's prior experience marketing and selling litigation claims in other bankruptcy cases, as well as from inbound inquiries and expressions of interest to the Debtors and/or their advisors.  (*Id.*, ¶ 10).

14.    Pursuant to the Bidding Procedures, the deadline for a Potential Bidder to submit a bid was February 14, 2020 (the "<u>Bidding Deadline</u>").  (*Id.*, ¶ 12).  The Bidding Conditions required, *inter alia*, that Potential Bidders:  (i) had not engaged in any collusive conduct and acted in good faith in the submission of a bid; (ii) had accepted the Claims "as is, where is,"; and (iii) had acted in good faith and not engaged in collusive conduct.  (*Id.*).

15.    Pursuant to the Bidding Procedures, the Debtors provided Potential Bidders who executed a non-disclosure agreement (the "<u>NDAs</u>") access to a data room (the "<u>Data Room</u>") containing information on the Claims.  (*Id.*, ¶ 13).  Of the thirty-seven Potential Bidders the Debtors contacted with the Teaser, seventeen executed an NDA and received access to the Data Room.  (*Id.*).  Between January 24, 2020 and the Bid Deadline, the Debtors answered Potential Bidders' questions, and supplemented the Data Room with additional materials and disclosures.  (*Id.*).

16.    On or prior to the Bid Deadline, eight Potential Bidders submitted bids (the "<u>Bidders</u>").  (*Id.*, ¶ 14).  Optium submitted a bid of $950,000 for all of the Claims and confirmed that its bid was in compliance with the Bidding Conditions.  (*Id.*).  The Debtors determined this to be the highest and best bid.  (*Id.*).  Following Optium's submission of its bid, on February 21,

---

[4] One Potential Bidder was sent a Teaser on February 11, 2020, in response to an inbound inquiry regarding the Claims after the bidding process had commenced.

2020, BRG emailed all Bidders to notify them regarding the outcome of the sale process. (*Id.*, ¶ 15).

17.     Between February 21, 2020 and April 1, 2020, the Debtors engaged in vigorous arms'-length negotiations, which culminated in the execution of the Sale Agreement. (*Id.*). Optium's signature is currently being held in escrow by Debtors' counsel, pending the occurrence of certain conditions to closing, including the Court's approval of the sale of the Claims.

18.     In exchange for the cash consideration provided by Optium for the Claims, in addition to and to effectuate an orderly transition of the Claims, the Sale Agreement also contains a provision requiring Fred's to cooperate with Optium, by providing "commercially reasonable assistance to [Optium] as may be necessary for the collection of the Claims, throughout the continued existence of the Debtors or any . . . successor or successors to the Debtors . . . ." with costs in connection therewith to be the responsibility of Optium. (Sale Agreement § 2.4). In connection therewith, each of the Debtors' and Optium's representation and warranties survive "until the conclusion or wind down" of "any . . . successor entity to the Debtors under a chapter 11 plan." (*Id.* §§ 3.7, 4.10).

**D.    The Claims Servicing Agreements.**

19.     Prior to the Petition Date, Fred's was party to thirteen claims servicing agreements (the "Claims Servicing Agreements") certain of which the Debtors believe may relate to the Claims (and some of which may have terminated prepetition). Nine of the Claims Servicing Agreements were between Fred's and Claims Compensation Bureau LLC ("CCB", and the "CCB Agreements," respectively). The CCB Agreements were scheduled as executory contracts in the Debtors' Schedules of Assets and Liabilities (the "Schedules"). [D.I. 475] at 316-18. One of the Claims Servicing Agreements was between Fred's and Spectrum Settlement

Recovery LLC ("<u>Spectrum</u>", and the "<u>Spectrum Agreement</u>," respectively), and remaining three Claims Servicing Agreements were between Fred's and Cascade Settlement Services LLC d/b/a Spectrum Settlement Recovery ("<u>Cascade,</u>" and the "<u>Cascade Agreements,</u>" respectively). The Spectrum Agreement and Cascade Agreements were also listed in the Debtors' Schedules as executory contracts. *Id.* at 315, 367.

20.     Pursuant to Section 2.2 of the Sale Agreement, the sale of the Claims is conditioned upon the Court's entry of an order: (i) authorizing the sale free and clear of the Claims Servicing Agreements; and (ii) authorizing the rejection of the Claims Servicing Agreements.[5]  (Sale Agreement, § 2.2). As discussed below, the Debtors request that the Court enter an order authorizing them to reject such agreements, to the extent they are executory, and to otherwise permit the sale free and clear thereof.[6]

## BASIS FOR RELIEF REQUESTED

## I.     The Sale of the Claims Should Be Approved.

21.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  With respect to the notice required in connection with a sale, Bankruptcy Rule 2002(c)(1) states:

> [T]he notice of a proposed use, sale or lease of property . . . shall include the time and place of any public sale, the terms and conditions of any private sale and the deadline for filing objections.  The notice of a proposed use, sale or lease of property, including real estate, is sufficient if it generally describes the property.

---

[5] The Debtors believe that none of the Cascade Agreements relate to the Claims, and such Cascade Agreements are not directly referenced in the Sale Agreement, but, as discussed below, the Debtors are requesting the authority to reject such agreements out of an abundance of caution.

[6] The Debtors do not concede that the Claims Servicing Agreements are executory contracts, or are binding, valid, or enforceable contracts, and the Debtors reserve all of their rights regarding the nature and validity of such agreements, including with respect to whether they are executory.

Fed. R. Bankr. P. 2002(c)(1).

22.     Courts can authorize sales of a debtor's assets under section 363 of the Bankruptcy Code if they find that such sale is based upon the sound business judgment of the debtor. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

23.     Generally, courts have applied four factors in determining whether a sale of a debtor's assets should be approved: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided.  *See, e.g.*, *In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) (citation omitted).

24.     The Debtors submit that the sale of the Claims to Optium should be approved because the four factors Courts consider regarding whether to approve a sale pursuant to section 363(b) of the Bankruptcy Code are satisfied.  As articulated in greater detail below, the Debtors' implementation of the Bidding Procedures and Bidding Conditions, and their decision to sell the Claims to Optium were in good faith, the product of the proper exercise of business judgment, were adequately informed, were and in the best interests of the Debtors, their estates, and the interests of other all parties in interest, and will be adequately noticed.

**A.    The Sale of the Claims to Optium is the Product of a Sound Exercise of the Debtors' Business Judgment.**

25.    There is more than ample business justification to sell the Claims as set forth herein and in the Renzi Declaration.  As discussed above, although the Debtors may eventually stand to benefit from the Claims, it is still uncertain whether or not the Debtors will ultimately stand to benefit.  (Renzi Decl., ¶ 8).  In particular, whether Claims will be realized is uncertain and could be well in the future, and the amount of consideration, if any, that would flow to the Debtors is uncertain.  (*Id.*).

26.    The Debtors are seeking to confirm the Plan and it go effective shortly.  It is uncertain whether their successor(s) will be around to receive the proceeds, if any, from uncertain future realization on the Claims.  (*Id.*, ¶¶ 8-9).  Therefore, the Debtors, in consultation with their advisors, reasoned that selling the Claims to receive cash now would provide a more favorable outcome to creditors.  (*Id.*).

**B.    The Consideration for the Sale is Fair and Reasonable.**

27.    As stated above, the Debtors received bids from eight different Bidders.  The Debtors, with the assistance of their advisors, reviewed bids submitted following the Bid Deadline and determined that Optium's bid of $950,000, was the highest and best.  (*Id.*, ¶ 14).  The consideration Optium has committed to provide will bring substantial value into the Debtors' estates.  Accordingly, the sale consideration is fair and reasonable, particularly in light of the fact that the value of the Claims, if any, cannot be known with certainty prior to the occurrence of a Settlement Event at an unknown future point in time.  (*Id.*, ¶¶ 8-9).

**C.    The Sale to Optium is in Good Faith and at Arms' Length.**

28.    As set forth in the Renzi Declaration, the Bidding Procedures were designed to ensure that no party was able to exert undue influence over the process.  The sale to Optium was

pursued in good faith by the Debtors and Optium, and Optium confirmed to the Debtors that its bid was non-collusive and in good faith, by its confirmation of compliance with the Bidding Conditions.  (*Id.*, ¶ 14).  Following Optium's submission of its bid, the Debtors and Optium engaged in vigorous arms'-length negotiations over the terms and conditions of the Sale Agreement for over one month.  (*Id.*, ¶ 15).  Additionally, Optium is not an insider of the Debtors.  The Court's approval of the sale of the Claims, therefore, will be the culmination of a fair and open solicitation and negotiation process.

       **D.**     **Adequate and Reasonable Notice of the Sale Will Be Provided.**

      29.     The Debtors will provide adequate notice of this Motion to parties in interest, as required by the applicable procedural rules.  *See* Fed. R. Bankr. P. 2002(c)(1) (notice must contain "the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections.").

      30.     The Debtors will serve this Motion on:  (a) the office of the United States Trustee for the District of Delaware; (b) counsel to the Official Committee of Unsecured Creditors; (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the state attorneys general for all states in which the Debtors conduct business; (g) Spectrum Settlement Recovery LLC; (h) Cascade Settlement Services LLC; (i) Claims Compensation Bureau, LLC; (j) Optium Fund 3, LLC; and (k) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## II.    The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code.

31.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell all or any part of its property free and clear of Interests if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such Interest consents to such sale; (iii) the Interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the Interest is the subject of a *bona fide* dispute; or (v) the party asserting the Interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such Interest.  *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).[7]   The Debtors submit that subsections (i) and (v), among others, are satisfied.

32.    With respect to subsection (i), the Debtors submit that any claim arising under the Claims Servicing Agreements, to the extent such claims exists, would not transfer to a successor in interest to the Debtors, and therefore would not encumber the Claims, pursuant to the terms thereof.[8]   As a result, the Claims are unencumbered by any Interests, and therefore, should be saleable under applicable non-bankruptcy law.

33.    With respect to subsection (v), the Debtors believe that even to the extent that CCB, Spectrum, or Cascade have an Interest with respect to the Claims, such Interests are

---

[7] Courts have also held that courts have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See, e.g.*, *In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. Mar. 27, 2001).

[8] The Claims Servicing Agreements contain confidentiality provisions preventing the Debtors from disclosing the terms of such agreements, other than acknowledging their existence.  To the extent that CCB, Spectrum, or Cascade object, the Debtors reserve the right to reply, including by providing analysis supporting that the Claims can be sold free and clear of the Claims Servicing Agreements under seal, to the extent that any objecting parties do not agree to waive confidentiality.

contractual in nature, and therefore, CCB, Spectrum, and Cascade could be compelled to accept a

money satisfaction of such interest.  *See AI Perry Enters., Inc. v. Appalachian Fuels, LLC*, 503

F.3d 538, 544 (6th Cir. 2007) (holding purchaser of debtor's assets not required to pay plaintiff

commissions where purchaser did not assume relevant contract under applicable sale agreement).

## III. <u>Optium is Entitled to the Protections of Section 363(m) of the Bankruptcy Code</u>.

34.    The Debtors request that the Court find that Optium is entitled to the full

protections of section 363(m) of the Bankruptcy Code.

35.    Section 363(m) provides that a purchaser of property of the estate is protected

from the effects of a reversal on appeal of the authorization to sell such property as long as the

purchaser acted in good faith and the appellant fails to obtain a stay of the sale.  In particular,

section 363(m) of the Bankruptcy Code states:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property does not
> affect the validity of a sale or lease under such authorization to an entity
> that purchased or leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such authorization and
> such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

36.    Although section 363(m) references a "good faith" purchaser, the term is not

defined in the Bankruptcy Code, but courts have adopted an equitable definition.  *Licensing by*

*Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997); *Lynch v. Vaccaro*, 566

B.R. 290, 302 (E.D.N.Y. 2017), *aff'd sub nom. Frank v. Lynch*, 728 F. App'x 71 (2d Cir. 2018).

In particular, "[g]ood faith of a purchaser is shown by the integrity of his conduct . . . . [W]here

there is a lack of such integrity, a good faith finding may not be made."  *Lynch*, 566 B.R at 302

(citation omitted).    The good faith requirement prohibits "fraudulent, collusive actions,

specifically intended to affect the sale price or control the outcome of a sale." *Gucci*, 126 F.3d at 390.

37.     As set forth in the Renzi Declaration, the terms and conditions of the sale of the Debtors' rights in and to Claims to Optium were negotiated by the Debtors at arm's-length and in good faith.  (Renzi Decl., ¶¶ 12, 15, 17).  Accordingly, the Debtors request that the Court find and determine that Optium is entitled to the protections afforded to good faith purchasers under section 363(m) of the Bankruptcy Code.

**IV.     The Debtors Should be Authorized to Reject the Claims Servicing Agreements.**

   **A.     Rejection of the Claims Servicing Agreements Reflects a Valid Exercise of Business Judgment pursuant to Sections 363 and 365 of the Bankruptcy Code.**

38.     Section 2.2 of the Sale Agreement provides that as a condition precedent to the Closing, that Fred's shall obtain an order reasonably satisfactory to Fred's and Optium providing for the rejection of the Claims Servicing Agreements.  Accordingly, the Debtors request that, to the extent that the Claims Servicing Agreements are executory, the Court authorize the Debtors to reject such agreements pursuant to the Sale Agreement.  (Sale Agreement § 2.2).

39.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract . . . of the debtor."  11 U.S.C. § 365(a).  "A debtor's authority to assume or reject an executory contract 'is vital . . . , because rejection can release the debtor's estate from burdensome obligations . . . .'"  *In re Trans World Airlines, Inc.*, 261 B.R. 103, 114 (Bankr. D. Del. 2001) (citing *N.L.R.B v. Bildisco*, 465 U.S. 513, 528 (1984)); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) ("The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or

debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'") (quoting 2 *Collier on Bankruptcy* ¶ 365.01[1] (15th ed. 1993)).

40.     In determining whether to allow a debtor to assume or reject, bankruptcy courts apply the "business judgment" standard.  *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to reject is governed by the business judgment standard and can only be overturned if the decision was the "product of bad faith, whim, or caprice").  Once a debtor states a valid business justification, there "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Further, "[s]ection 365 enables the [debtor] to maximize the value of the debtor's estate by assuming executory contracts and unexpired leases that benefit the estate and rejecting those that do not." *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 298 (3d Cir. 2000).

41.     Here, the Debtors concluded that, consistent with their decision to sell the Claims, they will have no continued need for assistance in administering the Claims, such that the Claims Servicing Agreements will be unnecessary and burdensome to their estates to continue.  (*See* Renzi Decl., ¶ 16).

42.     Accordingly, the Debtors submit that the rejection of Claims Servicing Agreements is beneficial to their estates and is a sound business decision, reflecting a valid exercise of business judgment.

**IV.**      **Request for Immediate Relief & Waiver of Stay.**

43.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As demonstrated in the Motion and the Renzi Declaration, an inability to sell the Claims could impair the Debtors' ability to realize substantial recoveries for their estates.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

NOTICE

44.    The Debtors will provide notice of this motion to:  (a) the office of the United States Trustee for the District of Delaware; (b) counsel to the Official Committee of Unsecured Creditors; (c) the United States Attorney's Office for the District of Delaware; (d) the Internal Revenue Service; (e) the United States Securities and Exchange Commission; (f) the state attorneys general for all states in which the Debtors conduct business; (g) Spectrum Settlement Recovery LLC; (h) Cascade Settlement Services LLC; (i) Claims Compensation Bureau, LLC; and (j) Optium Fund 3, LLC; and (k) any party that requests service pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as is just and proper.

15

Dated: May 1, 2020
       Wilmington, Delaware       **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/      Andrew R. Workman*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Andrew R. Workman (No. 6710)

1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email:  dabbott@mnat.com
       aremming@mnat.com
       jbarsalona@mnat.com
       aworkman@mnat.com

- and -

Adam L. Shiff (*pro hac vice*)
Robert M. Novick (*pro hac vice*)
Andrew H. Elkin (*pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
Email:  ashiff@kasowitz.com
       rnovick@kasowitz.com
       aelkin@kasowitz.com

**COUNSEL FOR DEBTORS AND
DEBTORS IN POSSESSION**